EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


JEREMIAH TEVEBAUGH,                )
                                   )
            Plaintiff,             )
                                   )
        -v-                        ) CAUSE NO.
                                   ) 1:23-CV-121-JMS-TAB
INDIANAPOLIS-MARION COUNTY,        )
ACTING BY AND THROUGH ITS          )
BOARD OF VOTER REGISTRATION,       )
THE MARION COUNTY                  )
AGRICULTURAL FAIR                  )
ASSOCIATION, AND CINDY             )
MOWERY,                            )
                                   )
            Defendants.            )


        The deposition upon oral examination of

CYNTHIA LEA MOWERY, a witness produced and sworn

before me, Gretchen Fox, RPR, Notary Public in and for

the County of Johnson, State of Indiana, taken on

behalf of the Plaintiff at the offices of Circle City

Reporting, 135 North Pennsylvania Street, Suite 1720,

Indianapolis, Indiana, on January 25, 2024, at 9:58

a.m., pursuant to all applicable rules.



                CIRCLE CITY REPORTING
                135 North Pennsylvania
                      Suite 1720
                Indianapolis, IN  46204
                   (317) 635-7857

```
1                           APPEARANCES

2    FOR THE PLAINTIFF:

3         Jeffrey S. McQuary, Esq.
          TOMPKINS LAW
4         608 East Market Street
          Indianapolis, IN  46202
5         jmcquary@tlawindy.com

6
     FOR THE DEFENDANT:
7    INDIANAPOLIS-MARION COUNTY, ACTING BY AND THROUGH ITS
     BOARD OF VOTER REGISTRATION
8
          John P. Lowrey, Esq.
9         CITY OF INDIANAPOLIS OFFICE OF CORPORATION
          COUNSEL
10        200 East Washington Street
          Room 1601
11        Indianapolis, IN  46204
          john.lowrey@indy.gov
12

13   FOR THE DEFENDANTS:
     THE MARION COUNTY AGRICULTURAL FAIR ASSOCIATION AND
14   CINDY MOWERY

15        Alexander P. Will, Esq.
          FROST BROWN TODD, LLC
16        111 Monument Circle
          Suite 4500
17        Indianapolis, IN  46244
          awill@fbtlaw.com
18

19   ALSO PRESENT: Jeremiah Tevebaugh

20

21

22

23

24

25
```

INDEX OF EXAMINATION

PAGE

DIRECT EXAMINATION

    Questions By Mr. McQuary:    4

CROSS-EXAMINATION

    Questions By Mr. Will:    146

CROSS-EXAMINATION

    Questions By Mr. Lowrey:    161

RECROSS-EXAMINATION

    Questions By Mr. Will:    163

REDIRECT EXAMINATION

    Questions By Mr. McQuary:    163

INDEX OF EXHIBITS

| NUM. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Copy of text messages | 106 |
| Exhibit 2 | E-mail Monday, November 22, 2021 | 106 |
| Exhibit 3 | E-mail chain beginning with an e-mail on Monday, July 11, 2022 | 115 |
| Exhibit 4 | E-mail, Tuesday, July 12, 2022 | 117 |
| Exhibit 5 | E-mail, Monday, October 5, 2020 | 121 |
| Exhibit 6 | E-mail, Tuesday, February 2, 2021 | 122 |
| Exhibit 7 | Copy of memo | 124 |
| Exhibit 8 | Zero Tolerance Policy | 128 |
| Exhibit 9 | E-mail, Friday, May 13, 2022 | 130 |
| Exhibit 10 | Notice to Appear | 132 |
| Exhibit 11 | Copy of text messages | 138 |
| Exhibit 12 | E-mail, Friday, July 29, 2022 | 142 |

CYNTHIA LEA MOWERY,

having been first duly sworn to tell the truth, the
whole truth, and nothing but the truth, testified as
follows:

DIRECT EXAMINATION

BY MR. McQUARY:

Q   Ma'am, I know we were just introduced a second ago,
    but for the record, my name is Jeff McQuary.  I'm
    an attorney.  I represent Jeremiah Tevebaugh who
    has brought a lawsuit against the City of
    Indianapolis, the Marion County Fairgrounds, and
    you individually.  As part of that lawsuit, we are
    here to take your deposition.  Have you been
    deposed before --

A   Yes.

Q   -- in a civil case?

A   Yes.

Q   All right.  Well, it sounds like you're familiar
    with it, with the process, so I won't go into a lot
    of detail, but I do want to remind you that we have
    a court reporter here taking down our words.  And
    she's very good at her job, but there are some
    limitations with the equipment she has.  It's
    really important that you speak all your answers in
    English.  Phrases like uh-huh and uh-uh, even

though they might be obvious in ordinary conversation, are difficult for her to transcribe. Similarly, hand gestures are often ambiguous. It's also really important that you wait until I'm finished asking my question before you begin answering it even though it may seem obvious what my question is going to be because when you see it in writing, it might not be obvious what the question is going to be. So it's important to let me finish my question before you answer, and I will do my best to let you finish without interrupting you. I may remind you of these rules from time to time. If I do that, it's not because I'm trying to be a jerk. It's just something that we need to do to have a readable transcript afterwards.

If you need to take a break at any time, feel free to do so. You're not a prisoner here. Just let me know that you need to go to the bathroom or want to take a drink of water or want to consult with your attorney, Mr. Will. Just let me know, and we will take the break. The only thing I would ask is that if there's a question pending, that you answer that question before we take the break. Do you have any questions for me about what we're going to do today?

|     |   |                                                           |
|-----|---|-----------------------------------------------------------|
| 1   | A | No, I don't think so.                                     |
| 2   | Q | All right.  Well, ma'am, could you state your full        |
| 3   |   | name for the record.                                      |
| 4   | A | Cynthia Lea Mowery.                                       |
| 5   | Q | Okay.  And how old are you, ma'am?  And I hate to         |
| 6   |   | ask that question, but it's better than getting           |
| 7   |   | your date of birth in a public record.                    |
| 8   | A | 65.                                                       |
| 9   | Q | All right.  And what is your address?                     |
| 10  | A | 4340 South Franklin Road, Indianapolis, Indiana          |
| 11  |   | 46239.                                                    |
| 12  | Q | Okay.  Are you employed?                                  |
| 13  | A | Yes, I am.                                                |
| 14  | Q | How are you employed?                                     |
| 15  | A | Do you mean where am I employed?                          |
| 16  | Q | Yes, ma'am.                                               |
| 17  | A | Marion County.                                            |
| 18  | Q | Okay.  What do you do for Marion County?                 |
| 19  | A | I'm the Republican Director for the Marion County        |
| 20  |   | Board of Voter Registration.                              |
| 21  | Q | Okay.  And we'll go through that a bit later, but I      |
| 22  |   | do have some basic background questions before we         |
| 23  |   | can get into that.  Are you taking any medications        |
| 24  |   | today that would affect your ability to understand        |
| 25  |   | my questions or answer them?                              |

1  A  No.

2  Q  Okay.  How did you prepare for this deposition?

3  A  By talking to my attorneys and...

4  Q  Okay.  I don't want to know anything that you said

5     to them or they said to you.  Did you look at any

6     documents before this to prepare for this

7     deposition?

8  A  E-mails.

9  Q  Okay.  What e-mails?

10 A  The ones that you had requested to be sent to you.

11 Q  Okay.  Anything in particular?

12 A  No, not necessarily.

13 Q  And the questions I have to ask, ma'am, have you

14    ever been arrested?

15 A  No.

16 Q  Have you ever been convicted?

17 A  No.

18 Q  Okay.  Have you ever entered into an agreement not

19    to prosecute with the prosecutor's office?

20 A  No.

21 Q  Or pled guilty to any crime?

22 A  No.

23 Q  Okay.  All right.  Ms. Mowery, where did you grow

24    up?

25 A  Wanamaker, Indiana.

1   Q   Did you go to high school there?

2   A   Yes.

3   Q   What was the name of that high school?

4   A   Franklin Central High School.

5   Q   All right.  Did you graduate?

6   A   Yes.

7   Q   Did you go to school after graduation?

8   A   Yes.

9   Q   Where did you go?

10  A   Indiana Wesleyan University.

11  Q   Okay.  Did you get a degree from Indiana Wesleyan?

12  A   Yes.

13  Q   Okay.  What was the degree in?

14  A   I have four of them.  I have an associate's degree,

15      which is business, I have a bachelor's degree,

16      which is business, I have a master's degree, which

17      is management, and then I have an MBA, which is a

18      master's degree.

19  Q   Are these all from Indiana Wesleyan?

20  A   Yes.

21  Q   Okay.  Do you remember the dates of these degrees?

22  A   Well, I think the last one I think I just

23      celebrated 12 years or 15 years being out of

24      school.  I was a late student.

25  Q   Well, when did you get the bachelor's degree?

| | | |
|---|---|---|
| 1 | A | I will say it was probably in my 40s. |
| 2 | Q | Okay.  Well, what did you do immediately after |
| 3 | | going to high school? |
| 4 | A | I went to work.  I also went to IUPUI part time |
| 5 | | as... |
| 6 | Q | Okay.  Where did you go to work? |
| 7 | A | American States Insurance. |
| 8 | Q | What were you doing for American States? |
| 9 | A | Typist. |
| 10 | Q | All right.  How long did you stay in that position? |
| 11 | A | Probably a year. |
| 12 | Q | What did you do after that? |
| 13 | A | I went to P.R. Mallory. |
| 14 | Q | What's that? |
| 15 | A | They do timers, capacitors, Duracell batteries. |
| 16 | Q | Was this a production position? |
| 17 | A | No.  It was an office.  I was a secretary. |
| 18 | Q | Okay.  How long were you with P.R. Mallory? |
| 19 | A | Probably about five years. |
| 20 | Q | All right.  What did you do after that? |
| 21 | A | I was self-employed.  P.R. had transferred me to |
| 22 | | Tarrytown, New York, because I knew the information |
| 23 | | on their Duracell trademark and stuff, so I went up |
| 24 | | there, helped with that, got that finished, came |
| 25 | | back home. |

1  Q  Did you actually live in New York for a while?

2  A  Yes.

3  Q  For how long were you there?

4  A  Probably a year or two.

5  Q  Okay.  At some point, did you become employed by

6     the Office of Voter Registration?

7  A  Yes.

8  Q  Okay.  When did that happen?

9  A  Well, it started with the county in 1987.  That

10    would be, I would say, probably about -- I have

11    probably been there 20 years.

12  Q  Okay.  Always working at Voter Registration?

13  A  No.  I have been with Marion County.

14  Q  Okay.  Well, let's start with that then.  What were

15    you doing -- what position did you obtain in 1987?

16  A  I worked for the Justice Agency.  I was a

17    secretary, and then I moved up to office manager,

18    and then I went over pretrial services.

19  Q  Is that in the Prosecutor's Office?

20  A  No.  That was over the Justice Agency.

21  Q  Okay.  How long were you at the Justice Agency?

22  A  12 years.

23  Q  Okay.  What was your last position there?

24  A  I was over pretrial services, which is conditional

25    release, bail commissioners.

1   Q   Okay.  And where did you go after pretrial
2       services?
3   A   I believe it was the Recorder's Office.  No.  The
4       Auditor's Office.
5   Q   What was your position there?
6   A   Budget manager.
7   Q   All right.  How long were you at the Auditor's
8       Office?
9   A   Three years.
10  Q   Okay.  What did you do after that?
11  A   I went to the Recorder's Office.
12  Q   All right.  What was your position there?
13  A   Budget manager, financial...
14  Q   Okay.  How about after that?
15  A   That's when I went to Voter Registration.
16  Q   Okay.  And you may have answered this question
17      already, ma'am, but just remind me when you started
18      at Voter Registration.
19  A   Well, it would have been 20 years ago, so 2002.
20  Q   2004, possibly?
21  A   Yeah, it could be.
22  Q   Okay.
23  A   I think Keith was still alive.
24  Q   And what are your duties as Republican codirector
25      of Voter Registration?

```
 1    A    I oversee all the Republican registrations that
 2         come in and out and oversee how they're processed
 3         and make sure that the staff is getting them done
 4         correctly and we are meeting the timelines that
 5         we're in.
 6    Q    Okay.  To whom do you report?
 7    A    The Marion County Republican Chair.
 8    Q    All right.  So you don't report to the mayor?
 9    A    No.
10    Q    Okay.  You're out of that chain of command?
11    A    Right.
12    Q    And there is also a Democratic codirector?
13    A    Yes.
14    Q    Okay.  How many employees do you supervise?
15    A    Six or five.
16    Q    Are these -- are their titles Republican Deputy
17         Clerks or --
18    A    HR has, like, odd names for them, production
19         analyst, you know, but they are Republican clerks,
20         Republican analysts.
21    Q    Okay.
22    A    Things like that.
23    Q    And then there are equal number of Democrat
24         employees?
25    A    As are democrats.
```

```
 1   Q   Okay.  Do you have any role in supervising them?
 2   A   The Democrats?
 3   Q   Yes, ma'am.
 4   A   Yeah, I think I'm involved with some day to day.
 5       When their director isn't there, I may step in.
 6   Q   Okay.  Are there -- is there a deputy director?
 7   A   Yes.
 8   Q   Who is the Republican deputy director?
 9   A   Excuse me.  Taylor Williams.
10   Q   Okay.  Who is the Democratic deputy director?
11   A   Michelle Brezeke.
12   Q   Who is the Democratic director?
13   A   Alexander, and then he's got like nine characters,
14       letters, after his name like Najarro or something.
15       I don't know how to pronounce his name.  I'm sorry.
16   Q   But you work with him?
17   A   Uh-huh.
18   Q   That must be a complicated name.
19   A   It kind of -- he doesn't think it is, but I don't
20       think any of us can really pronounce it.
21   Q   Okay.  Have you ever run for elective office?
22   A   Yes.
23   Q   When did you run, and what did you run for?
24   A   I ran for Franklin Township Board, and I ran for
25       Franklin Township Trustee.
```

1    Q   Do you know when you ran for those offices?

2    A   They would be back in the '80s.

3    Q   Okay.  Did you win either one of them?

4    A   I won both of them.

5    Q   Oh, okay.

6    A   The second time I ran for trustee I did not.

7    Q   But you did serve one term as the Franklin Township

8        Trustee?

9    A   Yes.

10   Q   Okay.  Have you ever held an office in a political

11       party?

12   A   Yes.

13   Q   What party offices have you held?

14   A   Republican.

15   Q   Yes, but, I mean, is it like county chairman?

16       State vice chairman?  Secretary?

17   A   I have been a vice precinct committeeman.  I have

18       been a precinct committeeman.  I have been a

19       delegate.  I have been --

20   Q   A convention delegate?

21   A   Yes.  A ward chair.  I have been a vice ward chair,

22       I have been a township chair, and I am currently

23       the county treasurer.

24   Q   Of Marion County?

25   A   Republican.

```
 1   Q   Okay.  Have you worked on the campaign of a
 2       candidate for office?
 3   A   Several.
 4   Q   Okay.  Whose campaigns have you worked on?
 5   A   Too many to name.
 6   Q   Can you give a couple of the more prominent
 7       examples?
 8   A   Yeah.  I just worked on Jefferson Shreve's.
 9   Q   And he ran for mayor of Indianapolis
10       unsuccessfully?
11   A   Yes.
12   Q   Anyone else?
13   A   I have helped out with the governor.  I helped out
14       with Jack Sandlin, Senator Jack Sandlin, Senator
15       Aaron Freeman.  You know, any Republican that runs
16       I pretty much have some way of helping.
17   Q   Okay.  Have you ever organized a fundraiser to
18       raise contributions for someone running for office?
19   A   Yes.
20   Q   All right.  How many times in your life have you
21       done that?
22   A   Three or four.
23   Q   Okay.  Who have you done it for?
24   A   I have done one for the minority leader, and I'm
25       trying to think what his title is -- and whip.  I
```

1    have done two for them.

2  Q  Can you name the names?  I'm not familiar enough

3    with local politics to know who those people are.

4  A  Okay.  Brian Mowery is the minority leader, and

5    Paul Annee is the whip.  I have done them for --

6    with groups along with the Greater Indianapolis

7    Republican Women's Club.  I have done them with

8    just various groups.

9  Q  Okay.  So these are city council officials,

10   correct?

11 A  Yes, they are.

12 Q  Not state legislature or congress or anything like

13   that?

14 A  Right.

15 Q  Okay.  Are you related to Brian Mowery?

16 A  Yes, I am.

17 Q  How are you related to him?

18 A  He is my paternal nephew.

19 Q  Okay.  Are you related to Paul Annee?

20 A  No.

21 Q  What is the Marion County Agricultural Fair

22   Association?

23 A  It's an auxiliary group that -- of past members and

24   organizers of the fair.

25 Q  Okay.  It put on the Marion County Fair?

1  A  Well, the Marion County Fair Board put it on, but,
2     yes, they also help.
3  Q  Okay.  All right.  Then just to be clear, the
4     Marion County Fair is not put on by a government
5     agency?
6  A  No.
7  Q  Is that unusual among Indiana county fairs?
8  A  No.
9  Q  Most county fairs are not put on by the county
10    government?
11 A  As far as I know.  I mean, when I have gone to
12    conventions and stuff, there are very few that are
13    government funded.
14 Q  Okay.
15 A  Now, state fairs, you know...
16 Q  The state fair is a state agency?
17 A  Yeah.
18 Q  Okay.  What kind of organization is the
19    fairgrounds?  And by that I mean is it a for-profit
20    business?  Is it a nonprofit charity or something
21    else?
22        MR. WILL:  Objection to the form of the
23    question.  That speaks for itself.  The witness can
24    answer if she knows.
25 A  It's a 501(c)(3) nonprofit.

```
 1   Q   How did you first become affiliated with it?
 2   A   The Councilor Bill Dowden was a close friend of
 3       mine, and he was also a close friend of my husband.
 4       And when my husband passed away, Councilor Dowden
 5       sat on the Fair Board, and he called me and asked
 6       me if I would assume my husband's place, and that's
 7       how I got on there.
 8   Q   Okay.  I hate to ask, ma'am, if this brings up
 9       painful memories, but who was your husband?
10   A   Keith Smith.
11   Q   Okay.  Did he play some kind of prominent role in
12       the community?
13   A   Yes.
14   Q   What was that?
15   A   He was the Indianapolis fire chief.
16   Q   Okay.  And he also happened to serve on the Fair
17       Board?
18   A   Yes, after he retired.
19   Q   Okay.  So you took a seat on the board?
20   A   Yes.
21   Q   All right.  What is the role of the board?  Does it
22       approve the budget and expenditures?  Does it hire
23       people?  Just what is the board's role there?
24   A   The board oversees the fairgrounds.  It determines
25       who works there.  It determines what's purchased.
```

1    It determines what vendors we use.  It determines

2    the concessionaires that are used, the rides that

3    are brought in, any lease of property that we have

4    or that we may need.  It just generally oversees

5    the fairgrounds and any business.

6  Q  Okay.  Can the president of the board spend money

7    without board approval?

8  A  Up to a certain dollar amount, I believe.

9  Q  Do you know what that dollar amount is currently?

10 A  I forget.

11 Q  Okay.  When did you take the seat on the board?

12 A  It would have been 2016 --

13 Q  Okay.

14 A  -- when I took a seat on the board.

15 Q  Okay.  And by this time, you were also the

16   Republican codirector of the Voter Registration

17   Office?

18 A  Yes.

19 Q  Okay.  Have you held offices on the board such as

20   president or vice president?

21 A  Yes.

22 Q  Okay.  Can you tell me what roles you have played

23   on the board and roughly when you held those

24   various offices?

25 A  I was a board member in 2016 and 2017, and I was a

1   treasurer in probably 2018, and then 2019 I became
2   president.
3   Q   Okay.  And to be president, you were elected by
4       your fellow board members?
5   A   Right.
6   Q   All right.  How long were you president starting in
7       2019?
8   A   I'm currently president still.
9   Q   Was there ever a period where -- or where you were
10      not president since 2019?
11  A   No.
12  Q   All right.  If I were to tell you that I have
13      correspondence from Abdul-Hakim Shabazz describing
14      himself as president, would you disagree with that?
15  A   No.  I apologize.  I forgot.  I did resign --
16      excuse me -- from the Fair Board after the '22
17      fair.
18  Q   Okay.  And would be in late June, beginning of
19      July?
20  A   It would have been like July 5 or July 6 or 7th,
21      the very next day.
22  Q   Okay.  That you resigned?
23  A   Yes.
24  Q   Okay.  How long were you -- now, when you resigned
25      as president, did you also resign as a board

1   member?

2  A   Yes.

3  Q   Okay.  How long after your resignation did it take

4      for you to get back on the board?

5  A   I think it was probably August or September.

6  Q   Okay.  Of that same year of 2022?

7  A   Yes.

8  Q   All right.  What is the lodge?

9  A   It's an event center that we built.  We tore down a

10     home where the groundskeeper lived and built -- we

11     call it the lodge -- but the front end of it is for

12     events.  We rent out that space, and then the back

13     end is for the groundskeeper or whatever we so

14     choose to put in there.

15 Q   But it's a residential space?

16 A   It could be, yes.

17 Q   Are among the duties of the board is to hire the

18     executive director?

19 A   With the recommendation of the president.

20 Q   All right.  And would that be true of anyone hired

21     by the fair?  I mean, they're typically hired at

22     the recommendation of the president?

23 A   Yeah.  Most people are hired by the president.

24 Q   Okay.  When did you first meet Jeremiah Tevebaugh?

25 A   I really don't know.  The vice president hired him

1    at the time, so I really don't know.  I don't

2    recall what year that was.

3  Q  Okay.  Who was the vice president?

4  A  Kay Elliott.

5  Q  Okay.  And do you remember roughly when that --

6    what time that would have been?

7  A  It would have been my second year of presidency, I

8    think.

9  Q  So that would be 2020?

10 A  Probably '19 or '20, something like that, yeah.

11 Q  Why was -- and by the way, if I refer to Jeremiah

12   Tevebaugh as Hoss, do you understand who I'm

13   talking about?

14 A  Yes.

15 Q  Why did the vice president take the step of hiring

16   Hoss if hires are typically made --

17       MR. LOWREY:  Objection.  Calls for speculation

18   as to someone else's motivation.

19 Q  You can answer the question, ma'am.

20       MR. WILL:  You can answer to the extent you

21   know.

22 A  We had been looking for a groundskeeper for an

23   extended period of time, and he kept, according to

24   her, he kept calling her.  He was not calling me.

25   And finally she said, let's just hire him and get

1    him off our back, and he says he can do all this

2    stuff.  He says he owns a 125-acre horse farm and

3    whatever.  Let's give him a shot.  And I said,

4    well, you're overseeing him because I'm covered up,

5    and that's kind of how that came down.

6  Q  Okay.  So he was hired as the fair's groundskeeper,

7    you said?

8  A  Yes.

9  Q  If I tell you that I have seen his job described as

10    a maintenance supervisor, would you disagree with

11    that characterization?

12  A  Somewhat.

13  Q  Why would you disagree?

14  A  You have to have people to supervise.

15  Q  All right.  But he did do maintenance?

16  A  Some.  He mostly hired it out.  We --

17  Q  Was there a problem with him hiring it out?

18  A  Well, we could have hired it out.

19  Q  Okay.  How long was Hoss in the position of

20    groundskeeper?

21  A  I don't know.  I don't recall.

22  Q  At some point, did he become the executive

23    director?

24  A  Yes.

25  Q  How did that happen?

1   A  He said that he knew QuickBooks and other office

2       software that we used, and the guy prior to him did

3       not, and we were having issues getting people paid.

4   Q  Okay.  So did you hire him as executive director?

5   A  Yes.

6   Q  Okay.  And ultimately the board signed off on that?

7   A  Yeah.  You got to realize this is a small

8       organization.  You're not talking Lilly, you know.

9       You're talking ten people at the board.

10  Q  Okay.  And how many employees?

11  A  At the time, I think it was just him or maybe one

12      guy that mowed the grass part time.

13  Q  Okay.  So the management was pretty informal?

14  A  Yeah.  And it's -- you know, titles are just thrown

15      around, like, you know, some people would covet,

16      you know, executive director.  They would --

17  Q  The title, you mean?

18  A  Yeah.  That would be their career path.  But at a

19      small agency like that, it's, you know, here, just

20      be the executive director, you know.

21  Q  Okay.  Do you know -- first of all, was -- I assume

22      that his job performance as groundskeeper was good

23      enough to be promoted?

24  A  It was average.

25  Q  Okay.  Once hired as executive director, who did

1    Hoss report to?

2  A  Me.

3  Q  Okay.  Do you know what his pay was at the time you

4     started?

5  A  I don't recall.

6  Q  Okay.  How about when he left?

7  A  I don't recall.

8  Q  All right.  Where did the executive director live?

9  A  When he left, he lived in the lodge, the back part

10     of the lodge.

11  Q  Okay.  Was that part of his compensation was to be

12     allowed to live in the lodge?

13  A  Yes.

14  Q  All right.  Were you aware that Hoss has several

15     felony convictions?

16  A  Not at the time.

17  Q  Okay.  And not at the time he was hired, you mean?

18  A  No.

19  Q  Okay.  When did you learn about them?

20  A  Well, actually, not too long ago because everything

21     we had showed him name to be Jeremiah, and his

22     felony convictions and records are all under

23     Jeremy.

24  Q  Okay.

25  A  We're a small county fair.  We don't have a

1    criminal justice system.

2  Q  Uh-huh.  By criminal justice system, do you mean

3     the ability to do background checks?

4  A  Uh-huh.

5  Q  Okay.  If I were to tell you that Hoss has

6     testified that he told you about his felony

7     convictions at the time or around the time he was

8     offered the position as executive director, would

9     you disagree with that?

10 A  Yes.

11 Q  Okay.

12 A  There was a point in time that we had a discussion,

13    and my counterpart tried to do a -- where you get

14    them removed from your record.

15 Q  An expungement?

16 A  Yes.  But she couldn't get them done, and the

17    attorney that he hired had said he wasn't going to

18    touch it because it wasn't -- it was with intent

19    with so many of the same thing.

20 Q  You mean the attorney said that Hoss wasn't

21    eligible for expungement?

22 A  Yeah.  He said he didn't think he could get it

23    done.

24 Q  Okay.  Do you know if he had -- if his record was,

25    in fact, expunged?

1    A    I have no idea.

2    Q    You mentioned a counterpart a few minutes ago.  You

3         had a discussion with your counterpart?

4    A    Yes.

5    Q    Who was that?

6    A    LaDonna Freeman.

7    Q    And how was she -- oh, you mean she's the

8         Democratic director?

9    A    Yes.

10   Q    Or was at the time --

11   A    Yes.

12   Q    -- of Voter Registration?

13   A    And LaDonna did a lot of expungements for people.

14   Q    Okay.  And what was the discussion with LaDonna

15        Freeman regarding Hoss' criminal record?

16   A    He talked to her about trying to get it expunged,

17        which I would have too, I guess.

18   Q    Okay.  And about when would this conversation have

19        taken place?

20   A    Well, I would say like in '19.  Not '19.  Maybe

21        2020 or 2021, maybe.

22   Q    Okay.

23   A    Whenever he worked for the agency.

24   Q    And by agency, you mean Voter Registration or the

25        fair?

1  A  Voter Registration.

2  Q  Okay.  Did Hoss also tell you that contrary to what

3     was written on his resume, he did not have

4     bachelor's degrees from --

5  A  No.

6  Q  -- from -- let me finish my question.

7  A  Okay.

8  Q  He did not have a bachelor's degree and a master's

9     degree.  Did he tell you that?

10  A  No.

11  Q  All right.  If I were to tell you that Hoss

12     testified at his deposition that he explained all

13     this to you around the time that he was promoted to

14     executive director, would you disagree with that?

15  A  Yes.

16        MR. WILL:  Objection as to form.  Go ahead.

17     You can answer.

18  A  Yes, I would.

19  Q  All right.  Why was Hoss fired from the

20     fairgrounds?

21        MR. WILL:  Objection as to form.  The witness

22     can answer.

23  A  I don't know.  I didn't fire him.

24  Q  Okay.  Who did fire him?

25        MR. WILL:  Objection as to form.  You can

1    answer.

2  A  I believe it was Abdul-Hakim Shabazz and Joe Goins.

3  Q  Okay.  And Abdul was president of the board at the

4     time?

5  A  Yes.

6  Q  What was Joe Goins?

7  A  Treasurer.

8  Q  Okay.  Did you hire Hoss to work for you at the

9     City of Indianapolis or the County?

10 A  Yes, I did.

11 Q  Okay.  How did that happen?

12        THE WITNESS:  Is it okay to answer?

13        MR. WILL:  Yes.  Go ahead.

14 A  Hoss had told me and several other people that he

15    had severe health issues, that he thought that he

16    was going to lose his leg, and that he had cancer.

17    He had a doctor that I believe was in the Chicago

18    area and that this doctor was running out of the

19    ability to write him prescriptions and things.  And

20    he didn't know how much longer he was going to be

21    around and needed help, so I said I have a position

22    open in Voter Registration.  Maybe we can put you

23    in there, and that will give you, you know, a year

24    or whatever time you need to get yourself on track.

25    And I said, let's see what happens there, and

1    that's how he came about to Voter Registration.

2  Q  Okay.  The job at the -- the position as executive

3    director, did that provide health insurance?

4  A  No.

5  Q  Okay.  So you thought that working for the County

6    that he would have good health insurance?

7  A  Would provide him with health insurance.

8  Q  Okay.  And that was the main reason you offered him

9    the job?

10 A  Yes.  Hoss was one of my best friends.  We worked

11    night and day together trying to put a fair

12    together.  I don't know if you have ever put an

13    event like that together.

14 Q  Not on that scale, ma'am.

15 A  But it's overwhelming, especially your first one.

16    And there wasn't anything that I wouldn't have done

17    for him because he was one of my best friends, and

18    I knew that he needed help, or that's what he said.

19    And that was why I pushed to get him into Voter

20    Registration.

21 Q  Okay.  Just for clarification, do you have any

22    reason to believe that Hoss didn't have health

23    problems?

24 A  We never saw any evidence of it.  I mean, no, I --

25    quite frankly, I've never seen anything and didn't

1    feel like, you know, you could really ask that.  My
2    brother loaned him a brand new truck to go to Mayo
3    in Florida to get some kind of test that he said he
4    needed that I don't know if he ever had or not.
5  Q  Okay.  Are you concerned that Hoss might have been
6    lying about having serious health problems?
7  A  I have no idea.
8  Q  You don't know whether you're concerned?
9  A  It's questionable.
10 Q  That he might have been lying or exaggerating?
11 A  I mean, who would do that?
12 Q  But, well, did you think Hoss was?
13 A  Like I said, Hoss was one of my best friends.  We
14    confided in one another.  We talked about life, our
15    lives.  We talked about things going on.  We helped
16    one another out.  I was a recent widow.  If he told
17    me it was happening, I believed it.  The rest of
18    the board kept saying, Cindy, you're crazy, but I
19    believed him because I trusted him.  He was one of
20    my best friends.
21 Q  Okay.  When you say the rest of the board thought
22    you were crazy, with regard to what?
23 A  To keeping Hoss.
24 Q  To keeping him or promoting him?
25 A  Keeping him.

1  Q  Okay.  Was there anything suggested that Hoss

2     should not be kept on as an employee?

3  A  Yes.  Several times.

4  Q  Who said that?

5  A  All the board.

6  Q  Okay.  Is that reflected in any board minutes?

7  A  I don't know.

8  Q  Okay.  Would that sentiment be reflected in any

9     other documents such as, say, a performance

10    evaluation or a --

11 A  Oh, I fired him a couple times.  In fact, I just

12    came across the letter I sent him.  I think it was

13    the 11th of May of some year where it said I was

14    letting him go.

15 Q  Okay.  And, yet, he remained employed?

16 A  I'll tell you again.  He was one of my best

17    friends.  I mean, he -- I believed what he told me.

18    And when he and I sat down and talked it out, I

19    knew that he didn't have anywhere to go.  I knew

20    that he didn't have anything.  He told me he didn't

21    have any family, and I thought, well, we'll give it

22    one more shot.

23 Q  So you started to fire him but didn't really go

24    through with it?

25 A  Right.

1    Q   And that happened several times?

2    A   More than one occasion.

3    Q   Okay.  Let's -- I want to get back a bit to the job

4       at Voter Registration.  To whom did Hoss report?

5    A   At Voter Registration?

6    Q   Yes, ma'am.

7    A   He reported to the deputy board member, which was

8       Michele Cash at the time, but he also reported to

9       me.

10   Q   Okay.  Ultimately you were his boss?

11   A   Yes.

12   Q   Okay.  And the mayor was not his ultimate boss?

13   A   No.  The mayor has nothing do with Voter

14      Registration.

15   Q   Okay.  What were Hoss' duties at Voter

16      Registration?

17   A   To enter registrations from people to update and

18      correct, to process voter registrations, to be

19      there to make sure everything was done,

20      particularly the day before -- the last day of

21      voter registration.  Everybody was on call because

22      you had to be able to make sure all those

23      registrations were received, and we can process

24      them and get them done.  He was to help with the

25      counter, which is people walking in.  On election

1       day, we're busy, things like that, the typical

2       Voter Registration person that you would expect.

3  Q  Okay.  To get that job, did a criminal background

4       check have to be performed?

5  A  Yes.

6  Q  All right.  Did you get the results of that

7       background check?

8  A  No, I didn't see it.  They told me that he did not

9       have a good one, though.

10  Q  Okay.  Who told you that?

11  A  HR.

12  Q  All right.  So you weren't allowed to see it

13       yourself?

14  A  I could have.

15  Q  Why didn't you see it?

16  A  Hoss was one of my best friends.  I wanted to help

17       him.  He needed healthcare.  I stuck my neck out

18       for him.

19  Q  Okay.  So you hired him in spite of the fact that

20       he had --

21  A  Yes.

22  Q  -- a bad criminal record?

23  A  That's exactly right.

24  Q  Okay.  All right.  While -- did Voter

25       Registration -- or does Voter Registration have any

1   practice of performing job performance evaluations
2   on the employees?
3 A Yes.  They tend to change with who's in charge.
4   Most of the time we don't do them because the staff
5   changes, you know.  It's just not -- we don't do
6   them most of the time.
7 Q Okay.  Was one ever done on Hoss?
8 A I don't think so.
9 Q Okay.
10 A I don't know, though.
11 Q All right.  Did Hoss ever get any kind of
12   progressive discipline while he was --
13 A Oh, yeah.
14 Q -- working for you?
15 A Oh, yeah.
16 Q All right.  And do you know what I mean by
17   progressive discipline?
18 A I sure do.
19 Q First warning?
20 A Uh-huh.
21 Q Second warning, final warning?
22 A (Nodding.)
23       MR. WILL:  You need to wait for him to ask the
24   question before you answer.
25       THE WITNESS:  Okay.

1     MR. WILL:  It's just for her benefit so that
2     she can get the question and the answer.  Then it's
3     for your benefit so we know what was said by whom
4     later.  It's just easier.
5     THE WITNESS:  Okay.
6  Q  I believe you testified that Hoss did receive some
7     kind of progressive discipline while he was at VR?
8  A  Yes.
9  Q  What discipline did he receive?
10 A  Well, there's one day that, I mean, I'm sitting in
11    LaDonna's office.
12 Q  And this would be the Democratic codirector?
13 A  Yeah.  Our offices are right there together, and he
14    just walks by the door with his backpack on.  And I
15    go, where are you going?  He said, I'm leaving.
16    And I said, you just can't leave like that.  And he
17    just left.  I said, Hoss, this is an office.  It's
18    not like the fair.  We had several conversations
19    like that.
20 Q  Did you document any of these conversations with,
21    you know, written warnings or reprimands or
22    anything like that?
23 A  Probably in e-mails or whatever, but I'm going to
24    say again Hoss was -- I was trying to help him.  I
25    wasn't trying to hurt him.  And with most of my

1    employees, well, all of them, if they were doing

2    something like that, I would take them aside and

3    say, hey, you know, you can't do that here.

4  Q  And I believe you, ma'am.  I'm just asking are

5    there any written records of that?

6  A  Well, I'm -- I think there are, but I'm not real

7    sure.

8  Q  Okay.  Anything you can specifically name today?

9  A  I thought I sent him an e-mail once on our e-mail

10   system, but I'm not 100 percent positive.

11 Q  Okay.  Does the Office of Voter Registration have

12   any policy on when employees can take their lunch

13   breaks?

14 A  Yes.

15 Q  What's the policy?

16 A  You're assigned a time, you know.  In fact -- and

17   I'm elaborating here, and I probably shouldn't --

18   but I just brought a girl back that was my chief

19   deputy, and she had been gone five or six years.

20   And she came in to my office and she goes, I'm

21   getting ready to take lunch.  And I said, oh, okay.

22   And I said, what time is your lunch?  She said,

23   well, you know, I go from whatever time it is.  I

24   still have the same time, right?  So she knew what

25   her time was because she had had it before.

1   Q  So is there a written policy telling employees

2      this?

3   A  I don't know if there's a written one, but they all

4      know.

5   Q  Okay.

6   A  Because one can't leave unless the other one is

7      back.

8   Q  Uh-huh.  How does the employee know what his

9      assigned time is?

10   A  We tell them.  When you're a new hire, you go

11      through all that, and the chief deputy sits down

12      and says, here's your time, and most of the time

13      Hoss and I went together.

14   Q  Okay.  So is there some document where -- or maybe

15      an e-mail or something like that that lets an

16      employee know what the proper time for lunch is?

17   A  I don't know.  HR orientation might cover that, but

18      I don't know.

19         MR. McQUARY:  Okay.  Why don't we just take a

20      real short break.

21         (A brief recess was taken.)

22   Q  Ms. Mowery, at some point, did Hoss complain to the

23      fair board members that things you were doing or

24      saying to him made him feel uncomfortable and that

25      he believed were unwelcome sexual advances?

1  A  Not that I'm aware of.

2  Q  You're not aware that he complained about board

3     members to this --

4  A  No.

5  Q  -- ever?

6  A  No.

7  Q  Okay.  How about in a conversation with you?  Did

8     he ever tell you that he thought perhaps some of

9     the things that you were saying to him might make

10    him uncomfortable?

11 A  No.  We had a meeting.  It was to discuss his job

12    performance.  It was with Abdul and John Sturgill

13    and myself, and we were talking about putting him

14    on the last chance.  I can't remember exactly what

15    it was, but he was making fun of it.  Like, this is

16    the last chance thing.  And John Sturgill was

17    supposed to have written it, and within the text of

18    it there was a sexual harassment section, and they

19    had something about sexual -- I said, he is not

20    guilty of any sexual harassment.  And then he

21    started going on about somebody sexually harassing

22    him, but it was just passed on.

23 Q  In that meeting, Hoss never said that you were

24    sexually harassing him?

25 A  No.

1    Q   Did you say that Hoss was sexually harassing you?

2    A   No.

3    Q   Okay.  So do you believe the meeting had nothing to

4        do with sexual harassment?

5    A   No.  It was his job performance.

6    Q   Okay.  What triggered a meeting about Hoss' job

7        performance?

8    A   Well, he wasn't doing anything, and if he was told

9        to do something, you know, again, we were, like,

10       good friends, so he would tell me -- I would say,

11       you need to get this done or get that done.  He'd

12       say, I'm not going to do it today or whatever.  I

13       knew he would get it done or whatever, but some of

14       it he was kind of serious about, and we would go

15       around about it.  But, you know, it was about that

16       kind of stuff.

17   Q   Okay.

18   A   And the way he -- the primary thing was how he

19       talked to people, and sometimes I think he says

20       things that -- the tone of voice he uses is not

21       probably the best tone to use for the situation.

22   Q   Are there any e-mails or memos or any kind of

23       documents that describe the purpose of that meeting

24       and what you wanted to accomplish by having it?

25   A   I think there was an e-mail, and I think that the

1    attached document that John was supposed to update

2    and I don't believe that he ever did, but I don't

3    recall really.

4  Q  Okay.  Did Hoss receive any written warnings or --

5  A  Oh.

6  Q  -- other documents telling him your job performance

7    is bad, and so we're going to have a meeting about

8    it?

9  A  Yeah.  He knew why we were having the meeting.  We

10   were having the meeting after the board meeting.

11 Q  But did he get anything in writing?

12      MR. WILL:  I'm sorry.  Was your answer done

13   before he asked the next question?  You said you

14   were having a meeting after the board meeting.  I

15   didn't know if your answer was done.

16      THE WITNESS:  Yeah.

17      MR. WILL:  Sorry.  It sounded too close.  I

18   just wanted to make sure she got all her answer in.

19 Q  And, ma'am, what did you mean by a meeting after

20   the meeting?

21 A  A lot of times if there's issues going on with

22   something about, like, hey, we're going to buy a

23   tractor, the group may get -- a small group of

24   people might get together.  I looked at these bids,

25   or I'm going over here, have a little meeting

1   afterwards, and then break it up.  But we had
2   scheduled a meeting with him to talk about his job
3   performance, and I probably do have an e-mail on
4   that.
5   Q  If you could get that to Mr. Will so he could pass
6      that on to me, I would appreciate that.
7   A  Okay.
8          MR. WILL:  What specific document are you
9      talking about?  I'm sorry.
10         THE WITNESS:  The meeting after the meeting
11     about Hoss' job performance and that.
12         MR. WILL:  Okay.
13  A  This is his last chance.  Well, I mean, right there
14     tells you we had several conversations when we
15     called it the last, and he would --
16  Q  He would what?
17  A  He would go around -- I mean, I know him well
18     enough to know it was a sense of humor, but he
19     would say, you know, he needs grapes because this
20     is my last chance, you know, or whatever it is.  I
21     can't remember, but kind of making fun of it, and
22     it was a very serious thing, but he hadn't signed
23     anything.
24  Q  Let me make sure I understand what you mean by
25     meeting after the meeting.  So there was a

1     regularly scheduled board meeting?

2   A  Uh-huh.

3   Q  Where you -- where the board members met and

4      discussed what was on the agenda for that meeting,

5      and then you and John Sturgill and Abdul-Hakim

6      Shabazz met with Hoss after that board meeting?

7   A  Right.

8   Q  Okay.  Did Hoss raise the topic of what he

9      perceived to be you sexually harassing him at that

10     meeting?

11  A  No.  My name wasn't brought up.  He said there was

12     someone, and, I mean, if it was me, I thought it

13     was somebody else so...

14  Q  Oh, he said he was being sexually harassed by

15     someone, but he didn't say who?

16  A  He didn't identify them.

17  Q  Okay.  And correct me if I'm wrong, but I think you

18     testified earlier that this meeting was on May 10,

19     2022?

20         MR. WILL:  Object to the form.  Witness can

21     answer.  Go ahead.

22         THE WITNESS:  What did you say?

23         MR. WILL:  I said object to the form.  Witness

24     can answer.

25  A  That I said that meeting was May 10?

1    Q   I think so.  I think you said that, but I'm asking

2        to make sure.

3    A   I don't know.

4    Q   Okay.

5    A   But it was right before the fair, so it very well

6        could have, but I will look.

7    Q   Were you checking your calendar just now?

8    A   No.  I was putting that down so I would look.

9           MR. WILL:  She's making a note.

10    Q   Okay.  I thought you were consulting your calendar.

11       All right.

12    A   No.

13    Q   Okay.  Who is John Sturgill?

14    A   John Sturgill is an attorney.  He's currently now

15       the small claims court judge for Decatur Township.

16       He's very involved with his children.  He's a good

17       person.

18    Q   But, I mean, what was his professional relationship

19       to the board or to the fairgrounds?

20    A   Board member.

21    Q   Okay.  And who -- Abdul-Hakim Shabazz was a board

22       member at that time?

23    A   Yes.

24    Q   Was he an officer of the board at this moment?

25    A   I think was vice president.

1  Q  Okay.  At that meeting, was Hoss presented with a

2     zero tolerance policy?

3  A  That's what it was, zero tolerance.

4  Q  Okay.  Was this a -- was the zero tolerance a

5     policy, or was it a written warning about his

6     personal conduct?

7  A  His -- it was a written warning about his personal

8     conduct.

9  Q  Okay.  Do you recall what it said his conduct or

10    misconduct was?

11 A  Well, that, you know, he wasn't getting his jobs

12    done.  He, you know, spoke to people terrible.

13    Vendors were complaining.  Let's just say he didn't

14    have any friends.

15 Q  Okay.  Friends among the board members or the --

16 A  Anyone.

17 Q  -- vendors of the fair?

18 A  (Nodding.)

19 Q  Okay.  And all that is documented in what was given

20    to him that day?

21 A  I think that's that memo, and he was going to edit

22    it.  John Sturgill was going to edit what he had

23    talked about during the meeting and then present it

24    to him as a final document.

25 Q  Well, did you see it?

1   A   I saw the edited version, but I didn't see the

2       edited version until the meeting, but I haven't

3       seen the final version.  I don't think he did it.

4   Q   Okay.  Did Hoss at any point in this meeting say

5       that you were making him uncomfortable through

6       sexual advances?

7   A   No.

8   Q   Okay.  I would like to talk to you about some of

9       the things that Hoss believes that you did or said

10      that made him uncomfortable.  On May 31, 2022, did

11      you say something, text or e-mail him, to say, "You

12      have replaced me.  We don't talk about everything

13      in your life or mine anymore.  You're having those

14      conversations with someone else, and I miss our

15      friendship.  I'm happy for you, though, as I know

16      you would be if the tables were turned.  Mark your

17      calendar for Monday evening council meeting.  Pearl

18      asked if you were going to one of your donation

19      places.  She needs laundry detergent."  Do you

20      recall saying anything like that?

21  A   I probably sent that to him.

22  Q   Okay.  On June 1, 2022, you said, "I just may have

23      a sangria tonight.  Sounds good."

24  A   Yeah.  I...

25  Q   You said that?

1  A  Yeah.

2  Q  Okay.

3  A  That -- I mean, that's not saying come over and

4     have one.

5  Q  Okay.

6  A  I don't invite anybody over.

7  Q  All right.  On June 4, 2022, did you say, "Do you

8     want a frozen Coke?"

9  A  I don't think I had a frozen Coke, no.

10  Q  On June 7, 2022, did you ever --

11  A  That might have been at the fair, though, too.

12  Q  Okay.  On June 7, 2022, did you text or e-mail him

13     to say, "Ever been on Route 66?  Any interest?

14     Been to Key West?"

15  A  Well, we had been talking about going somewhere.

16  Q  Okay.  On June 17, 2022, did you say, "You'll never

17     know how much I appreciate you.  Pool is open."?

18  A  Yeah.  That's -- I probably said that.

19  Q  Okay.  On June 19, 2022, did you say, "Where have

20     you been all weekend?  Are you at the fairgrounds?"

21  A  What's the date on that?

22  Q  June 19, 2022.  I probably did ask that.

23  A  You realize he's living there, right?

24  Q  Oh, yes, ma'am.

25  A  So the place is unsecured.

1    Q   Okay.  On June 21, 2022, did you say, "By the way,
2        I just took my bath."?
3    A   Yeah, and there's a story behind that too.
4    Q   What's the story?
5    A   We had an agreement that if one of us started
6        smelling because we were out in those barns, we
7        were to tell the other one.  And he says to me that
8        day -- he said, do you remember that agreement we
9        had?  And I said, yeah.  And he said, well, you
10       probably want to take a bath.
11   Q   He told you you smelled bad that day?
12   A   Yeah.  I mean, that was -- we're working out in
13       barns and stuff at -- around people.
14   Q   Okay.  Well, had you been working in the barn on
15       June 21?
16   A   Probably so.  We do it all.  There isn't anybody
17       that's exempt from anything.
18   Q   All right.  On June 26, 2022, did you say, "Two
19       months from tomorrow we'll be leaving for our trip
20       if you don't back out.  Smily face."?  I think
21       smiley face is an emoji.  Did you say that?
22   A   I was more than ready to leave, but did he tell you
23       why we were leaving?
24   Q   Well, you tell me.
25   A   We decided -- or, well, he told me that he had

1      never -- he didn't know who his dad was.  He had no

2      family.  This was when he started, and then all of

3      a sudden, his aunt dies.  Well, that's family to

4      me.  And then pretty soon another aunt pops up.

5  Q  You mean dies?

6  A  No.  She pops up.

7  Q  Oh.

8  A  Supposedly running one of these companies he has.

9      Then he has another aunt that's a retired Lilly

10     employee.  Well, then he tells me that he's found

11     family that have found him from Facebook or one of

12     those social media things, and they all lived out

13     west.  So I said, well, are you going out there, or

14     are they coming out?  He said, no.  No.  They're

15     coming up.  We're going to have a big barbecue at

16     the lodge.  Come on up.  Well, I didn't know if I

17     wanted to do that or not --

18  Q  Okay.

19  A  -- because I had something else going on.  Well,

20     that didn't -- they didn't -- for some reason, he

21     said they didn't come out.  I don't remember what

22     it was.  So I said later, Hoss, I have a

23     sister-in-law that lives in Seattle because these

24     people lived in Seattle, and I said, I haven't seen

25     her since Keith passed away.  Why don't we drive

1     out to Seattle?  I'll drop you off where your

2     family is at.  It was a brother, I think, and I

3     think I had pictures of him.  It was a brother.

4     And I said, and I'll go on to my sister-in-law's,

5     and then when we're done visiting with them, we'll

6     come back.  I'll pick you up and come back.  And

7     then he said something about he'd never seen Mount

8     Rushmore.  And I said, well, that's up that --

9     you're up north.  We can just ride through there.

10    I mean, while you're there.  Why not?  That's what

11    the trip was about.  There was no romantic getaway

12    or interlude or anything like that.

13  Q  Okay.  Well, did you book a hotel?

14  A  No.

15  Q  Okay.  Did you book a flight?

16  A  No.

17  Q  Okay.

18  A  We were going to drive.

19  Q  Okay.

20  A  And that was because of the COVID.

21  Q  Okay.  Where was the destination?  What --

22  A  Seattle.

23  Q  Okay.

24  A  He was going to Seattle in the city part of it, I

25    guess, and I was going to Arlington, Washington,

1    where Karen lives, my sister-in-law.

2  Q  Okay.

3  A  There was nothing romantic about it at all.

4  Q  But the plan was to drive all the way to Seattle?

5  A  Yeah.

6  Q  And stop at Mount Rushmore?

7  A  If we wanted to.

8  Q  Okay.  Did you buy him some clothes for the trip?

9  A  Yes, I did.

10 Q  Okay.  What did you buy him?

11 A  I think it was either two or three shirts.

12 Q  Okay.  Where did you buy them from?

13 A  I think Kohl's.

14 Q  All right.

15 A  Would you like to know why?

16 Q  Yes, please.

17 A  Because he wore shirts around the fair that said

18    "your hole is my goal."  There was another one

19    about lube.  I can't remember exactly what that

20    was.  We had fair shirts.  I asked him to wear

21    them.  He refused to wear them.  When we finally

22    forced him to wear it, he cut big places here.

23 Q  On his armpits?

24 A  Yeah, so this sleeve part wasn't there.

25 Q  Uh-huh.

```
 1   A   And if he was going to see any part of my family,
 2       he was not going to wear "your hole is my goal,"
 3       and I didn't care what he said.  So I bought
 4       shirts, yes.  I bought shirts.
 5   Q   So the shirts were purely for him to be seen by
 6       your family in?
 7   A   Yeah, or anybody that we -- along the way.  I mean,
 8       can you imagine getting out at the gas station or
 9       whatever and he's walking around like that?  Who
10       does that?
11   Q   All right.  Okay.  Do you know if Hoss accepted the
12       gift of the shirts?
13   A   Yeah.  I took them over there.  I bought them.  He
14       was on the tractor.  I walked up there, and I said,
15       hey, I bought you a couple shirts for our trip.
16       And he said, okay.  I took them out of the bag, and
17       I said, do these look good to you?  He said, yeah.
18       He goes, just go hang them in my closet in there
19       where the -- I think the bathroom is.  I did.  I
20       took them up there, put them in there and left, got
21       back in my car and left.
22   Q   Okay.  On June 26, 2022, did you text him, "I need
23       my friend with benefits.  By the way, talk about
24       sexual harassment.  What about Ashley?  Gees."?
25   A   Yes.  But I wasn't talking about he was my friend
```

1       with benefits.  Anybody -- I mean, you can have
2       several friends with benefits.
3    Q  Uh-huh.
4    A  But Ashley was in the office, and she was talking
5       about -- and I guess it was something they did all
6       the time -- but talking about genitalia and things
7       like that and people that were walking by and
8       totally inappropriate, and I was bringing it to his
9       attention, really.
10   Q  Just to clarify, Ashley --
11   A  Was the girl he hired he wasn't supposed to hire.
12   Q  She was the secretary?
13   A  Uh-huh.
14   Q  Do you know her full name?
15   A  Ashley Ort, O-r-t.
16   Q  So Hoss hired her rather than you?
17   A  Yeah.  We walked in the office one day, and there
18      she is.  We're, like, who is that girl?  I mean, we
19      go upstairs to a board meeting, and we're all,
20      like, who is that girl?  I said, I don't know who
21      that girl is.  He did that three or four times.
22   Q  Hoss hired multiple people?
23   A  Yes.
24   Q  Without approval?
25   A  Yes.  Yes.

1  Q  Who else did he hire?

2  A  He went down to the homeless shelter and got a

3     bunch of people once.  He had another lady.  Her

4     name was Misty, and I think her last name might be

5     Cox.  But she and her family -- I'm telling you.

6     They were something else, and they were at the

7     front desk.  I could come up with a whole list.  I

8     mean, he just -- he hired Kaitlyn Kendall Ward, and

9     nobody knew she was on the books.

10 Q  What did he hire her to do?

11 A  Some kind of media.  I guess nobody seen a job

12    description, job title, nothing.

13 Q  Did Hoss have the authority to hire people?

14 A  No.

15 Q  And pay them money?

16 A  No.  No.

17 Q  Was there ever any consequence to this?  Did you

18    tell Hoss you don't have the authority?

19 A  Oh, yeah, we tell him.  He just chose to ignore us.

20 Q  Okay.  All right.  One last one.  On June 26, 2022,

21    did you text him, "I'm getting ready to come over

22    there, but if you were here right now, I would, dot

23    dot, dot"?

24        MR. WILL:  Objection to the form of the

25    question.  Again, it takes it out of context.  The

1    witness can answer to the extent she knows.  Go

2    ahead.  You can answer.

3  A  I've got no idea.  I can tell you that was at the

4    beginning of the fair.  I can tell you I was

5    sitting on the couch putting on my shoes and socks,

6    but I got no idea.  I have wracked my brain what we

7    were talking about, and I got no idea.

8  Q  Do you believe it had any kind of sexual intent?

9  A  No.

10 Q  Okay.  Do you understand why it might be

11   interpreted by other people as having a sexual

12   meaning?

13       MR. WILL:  Objection.  Calls for speculation.

14   The witness can answer to the extent she knows.  Go

15   ahead.

16 A  I don't know.

17 Q  Okay.

18 A  Hoss and I did all kinds of stuff together.  There

19   was never any sexual stuff going on.

20 Q  Okay.  Did you ever go on to Hoss' Facebook page?

21 A  Yes.

22 Q  Okay.  Did you see pictures of him shirtless?

23 A  Yes.

24 Q  Did you discuss those pictures with other people?

25 A  Yes.

1  Q  Okay.  Who were the other people?

2  A  Wrestlers, little wrestlers.  I had had a nose

3     earring done, and I had no idea of the pain that

4     that would cause, none.  Well, these guys show up,

5     and they were -- we were at the smaller -- like a

6     ball diamond thing.  And, I mean, this guy says, it

7     looks like you just got your nose done.  It's all

8     red and all this stuff.  I said, oh my God.  I've

9     never had anything hurt like that.  He said, well,

10    I've got them everywhere.  And he said, I even got,

11    you know, like in his pits and everywhere.  And he

12    says, I even got them on my nipples.  And I said,

13    so does Hoss.  I don't know how you guys stand

14    that.  And he said, yeah, look at mine.  And he was

15    showing me, and I got on Hoss' --

16 Q  This is the wrestler?

17 A  Yeah, the little guys.  There were probably four or

18    five of us standing there.  And I got on there, and

19    I said, see?  Doesn't that look like that hurt?

20    And they were, like, yeah.  Then he walks up, and

21    he's, like, huge.  I mean, these are miniature,

22    like, they're not like the mini, mini ones.

23 Q  Were they midgets?

24 A  Well, I wouldn't say midgets, but they're not big

25    guys.

1    Q   Uh-huh.

2    A   But it wasn't -- there wasn't any -- it's on

3        Facebook.  If you don't want it on Facebook, what's

4        it out there for?

5    Q   Was one of the wrestlers Tyler Hargraves?

6    A   I have no idea.

7    Q   Okay.  Is it -- did one of the wrestlers -- I think

8        it was Tyler Hargraves, but I'll let you confirm

9        this -- comment that he was attracted to Hoss?

10   A   No, no, no, not -- there wasn't any inappropriate

11       conversations.  You know, to these people -- and it

12       pains me to say it -- but I'm an old lady.  They're

13       not telling me they're hot for some guy or

14       whatever, you know.  They just want to know what I

15       need done so I can get away, and they can kid

16       around and do whatever it is they're doing.

17   Q   Uh-huh.  Why were there wrestlers on the

18       fairgrounds?

19   A   Hoss had scheduled a wrestling event, and I think

20       they were doing it out there on that field that

21       day, and they have also done them in the Coliseum.

22       You can't believe -- that's a big attraction.

23   Q   Oh, I believe it.  I just want to make sure I

24       understand that at the May 10 meeting Hoss never

25       raised the topic of sexual harassment?

1      MR. WILL:  Objection.  Misstates her

2   testimony.  She can answer the question.

3 Q  If I misstated what's happened, please, by all

4   means, tell me what really did happen.

5      THE WITNESS:  Am I supposed to answer that?

6      MR. WILL:  Answer it to the best of your

7   ability from your memory.

8 A  Okay.  So what did you ask me?

9 Q  I just want to be clear that at the May 10, 2022,

10   meeting, Hoss never raised the topic of sexual

11   harassment?

12 A  Now, there was that sexual harassment section that

13   John had in there, and Hoss said something about

14   well, this has sexual -- I said, no.  He's not

15   guilty of any sexual harassment.  And then he

16   started to say something about sexual harassment,

17   and I'm thinking, you know, that ain't me because I

18   never did it.

19 Q  So he did say that he was --

20 A  But it was over this --

21 Q  -- being sexual harassed?

22 A  He didn't say he was being sexually harassed, but

23   he said this -- you know, this no-tolerance policy

24   was a list of things we weren't accepting anymore.

25   He was not sexually harassing anyone, and that was

1    my point with John.  This should not be in here.

2    And I think what John did was wait till the last

3    minute to put that document together or used one

4    from another case and just didn't get it deleted

5    out.

6  Q  Okay.  If Hoss did not complain about sexual

7    harassment at the May 10, 2022, meeting, was there

8    some point afterward where he did?

9  A  Not that I'm aware of.

10 Q  Okay.  All right.  Who is Paul Annee?

11 A  He is our office assistant.

12 Q  All right.  So he's an employee at the --

13 A  Fairgrounds.

14 Q  All right.  Working in a clerical capacity?

15 A  Yes.

16 Q  Is that a full-time position?

17 A  Uh-huh.

18 Q  Okay.  Is he also a member of the Indianapolis City

19   Council?

20 A  Excuse me.  Yes, he is.

21 Q  Okay.  Which is a full-time position, right?

22 A  Right.

23 Q  Is his position with the fair a full time?

24 A  Yes.  Well, no.  He only works 9 to 4.

25 Q  But five days a week?

1   A   (Nodding.)

2   Q   Okay.  What are his duties as office assistant?

3   A   We're putting a billboard up, so he's working with

4       people on that.  He works with the attorneys on all

5       this stuff.

6   Q   On what stuff?

7   A   The case with --

8   Q   This case?

9   A   You know, he'll put together the documents that I

10      asked him to pull together.  He'll write checks.

11      He does not sign checks, but he writes checks.

12      He'll schedule meetings.  He does -- he's learning

13      QuickBooks.  He files, just general office duties.

14  Q   Did he take this job after Hoss left as executive

15      director?

16  A   Well, no.  Ashley was there, Ashley Ort.

17  Q   Okay.  But now she's gone too, isn't she?

18  A   Yes.

19  Q   He replaced her?

20  A   Right.

21  Q   Okay.

22  A   He worked with her for a while, but then she walked

23      off of her job and...

24  Q   Was Paul Annee employed by the fair in some other

25      capacity perhaps while Hoss was executive director?

1   A  I don't remember.

2   Q  Okay.

3       MR. WILL:  Let me clarify the question.  Were

4     you asking as a like a regular full-time employee?

5       MR. McQUARY:  In any capacity or amount of

6     time.

7   A  I don't remember if he did or not.

8   Q  Okay.

9   A  Yes, when he was a groundskeeper.  When Hoss was a

10    groundskeeper, Paul was the one that worked in the

11    office.

12   Q  Okay.  Do you know about how many hours a week that

13    was?

14   A  Probably 30.

15   Q  Okay.  Are you the treasurer of Annee's campaign

16    committee?

17   A  Yes, I am.

18   Q  Okay.  What does that entail to be the treasurer of

19    a campaign committee?

20   A  Reporting what he's received as far as donations

21    and expenditures.

22   Q  So the main duty is to fill out those disclosures

23    that go to the Election Commission?

24   A  Yeah.  But that has nothing to do with the fair or

25    any of this.

1    Q   Okay. Have you hosted campaign fundraisers for

2        Paul Annee?

3    A   Yes, I have.

4    Q   About how many would you say over the years?

5    A   Probably two.

6    Q   Okay. Was there a fundraiser for him at the lodge

7        soon after the lodge was built?

8    A   Uh-huh.

9    Q   You hosted or helped organize?

10    A   I helped organize.

11    Q   Okay. Who else -- did anyone else help you

12        organize it or sponsor it?

13    A   Oh, yeah. There were a lot of people involved with

14        that. Hoss was even helpful with it.

15    Q   Okay. Did you tell Hoss to cater the event, to

16        provide refreshments?

17    A   No.

18    Q   Okay. Do you know if Hoss did, in fact, provide

19        refreshments for that event?

20    A   No.

21    Q   You don't know, or you're sure that he didn't?

22    A   I don't know.

23    Q   Did you ever tell Hoss to pay for catering out of

24        the fairgrounds funds?

25        MR. WILL: Objection to the form of the

1    question.  You can answer it.

2  A  I don't know.  No, I don't think so, but, no.

3  Q  Okay.  Do you know if Hoss did, in fact, provide

4     refreshments for the fundraiser using fairgrounds

5     funds?

6  A  No.  No.  I don't know how he could have.  We only

7     had, according to our treasurer because I called

8     and asked him, we only keep $100 in the petty cash.

9     And at the most, he said Hoss -- or he said what he

10    knew of, the most Hoss kept in petty cash was $250

11    and if -- he said he would try to keep more, hide

12    more, and he kept on him that -- no, we don't keep

13    that kind of cash out here.

14  Q  Okay.

15  A  So I don't know how he could pay for it out of

16    petty cash.

17  Q  Do you know -- let me rephrase the question.  Was

18    Hoss responsible for keeping track of the petty

19    cash fund?

20  A  As part of his executive director stuff.

21  Q  Okay.  Do you know if Hoss did, in fact, provide --

22    obtain refreshments that were used at the

23    fundraiser?

24  A  I have no idea.

25  Q  All right.  Would it have been inappropriate for

```
 1        Hoss to obtain funds for the fairground funds for
 2        Paul Annee's fundraiser?
 3   A    Not if the board approved it.
 4   Q    Did the board approve it?
 5   A    Not that I'm aware of.
 6   Q    Were you having work done on your house in 2021?
 7   A    Not really.
 8   Q    Perhaps it needed to be repainted?
 9   A    Yes.
10   Q    Okay.  Any other work on your house --
11   A    No.
12   Q    -- around that time period?
13   A    Unless you can think of it.
14   Q    Okay.  Well, did you hire Maria Banuelos and her
15        husband to do any work on your house around 2021?
16             MR. WILL:  Object to the form.  Witness can
17        answer.
18   A    Hoss did.
19   Q    Okay.  To do work on your house?
20   A    Yes.
21   Q    Why would Hoss hire someone to do work on your
22        house?
23   A    Hoss and I were best friends, and probably someday
24        when we were going down the road somewhere or doing
25        something, I probably said, I need to get the
```

1   outside of the house painted.  So when he was
2   having stuff done at the fair, he'd call me and
3   say, hey, do you need this done, or do you need
4   that done?  I mean, he would come over and spray
5   off the pool cover.  He helped me hang lights in
6   the backyard.  You know, this isn't -- I kept his
7   dog.  My neighbor and I kept his dog for almost a
8   year, you know.  It's not -- it's just like in
9   passing.  It's not like, hey, you know, give me
10  somebody to paint my house.  It wasn't that way,
11  you know.  And he probably -- I would imagine he
12  said, you know, they're going to paint the lodge.
13  Do you need them to paint your house?
14 Q  Okay.  Are you familiar with Maria Banuelos?
15 A  No.  I think I've seen her once.
16 Q  Did she do any work for the fairgrounds, she and
17  her husband?  And I think they have some employees
18  of their own.
19 A  I don't know.  Hoss told me she painted the lodge,
20  but I have a full-time job.  I mean, he was pretty
21  much kind of running things out there for me and
22  would keep me apprised.
23 Q  Okay.  So did he ever tell you that, hey, I hired
24  someone to go paint your house?
25 A  He said, do you still want your house painted?

1    Yeah.  He said, I got these people that can paint

2    it, and then he just took it from there.  He said,

3    what color do you want?  And I said, the same color

4    that's on there.

5  Q  All right.  Did the Banueloses do any other work on

6    your house?

7  A  Not that I'm aware of.

8  Q  Okay.  Was that work that they did, the Banueloses

9    did on your house, paid for on a check drawn on

10   fairgrounds funds?

11       MR. WILL:  Objection to the form.  The witness

12   can answer to the extent she knows.  You can go

13   ahead and answer if you know.

14 A  I don't know how he paid them.

15 Q  Okay.  Well, if he paid with a fairgrounds check,

16   wouldn't you have to sign it?

17 A  You would think so.

18 Q  Okay.  You don't recall signing one?

19 A  I didn't.

20 Q  Okay.  Did you ever pay the Banueloses for work on

21   your house?

22 A  Yes.  I gave Hoss cash.

23 Q  Okay.  Do you know how much cash you gave him?

24 A  I'm thinking it's between 25 and $3,500.

25 Q  Okay.  Did you get a receipt or anything from Hoss

1      for giving him a couple thousand dollars?

2  A  No.

3  Q  Okay.  Did you get anything from the Banueloses

4      saying we have been paid?

5  A  No.

6  Q  Okay.  But they didn't keep coming after you for

7      money, so they appear to have been paid?

8  A  No.  No.  He was going to put a fan in my living

9      room that he got somewhere, and the fan is still in

10     my living room.  I have no idea where the fan came

11     from.

12  Q  So he gave you a fan?

13  A  I guess.

14  Q  Okay.

15  A  He said something to another board member that he

16     gave her a fan, and I said, take this one in my

17     garage, and you got to pay her because he needed to

18     pay her.

19  Q  Do you know if Hoss scheduled work on the houses of

20     any other board members?

21  A  No, I don't.

22  Q  Okay.  Did the board approve any kind of payment

23     drawn on fairgrounds funds for repairs to your

24     personal -- for work on your personal house?

25  A  Yeah, because -- no, because they didn't.

1  Q  Okay.  All right.  Who is Danny Huston?

2  A  He owns North American Midway, and he is our midway

3     vendor that does our carnival.

4  Q  Who is Troy Huston?

5  A  Who?

6  Q  Troy Huston?

7  A  I don't know.

8  Q  I'm sorry, ma'am.  Miles Huston.

9  A  It's his son, and his son is over our event.

10 Q  Over your event?

11 A  Well, North American is a huge company.

12 Q  All right.

13 A  They're all over the world.

14 Q  Uh-huh.

15 A  And so Danny's son Miles oversees our event, our

16    fair.

17 Q  Okay.  Any chance Danny Huston is related to Judge

18    Huston who was a Marion Superior Court judge?  I

19    think he must have retired in the '90s?

20 A  I knew him, but, no.

21 Q  No relation?

22 A  Uh-uh.

23 Q  Well, that led me to my next question.  What is

24    North American Midway entertainment?

25 A  Midway, amusement.  I mean carnivals, Ferris

1        wheels, food, concessions.
2    Q   So it's a big company that provides all these
3        things?
4    A   It's huge, yeah.
5    Q   Okay.  And Danny Huston is the owner?  Is he the
6        president?
7    A   He's -- I think he's like chairman of the board or
8        something.
9    Q   Okay.  And Miles Huston also works for that
10       company?
11   A   Yes.
12   Q   Okay.  And North American Midway Entertainment, can
13       we just call it NAME?
14   A   Yeah, NAME.
15   Q   NAME.  Okay.  NAME is, I guess, a major vendor for
16       the fairgrounds?
17   A   Yes.  They do all of our carnival stuff.
18   Q   Okay.  Is Danny Huston a frequent donor to
19       Republican causes?
20   A   Probably.
21   Q   Okay.  Has Danny Huston ever contributed to Paul
22       Annee's campaign fund?
23   A   $750.
24   Q   In just one year, or is that all the time you have
25       known him?

1   A   All the time I have known him.

2   Q   Okay.  Has Huston ever made a contribution at a

3       fundraiser that you organized?

4   A   Yeah, the one for Brian and Paul.  It was a $1,500

5       donation that was split between the two.

6   Q   For Paul Annee and Brian Mowery?

7   A   Yes.

8   Q   Okay.  When NAME comes to the fair, do they bring a

9       large amount of equipment and people and park all

10      this on the fairgrounds?

11   A   Yes.

12   Q   All right.  Does the fairgrounds normally charge

13      vendors for that?

14   A   No.

15   Q   All right.

16   A   We do if it's a private citizen, or, you know, I

17      guess we do small vendors but not NAME.

18   Q   Okay.  So NAME is allowed to come and occupy the

19      fairgrounds, campgrounds, rent free?

20   A   They pay for any utilities or things like that that

21      they have used.

22   Q   Okay.  Have you ever instructed Hoss not to invoice

23      NAME for occupying the fairgrounds, campgrounds,

24      and other property?

25   A   Yes, I have.

1  Q  Okay.  Why did you do that?

2  A  Because they gave us a half a million dollar loan

3     at 4 percent.

4  Q  Okay.  So you believe that loan was a financially

5     favorable transaction?

6  A  Yes.

7  Q  All right.  That --

8  A  And they have only done it the last couple of

9     years, and they would pay if I asked them to.

10  Q  Do you know how much that they would have incurred

11     if they -- in an arm's length transaction?

12  A  I have no idea.

13  Q  Okay.  Were they -- did they pay utilities?

14  A  Yes.

15  Q  Okay.  How do you go about deciding that some

16     vendors get charged and others don't?

17  A  Everyone else pays.

18  Q  Okay.  Why does NAME not pay?

19  A  Because we have got that loan, and it saved our

20     neck when the fair was about to go down.  This was

21     a couple of presidents before me, and it literally

22     kept the bank from coming in and taking them.

23  Q  Okay.

24  A  And that is a board decision.

25  Q  Okay.  Is it reflected somewhere in the board

1      minutes that NAME is not to be charged rent?

2    A  It should be.  I mean, where it's brought up every

3       year they wanted, you know -- do you want to charge

4       them rent or what?

5    Q  Can you recall a specific notation in the board

6       meeting where there's a vote to, you know, we're

7       not going to charge NAME rent?

8    A  I'll see if I can find it.

9    Q  All right.  If you could get that to your attorney,

10      I would appreciate it.

11   A  Sure.

12   Q  And since you did turn over the board minutes in

13      discovery, can you suggest a time period where we

14      might look at the minutes we have already got where

15      NAME was exempted from rent because of that loan?

16   A  Okay.  I'll see what we have got.

17   Q  I'm just asking you right now.  Do you remember

18      when that decision was made?  You can tell me

19      roughly the month and year, and I'll go look and

20      save your attorney the work.

21         MR. WILL:  He's asking you now if you know.

22   A  No, I don't.  It could be around fair time but...

23   Q  Okay.  But you believe this is actually discussed

24      and decided at a board meeting?

25   A  Yes.  Yes.

1    Q   Okay.

2    A   Danny does a lot for the fair.

3    Q   Okay.  And a little off topic, but the -- who is

4        responsible for keeping the board minutes?

5    A   The secretary.

6    Q   Okay.  Do you have custody of them yourself?

7    A   No.  The secretary does.

8    Q   Okay.  When we requested the board minutes in

9        discovery, who actually got them?

10   A   Paul probably called the secretary.

11   Q   Okay.  Do you ever -- did you ever have access to

12       the minutes themselves?  Like, are they stored in a

13       book or on a computer?

14   A   I think she keeps them in a three-ring binder, but

15       if you wanted to look at them, she would say sure.

16   Q   Did you ever do that?

17   A   If I needed to.

18   Q   As part of this lawsuit?

19   A   Probably.

20   Q   Okay.  So you have had access to the minutes?

21   A   I'm sure I have.

22   Q   All right.  Did you copy them yourself, provide

23       them to your attorney?

24   A   I don't remember.  I don't know.

25   Q   Okay.  Are you confident that the minutes that you

1    turned over are accurate reflections of the

2    official record?

3  A  Yes.

4  Q  Okay.  All right.  I would like to go back to the

5    fall of 2022 and ask you what was Paul Annee's

6    employment status at the fairgrounds back then?  I

7    know you have -- apparently since then he's got a

8    nearly -- it sounds like a nearly full-time job as

9    the office assistant, but what was he doing in the

10    summer and fall of 2022?

11  A  I don't know.  I don't know because Ashley Ort was

12    in there.

13  Q  Okay.  Was he working at the fair in any capacity?

14  A  I don't know.

15  Q  Okay.  Do you recall hiring him --

16  A  Yeah.

17  Q  -- in the summer or fall of 2022 or --

18  A  Yeah.

19  Q  Okay.

20  A  Let's see.  Last year was -- I get '22 and '23

21    confused.

22  Q  Do you know what he was paid?

23  A  No.

24  Q  Okay.  At any point in 2022, did you give him a

25    bonus?

```
 1   A   No, I did not.
 2   Q   Okay.  Did someone else give him a bonus?
 3   A   The board.
 4   Q   All right.  So the board voted to give him a bonus?
 5   A   As far as I know.
 6   Q   How much was the bonus?
 7   A   I thought originally it was $2,500, but then I was
 8       told later it was 1500, but he was worth anything
 9       they paid.
10   Q   Well, how so?
11   A   Because Hoss had quit doing his job, and Paul
12       assumed the responsibilities that Hoss was to be
13       doing.
14   Q   So Paul Annee was essentially functioning as the
15       executive director?
16   A   Uh-huh.
17   Q   Okay.  Did anyone tell Hoss, you know, you need to
18       do your job so we don't have to hire other people
19       to do it for you?
20   A   You couldn't even approach Hoss.
21   Q   What do you mean by that, ma'am?
22   A   He was very threatening, very unapproachable.
23   Q   What would he do if you approached him and said
24       something?
25   A   He throws fits.  He'll throw anything.  We got a
```

1  hole in the wall where he punched the wall that

2  we've got to fix.  He throws things.  He destroys

3  stuff.  He calls you anything he wants.  He has

4  what we call temper tantrums, and nobody wants to

5  deal with that.  We have a fair going on, and who

6  wants that to -- any of the public to see any of

7  that?

8 Q  Have these temper tantrums been documented anywhere

9  in a written warning, in an e-mail, or maybe a text

10  message the next day saying, Hoss, you kind of

11  overreacted yesterday?

12 A  Well, I called him on it.  One day I walked into

13  the office, and the secretary was leaving.  I said,

14  where are you going?  She said, I quit.  I'm not

15  taking anymore off him.  And she was getting ready

16  to leave, and I said, hey.  Wait a minute.  Wait a

17  minute.  I had another call from one of them, Misty

18  Cox.

19 Q  Well --

20 A  I said, Misty, you know, are you -- are you

21  thinking about coming back to the fair?  Because we

22  were getting ready to put some people on.  And she

23  said, is Hoss out there?  I said, no.  She said, is

24  he anywhere around?  I said, I don't know where he

25  is.  She said, I'm not doing anything where he's

1    near or anything.  She said, he will go to any

2    extreme for retaliation or what he perceives is

3    retaliation.  She said, I'm scared to death of him.

4    She said, he still owes me two weeks' pay, and she

5    said the way that he did my family -- we all stood

6    there and watched how he talked to her husband

7    outside of the fairgrounds one day, and he thinks

8    just because he's big he can say or do whatever he

9    wants to people.

10  Q  Well, let me take the first one.  I think you

11     mentioned secretary.  Would that be Ashley Ort?

12  A  Uh-huh.

13  Q  You said she quit because of Hoss?

14  A  Well, no.  That was Misty Cox.

15  Q  I'm sorry.  Ashley said that she felt threatened by

16     Hoss?

17  A  Ashley just didn't like Hoss, but Ashley has other

18     issues, I think.  But the day that I went in there,

19     she and Hoss were going at it hot and heavy.  And

20     one day I was getting ready to leave, and she said,

21     did you see that hole behind the door?  I said,

22     yeah.  And she said, that's where he punched it.  I

23     said, Hoss did that?  And she said, yeah.  And I

24     said, I never seen Hoss do any of that.  Other

25     people have stepped up now that he's gone and said

1    he's done this.  He's done that.  Why weren't you

2    saying anything?  Are you crazy?  He told her and

3    he told me that he could have my house burnt down.

4    And when he told me that, I said, please, Hoss,

5    just one thing.  Please, please do not do that when

6    my dog is in there.

7  Q  Are there any written warnings or --

8  A  Are you going to put something in writing about

9    somebody like that?

10 Q  Well, yes, ma'am.  Frankly, if one of my employees

11   became violent or threatening, I would.

12 A  Well, we did do a police report.  He thought it was

13   a big joke.

14 Q  When did you do the police report?

15 A  Oh, I don't know.  It's out there, I'm sure.  He

16   thinks he's friends with the police too.

17 Q  I do want to ask specifically about records at the

18   fairgrounds.  Are there any records of the

19   fairgrounds that say this is inappropriate behavior

20   in an employee to become violent or threatening?

21   And it doesn't have to be -- I'm not just asking

22   about, you know, a form carefully prepared by the

23   human resources department.  It may be something

24   less formal than that like an e-mail saying, you

25   know, Hoss, you really shouldn't have gotten out of

1   hand yesterday.

2   A   Like I said, Hoss -- I trusted Hoss.  I considered

3       him to be one of my closest friends.  I was doing

4       everything I could to keep it together for him

5       because he was his own worst enemy.  I have a

6       hotheaded brother who got in trouble, and a guy

7       helped him out and got him back on life's track.

8       That's what I was trying to do for him but

9       they're --

10  Q   So this behavior is not documented?

11  A   I don't know if it is or not.  I mean, I could go

12      through.  I looked through so many times and so

13      many papers and so many texts I can't even tell

14      you, but I will look and again and see if I can

15      find anything.

16  Q   Okay.  And the second person, is it -- did you say

17      Misty?

18  A   Misty Cox.

19  Q   What inappropriate thing did Hoss do around her,

20      around Misty Cox?

21  A   Treated her terrible, talked to her, like,

22      terrible, threw a -- Danny Meador was there when he

23      threw an orange juice at her.  It hit the wall, and

24      he said he cleaned it up, and she said she cleaned

25      it up.  This was while the fair is going on.

1       Whether it's the fair or not, it's inappropriate
2       behavior.
3    Q  Again, is this -- is it documented?
4    A  She's terrified of him.  She's not going to do
5       anything.  That's how he's getting by with all this
6       stuff.  She's terrified.
7    Q  Let me just ask the question, ma'am, because the
8       court reporter has got to transcribe it.
9    A  I understand.
10   Q  Is it documented anywhere that Hoss became violent
11      and threw something at Misty Cox?
12   A  I don't know, but I will look, and I will ask
13      others to look, but there's nothing kept out at the
14      fair.
15   Q  Okay.  Or that he became threatening on any
16      occasion, and people were intimidated by it?
17   A  I will look.  I will look.
18   Q  Okay.  I have a few more questions to ask you about
19      Paul Annee.  Now, forgive me if I already asked
20      this, but did the board approve the bonus?
21   A  I don't know because I wasn't on the board at the
22      time.
23   Q  Okay.  Remind me.  What were the dates of this
24      brief period when you were not on the board?
25          MR. WILL:  Objection.  Asked and answered.  Go

1    ahead and answer.

2  A  I think it was like July.  I quit the very next day

3     after the fair, so I would say it was probably like

4     July 5, and I probably came back on sometime in

5     August.

6  Q  Okay.  Why did you quit, ma'am?

7  A  I couldn't take any more of Hoss.  I just couldn't

8     do it anymore.  I just couldn't do it.  He had

9     beaten me down.  I couldn't do it anymore.

10 Q  Okay.  Beat you down with what?

11 A  Verbal, I mean.  It's almost comical that you think

12    there's sexual harassment because I had just had

13    enough.  It was mental abuse.  It was -- he never

14    laid a hand on me.  He always -- but just

15    everything you did was wrong.  He refused to do

16    anything out at the fair, would stand and just

17    stare at you when you're trying to get people -- to

18    intimidate you -- would stand there like this and

19    just look at you, you know, and intimidate them as

20    well.  I had just -- and I thought -- I thought --

21    at the time, I'm 63 or 64 years old, and I don't

22    need this.

23 Q  Did any of the verbally abusive things that Hoss

24    said to you get preserved maybe in a text message

25    or an e-mail?  Can you point me to some

1       conversations where --

2   A   Ours were always verbal.

3   Q   -- Hoss was threatening?

4   A   We were always verbal.  We were always going at one

5       another because we were friends, but at that point

6       at the fair, I even sent him a note and said,

7       you're not even going to talk to me during -- or

8       you're not not going to talk to me.  And I can tell

9       you what set him off about the sexual harassment

10      too.

11  Q   What?

12  A   I went around -- I went around the fair as I do

13      every year and talked to every board member and

14      said, how do you think the fair is going?  How do

15      you think the fair is going?  And I take notes

16      because we talk about it there.  He knew he wasn't

17      doing anything.  The years he was doing anything he

18      was fine, so I went around, and I kept saying, how

19      do you think the fair is doing?  What can we do to

20      improve?  So he was on my string, you know.

21  Q   On your string?

22  A   Yeah, you know, the --

23  Q   Oh, one of the people you talked to?

24  A   Yeah.  So I said, we probably need to talk about

25      this right away because people had issues with how

1    he wasn't doing anything and the way he was talking

2    to people and treating them.  So I said, okay.

3    They want to talk about, you know -- I can come

4    around, and they want to talk about the treatment

5    or if we're going to extend the fair to the 5th, I

6    think is what it was or something.  I don't think

7    it had nothing to do with him.  So I said, do you

8    want me to come by and meet with you one on one, or

9    do you want to have a group meeting?  And Abdul,

10   who does not like confrontation, says, just do it

11   one on one.  I mean, I was standing there at the

12   edge of the thing.  Abdul is in the Gator.  Susie

13   Day is there.  Frank Taylor is there, and they said

14   just do a one on one.  It would probably be

15   quicker, so I sent a text out.  And I said, okay,

16   I'll just come around and do a one on.  He thought,

17   because he knew he crossed the line, that he was

18   getting fired, and that's when he started throwing

19   all these accusations around, and that's when the

20   brown bag started missing too.

21   Q   Brown bag?

22   A   Yeah.

23   Q   I don't know what you mean by that.

24   A   We had -- I had called and asked for everyone to

25       bring in the money to the treasurer's office.  Paul

1    Annee and Ashley Ort, they had a brown bag in there
2    that the concessionaires paid money and the ice and
3    all these people.  There was probably $10,000 in
4    there cash, and the brown bag was so full it could
5    not zip, so it was just stuffed.  So I called them
6    and I said, Joe Goins says he doesn't have the
7    brown bag.  Who has got it?  And they said, well,
8    we're looking here, and we can't find it.  And I
9    said, somebody needs to find this brown bag.  It's
10   got to be turned in.  They searched.  They are
11   almost hysterical.  They're terrified.  They don't
12   know what to do, so I told Danny Meador and Steve
13   Perry who were on the Gator, also collecting the
14   monies, I said, please go to the office and get the
15   brown bag from Ashley and Paul.  They said they
16   went in, and they said, we don't have the brown
17   bag.  So I asked Hoss where the brown bag is.  Hoss
18   didn't know.  The kids in the office asked him,
19   which is Ashley and Paul.  Hoss didn't know.  So
20   they're searching, tearing the office apart, which
21   anyone would, and they couldn't find it.  They're
22   calling me, Cindy, we don't know what to do.  Just
23   keep looking.  Couldn't find it.  They're obviously
24   upset.  So I said, well, we're going to have to
25   figure out what's going on.  And I said, Danny and

1    Steve, go back to Hoss and ask where the brown bag
2    is.  That's when he started off with all these
3    stories, taking people aside.  He had to talk to
4    them about this and about that and about that.  And
5    I told him.  I said, I'm fine with him talking to
6    you about whatever you want to talk about, but I
7    want the damn brown bag.
8  Q  Uh-huh.
9  A  He didn't have it, and then he comes in and walks
10    in the office, and he told Paul and Ashley -- now,
11    this is their version coming through to him.  And
12    he said, what are you guys so upset about?  And
13    they said, we're looking for the brown bag.  We
14    can't find that brown bag where they paid for their
15    ice and all this stuff all weekend.  And he said,
16    well, I have it.  So they said, well, Cindy and
17    them is looking for it.  So they went up there.  He
18    said, I'll get it for you.  I believe that's how
19    that happened, and he brings the bag back to them,
20    and it's half full, not even half full, and gave it
21    to them, and they turned it in.
22  Q  So you believe that Hoss stole money out of the
23    brown bag?
24  A  I have no idea what happened to the money in the
25    brown bag, but all this stuff, all these

1    accusations and stuff --

2        MR. WILL:  We have been going about an hour

3    and 20 minutes.  Can we take five minutes?

4        MR. McQUARY:  Sure.  Why don't we take ten.

5        (A brief recess was taken.)

6  Q  Ms. Mowery, you mentioned that you had taken out

7    some police report because of some of Hoss'

8    behavior.  Do you recall, first of all, when you

9    made that police report?

10 A  It would have been shortly after he left.

11 Q  Okay.  What was the subject of the police report?

12    I mean, what did you say he was doing?

13 A  When he threatens to burn your house down, I mean,

14    you need to let somebody know.

15 Q  Okay.  When did Hoss threaten to burn your house

16    down?

17 A  Well, he not only did that to me.  He told several

18    people that he would have my house burned down.

19 Q  Okay.  When did he make that threat?

20 A  Well, I know he said it to Ashley Ort because she

21    confirmed it to me.  That was before he left, and

22    then when he knew that he was in trouble, he had

23    told me that he was going to have my house burned

24    down shortly before he was -- we were having that

25    meeting on May 10.

1   Q  To your knowledge, did the police investigate

2      the --

3   A  Yeah.  They had patrols going by there for a while.

4   Q  Okay.  Was Hoss arrested or charged with anything?

5   A  No.  He's -- he would be slick enough to have

6      somebody else do it.

7   Q  But, I mean, did the police act?  Did the police

8      arrest him?

9   A  I don't know.

10   Q  All right.  Or was he criminally charged?

11   A  I don't know.

12   Q  Okay.  I would like to -- was Paul Annee fired from

13      his job at the fairgrounds at any point?

14   A  Yes.

15   Q  Tell me about that.

16   A  Paul Annee, when Hoss was groundskeeper and Paul

17      was there doing the office work, he got involved

18      with a young woman that was one of the princesses

19      in the queen pageant and just wasn't doing his job.

20   Q  Paul did or Hoss did?

21   A  Paul did.

22   Q  Okay.

23   A  So, you know, I mean, even though most people may

24      think, boy, there's nothing going on there all

25      year, there's a lot going on there all year.  And I

1    told him, you know, you need to get your stuff

2    done, and he didn't.  And we needed somebody that

3    knew Quicken -- or QuickBooks -- and he didn't

4    learn it, and so he kept messing around with this

5    girl and taking time, company time up with that, so

6    I just let him go.

7  Q  Okay.  But obviously he later came back, is that

8     correct?

9  A  Uh-huh.

10 Q  Okay.  Has he been fired on any other occasion by

11    the fair?

12 A  No.

13 Q  All right.  But he was -- he was having an affair

14    with one of the princess candidates or fair queen

15    candidates?

16    MR. WILL:  Objection to the form of the

17    question.  The witness can answer.

18 A  It wouldn't be an affair.  It would be a

19    relationship.

20 Q  Okay.  An inappropriate sexual relationship?

21    MR. WILL:  Objection to the form of the

22    question.  The witness can answer.

23 A  I don't know about that.  I mean...

24 Q  What were you concerned about?

25 A  Well, him getting his work done.  You can date

1    somebody in your office, but you still get your
2    work done.
3  Q  Okay.  Let's see.  Are you familiar with how Hoss
4    ceased to be employed by the fairgrounds?
5       MR. WILL:  Objection.  Asked and answered.
6    The witness can answer.
7  A  How he what?
8  Q  He ceased to be employed, how his job ended?
9       MR. WILL:  Same objection.  You can answer if
10    you know.
11  A  I didn't terminate him.
12  Q  Well, and that's what I'm getting at.  Simply what
13    do you know about it?  You were not president of
14    the fair at the time?
15  A  No.
16  Q  I'm simply asking what you know about it, how it
17    happened.
18  A  I don't know.
19  Q  All right.  Who was president at the time?
20  A  Abdul.
21  Q  All right.  Did he become president when you
22    resigned?
23  A  Uh-huh.
24  Q  Okay.  Shortly before resigning from the board, did
25    you send an e-mail to the board criticizing Hoss?

1   A   I don't know that it was criticizing Hoss.  It was
2       telling them why I was leaving and what to be aware
3       of.
4   Q   Okay.  And would this perhaps be on July 12,
5       2022 --
6   A   It could be.
7   Q   -- you sent an e-mail?  What did you tell them?
8   A   Well, that I was leaving and that, you know, I
9       enjoyed having the time and to watch the money, and
10      I wish them all well.
11  Q   Okay.  Did the letter mention Hoss?
12  A   I don't remember.  I have been looking for the
13      letter, so if you have it and would send it to my
14      attorney, I would appreciate it.
15          MR. WILL:  We have it.  We can talk about it.
16          THE WITNESS:  Okay.  I have been looking all
17      over for it.
18  Q   Okay.  But you don't recall whether or not you
19      referenced Hoss in that letter?
20  A   No, I don't.
21  Q   Okay.  Did any of the board members ever talk to
22      you and let you know, hey, we're thinking about
23      firing Hoss?
24  A   No, not really.
25  Q   Okay.  Did you suggest to anyone on the board you

1    should fire Hoss?

2  A  Oh, they knew that was my opinion.  That didn't,

3     you know...

4  Q  How did you make that opinion known to the board?

5  A  We had conversations.  You know, like when you're

6     out there -- when I was president and you're out

7     there doing something or whatever, and they're

8     talking to you about things, you know.

9  Q  So you -- who had you told that you thought Hoss

10    should be fired?

11 A  Whoever would talk to me about it, you know.  It

12    wasn't like I brought him up.  Most of them would

13    bring him up, and I would say yea or nay, whatever

14    my opinion was.

15 Q  Why didn't you fire him when you were president?

16 A  I tried, but like I said, he -- I was trying to

17    protect him from himself.  He's his own worst enemy

18    and he -- I finally learned he wasn't going to

19    listen to anybody.  He wasn't going to do what was

20    right.  He wasn't -- it was going to be his way and

21    nobody else's.

22 Q  And how did you try to fire him?

23 A  Well, I told him he was fired.  And he came over to

24    my house one day telling me, don't fire me.  Don't

25    fire me.  I gave him that letter I had.  I had

1      numerous occasions of, you know, he wanted to be --

2      in my humble opinion, he wanted to be respected and

3      was never going to get it the way he went about it.

4  Q  Are any of these attempts to fire Hoss documented?

5  A  Yeah. I just found that letter. Well, in the

6      meeting with -- that May 10 meeting -- and I'll

7      have to look to see if there's anything else. I'm

8      not sure.

9  Q  Okay. Were you aware when Hoss was terminated?

10  A  Yes.

11  Q  How did you find out?

12  A  One of the board members called me.

13  Q  Who was it that called?

14  A  Susie Day.

15  Q  What did Susie Day say about it?

16  A  She just told me that they let Hoss go.

17  Q  Was he for it or against it?

18  A  Oh, he was for it.

19  Q  Okay.

20  A  That he was going to stay on the property, I think,

21      but I didn't know anything about that.

22  Q  You mean continue to live in the lodge?

23  A  Uh-huh.

24  Q  Okay. How soon after Hoss was fired did you come

25      back to the board?

```
 1   A   I think it was late August, maybe.  I'm not
 2       absolutely certain.
 3   Q   So a few weeks?
 4   A   Yeah.  Later, yeah.
 5   Q   A month?
 6   A   Yeah.
 7   Q   Okay.  At some point, did you suggest to Hoss that
 8       he run for the City Council?
 9   A   I sure did.
10   Q   Why did you do that?
11   A   Because he was going to run for mayor.
12   Q   So you got him to run for City Council instead of
13       running for mayor?
14   A   If he was going to do something silly like that, go
15       for lower -- I mean, don't run for mayor and just
16       obliterate yourself.
17   Q   But you -- so you encouraged him to run for a City
18       Council seat?
19   A   Yes.  And contrary to popular opinion, it had
20       nothing to do with Michael-Paul Hart.
21   Q   With who?
22   A   Michael-Paul Hart, the current counselor there.
23   Q   Did you recommend a specific seat that he run for?
24   A   Michael-Paul Hart's.
25   Q   Okay.  The one that Michael-Paul Hart occupies
```

1       today?

2   A   Uh-huh.

3   Q   Would this have been -- the seat was open, though,

4       wasn't it?  It was open?

5   A   No.  Michael -- well, it's a new district that

6       Michael was in.  They just moved Michael over.

7   Q   Okay.  Did you assist Hoss in any way in running?

8   A   I tried to get him to go to GOP functions because

9       you have to know those people.

10  Q   Uh-huh.

11  A   And he went.

12  Q   So you took him to Republican Party functions and

13      introduced him around?

14  A   Uh-huh.

15  Q   Did you recommend him to other people?

16  A   Well, I never said anything about what he was

17      running for, but I introduced him.

18  Q   Okay.  I would like to talk a bit about Hoss' job

19      at the City.  At some point in the late summer of

20      2022, did you suspend or attempt to terminate Hoss

21      from his job at Voter Registration?

22  A   Yes, I did.

23  Q   Okay.  Tell me what happened.

24  A   What period of time of this?

25  Q   The summer of 2022, probably around the time of the

1    fair.

2  A  Okay.  You have to have preapproved leave.  You

3     can't just take off.  He had preapproved leave the

4     week before the fair and the week of the fair.  He

5     did not have preapproved leave for the week after

6     the fair.  He came in on that weekend and signed

7     his name out on our -- we have an out board -- like

8     he had been preapproved.  No.  You're here because

9     we're counting on you.  And he had done other

10    things like that, and that's what it was.

11 Q  Okay.  Did Hoss notify Michele Cash, the deputy

12    director, that and ask her permission?

13 A  He could have, but Michele didn't approve time off,

14    and he knew that too.

15 Q  You mean she didn't have the authority?

16 A  That's right.

17 Q  Okay.  So what happened when he didn't show up?

18 A  Well, I told him he needed to come in the office,

19    but once again, no answer, no response.  He didn't

20    have to answer to people.  And I told HR, and

21    that's, you know, the rest.

22 Q  What did HR tell you?

23 A  Well, they didn't understand why he just came and

24    went as he pleased.  None of us did.

25 Q  All right.  Did they consider them to be no call,

1    no show, given that he had contacted the chief

2    deputy?

3  A  They were going through transition as well up

4    there, and I don't know what they thought.

5  Q  Okay.  Did they allow you to fire him?

6  A  No.

7         MR. WILL:  I want to object to the form of the

8    question.  You can go ahead and answer.

9  A  No, they didn't.

10  Q  Okay.  What did they tell you instead?

11  A  I don't remember, and I'm not even sure I suspended

12    him at that time.  I'm not sure.

13  Q  Okay.  So you wound up suspending him, is that

14    correct?

15  A  I'm not sure, but I think so.

16  Q  Okay.  Do you know if Hoss was ultimately paid for

17    that suspension?

18  A  Probably.

19  Q  In the course of working with human resources, did

20    you tell Hoss that you -- excuse me -- tell HR that

21    Hoss had recently accused you of sexual harassment?

22  A  I don't remember, but I know that I accused him.

23  Q  You accused Hoss of sexual harassment?

24  A  I sure did.

25  Q  How do you believe that Hoss sexually harassed you?

1    A    And I've got it in a memo somewhere.  He was

2         sitting in my office, as he typically did, and we

3         were just talking about things.  And then he said

4         something about -- it's like women with big titties

5         and no teeth.  And I said -- I looked at him and I

6         said, get out of my office.  And he said, no.  And

7         I said, I said get out of my office.  He goes, I

8         was talking about her, pointed toward LaDonna's

9         office.  And I said, I don't care.  Get out of my

10        office.

11   Q    So you're just --

12   A    And I let it go when I should have had -- had I

13        known we were going to do this, I would have

14        brought it up.

15   Q    So Hoss is in your office and just suddenly says --

16   A    We were just talking.

17   Q    He likes women with big titties and no teeth?

18   A    I don't know if he said he did, but that's what he

19        said was --

20   Q    Uh-huh.  Just made a reference to big titties and

21        no teeth?

22   A    Uh-huh.

23   Q    Okay.

24   A    I don't talk that way.

25   Q    Uh-huh.  What led up to this remark?

1  A  We were just having a conversation about anything,

2     you know, and I don't know if we were having a

3     conversation about -- I don't really know why --

4     what conversation we were having.  I'll have to

5     look at that memo again.

6  Q  So you described this incident in the memo?

7  A  Yeah.  I wrote it down because I thought, you know,

8     at that point, he was getting to be kind of a

9     handful.

10 Q  Uh-huh.  Have you provided that memo to your

11    attorneys so they can serve it in discovery?

12 A  I'm sure you guys have it.  Yeah.  It's probably --

13    John probably --

14        MR. LOWREY:  Yeah.  I'm pretty sure that we

15    have provided that to you.

16        MR. McQUARY:  Okay.

17        MR. LOWREY:  But I can double check.

18 A  And that particular comment is at the bottom of the

19    page.

20 Q  But you chose not to discipline Hoss for saying

21    that?

22 A  That's right.

23 Q  Okay.  Did Hoss return to work?

24 A  Yeah.

25 Q  Okay.  Do you know if HR investigated Hoss'

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | allegation that you had sexually harassed him?           |
| 2  | A | Yes, they did.                                           |
| 3  | Q | Did they interview you as part of that?                  |
| 4  | A | Yes.                                                     |
| 5  | Q | Do you know if they interviewed Hoss?                    |
| 6  | A | I'm sure.                                                |
| 7  | Q | All right.  But you don't know -- I mean,                |
| 8  |   | obviously, you weren't part of that interview?           |
| 9  | A | No.                                                      |
| 10 | Q | Okay.  Do you know if they interviewed anyone            |
| 11 |   | besides you or Hoss?                                     |
| 12 | A | Uh-huh.                                                  |
| 13 | Q | Who else did they interview?                             |
| 14 | A | There was an -- well, no.  I don't know who they         |
| 15 |   | interviewed.  I know there was an interviewer or --      |
| 16 |   | the lady, Adriana Burrows or something.                  |
| 17 | Q | Burgos?                                                  |
| 18 | A | Yeah.  And then there was the lady at Taft.              |
| 19 | Q | Okay.  Did HR place any restrictions on your -- on       |
| 20 |   | you after this accusation such as where you could        |
| 21 |   | work and how you might communicate with Hoss?            |
| 22 | A | Well, I had to take a sexual harassment class.           |
| 23 |   | There were a couple things that I did, but that          |
| 24 |   | was, you know, it.                                       |
| 25 | Q | Okay.  Did they have you working remotely for a          |

1    while?

2  A  No.  I mean, we when were working remotely was

3     because of COVID-19.

4  Q  Okay.  Did they tell you to communicate with Hoss

5     via e-mail?

6  A  I don't recall.

7  Q  Do you recall any of the restrictions they placed

8     on you?

9  A  Not really, but I would have followed them.

10 Q  Uh-huh.  Let's go to October 11, 2022.  Did Hoss

11    ask you for permission to take an extended lunch

12    hour that day?

13 A  No.

14 Q  Did he ask for any kind of time off?

15 A  On a Sunday, he sent me a note, told me he needed

16    to take some time off in the morning or something.

17    And I said, this is the last day before -- I mean,

18    this is the last day of voter registration.  Nobody

19    takes time off, nobody.  They get their lunch, and

20    they bring it back because we're covered up.  And,

21    of course, he sent it on a Sunday, and I told him I

22    had -- unfortunately, I'm not -- I can't approve

23    that.  And I said, here's -- you know why, da, da

24    da.  The next thing I know he's complaining that

25    he's being denied all this stuff when everybody

1       else was there working there because it was the

2       last day before voter registration.

3   Q   So on that day, employees aren't allowed to leave

4       for lunch?

5   A   It's just kind of an unwritten rule where we all --

6       you know, if we're going to have lunch, we normally

7       just bring it in, and we're there just in case

8       there's a flood because, you know, people are

9       trying to get in to get their registration in.

10  Q   Uh-huh.  To your knowledge, did anyone not take a

11      lunch hour other than just to go get something and

12      bring it back that day?

13  A   No.  Everybody was there.

14  Q   Okay.  Do you know what time Hoss reported for work

15      on October 11?

16  A   I'm not sure.

17  Q   If I were to tell you that Hoss says he came to

18      work at about 6:30 that morning, 6:30 a.m., would

19      you have any reason to say that's wrong?

20          MR. WILL:  Objection.  Form.  Witness can

21      answer.

22  A   Yeah, I would.

23  Q   Were you there at 6:30, and you could say, no, I

24      know I didn't see him at that time?

25  A   No.

1   Q  Okay.  How do you know he wasn't there then?

2   A  Because he had been caught in so many untruths that

3      we couldn't believe anything he said.

4   Q  Okay.  When did you believe he reported for duty on

5      October 11, 2022?

6   A  I'm not sure.  I'm sure that probably he told City

7      HR something, but I don't know.

8   Q  Did you ever ask anyone, hey, when did you first

9      see Hoss today?

10   A  Yeah, I think that we did.  I think that there is a

11      notation in the file, but I don't recall what it

12      is.

13   Q  How did you become aware that Hoss -- well, do you

14      know when he left for --

15   A  Yeah.

16   Q  What time did he leave?

17   A  About 9:30.

18   Q  Okay.  How did you realize that?

19   A  He walked right by my office with his backpack on.

20   Q  Okay.  Did you say anything to him or he to you?

21   A  No, because I couldn't believe anybody would

22      have -- would do that.

23   Q  Did you know where he was going?

24   A  No.

25   Q  Okay.  What time did Hoss return to the office on

1    the 11th?

2  A  I'm not 100 percent sure.  I don't know.

3  Q  Okay.  If I told you that Hoss says he returned

4     midmorning, would you have any reason to dispute

5     that?

6         MR. WILL:  Object as to form.  The witness can

7     answer.

8  A  I don't know that he did.  I don't recall that.  I

9     think, you know...

10 Q  How do you know that?

11 A  I didn't say that I knew it.  I said I don't think

12    that he did.

13 Q  Okay.  What makes you think that he didn't?

14 A  Because it seemed to me like it was an hour and a

15    half to two hours that we were talking about in the

16    office and what to do.

17 Q  Okay.  What did you do when he returned?

18 A  I don't think I said anything at first.

19 Q  How quickly did you say something?

20 A  I don't remember.

21 Q  Okay.  Did you have a meeting with Hoss and Michele

22    Cash and yourself in your office that morning?

23 A  I don't recall if it was that morning, but I think

24    it was --

25 Q  Or that day?

| | | |
|---|---|---|
| 1 | A | Yeah, I think it was. |
| 2 | Q | Okay.  What happened at that meeting? |
| 3 | A | I let him go. |
| 4 | Q | Did you say that to him yourself, or did Michele |
| 5 | | Cash say that? |
| 6 | A | I said that. |
| 7 | Q | Okay.  Did you give him any document, you know, |
| 8 | | like a paper that says you're fired? |
| 9 | A | Uh-huh. |
| 10 | Q | Okay.  Did you write that yourself? |
| 11 | A | Uh-huh. |
| 12 | Q | Okay.  Did you tell human resources that Hoss had |
| 13 | | come back that day? |
| 14 | A | Uh-huh.  They knew.  They knew before it happened. |
| 15 | Q | How did they know? |
| 16 | A | Because I told them. |
| 17 | Q | How did you know it happened before it happened? |
| 18 | A | Well, I told you that he left. |
| 19 | Q | Uh-huh. |
| 20 | A | And I told him not to leave. |
| 21 | Q | Uh-huh. |
| 22 | A | So they knew there was a problem already. |
| 23 | Q | Okay.  So as soon as he left, you went upstairs to |
| 24 | | human resources and -- |
| 25 | A | We just talked on the phone. |

1  Q  Okay.

2  A  I have to look at the file to refresh my memory

3     but, yeah, I'm pretty sure.

4  Q  Okay.  Did Hoss give an explanation for his

5     absence?

6  A  No.

7  Q  Okay.  Was he given an opportunity to speak?

8  A  Oh, yeah.

9  Q  Did he say, I was just taking my lunch hour; I

10    already worked two hours today?

11 A  No.

12        MR. McQUARY:  All right.  Well, I only have

13    documents to show you at this point.  Why don't we

14    take a break.

15        MR. WILL:  Do you want to take a lunch break?

16        MR. McQUARY:  Yeah.  What time is it?

17        MR. WILL:  It's 5 to 1.

18        MR. McQUARY:  Okay.  Is 30 minutes enough?

19        MR. WILL:  That's fine.

20        MR. LOWREY:  Fine with me.

21        MR. McQUARY:  Why don't we say 1:30?  We'll

22    make it an even 1:30.

23        MR. LOWREY:  Also, Jeff, the memo she was

24    referencing, I think it was provided in response to

25    RFP 5.

1    MR. McQUARY:  Okay.  Great.

2        (The deposition recessed from 12:54 p.m. to

3    1:39 p.m. for lunch.)

4  Q  Ms. Mowery, I have some documents I would like to

5    show you.

6        I would like to have this marked as Exhibit 1.

7        (Exhibit 1 was marked for identification.)

8    Ms. Mowery, do you recognize Exhibit 1?

9  A  Uh-huh.

10  Q  Are these text messages between you and Hoss?

11  A  Uh-huh.

12        MR. WILL:  Take a look at them all the way

13    through if you want to.

14  A  Okay.

15  Q  All right.  Do you recognize these as text messages

16    between yourself and --

17  A  Uh-huh.

18        MR. WILL:  The whole document?

19        MR. McQUARY:  So let's use the second part

20    starting here, and I will make this Exhibit 2.

21        (Exhibit 2 was marked for identification.)

22        MR. WILL:  Okay.  So the first three pages are

23    what you've handed to the witness --

24        MR. McQUARY:  Yes.

25        MR. WILL:  And the last two are Exhibit 2,

1    fair?

2         MR. McQUARY:  Yes.

3         MR. WILL:  Okay.

4  Q  Do you recognize Exhibit 1?

5  A  Uh-huh.

6  Q  All right.  What is Exhibit 1?

7  A  Just text between me and Hoss looking for a

8     handyman or...

9  Q  Okay.  So if you see at the top where it says,

10    "Hoss, I need a handyman, do you know anyone,"

11    would you agree that you initiated the discussion

12    about the handyman?

13 A  Yeah, on that day.

14 Q  Okay.  Well, before that was Hoss recommending the

15    Banueloses?

16 A  I don't know the Banueloses.

17 Q  Okay.  So you're looking for someone to --

18 A  To do some work around my house.

19 Q  Hang living room fans, put up a screen door, new

20    lights in the bathroom, and you also want your

21    house painted?

22 A  Uh-huh.

23 Q  Okay.

24 A  My house, though, is half to two-thirds stone.

25    It's not all -- so it's not like we're looking

1    at --

2  Q  It doesn't all need to be painted?

3  A  Yeah.

4  Q  Okay.  It looks like you're also asking for hanging

5     a TV and rearranging your furniture?

6  A  Uh-huh.

7  Q  You need some big guys to do that?

8  A  Uh-huh.

9  Q  All right.  And that seems to be dated

10    September 21, it looks like.  The date is a little

11    bit covered up, but it looks to me like Tuesday,

12    September 21.  Is that a yes?

13         MR. WILL:  Well --

14         MR. McQUARY:  On the first page.

15         MR. WILL:  Right, but it's unclear on this

16    text what the date stamp applies to, what comes

17    after, right?  It's unclear what --

18 Q  Okay.

19         MR. McQUARY:  I'm thinking before.

20         MR. WILL:  Fair.

21 Q  Do you agree with that, Ms. Mowery?

22 A  Yeah.

23 Q  Okay.  And then on the next page under the date,

24    Monday, November 8, it looks like you texted -- is

25    that you or Hoss who texted "painters on the way

1      over to work"?  Is that from Hoss?

2   A  Yeah.

3   Q  All right.  And if you go to the third page under

4      the date, Friday November 3, did you text, "The

5      painting people asked to be paid today."?

6          MR. WILL:  I'm sorry.  You said Friday,

7      November 3?

8          MR. McQUARY:  I mean November 12.

9          MR. WILL:  Okay.  Just to clarify.

10  Q  On the third page.  "The painting people asked to

11     be paid today.  Can you pay them today?"

12  A  Yeah, I sent that.

13  Q  Okay.  And then Hoss asked, "Yes.  Are they done?"

14     And you say that, "They will be.  I told them to

15     see you for payment.  I think they're finishing up

16     the lodge today too."

17  A  Uh-huh.

18  Q  "Who is going to sign their check?"

19  A  Uh-huh.

20  Q  Why did you ask Hoss to pay the people painting,

21     doing work on your personal house?

22  A  We were talking about the lodge too.

23  Q  Okay.

24  A  We're talking about painting in general.  And, I

25     mean, I gave him cash.  I took the cash over there,

1    so he requires two signatures on a check.  He

2    cannot sign a fair check, so that's why I'm saying

3    who is going to sign the check?  Did he call Susie

4    over there?  Did he call Mike Dilk over there?  Who

5    was coming?

6  Q  Okay.  So your contention is that this -- the

7    question you asked, the painting people asked to be

8    paid today, can you pay them, you're not referring

9    to a payment at your own house?

10 A  They were talking about everything, to me.  There

11   was -- I had no idea what any of the agreements

12   were.

13 Q  Uh-huh.

14 A  He did.

15 Q  So Hoss made all the arrangements with the

16   painters?

17 A  Everything.

18 Q  To paint your house?

19 A  Everything.

20 Q  Along with fairgrounds property?

21 A  Yes.

22 Q  Okay.

23 A  And that's pretty typical.

24 Q  All right.  And you're saying that you brought Hoss

25   cash --

1  A  Yes.

2  Q  -- to compensate the fairgrounds for the share of

3     the painting work that was to your personal

4     property?

5  A  That's exactly right, and I put it -- I handed it

6     to him, and he was standing outside yelling at

7     somebody, and I just put it in his hand, and I

8     left.

9  Q  What did you expect Hoss to do with the cash?

10 A  To pay them.

11 Q  To pay who?

12 A  The painters.

13 Q  Well, they already got a check, didn't they?

14 A  I didn't know.  I figured he was -- I didn't know

15     what the deal was.  I didn't know if he was paying

16     him a check.  He still had to pay for the lodge.

17     I didn't know what their deal was.  He cut that

18     deal.  I don't even know where those people came

19     from.

20 Q  So you're telling me that Hoss arranged completely

21     to pay for the painters simultaneously for work on

22     the fairgrounds and at your personal residence?

23        MR. WILL:  Objection.  That is not what she

24     testified to.  That misstates her testimony.  She

25     said she didn't know.

1    MR. McQUARY:  Let her testify what she said.

2  Q  Ma'am, if I misstated that, please correct me.

3  A  I did not say pay simultaneously.  I don't know

4     when he paid them.  I got no idea when he paid for

5     mine.  I'm assuming he gave them the cash and then

6     wrote -- had the fair people come over -- but I

7     didn't sign the check that they showed me.

8  Q  Okay.  So it's your understanding that Hoss

9     arranged to pay the Banuelos workers for both work

10    done on the fairgrounds and work done on your

11    house?

12    MR. WILL:  Objection.  Form.

13 A  He always did that.

14 Q  He always did that?

15 A  If we had something done somewhere or some -- he

16    always took care of all that.

17 Q  But if some kind of maintenance needed to be done

18    to fairgrounds property, would he have the same

19    people do maintenance to your house or other board

20    members' personal property?

21 A  If I needed it, he would say, hey, Cindy, these

22    people do whatever, and you might check with them.

23 Q  But would he pay for the work to the personal

24    residence out of fairgrounds property?

25 A  No, not out of fairgrounds money.  I always paid

1   for it.

2  Q  By reimbursing --

3  A  I don't know how he did it.

4  Q  -- bringing cash to Hoss or by paying the workers

5   directly out of your own -- with your own personal

6   check?

7  A  He would tell me just to give it to him, and he

8   would give it to them.

9  Q  So this happened more than once?

10  A  Probably.

11  Q  Okay.  All right.  Let's turn to Exhibit 2, the

12   first -- can you identify what's on the first page

13   of Exhibit 2?

14  A  I sent him an e-mail and told him we needed to

15   discuss something.

16  Q  Do you know what it was you needed to discuss?

17  A  Let me look at it.  Probably where he signed my

18   name on this.

19  Q  Did you instruct Hoss to sign that check?

20  A  No.  No, I did not.

21  Q  Did he have your permission to sign the check?

22  A  No.  No, he did not.  And you cannot, with a fair

23   check, just use one signature.  It has to be two.

24  Q  That's a fair board rule?

25  A  Yes.

1  Q  Why would Hoss go and pay the Banueloses for your

2     house with a -- work on your house with a

3     fairgrounds check?

4  A  First off, I don't know if this is for my house,

5     and, secondly, I got no idea who it's for.  And I

6     don't know why he would pay or sign my name.

7  Q  All right.

8  A  He had no authority to sign my name on anything.

9  Q  You don't know who Maria Banuelos is?

10 A  Do I know who she is?

11 Q  Yes, ma'am.

12 A  No.  I mean, I know she's a painter, but I wouldn't

13    know her if she stood up here.

14 Q  Do you know her to be the person who did work on

15    your house?

16 A  Yes.

17 Q  Why would Hoss make a fairgrounds check to Maria

18    Banuelos without your permission if you didn't

19    instruct him to?

20         MR. WILL:  Objection.  Calls for speculation.

21    Witness can answer.

22 A  You need to ask him.  I don't know.

23 Q  All right.

24 A  There are a number of these checks out where he has

25    signed my name on checks to various people.

```
 1   Q   Without your permission?

 2   A   That's right.

 3   Q   Okay.  What other checks can you think of?

 4   A   Well, there are several.

 5   Q   Can you tell me?

 6   A   No, I don't have them, but, you know...

 7   Q   Perhaps not precise details, but can you at least

 8       say who they went to?

 9   A   I don't know.  Some of them don't even have who

10       they went to.

11   Q   All right.  Okay.

12           Could you mark this as Exhibit 3?

13           (Exhibit 3 was marked for identification.)

14   Q   Ma'am, do you --

15           MR. WILL:  Excuse me.  I'm sorry.  Do you

16       have --

17           MR. McQUARY:  Did you not get one?

18           MR. LOWREY:  Here.  I can share.

19           MR. McQUARY:  He might be missing this page.

20           MR. WILL:  Okay.  Thank you.

21   Q   Ma'am, do you recognize Exhibit 3?

22   A   Not really.

23   Q   My client believes this is an e-mail you sent to

24       him from your work account at Voter Registration.

25   A   Uh-uh.  We don't use Gmail.
```

1    Q   If you look a little bit below where it says Gmail,

2        do you see your name in bold type?

3    A   Yeah.  And I see at indy.gov, but that doesn't mean

4        I sent this.

5    Q   Do you recognize these words?

6    A   No.

7    Q   Okay.  Did you ever inform Hoss that he had a new

8        password on his Outlook account?

9    A   I don't recall.

10   Q   Okay.

11   A   The second one looks familiar to me but not this

12       first one.

13   Q   Okay.  All right.  Just regarding the first page,

14       if Hoss were to tell you that or testify that you

15       told him he had a new password on his Outlook

16       account, would you have any reason to dispute that?

17   A   I guess not.  I mean, I don't know why I would tell

18       him.  That would come from ISA.  If it came from

19       the City, they wouldn't give me his.

20   Q   Could it be because when you attempted to have him

21       fired, his password was removed, his access was

22       denied?

23           MR. LOWREY:  Objection.  Calls for

24       speculation.

25   Q   You can answer that if you know.

1   A   I don't know.

2   Q   All right.  Let's look at the second page.  I know

3       you testified that you did recognize that.

4   A   Uh-huh.

5   Q   What is this?  What is the second page?

6   A   Where he's got an unacceptable performance.

7   Q   Okay.  Was that regarding his --

8   A   Uh-huh.

9   Q   -- his absence?

10  A   Uh-huh.

11  Q   -- after the fair?

12  A   Uh-huh.

13  Q   Okay.  I don't have any more questions about that.

14              (Exhibit 4 was marked for identification.)

15              The court reporter is going to hand you what

16      has been marked as Exhibit 4.  Do you recognize

17      Exhibit 4?

18  A   Uh-huh.

19  Q   Okay.  What is Exhibit 4?

20  A   This is from me going around talking to each of the

21      board members, as I had mentioned earlier.

22  Q   Okay.  And this is the letter that you wrote around

23      the time you resigned from the fair board?

24  A   Uh-huh.  Well, it was probably the evening that I

25      met and talked to all the board members.  I would

1    do that at least once a day and capture their

2    thoughts.

3  Q  Looking at the -- so this is dated July 12.  Did

4    you resign around July 12, 2022?

5  A  I'm not sure what the date was.

6  Q  Okay.  And on the first page, the final sentence

7    says, "I don't see how you can possibly meet to

8    discuss this year's fair without addressing the

9    issues with Hoss."  Do you see that?

10 A  Uh-huh.

11 Q  What are the issues with Hoss that you had in mind?

12 A  Well, they're all listed in here.

13 Q  Okay.  So do you believe all of these problems were

14    caused by Hoss?

15 A  I just -- he was involved with many of them, yes.

16 Q  Okay.  Did you talk to every board member about

17    this?

18 A  Oh, yeah.  I mean, we're all at the fair and having

19    conversations.  This one looks like it's from '22,

20    maybe.

21 Q  Yes, this is regarding the fair that occurred in

22    the summer of 2022, isn't it?

23 A  Uh-huh.

24 Q  Okay.  So I'm just going to pick one.  "The

25    fairgrounds had lots of weeds.  It was quite

1    embarrassing when Congressman Pence had his picture

2    taken by our sign on Troy and posted it to

3    Facebook.  Is that the image we all strive for?

4    There were weeds all over the grounds and in

5    particular the stream by the park stage.  When I

6    inquired with him about it, he became enraged and

7    said I was just picking on him."

8         I assume that "him" is Hoss?

9   A  Uh-huh.

10  Q  Okay.  Do you believe it was his fault that there

11     were -- the fairgrounds had weeds?

12  A  Yes.

13  Q  How so?

14  A  He was taking -- he was in charge of the fair.  He

15     was to make sure the grounds were done and

16     everything.

17  Q  Okay.  Had anyone -- had you told him before that

18     that, hey, there are a lot of weeds, and those need

19     to be fixed?

20  A  Yes.

21  Q  Is there any documentation that you discussed the

22     problem of weeds with Hoss?

23  A  I do not know.

24  Q  Have any of the problems you identify in this

25     letter been addressed with Hoss in any kind of

1    meeting where a progressive discipline was applied?

2  A  This would have been part of the issue after that

3     May meeting.  I mean, he knew.  He was fully aware

4     of all this.  We talked to him about the May

5     meeting, these things.  None of this is new.

6  Q  Okay.  Let me make sure I understand.  These issues

7     or most of these issues were discussed at the

8     May 10 meeting?

9  A  He knew he wasn't doing things.  In fact, one of

10    the secretaries, Ashley Ort, told me he was never

11    there, said he never came to work, said that he was

12    paying her husband to mow the grass when we were

13    paying him.

14 Q  Okay.  The final sentence of the letter is, "Hoss

15    has done a lot of positive things for the fair, but

16    unfortunately his issues far outweigh any good that

17    he's done.  I trust that you will do the right

18    thing, whatever that may be."

19 A  Uh-huh.

20 Q  What did you consider the right thing to do?

21 A  Whatever they decided.

22 Q  Okay.  Did you want them to fire Hoss?

23 A  I didn't say that.

24 Q  That's what you wanted?

25       MR. WILL:  Objection as to form.  The witness

1    can answer.

2  A  I didn't say that.

3  Q  Yes, but my question is, what did you want them to

4     do?

5        MR. WILL:  Objection as to form.  You can

6     answer.

7  A  Whatever they wanted to do.

8  Q  Go ahead.

9        MR. WILL:  You can answer.

10 A  Whatever they decided to do.  They're all good,

11    competent people.

12       (Exhibit 5 was marked for identification.)

13 Q  Ms. Mowery, do you recognize Exhibit 5?

14 A  No.

15 Q  Okay.  If you look to the second page, does that

16    help?

17 A  No.

18 Q  Okay.  I'm going to represent to you that Hoss

19    believes he sent you a resignation letter on

20    October 3, 2020.  Do you have any recollection of

21    that?

22 A  No.

23 Q  Okay.  Did Hoss ever tell you that he wanted to

24    quit or might quit?

25 A  No, because I wasn't president then.

1   Q  Okay.

2   A  Wait a minute.  Yeah.  Yeah.  He did send this to

3      me, that's right.

4   Q  Okay.  When you mentioned this before, you said

5      that you might have fired him, could this be what

6      you're talking about, or was that something else?

7   A  This is another deal where he knew he was going to

8      get fired.

9   Q  Did Hoss, in fact, resign?

10   A  No.  He stayed.

11   Q  How did he wind up staying?

12   A  We talked about it, and I said, you know, it's got

13      to improve.

14   Q  Was there anything in particular that you thought

15      needed improvement, anything specific?

16   A  Do his job.

17        (Exhibit 6 was marked for identification.)

18   Q  Okay.  All right.  Ms. Mowery, you have been handed

19      what has been marked as Exhibit 6.

20   A  Uh-huh.

21   Q  Do you recognize Exhibit 6, which includes the

22      letter on page 2?

23   A  Uh-huh.

24   Q  What is Exhibit 6?

25   A  It's a reference, kind of -- or it's trying to help

1      him get his expungement.

2  Q  Okay.  So -- and what was it that needed to be

3      expunged?

4  A  Oh, he had a boatload of cases.

5  Q  Okay.

6  A  I mean, a boatload.

7  Q  All right.  I want to refer you to the second --

8      excuse me -- the third paragraph of that letter.

9  A  Uh-huh.

10 Q  "I learned of Mr. Tevebaugh's past from him.  We

11     had a lengthy conversation regarding it as well as

12     my expectations of him as an employee."

13 A  Uh-huh.

14 Q  So did Mr. Tevebaugh tell you about the felony

15     convictions?

16 A  He must have.  I didn't recall it.

17 Q  Okay.  Is it possible he also told you that he

18     didn't attend -- or didn't receive a bachelor's

19     degree and a master's degree from Indiana Wesleyan

20     University?

21 A  No, because he said he got a free ride.  And I'm a

22     graduate of IWU, and I thought a free ride, that's

23     pretty good.  But he said he got the free ride

24     because his family was so terrible.

25 Q  Well, it's one thing to get a scholarship and

1   another thing to actually graduate?

2  A  Uh-huh.  Oh, no.  He had two masters'.  We even

3     talked about it at our VIP dinner where his aunts

4     were and their friends.

5  Q  Okay.  So you don't recall him mentioning that he

6     had multiple felonies, but you're sure that he --

7     that when he came clean about the felonies, he

8     never told you he didn't actually have a graduate

9     degree?

10 A  Uh-uh.

11        (Exhibit 7 was marked for identification.)

12 Q  All right.  Ms. Mowery, you have just been handed

13    what's been marked as Exhibit 7.  Do you recognize

14    Exhibit 7?  I should tell you, like everything

15    that's been marked with these numbers at the

16    bottom, this came to me from your attorney in

17    response to a discovery request.

18 A  Okay.

19 Q  Do you recognize Exhibit 7?

20 A  Uh-huh.

21 Q  What is Exhibit 7?

22 A  It's a memo that I put together -- or, actually,

23    not a memo -- but it's just thoughts I had about

24    Hoss.

25 Q  And for whom did you make this memo?

```
 1   A   A lot of times I will make them for my own file.
 2   Q   Okay.  Is it possible that you gave this to HR at
 3       the City of Indianapolis?
 4   A   Not until later.
 5   Q   So you wrote it and then sometime later gave it to
 6       HR?
 7   A   I do that with a lot of situations that occur.
 8   Q   Okay.  When do you think you first wrote it?  I'm
 9       not looking for a precise day.  You can say spring
10       of 2019 or something like that.
11   A   Well, it says 7/25/22.
12   Q   Okay.  Well, obviously, you're quite a bit more
13       perceptive than I am.  So you wrote this on July
14       25, 2022?
15   A   Uh-huh.
16   Q   And then would you have given it to HR at about
17       that time?
18   A   I think when he filed sexual harassment claims or
19       whatever I might have given it to him then.
20   Q   Okay.  I'd like you to look at the
21       third-to-the-last paragraph on page 1.
22   A   Uh-huh.
23   Q   "One of the fair board members met with me and
24       accused him of sexual harassment.  I talked with
25       him about it, gave him info on sexual harassment,
```

1    and warned him that he would be terminated if he

2    did it again.  She did not want to pursue things

3    any further as she was afraid of him."

4  A  That's right.

5  Q  Okay.  Who accused Hoss of sexual harassment?

6         THE WITNESS:  Am I allowed to --

7         MR. WILL:  You have to answer the question.

8  A  Suzanne McVeigh.

9  Q  And she's a board member?

10 A  She was.

11 Q  Was --

12 A  She left to get away from him.

13 Q  Okay.  Did she say what Hoss did to --

14 A  No.

15 Q  Okay.  She didn't even tell you?

16 A  I don't recall.

17 Q  Did you document this anywhere?

18 A  Well, it's here, and I -- it's probably somewhere

19    in one of my fair files.

20 Q  Okay.  Has that file been turned over to your

21    attorneys?

22 A  I don't know.

23 Q  Could you please give that to them?

24        THE WITNESS:  I think you talked to them,

25    haven't you?

1        MR. WILL:  I don't have any records that I

2     could provide, so if there are other records out

3     there, we can follow up and provide them.

4        THE WITNESS:  I think you talked to her one

5     day on the phone.

6        MR. WILL:  I don't have any records.

7  Q  I just want to be clear.  You say you gave this to

8     the City of Indianapolis human resources, correct?

9  A  Right.  When this went -- I mean, this whole

10    document went to them.

11  Q  Okay.  But if he harassed a fair board member,

12    obviously, that's a fair issue that --

13  A  Right.

14  Q  -- City HR would not have any control over?

15  A  Right.  I had a young girl come in from my Voter

16    Registration office too.  She was new, and she told

17    me that she had some -- she was scared of Hoss, and

18    he had made some statements to her and all that

19    kind of stuff.  And I said, like, what are you

20    talking about?  And she said, well, just kind of

21    sexual harassment.  And I said, well, like what

22    kind of things were said?  So she said, well, you

23    know -- and I said, do you want me to talk to him?

24    And she said, no.  And I said, well, then how are

25    we going to resolve it?  She said, well, I don't

1    know.  I just want you to know.  And we talked

2    about it, and I said, you know, sexual harassment

3    is a serious offense, so you need to let me know

4    what you want to do.

5  Q  Okay.  I would like you to look at the

6    second-to-last paragraph.  "It should also be noted

7    that at no time did Jeremiah ever say I was

8    harassing him or sending him harassing texts nor

9    did he ever ask me to quit sending whatever he

10   found offensive."

11 A  Right.

12 Q  Do you believe that statement to be accurate?

13 A  Yes, I do.

14 Q  The very last sentence says, "I must admit that I'm

15   hurt and quite surprised that he would file any

16   type of claim against me."  Was that -- by claim,

17   do you mean the accusation --

18 A  Uh-huh.

19 Q  -- that he made to the City HR?

20 A  To any of this.

21        (Exhibit 8 was marked for identification.)

22 Q  You have been handed what's marked as Exhibit 8.

23 A  Uh-huh.

24 Q  Do you recognize Exhibit 8?

25 A  Uh-huh.

1    Q    What is Exhibit 8?

2    A    It's a misconduct policy.

3    Q    Is this what you were referring to when you --

4    A    Yes.

5    Q    -- testified that Hoss was given something at the

6         May 10 meeting?

7    A    Yes.

8    Q    This is what he was given?

9    A    (Nodding.)

10   Q    Okay.  Does this summarize or describe any actions

11        that Hoss took or any of his behavior?

12   A    No.  I think I told you that sexual harassment

13        wasn't part of the issue that we had with him.  No

14        one cared if he had ten girlfriends, you know, or

15        whatever.  It didn't -- we all kidded around and

16        had fun but it was -- this was not -- this page is

17        what we told John Sturgill this was not

18        appropriate.  It needed to be taken out, and John

19        said, I'll have it -- I'll edit it and take it out.

20   Q    Okay.  So was Hoss given anything at the May 10

21        meeting that describes what he did wrong?

22   A    Yeah.  He was given this document, I think.  And

23        then I think we had notes, and we talked to him

24        about how he talked to people and vendors and board

25        members and stuff like that.

1   Q   But did he get anything in writing that says you
2       did this wrong?
3   A   I don't remember.  Do you put all this stuff in
4       writing for yourself?
5   Q   Well, I'm very lucky not to have had to fire many
6       employees, but when I have, yes.
7   A   Okay.
8   Q   Do you not put it in writing?
9   A   For the most part, but, I mean, every little
10      detail --
11  Q   Well, there are no details whatsoever in this that
12      I can see.
13  A   Okay.
14  Q   Can you point to me anything in this document that
15      describes how Hoss was doing his job poorly or
16      inappropriately?
17  A   Hoss knows, and he also knows it's a disciplinary
18      action out there.
19  Q   But there's nothing talking about it in Exhibit 8,
20      is there?
21  A   I don't know.
22          (Exhibit 9 was marked for identification.)
23  Q   Ms. Mowery, do you recognize Exhibit 9?
24  A   Uh-huh.
25  Q   What is Exhibit 9?

1   A   It's an executive director project description.  I
2       mean job description.
3   Q   Okay.  Is this something that was discussed by the
4       fair board of directors?
5   A   Uh-huh.
6   Q   Okay.  And the executive committee is a committee
7       of the board?
8   A   Uh-huh.
9   Q   Okay.  Do you know what the black square at the top
10      of the page is?
11  A   Probably just where it was --
12          MR. WILL:  I'll tell you that's a redaction.
13          MR. McQUARY:  Who made the redaction?
14          MR. WILL:  We did.  That's an e-mail to
15      counsel, so we redacted the e-mail to counsel.
16          MR. McQUARY:  Okay.
17  Q   I want to give you -- actually, before you turn to
18      this, so it said that Hoss has asked for a job
19      description.  Was there no job description before?
20  A   No.
21  Q   Okay.  How would Hoss learn what his job duties
22      are?
23  A   That's what we were trying to do.
24  Q   Okay.  How did he do it?  I mean, as a practical
25      matter when there was no job description, who told

```
 1      him --
 2   A  We had a list of things he needed to do, and so he
 3      just did them as we went along.
 4   Q  Okay.  Did you know if the board approved the
 5      document that we see in the rest of the other
 6      pages?
 7   A  No.  We were waiting on him to return it, and he
 8      never did.
 9   Q  Okay.  So this never got --
10   A  Right.
11   Q  This never got approved?
12   A  Right.
13          (Exhibit 10 was marked for identification.)
14   Q  Ms. Mowery, do you recognize Exhibit 10?
15   A  Uh-huh.
16   Q  Could you speak your answer out loud for the court
17      reporter?
18          MR. WILL:  The "uh-huh" doesn't come across
19      very well.
20   A  Yes.
21   Q  All right.  What is Exhibit 10?
22   A  It's the request for a protective order.
23   Q  Against Hoss to you?
24   A  Yes.
25   Q  On page 8 -- excuse me -- page 3, under item 8, if
```

1    you look about a little more than halfway down, one

2    of the descriptions of the incident is, "Called my

3    direct boss and made many untrue statements."  Who

4    did Hoss call?

5  A  Joe Elsener.

6  Q  What did he tell Joe Elsener?

7  A  Oh, I don't know.  I wasn't present.

8  Q  How do you know he said something untrue?

9  A  Because Joe told me.

10 Q  What did Joe tell you that Hoss told him?

11 A  It would be secondhand.  I don't know.

12 Q  I'm asking.

13 A  Well, I don't know.

14 Q  You don't know what Joe Elsener told you?

15 A  No, I don't remember.

16 Q  Okay.  But you felt comfortable putting it in a

17    court filing that Hoss said something untrue?

18 A  Uh-huh.

19 Q  Okay.  So do you regularly make statements about

20    things you don't know?

21        MR. WILL:  Objection as to form and objection

22    that misstates her testimony.  She can answer the

23    question to the extent she knows.

24 Q  Okay.

25        MR. WILL:  You can answer the question.

```
 1   A   I don't know.

 2   Q   If you look below that, description of incident,

 3       "Has sent several e-mails to my employer, council,

 4       attorney, and fair board that contained false

 5       information."  What was the false information?

 6   A   Well, it said here it's on page 8A.  I don't

 7       recall, I guess.

 8   Q   Okay.  The first one, if you look on page 3 where

 9       it says description of incident it said, "He

10       advised me he knew people that burns houses down,

11       and he used to be the person people called to do

12       it.  Also stated he would burn the entire

13       fairgrounds to the ground if he was ever

14       terminated."

15   A   Uh-huh.

16   Q   Okay.  When did Hoss tell you that?

17   A   He told me that several times.

18   Q   Okay.

19   A   He also told other people.

20   Q   All right.  What other people?

21   A   Ashley Ort.

22   Q   Okay.

23   A   I think Steve Ort was also one.

24   Q   Would that be Ashley's husband?

25   A   Uh-huh.
```

1   Q  Okay.  I would like you to look at the last page

2      where it said police narrative.  Now, it said you

3      notified Constable David Taylor?

4   A  Yes.

5   Q  Okay.  He is the policeman to whom you gave the

6      report?

7   A  Yeah.  I talked to him about it, and he said I

8      needed to file it.

9   Q  Okay.  So look below that where it says

10     investigating department, Indianapolis Metro Police

11     but -- correct?

12   A  I'm not sure where we are.

13          MR. WILL:  The very last page of the exhibit,

14     so not the last page of the motion.

15          MR. McQUARY:  It looks like this.

16          MR. WILL:  It's the last page of the exhibit.

17     There's a police report on the back two pages.

18   A  Right here?

19   Q  Below that where it says investigating department?

20   A  Uh-huh.

21   Q  Indianapolis Metro Police?

22   A  Uh-huh.

23   Q  But David Taylor is not actually with IMPD, is he?

24   A  No.

25   Q  He's the elected constable of Perry Township?

1    A    Yes, he is.

2    Q    And the township constable's primary function is to

3         serve papers for the township small claims court?

4    A    Yeah.  But they do all kinds of stuff.  And, I

5         mean, I could have had a lot of IMPD officers file

6         it.

7    Q    Okay.  But instead you went to the elected township

8         constable?

9    A    Yeah, for convenience.

10   Q    Okay.  And if you look at the first sentence of the

11        narrative it said, "Mowery notified Constable David

12        Taylor of a delayed threat made against her on

13        May 12 of this year," but the time the report was

14        made was August 8?

15   A    Uh-huh.

16   Q    So you were so fearful for your life and safety

17        that you waited four months to tell the police

18        about it?

19   A    Well, I actually thought he just said it to me.

20        Then as I'm hearing other people say it, I'm

21        thinking, well, maybe he is going to do something,

22        you know.  I don't run around with people like

23        that, so I don't know.

24   Q    Did you attend the hearing that was set on this for

25        September 26, 2022?

1    A    No.

2    Q    Did you attend remotely?

3    A    No.

4    Q    Okay.  Do you recall seeing me at the hearing?

5    A    Uh-huh.

6    Q    Okay.  So you were there --

7    A    Uh-huh.

8    Q    -- remotely?

9    A    Uh-huh.

10   Q    Okay.  All right.  Did you immediately dismiss the

11        request for protective order?

12   A    Yes.

13   Q    All right.  Actually, I do have one more question

14        about this exhibit.  To your knowledge, did David

15        Taylor file any charges -- or did David Taylor

16        arrest or were any charges filed against Hoss for

17        threatening to burn down your house?

18   A    No.

19   Q    One last thing, the last sentence in that narrative

20        is, "Complainant Mowery does not wish that the

21        suspect be contacted at this time."

22   A    Uh-huh.

23   Q    Why did you tell David Taylor not to contact the

24        person you were accusing of essentially arson?

25   A    I'm like everybody else.  I'm afraid of him.

1   Q  Okay.

2   A  You have no idea.

3   Q  So what did you expect David Taylor to do if --

4   A  Just file a report.

5   Q  You just wanted it on the record?

6   A  Yeah, in case my house burned down.

7   Q  But you didn't want it to be investigated or that

8      any action be taken against the person who is

9      supposedly threatening your life?

10   A  Well, I didn't know because I don't get involved in

11      these things.

12         (Exhibit 11 was marked for identification.)

13   Q  Okay.  Ms. Mowery, do you recognize Exhibit 11?

14   A  Uh-huh.

15   Q  What is Exhibit 11?

16   A  It's a photograph with the inside of the lodge.

17   Q  Well, is this -- does this document depict text

18      messages between you and Hoss?

19   A  Uh-huh.

20   Q  Do you recognize or do you recall sending and

21      receiving these texts?

22   A  Uh-huh.

23   Q  All right.  So I would like you to look at the line

24      in the middle of the page under the date, Monday,

25      December 20.  "Do you have the dollar sign, dollar

1    sign, for the caterer?"

2  A  Uh-huh.

3  Q  Did you write that?

4  A  Did I send this?

5  Q  Yes, ma'am.

6  A  Are you saying I sent it?

7  Q  Yes, ma'am.

8  A  Okay.  Then I must have sent it.

9  Q  And what -- why did you send that to Hoss?

10  A  I probably wanted to know if he paid the caterer.

11  Q  Okay.  Was this for the event, the fundraiser at

12     the lodge, for Paul Annee and --

13  A  Yes, and Brian.

14  Q  -- Brian Mowery, your nephew?

15  A  Yes.

16  Q  And is that a picture of the event --

17  A  Uh-huh.

18  Q  -- held at the lodge?

19  A  Yeah.

20  Q  And just for clarification, part of the lodge was

21     where Hoss lived, but part of it was also an event

22     space?

23  A  Yes.

24  Q  Okay.  And this depicts the event space?

25  A  Right.

1   Q   Why would Hoss pay a caterer for a fundraiser for

2       Brian Mowery and Paul Annee?

3   A   I don't know who paid the caterer.  He was running

4       around doing things.  I was running around doing

5       things.  Everybody -- I don't even know if the

6       caterer got paid.

7   Q   Did Hoss tell you he paid the caterer?

8   A   Well, I don't know.  Did he?  I mean, he says it

9       came out of petty cash.  I doubt that, but, you

10      know.

11  Q   Why do you doubt that?

12  A   We don't keep that kind of petty cash.

13  Q   Do you know how much the caterer got paid?

14  A   I have no idea.

15  Q   Did you or the Mowery or Annee campaigns ever

16      compensate the fairgrounds for any payment that

17      Hoss or the fairgrounds made?

18  A   I don't believe that the fairgrounds paid for it.

19      I believe that the cash they collected that night

20      paid for it.

21  Q   Okay.  So if Hoss were to testify that he paid it

22      out of the fairgrounds petty cash fund, would you

23      dispute that?

24  A   Yes.

25  Q   What is your basis for disputing, for knowing --

1    how do you know that he didn't pay it out of the

2    petty cash?

3  A  Where would he get the money?  If the most money we

4    kept in petty cash was $100 and Joe was saying that

5    the most he kept there was 250, then where did he

6    get the money to pay for the caterer?

7  Q  Okay.  If Hoss were to testify that there was $500

8    in the petty cash funds, would you have a reason to

9    dispute that?

10        MR. WILL:  Objection to form.  The witness can

11    answer.

12  A  Well, Hoss did the petty cash.  I have no idea.

13  Q  Did the Annee or Mowery campaigns note that payment

14    to the caterer as a contribution on their election

15    financial forms?

16        MR. WILL:  Objection as to the form of the

17    question.  I think it misstates testimony.  The

18    witness can answer.

19  A  I don't know.

20  Q  Okay.

21  A  But I would look into it.

22  Q  Okay.  If the money did come out of the fairgrounds

23    petty cash fund, do you see how that would be a

24    concern as an improper campaign donation?

25  A  Well, sure.  No, it's not an improper campaign

1    donation.  The fairgrounds can donate to anyone or

2    anything it wants to.  It's a private corporation.

3    It's a nonprofit.  It's not government money.  He

4    kept telling people we were all funded by the City

5    of Indianapolis.  That is not true.  We get a

6    stipend, period, end of story.  The rest of it we

7    work and earn.

8  Q  How about if it's not noted in there as a --

9    recorded as a campaign contribution with the

10   Election Commission?

11 A  You just amend the report and make sure it's in

12   there.

13 Q  Was it ever amended?

14 A  I don't know.  I have to look.

15 Q  You were Paul Annee's campaign treasurer, weren't

16   you?

17 A  Yeah, but you're talking two years ago.  You want

18   me to answer this when I do God knows how many.  I

19   mean, I'll be more than happy to look and amend it.

20   The GOP Club could have paid it because they were

21   actually the host.

22        (Exhibit 12 was marked for identification.)

23 Q  Ms. Mowery, do you recognize Exhibit 12?

24 A  Uh-huh.

25 Q  This came to me from your attorney.

1   A   This is from -- yeah, I do.

2   Q   What is Exhibit 12?

3   A   It's a memorandum that I wrote to the board and

4       advising them of some situations that I became

5       aware of and wanted to make sure they were aware of

6       them.

7   Q   Is this in response to something that Hoss wrote to

8       the board?

9   A   I don't recall.

10  Q   Okay.  Well, the reason I ask is the very first

11      paragraph says, "I recently learned of some

12      accusations that Hoss made and believe they need

13      addressed.  If necessary, I will go head on with

14      Hoss on his comments."

15  A   Uh-huh.

16  Q   Okay.  So would you agree this is a response to

17      criticisms that Hoss made?

18  A   Uh-huh.

19  Q   And I think I testified earlier or -- excuse me --

20      I asked you earlier if you knew the hours that Paul

21      Annee worked.  You list them there in about the top

22      third of the page.  Do you see that?

23  A   Uh-huh.

24  Q   All right.  How did you know what precisely what

25      hours Paul Annee worked at that time?

1   A   I would imagine he gave them to me.

2   Q   Because you were not present on the board on this

3       date?

4   A   No.

5   Q   Did you have access to time sheets --

6   A   No.

7   Q   -- independently?

8   A   No.

9   Q   Okay.  So you're simply passing on the hours that

10      Paul Annee told you?

11  A   Right.

12  Q   But you had -- would have no way of knowing for

13      yourself whether he actually worked those hours?

14  A   Right.

15  Q   Forgive me if I already asked this, but did the

16      board approve the bonus you recommended for Paul

17      Annee?

18  A   I believe so, but I don't know.

19  Q   All right.  I would like you to look at the last

20      regular paragraph of this letter or -- excuse me --

21      not the post script but above that.  Do you see

22      where it says, "I could go on and on about Hoss and

23      relive the horror he added to my life.  I left

24      because of Hoss, and it was quite a relief not to

25      have to deal with him and his bullying tactics.  He

1    has proven himself to be a liar among other things,

2    and I feel for you and that your leadership won't

3    let him go.  How much more evidence is needed to

4    terminate his employment?"

5  A  Uh-huh.

6  Q  All right.  So you were asking the board to fire

7    him?

8        MR. WILL:  Objection.  The document speaks for

9    itself.  The witness can testify.

10 A  No.

11 Q  You were asking the board to terminate him?

12 A  No.  I was giving them my opinion.

13 Q  And then after that is, "P.S., you have a leak on

14   your board.  Hoss knows every move you consider or

15   make."

16 A  Uh-huh.

17 Q  Do you mean that Hoss was leaking information about

18   the board?

19 A  No.  Someone on the board was telling Hoss

20   everything they were doing.

21 Q  Okay.  So the board -- did the board not

22   unanimously disapprove on Hoss' performance?

23 A  I have no idea.

24       MR. McQUARY:  I think I am finished, but I

25   would like to confer with my client before closing,

1    before passing the witness.

2        (A brief recess was taken.)

3  Q  Ms. Mowery, I believe that earlier you testified

4     that a female employee at Voter Registration came

5     to you and complained of Hoss sexually harassing

6     her?

7  A  Yes.

8  Q  Who was that person?

9  A  Taylor Williams.

10 Q  And what did she say that Hoss did?

11 A  Something that he said to her, you know.  I don't

12    recall, but she didn't like it.  She didn't want to

13    be near him.  And I just told her.  I said, you

14    know, we've got -- you have to sit with -- where

15    you're sitting.

16 Q  Okay.  Did you pass the complaint on to human

17    resources?

18 A  No.

19 Q  Did she, to your knowledge?

20 A  I don't think so, but I'm not sure.

21        MR. McQUARY:  Okay.  All right.  No further

22    questions.

23 CROSS-EXAMINATION

24 BY MR. WILL:

25 Q  Okay.  I have a few.  Hopefully it won't be too

1    long.

2  A  All right.

3  Q  I just want to clear up some points, Ms. Mowery.

4     Let's see here.  I think plaintiff's counsel

5     highlighted the fact that -- in fact, it's in

6     Exhibit 6, is that right?  Exhibit 6, yeah.  If you

7     look at Exhibit 6 --

8        MR. McQUARY:  Which one is that?  Mine aren't

9     numbered.

10       MR. LOWREY:  They're your exhibits.

11       THE WITNESS:  It's the expungement letter.

12       MR. McQUARY:  Great.  Thanks.

13 Q  I think we established in Exhibit 6 that at least

14    in January or February of 2021 you were aware of

15    Mr. Tevebaugh's criminal history, correct?

16 A  Yes.

17 Q  And that came up when he applied to the City,

18    correct?

19 A  Yes, now that -- when we talked about this, I

20    recall that I was aware from HR.

21 Q  Okay.  And that came up because he applied for a

22    job with the City, and the background check was run

23    by the City?

24 A  Right.

25 Q  And that's where you found out about those?

```
 1   A   Right, and when we were going to try to help him
 2       get them expunged.
 3   Q   Turn to page 2 of that exhibit.  Now, you wrote
 4       this page 2, right?  You wrote this document?
 5   A   Uh-huh.
 6   Q   And you wrote this -- it would have been on or
 7       around February 4 of -- on or around February 1 of
 8       2021?
 9   A   Uh-huh.
10   Q   Okay.  And if you look in the second paragraph,
11       one, two, third sentence --
12   A   Uh-huh.
13   Q   -- read that third sentence to me.
14   A   "He holds a master's degree from Indiana Wesleyan
15       University and is highly intelligent."
16   Q   Okay.  So counsel asked you if Mr. Tevebaugh came
17       clean about not having a master's degree or
18       bachelor's degree from Indiana Wesleyan.  It
19       appears that, at least by February 1 of 2021, you
20       still believed that he had a master's degree?
21   A   Yes.  We just recently found out.
22   Q   Okay.  That's all I have with that exhibit.  Thank
23       you.  Now, there was talk about -- I think it was a
24       May 2022 meeting.  I think the date we have been
25       using is May 10, but I don't know if you have
```

1    specifically identified a date for certain.  Do you
2    know the meeting I'm talking about?
3  A  Uh-huh.
4  Q  You can correct me if I'm wrong, but I believe it
5    was you, Tevebaugh, John Sturgill, and Abdul-Hakim
6    Shabazz, is that correct?
7  A  Yes.
8  Q  And I think you said in that meeting Tevebaugh said
9    somebody was sexually harassing him?
10 A  Yeah.  He said -- he said something about, like,
11   somebody sexually harassed me or something like
12   that.
13 Q  Did he give you any -- what specifically do you
14   recall him saying?
15 A  Like, just like that, you know.  Like, well, it's
16   not like somebody that's sexually harassed me or
17   something like, you know.  It was -- that it was
18   inferring.
19 Q  Okay.  Oh, okay.  So it was -- he said something
20   similar to it's not like somebody sexually harassed
21   me?
22 A  Right.  I mean, it wasn't like he was saying I have
23   been sexually harassed by Cindy Mowery or Susie
24   day, Suzanne McVeigh.
25 Q  He was saying that in a way that it required the

1    listener to infer that somebody had sexually

2    harassed him?

3  A  Yeah, because --

4  Q  Did he say who did that?

5  A  No.

6  Q  Okay.  Did he say who he believed did that?

7  A  No, because I didn't think it was me.

8  Q  Okay.  Now, I think you said there were complaints

9    about his job performance kind of over a broad

10    period of his time with the fair.  At one point,

11    you said sometimes he would say he would not do

12    stuff, and then sometimes he would do it, and

13    sometimes he wouldn't and then go on about it.  Can

14    you kind of explain what you meant by that?

15  A  Well, he didn't like authority.  He's very

16    narcissistic.  He didn't want to take direction

17    from anybody.  He wanted to be the boss.  It had to

18    be his way, the way that it was -- regardless what

19    you thought, we're not doing it that way.  We're

20    doing it this way, and I'm in charge, and that's

21    just the way that it is.  Like, there were things

22    with the lodge that he, you know, just -- we would

23    suggest things.  The board would suggest things,

24    and he just went ahead and did them his own way,

25    you know, different things on the fairgrounds he

1  would do.  If I asked him to put a budget document
2  together and said this is the way I want it, he
3  would put it together the way he wanted it.  It's
4  not -- when you're a subordinate, you do what
5  you're asked to do and how they want it done.
6  Q  Okay.  And he did not do that, right?
7  A  He wasn't in charge.
8  Q  You said there were also complaints about how he
9     was talking to people?
10 A  Yes.
11 Q  Can you kind of explain what you meant by that?
12 A  Well, first thing, you know, the fair is a family
13    thing, and he could be standing in the middle of 20
14    kids and throw up 10 F bombs, you know.  He didn't
15    care what he said, when he said it, unfiltered.  It
16    just didn't matter.  And, you know, he would just
17    tell you to your face.  If you say, you know, I
18    need you to do this, he'd say, I'm not doing it.
19 Q  Did you have particular problems with vendors
20    complaining about how he dealt with them?
21 A  Yes.
22 Q  Can you explain what you mean by that?
23 A  We have had vendors that say they will not come
24    back.  One of them was the midgets.  Now that they
25    know he's gone, they're saying they'll come back if

1    he's gone.

2  Q  The little person wrestling?

3  A  Yeah.  You know, that's a big draw, as much we

4     think, you know, maybe it isn't, but people love

5     that stuff.  And then there were people at the

6     garage doors.  We had the garage doors redone, and

7     they wouldn't even give us a quote until they found

8     out he was gone.  Police officers.  There's been

9     all kinds of things.

10 Q  Okay.  Any other examples you can think of?

11 A  Not right off the top of my head.  I'm tired.

12 Q  That's okay.  Now, there was a -- you were asked

13    about a June 26, 2022, text message where you said

14    something about, you know, if you were here, and

15    you said you were -- and there was a smiley face

16    emoji.

17 A  Uh-huh.

18 Q  You were actually -- I think you actually said I

19    know where it was.  I was on my couch putting on

20    shoes and socks when you said that?

21 A  I had to go to the fair.

22 Q  That was what I was going to say.  Where were you

23    putting shoes on socks on to go?

24 A  To the fair.

25 Q  So this was in morning?  In the afternoon?

1    A    It was in the afternoon.

2    Q    Okay.  You were getting ready to leave?

3    A    Yeah.

4    Q    You weren't inviting somebody over?

5    A    Oh, no.

6    Q    Okay.

7    A    I don't invite anybody over to my house.

8    Q    Okay.  Now, I think you commented about a picture

9         from Tevebaugh's Facebook, correct?

10   A    Planting a picture?

11   Q    No.  Pulling up a picture.

12   A    Yes.  I did that, yes.

13   Q    Okay.  And it was in a conversation with this Tyler

14        Hargraves, maybe?

15   A    I don't know.  I don't know.

16   Q    Was it one of the wrestlers?

17   A    Uh-huh.

18   Q    Is that yes?

19   A    Yes.

20   Q    You've got to say yes because then she can't

21        transcribe it.  I guess the question -- the

22        follow-up question I have on that is were you

23        Facebook friends with Tevebaugh at the time?

24   A    Oh, yeah.

25   Q    This wasn't someone pulling up access to someone's

1      page you did not have access to?

2    A  We were like -- in my opinion, we were best

3      friends.

4    Q  Okay.  And so you just had to go to his page to

5      pull it up?

6    A  Right.

7    Q  Okay.  And then you were asked about Exhibit 12?

8    A  Uh-huh.

9    Q  And if you could pull up Exhibit 12 --

10   A  You guys have more paper than Voter Registration

11     does.

12   Q  You should see one of these reverse conviction

13     cases.  Crazy.  Okay.  And I believe -- again, I'm

14     summarizing your testimony, but I'm trying to speed

15     things along.  We have been here -- it's been a

16     while.  It says -- it looks like this is an e-mail

17     you sent to various members of the board regarding

18     Paul Annee's time at the fair, correct?

19   A  Right.

20   Q  And I think you said that this was the time that

21     you believe he submitted for work and that he --

22     you believe he worked this time?

23   A  Right.

24   Q  I guess my follow-up question to that is, I mean,

25     you were at the fair in July of 2022?

1   A  Correct.

2   Q  Were you there every day?

3   A  Uh-huh.

4   Q  Did you see Paul there?  Did you see Paul working?

5   A  Yeah.

6   Q  You saw Paul there, and you saw Paul working?

7   A  Uh-huh.

8   Q  That's a yes?

9   A  Yes.  Sorry.

10   Q  It's okay.  Did Paul work a lot of hours during

11      that fair?

12   A  Yes, he did.

13   Q  Okay.  And was Paul doing a lot of work throughout

14      the entire fair and in the lead up to the fair?

15   A  Yes.

16   Q  Okay.  So you may not know the exact hours, but you

17      did see him working a lot during that time period

18      you were at the fair?

19   A  We all did.  I mean, we were surprised that we

20      needed Paul.

21   Q  Let's see here.  There's been a lot of questions

22      about the painting of your house and painting of

23      the lodge that went on.  To be clear, both the

24      painting of the house and the painting of the

25      lodge, to your knowledge, went on at the same time,

1    right?

2 A  Yes.

3 Q  Okay.  Did Tevebaugh give you -- did he tell you

4    what the price for the painting was?

5 A  An estimate.  I never saw a piece of paper, an

6    invoice.  We searched the office for quotes,

7    invoices, whatever, nothing.

8 Q  Okay.  And so what did Tevebaugh tell you about an

9    estimate for the price of painting your house?

10 A  Well, he said, you know, it will be under 4,000.

11 Q  Okay.  And I remember you said you gave him some

12    cash.  Do you recall how much cash you gave him?

13 A  35.

14 Q  35?

15 A  Yes.

16 Q  You think it was -- because I think initially you

17    said it was between 2500 and 3500?

18 A  Yes, something like that.

19 Q  Okay.  But you think it was 3500?

20 A  Whatever he asked me for is what I gave him.

21 Q  Okay.  And you didn't get a receipt or anything for

22    that?

23 A  No, because I trusted him.

24 Q  Do you recall what he asked you for?

25 A  No.

1  Q  Okay.  And I think you said you don't know what the
2     arrangement between Maria Banuelos and Tevebaugh
3     was for painting for the lodge or for your house?
4  A  No.  When he left the office, the records left with
5     him.
6  Q  Okay.  And let's see here.  You did make a comment
7     about if you paid -- or if he paid with a
8     fairgrounds check for the painting, you did not
9     sign one, correct?
10 A  No.
11 Q  Okay.  And do you know if there was a -- do you
12    know what checks were issued for, from your own
13    personal knowledge, for the painting?
14 A  For everything?
15 Q  Let me rephrase that.  It was a bad question.  Do
16    you know whether there was a $7500 check written to
17    Maria Banuelos from the fairgrounds account?
18 A  Yes.
19 Q  Okay.  Did you sign that check?
20 A  No.
21 Q  Okay.  Do you know, would a check be recorded in
22    QuickBooks when it was written?
23 A  Yes.
24 Q  Okay.  And I think you said checks should be signed
25    by two people?

1  A  Yes.

2  Q  Okay.  And do you know who would have recorded the

3     QuickBooks notations for the checks at the time?

4  A  Hoss.

5  Q  Okay.  Do you know what the QuickBooks notations

6     for that check is, from our own personal knowledge?

7  A  I don't remember.

8  Q  Okay.  Do you know -- I think you said that -- let

9     me ask you this.  From your knowledge or

10    investigation in this case, are you aware of any

11    other checks being written to Maria Banuelos from a

12    fairgrounds account?

13 A  Yes.

14 Q  And what other checks have you come to learn were

15    written to Maria Banuelos from the fairgrounds

16    account?

17 A  There's a $2,500 check.

18 Q  Okay.  And who signed that check?

19 A  Susie Day and I.

20 Q  Okay.  So you did sign a check to Maria Banuelos

21    with Susie Day that was countersigned and given to

22    Maria Banuelos for $2,500?

23 A  Right.

24 Q  Okay.  And do you recall what that check was for?

25 A  The outside fair activity or something like that.

1    Q    That's the notation in QuickBooks, right?  You

2         don't recall now what it was for?

3    A    No.

4    Q    Okay.  If you go to the text message about the

5         painters -- I think it's Exhibit 1, actually --

6    A    Uh-huh.

7    Q    I think you said -- if you look at page 1, it says

8         September 21 or around there, maybe shortly before

9         there, you asked about, "I need my house painted

10        too."  Do you see that?

11   A    Down here, yeah.

12   Q    "I need my house painted.  Do you know anyone I can

13        hire?  I need my house painted too."  And it looks

14        like it was at least shortly before September 21,

15        if not on September 21, right?

16   A    Right.

17   Q    If you look at page 2 it says November 8, a text

18        from Tevebaugh to you, "Painters on the way over to

19        work."  Do you see that?

20   A    Uh-huh.

21   Q    Okay.  When he texted you that day saying painters

22        on the way over to work, what prior knowledge did

23        you have that someone was going to paint your

24        house?

25   A    Well, normally if we were going to do something

1    like that and Hoss was in the middle of a job he

2    would say, hey, I've got painters or a gardener or

3    whatever.  Do you need something done?  And he

4    would say, I'll send them over when they're done.

5    It was never really a planned out thing, and then

6    they come over, and that's what happened with this

7    painting thing was he said I got these painters

8    that have been at the lodge.  Do you want them to

9    paint your house?

10  Q   Okay.  So but prior to this painters on the way to

11       work, do you recall in the circumstance what other

12       notice you might have had that somebody was going

13       to come paint your house?

14  A   No.

15  Q   Was it a surprise to you when he texted you and

16       said painters are on the way over to work?

17  A   Well, that it was that particular day, but, no,

18       because that's kind of the way we worked, you know.

19  Q   Okay.

20  A   Or I would call him and say, hey, I got so and so,

21       and they need something done, and he would find

22       something for them to do.

23          MR. WILL:  Okay.  That's all I have.

24          MR. LOWREY:  I actually have a couple things

25       myself after.

1    MR. McQUARY:  John, would you mind if we took

2    a super quick break?  I didn't go to the men's room

3    on my last break.

4        MR. LOWREY:  Yeah.  Five minutes?

5        MR. McQUARY:  I don't think it will take that

6    long.

7        MR. LOWREY:  Okay.

8        (A brief recess was taken.)

9    CROSS-EXAMINATION

10   BY MR. LOWREY:

11   Q  Ms. Lowery, I just have a few follow-on questions

12      from the matters raised by Mr. McQuary and

13      Mr. Will.  So first of all, there was the

14      discussion earlier about Taylor Williams at the

15      Voter Registration Board having complained to you

16      about harassment done by Mr. Tevebaugh?

17   A  Right.

18   Q  You said you hadn't reported that to HR.  Had

19      Ms. Williams asked you to report that to HR?

20   A  Right.

21   Q  Right, she asked you or asked you --

22   A  She asked me not to say anything right at the

23      moment.  If it happened again, then she was going

24      out there, or we will go up there together.

25   Q  And did she come to you again after that?

1  A  No.

2  Q  Okay.

3  A  I believe I said something to him about it.

4  Q  And then there were -- there was a discussion with

5     Mr. Will about Mr. Tevebaugh's performance issues

6     at the fairgrounds, and you stated that he didn't

7     like authority and didn't follow directions.  Did

8     you have the same problem with his work over at the

9     Voter Registration Board?

10 A  Oh, yeah.

11 Q  Were there any people in particular that he had

12    trouble working with there?

13 A  I would probably say women, really.

14 Q  Okay.  Did he have trouble working with the

15    Democrat people?

16 A  I don't think so.

17 Q  Okay.  And then there were -- there was also a

18    comment about his manner of speech being

19    inappropriate, using profanity, that sort of thing.

20    Did you run into those problems with his work at

21    the VRB as well?

22 A  Yes.

23         MR. LOWREY:  No further questions.

24         MR. WILL:  I do have one omitted if I can come

25    back over.

```
 1            MR. McQUARY:  Sure.
 2    RECROSS-EXAMINATION
 3    BY MR. WILL:
 4    Q   You talked about a check that you wrote to Maria
 5        Banuelos and was countersigned by --
 6    A   Susie.
 7    Q   Susie Day.  You signed that was countersigned by
 8        Susie Day.  Again, did you know Maria Banuelos?
 9    A   No.
10    Q   So who would have directed you to issue a payment
11        to Maria Banuelos?
12    A   Normally Hoss would have a folder full of invoices
13        and checks, and we go through and sign.
14            MR. WILL:  Okay.  That's it.
15    REDIRECT EXAMINATION
16    BY MR. McQUARY:
17    Q   Just very quickly.  Ms. Mowery, was a master's
18        degree in psychology required for the position of
19        groundskeeper?
20    A   I don't know.
21    Q   Okay.  Well, were you the one who hired Hoss at
22        that time?
23    A   No.
24    Q   All right.  How about a bachelor's degree?  Was
25        that required for --
```

1   A   Probably not.

2   Q   Okay.  Now, Hoss worked for -- as -- Hoss was later

3       promoted to executive director, is that correct?

4   A   Uh-huh.

5   Q   Did he actually have -- did he apply for that job?

6   A   No.  We just talked about it and said we'd give him

7       a try and that's --

8   Q   Okay.  So he didn't resubmit a --

9   A   No.

10  Q   -- an application form?

11  A   No, but he made it clear he wanted the job.

12  Q   Okay.  Did he submit a resume?

13  A   No.

14  Q   Okay.  Do you recall looking at his resume when the

15      decision was made to hire him for --

16  A   I'm not even sure I've ever seen his resume until

17      just recently.

18          MR. McQUARY:  Okay.  No further questions.

19          MR. WILL:  All right.  I have nothing on that.

20          MR. LOWREY:  I have nothing further.

21          MR. WILL:  We're done.

22          We're off, right?

23          (A discussion was held off the record.)

24          THE REPORTER:  Do you need a copy?

25          MR. WILL:  I will need a copy.

1          THE REPORTER:  E-Tran?

2          MR. WILL:  E-Tran is fine.

3          MR. LOWREY:  E-Tran as well, please.

4          MR. McQUARY:  Same for us, please.

5                    AND FURTHER THE DEPONENT SAITH NOT.

6

7

8          _____
                    CYNTHIA LEA MOWERY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   STATE OF INDIANA        )
                            )  SS:
2   COUNTY OF JOHNSON       )
```

3        I, Gretchen Fox, RPR, a Notary Public in and

4   for the County of Johnson, State of Indiana at large,

5   do hereby certify that CYNTHIA LEA MOWERY, the

6   deponent herein, was by me first duly sworn to tell

7   the truth, the whole truth, and nothing but the truth

8   in above-captioned cause.

9        That the foregoing deposition was taken on

10  behalf of the Plaintiff at the offices of Circle City

11  Reporting, 135 North Pennsylvania, Suite 1720,

12  Indianapolis, Marion County, Indiana, on the 25th day

13  of January, 2024, pursuant to the Applicable Rules.

14       That said deposition was taken down in

15  stenograph notes and afterwards reduced to typewriting

16  under my direction, and that the typewritten

17  transcript is a true record of the testimony given by

18  said deponent; and thereafter presented to said

19  deponent for his/her signature;

20       That the parties were represented by their

21  aforementioned counsel;

22       I do further certify that I am a disinterested

23  person in this cause of action; that I am not a

24  relative or attorney of either party, or otherwise

25  interested in the event of this action, and am not in

the employ of the attorneys for either party.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this \_\_\_\_\_ day of _____, 2024.


                    _____
                       Gretchen Fox

Commission Number 0661154

My Commission Expires:
January 25, 2031

1      (Originating Party)
       Jeffrey S. McQuary, Esq.
2      TOMPKINS LAW
       608 East Market Street
3      Indianapolis, IN  46202

4              NOTICE OF DEPOSITION FILING

5         IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF INDIANA
6                 INDIANAPOLIS DIVISION

7
JEREMIAH TEVEBAUGH,            )
8                              )
            Plaintiff,         )
9                              )
          -v-                  ) CAUSE NO.
10                             ) 1:23-CV-121-JMS-TAB
INDIANAPOLIS-MARION COUNTY,    )
11 ACTING BY AND THROUGH ITS   )
BOARD OF VOTER REGISTRATION,   )
12 THE MARION COUNTY           )
AGRICULTURAL FAIR             )
13 ASSOCIATION, AND CINDY      )
MOWERY,                        )
14                             )
            Defendants.        )
15

16        In compliance with the Indiana Rules of
Procedure, Federal Rules of Civil Procedure and/or the
17 Rules of the Industrial Board, you are notified that
the signed original deposition of CYNTHIA LEA MOWERY,
18 taken on the 25th day of January, 2024, has been
sealed and submitted to the originating party, along
19 with the attached Errata Sheet(s), if applicable.

20     _____
       (Date received by Circle City Reporting)
21

22

23              CIRCLE CITY REPORTING
               135 North Pennsylvania
24                   Suite 1720
               Indianapolis, IN  46204
25                 (317) 635-7857

**$**

**$1,500 (1)**
70:4
**$10,000 (1)**
84:3
**$100 (2)**
63:8;141:4
**$2,500 (3)**
75:7;158:17,22
**$250 (1)**
63:10
**$3,500 (1)**
66:24
**$500 (1)**
141:7
**$750 (1)**
69:23
**$7500 (1)**
157:16

**A**

**Aaron (1)**
15:15
**Abdul (5)**
29:3;39:12;83:9,
12;89:20
**Abdul-Hakim (5)**
20:13;29:2;43:5;
44:21;149:5
**ability (4)**
6:24;26:3;29:19;
58:7
**able (1)**
33:22
**above (1)**
144:21
**above-captioned (1)**
166:8
**absence (2)**
105:5;117:9
**absolutely (1)**
93:2
**abuse (1)**
81:13
**abusive (1)**
81:23
**accepted (1)**
52:11
**accepting (1)**
58:24
**access (6)**
73:11,20;116:21;
144:5;153:25;154:1
**accomplish (1)**
40:24
**according (2)**
22:23;63:7
**account (6)**
115:24;116:8,16;
157:17;158:12,16

**accurate (2)**
74:1;128:12
**accusation (2)**
99:20;128:17
**accusations (3)**
83:19;86:1;143:12
**accused (5)**
96:21,22,23;
125:24;126:5
**accusing (1)**
137:24
**across (2)**
32:12;132:18
**act (1)**
87:7
**ACTING (1)**
168:11
**action (4)**
130:18;138:8;
166:23,25
**actions (1)**
129:10
**activity (1)**
158:25
**actually (18)**
10:1;25:20;72:23;
73:9;124:1,8,22;
131:17;135:23;
136:19;137:13;
142:21;144:13;
152:18,18;159:5;
160:24;164:5
**added (1)**
144:23
**address (1)**
6:9
**addressed (2)**
119:25;143:13
**addressing (1)**
118:8
**admit (1)**
128:14
**Adriana (1)**
99:16
**advances (2)**
38:25;46:6
**advised (1)**
134:10
**advising (1)**
143:4
**affair (2)**
88:13,18
**affect (1)**
6:24
**affiliated (1)**
18:1
**affixed (1)**
167:3
**aforementioned (1)**
166:21
**afraid (2)**
126:3;137:25
**afternoon (2)**

152:25;153:1
**afterward (1)**
59:8
**afterwards (3)**
5:15;42:1;166:15
**again (13)**
32:16;36:24;40:9;
54:25;79:14;80:3;
95:19;98:5;126:2;
154:13;161:23,25;
163:8
**against (7)**
4:10;92:17;128:16;
132:23;136:12;
137:16;138:8
**Agency (8)**
10:16,20,21;17:5,
16;24:19;27:23,24
**agenda (1)**
43:4
**ago (5)**
4:7;11:19;25:20;
27:2;142:17
**agree (3)**
107:11;108:21;
143:16
**agreement (3)**
7:18;48:5,8
**agreements (1)**
110:11
**Agricultural (2)**
16:21;168:12.5
**ahead (10)**
28:16;29:13;43:21;
55:2,15;66:13;81:1;
96:8;121:8;150:24
**ain't (1)**
58:17
**Alexander (1)**
13:13
**alive (1)**
11:23
**allegation (1)**
99:1
**allow (1)**
96:5
**allowed (5)**
25:12;34:12;70:18;
101:3;126:6
**almost (3)**
65:7;81:11;84:11
**along (6)**
16:6;52:7;110:20;
132:3;154:15;
168:18.5
**Always (9)**
10:12;81:14;82:2,
4,4;112:13,14,16,25
**ambiguous (1)**
5:3
**amend (2)**
142:11,19
**amended (1)**

142:13
**American (6)**
9:7,8;68:2,11,24;
69:12
**among (4)**
17:7;21:17;45:15;
145:1
**amount (4)**
19:8,9;61:5;70:9
**amusement (1)**
68:25
**analyst (1)**
12:19
**analysts (1)**
12:20
**and/or (1)**
168:16.5
**Annee (19)**
16:5,19;59:10;
60:24;62:2;70:6;
75:14;80:19;84:1;
87:12,16;139:12;
140:2,15;141:13;
143:21,25;144:10,17
**Annee's (6)**
61:15;64:2;69:22;
74:5;142:15;154:18
**answered (3)**
11:16;80:25;89:5
**anymore (5)**
46:13;58:24;76:15;
81:8,9
**apart (1)**
84:20
**apologize (1)**
20:15
**apparently (1)**
74:7
**appear (1)**
67:7
**appears (1)**
148:19
**Applicable (2)**
166:13;168:19
**application (1)**
164:10
**applied (3)**
120:1;147:17,21
**applies (1)**
108:16
**apply (1)**
164:5
**appreciate (4)**
42:6;47:17;72:10;
90:14
**apprised (1)**
65:22
**approach (1)**
75:20
**approached (1)**
75:23
**appropriate (1)**
129:18

**approval (2)**
19:7;53:24
**approve (5)**
18:22;64:4;67:22;
80:20;95:13;100:22;
144:16
**approved (3)**
64:3;132:4,11
**area (1)**
29:18
**Arlington (1)**
50:25
**armpits (1)**
51:23
**arm's (1)**
71:11
**around (36)**
24:15;26:7;28:13;
29:21;40:15;42:17;
48:13;51:17;52:9;
57:16;64:12,15;
72:22;76:24;79:19,
20;82:12,12,18;83:4,
16,19;88:4;94:13,25;
107:18;117:20,22;
118:4;129:15;
136:22;140:4,4;
148:7,7;159:8
**arranged (2)**
111:20;112:9
**arrangement (1)**
157:2
**arrangements (1)**
110:15
**arrest (2)**
87:8;137:16
**arrested (2)**
7:14;87:4
**arson (1)**
137:24
**Ashley (15)**
52:24;53:4,10,15;
60:16,16;74:11;
77:11,15,17,17;84:1,
15,19;85:10;86:20;
120:10;134:21
**Ashley's (1)**
134:24
**aside (2)**
37:2;85:3
**assigned (2)**
37:16;38:9
**assist (1)**
94:7
**assistant (3)**
59:11;60:2;74:9
**associate's (1)**
8:14
**Association (2)**
16:22;168:13
**assume (3)**
18:6;24:21;119:8
**assumed (1)**

75:12
**assuming (1)**
112:5
**attached (2)**
41:1;168:19
**attempt (1)**
94:20
**attempted (1)**
116:20
**attempts (1)**
92:4
**attend (3)**
123:18;136:24;
137:2
**attention (1)**
53:9
**attorney (13)**
4:9;5:20;26:17,20;
44:14;72:9,20;73:23;
90:14;124:16;134:4;
142:25;166:24
**attorneys (5)**
7:3;60:4;98:11;
126:21;167:1
**attracted (1)**
57:9
**attraction (1)**
57:22
**Auditor's (2)**
11:4,7
**August (4)**
21:5;81:5;93:1;
136:14
**aunt (3)**
49:3,4,9
**aunts (1)**
124:3
**authority (6)**
54:13,18;95:15;
114:8;150:15;162:7
**auxiliary (1)**
16:23
**average (1)**
24:24
**aware (15)**
25:14;39:1,2;59:9;
64:5;66:7;90:2;92:9;
102:13;120:3;143:5,
5;147:14,20;158:10
**away (5)**
18:4;49:25;57:15;
82:25;126:12

**B**

**bachelor's (7)**
8:15,25;28:4,8;
123:18;148:18;
163:24
**back (29)**
9:25;14:2;21:4,12;
23:1;25:9;33:3;
37:18;38:7;48:20;

50:6,6;52:21;74:4,6;
76:21;79:7;81:4;
85:1,19;88:7;92:25;
100:20;101:12;
104:13;135:17;
151:24,25;162:25
**background (5)**
6:22;26:3;34:3,7;
147:22
**backpack (2)**
36:14;102:19
**backyard (1)**
65:6
**bad (4)**
34:22;41:7;48:11;
157:15
**bag (17)**
52:16;83:20,21;
84:1,4,7,9,15,17,17;
85:1,7,13,14,19,23,25
**bail (1)**
10:25
**ball (1)**
56:6
**bank (1)**
71:22
**Banuelos (14)**
64:14;65:14;112:9;
114:9,18;157:2,17;
158:11,15,20,22;
163:5,8,11
**Banueloses (7)**
66:5,8,20;67:3;
107:15,16;114:1
**barbecue (1)**
49:15
**barn (1)**
48:14
**barns (2)**
48:6,13
**basic (1)**
6:22
**basis (1)**
140:25
**bath (2)**
48:2,10
**bathroom (3)**
5:18;52:19;107:20
**batteries (1)**
9:15
**Beat (1)**
81:10
**beaten (1)**
81:9
**became (6)**
20:1;78:11;80:10,
15;119:6;143:4
**become (6)**
10:5;18:1;23:22;
78:20;89:21;102:13
**begin (1)**
5:5
**beginning (2)**

20:18;55:4
**behalf (1)**
166:10
**behavior (5)**
78:19;79:10;80:2;
86:8;129:11
**behind (2)**
48:3;77:21
**believes (3)**
46:9;115:23;
121:19
**below (4)**
116:1;134:2;135:9,
19
**benefit (2)**
36:1,3
**benefits (3)**
52:23;53:1,2
**besides (1)**
99:11
**best (11)**
5:11;30:10,17;
31:13,20;32:16;
34:16;40:21;58:6;
64:23;154:2
**better (1)**
6:6
**bids (1)**
41:24
**big (12)**
49:15;51:22;56:24;
57:22;69:2;77:8;
78:13;97:4,17,20;
108:7;152:3
**Bill (1)**
18:2
**billboard (1)**
60:3
**binder (1)**
73:14
**birth (1)**
6:7
**bit (6)**
6:21;33:3;94:18;
108:11;116:1;125:12
**black (1)**
131:9
**Board (99)**
6:20;13:24;17:1;
18:5,17,19,21,24;
19:6,7,11,14,19,23,
25;20:4,16,25;21:4,
17;24:6,9;29:3;
31:18,21;32:5,6;
33:7;38:23;39:2;
41:10,14;43:1,3,6;
44:19,20,21,24;
45:15;53:19;64:3,4;
67:15,20,22;69:7;
71:24,25;72:5,12,24;
73:4,8;75:3,4;80:20,
21,24;82:13;89:24,
25;90:21,25;91:4;

92:12,25;95:7;
112:19;113:24;
117:21,23,25;118:16;
125:23;126:9;
127:11;129:24;
131:4,7;132:4;134:4;
143:3,8;144:2,16;
145:6,11,14,18,19,21,
21;150:23;154:17;
161:15;162:9;
168:11,5,17
**board's (1)**
18:23
**boatload (2)**
123:4,6
**bold (1)**
116:2
**bombs (1)**
151:14
**bonus (6)**
74:25;75:2,4,6;
80:20;144:16
**book (3)**
50:13,15;73:13
**books (1)**
54:9
**boss (4)**
33:10,12;133:3;
150:17
**both (3)**
14:4;112:9;155:23
**bottom (2)**
98:18;124:16
**bought (4)**
52:3,4,13,15
**boy (1)**
87:24
**brain (1)**
55:6
**brand (1)**
31:2
**break (9)**
5:16,21,23;38:20;
42:1;105:14,15;
161:2,3
**breaks (1)**
37:13
**Brezeke (1)**
13:11
**Brian (7)**
16:4,15;70:4,6;
139:13,14;140:2
**brief (5)**
38:21;80:24;86:5;
146:2;161:8
**bring (6)**
70:8;83:25;91:13;
100:20;101:7,12
**bringing (2)**
53:8;113:4
**brings (2)**
18:8;85:19
**broad (1)**

150:9
**brother (4)**
31:2;50:2,3;79:6
**brought (8)**
4:10;19:3;37:18;
43:11;72:2;91:12;
97:14;110:24
**brown (5)**
83:20,21;84:1,4,7,
9,15,16,17;85:1,7,13,
14,23,25
**Budget (2)**
11:6,13;18:22;
151:1
**built (3)**
21:9,10;62:7
**bullying (1)**
144:25
**bunch (1)**
54:3
**Burgos (1)**
99:17
**burn (4)**
86:13,15;134:12;
137:17
**burned (3)**
86:18,23;138:6
**burns (1)**
134:10
**burnt (1)**
78:3
**Burrows (1)**
99:16
**business (4)**
8:15,16;17:20;19:5
**busy (1)**
34:1
**buy (4)**
41:22;51:8,10,12

**C**

**calendar (3)**
44:7,10;46:17
**call (11)**
21:11;33:21;65:2;
69:13;76:4,17;95:25;
110:3,4;133:4;
160:20
**called (11)**
18:5;42:15;63:7;
73:10;76:12;83:24;
84:5;92:12,13;133:2;
134:11
**calling (3)**
22:24,24;84:22
**Calls (5)**
22:17;55:13;76:3;
114:20;116:23
**came (23)**
9:24;23:5;30:1;
32:12;37:20;67:10;
81:4;88:7;91:23;

95:6,23;101:17;
111:18;116:18;
120:11;124:7,16;
140:9;142:25;146:4;
147:17,21;148:16
**campaign (9)**
15:1;61:15,19;
62:1;69:22;141:24,
25;142:9,15
**campaigns (3)**
15:4;140:15;
141:13
**campgrounds (2)**
70:19,23
**can (90)**
6:23;13:20;15:6;
16:2;17:23;19:6,22;
22:19,20;23:1;28:17,
22,25;29:22;33:23;
36:2;37:8,12;43:20,
24;50:9;52:8;53:1;
55:1,2,3,4,14;57:15,
15;58:2;63:1;64:13,
16;66:1,12,12;69:12;
72:5,8,13,18;77:8;
79:14;81:25;82:8,19;
83:3;86:3;88:17,22,
25;89:6,9;90:15;
96:8;98:11,17;
101:20;103:6;
109:11;110:8;
113:12;114:21;
115:3,5,7,18;116:25;
118:7;121:1,5,9;
125:9;127:3;130:12,
14;133:22,25;141:10,
18;142:1;145:9;
149:4;150:13;
151:11,22;152:10;
159:12;162:24
**cancer (1)**
29:16
**candidate (1)**
15:2
**candidates (2)**
88:14,15
**capacitors (1)**
9:15
**capacity (4)**
59:14;60:25;61:5;
74:13
**capture (1)**
118:1
**car (1)**
52:21
**care (4)**
52:3;97:9;112:16;
151:15
**cared (1)**
129:14
**career (1)**
24:18
**carefully (1)**

78:22
**carnival (2)**
68:3;69:17
**carnivals (1)**
68:25
**case (7)**
4:16;59:4;60:7,8;
101:7;138:6;158:10
**cases (2)**
123:4;154:13
**Cash (29)**
33:8;63:8,10,13,16,
19;66:22,23;84:4;
95:11;103:22;104:5;
109:25,25;110:25;
111:9;112:5;113:4;
140:9,12,19,22;
141:2,4,8,12,23;
156:12,12
**cater (1)**
62:15
**caterer (9)**
139:1,10;140:1,3,6,
7,13;141:6,14
**catering (1)**
62:23
**caught (1)**
102:2
**cause (4)**
56:4;166:8,23;
168:9.5
**caused (1)**
118:14
**causes (1)**
69:19
**ceased (2)**
89:4,8
**celebrated (1)**
8:23
**center (1)**
21:9
**Central (1)**
8:4
**certain (3)**
19:8;93:2;149:1
**certify (2)**
166:5,22
**chain (1)**
12:10
**Chair (4)**
12:7;14:21,21,22
**chairman (3)**
14:15,16;69:7
**chance (5)**
39:14,16;42:13,20;
68:17
**change (1)**
35:3
**changes (1)**
35:5
**characterization (1)**
23:11
**characters (1)**

13:13
**charge (7)**
35:3;70:12;72:3,7;
119:14;150:20;151:7
**charged (4)**
71:16;72:1;87:4,10
**charges (2)**
137:15,16
**charity (1)**
17:20
**check (30)**
34:4,7;66:9,15;
98:17;109:18;110:1,
2,3;111:13,16;112:7,
22;113:6,19,21,23;
114:3,17;147:22;
157:8,16,19,21;
158:6,17,18,20,24;
163:4
**checking (1)**
44:7
**checks (13)**
26:3;60:10,11,11;
114:24,25;115:3;
157:12,24;158:3,11,
14;163:13
**Chicago (1)**
29:17
**chief (4)**
18:15;37:18;38:11;
96:1
**children (1)**
44:16
**choose (1)**
21:14
**chose (2)**
54:19;98:20
**Cindy (6)**
31:18;84:22;85:16;
112:21;149:23;
168:13
**Circle (3)**
166:10;168:20.5,
8
**circumstance (1)**
160:11
**citizen (1)**
70:16
**City (22)**
4:10;16:9;29:9;
50:24;59:18;93:8,12,
17;94:19;102:6;
116:19;125:3;127:8,
14;128:19;142:4;
147:17,22,23;166:10;
168:20.5,23
**civil (2)**
4:16;168:16.5
**claim (2)**
128:16,16
**claims (3)**
44:15;125:18;
136:3

**clarification (2)**
30:21;139:20
**clarify (3)**
53:10;61:3;109:9
**class (1)**
99:22
**clean (2)**
124:7;148:17
**cleaned (2)**
79:24,24
**clear (6)**
17:3;58:9;127:7;
147:3;155:23;164:11
**clerical (1)**
59:14
**Clerks (2)**
12:17,19
**client (2)**
115:23;145:25
**close (3)**
18:2,3;41:17
**closest (1)**
79:3
**closet (1)**
52:18
**closing (1)**
145:25
**clothes (1)**
51:8
**Club (2)**
16:7;142:20
**codirector (4)**
11:24;12:12;19:16;
36:12
**Coke (2)**
47:8,9
**Coliseum (1)**
57:21
**collected (1)**
140:19
**collecting (1)**
84:13
**color (2)**
66:3,3
**comfortable (1)**
133:16
**comical (1)**
81:11
**coming (7)**
49:14,15;67:6;
71:22;76:21;85:11;
110:5
**command (1)**
12:10
**comment (4)**
57:9;98:18;157:6;
162:18
**commented (1)**
153:8
**comments (1)**
143:14
**Commission (4)**
61:23;142:10;

167:8,9
**commissioners (1)**
10:25
**committee (4)**
61:16,19;131:6,6
**committeeman (2)**
14:17,18
**communicate (2)**
99:21;100:4
**community (1)**
18:12
**companies (1)**
49:8
**company (4)**
68:11;69:2,10;88:5
**compensate (2)**
111:2;140:16
**compensation (1)**
25:11
**competent (1)**
121:11
**complain (2)**
38:22;59:6
**Complainant (1)**
137:20
**complained (3)**
39:2;146:5;161:15
**complaining (3)**
45:13;100:24;
151:20
**complaint (1)**
146:16
**complaints (2)**
150:8;151:8
**completely (1)**
111:20
**compliance (1)**
168:16
**complicated (1)**
13:18
**computer (1)**
73:13
**concern (1)**
141:24
**concerned (3)**
31:5,8;88:24
**concessionaires (2)**
19:2;84:2
**concessions (1)**
69:1
**conditional (1)**
10:24
**conduct (3)**
45:6,8,9
**confer (1)**
145:25
**confided (1)**
31:14
**confident (1)**
73:25
**confirm (1)**
57:8
**confirmed (1)**

86:21
**confrontation (1)**
83:10
**confused (1)**
74:21
**congress (1)**
16:12
**Congressman (1)**
119:1
**consequence (1)**
54:17
**consider (3)**
95:25;120:20;
145:14
**considered (1)**
79:2
**Constable (4)**
135:3,25;136:8,11
**constable's (1)**
136:2
**consult (1)**
5:19
**consulting (1)**
44:10
**contact (1)**
137:23
**contacted (2)**
96:1;137:21
**contained (1)**
134:4
**contention (1)**
110:6
**context (1)**
54:25
**continue (1)**
92:22
**contrary (2)**
28:2;93:19
**contributed (1)**
69:21
**contribution (3)**
70:2;141:14;142:9
**contributions (1)**
15:18
**control (1)**
127:14
**convenience (1)**
136:9
**convention (1)**
14:20
**conventions (1)**
17:12
**conversation (8)**
5:2;27:18;39:7;
98:1,3,4;123:11;
153:13
**conversations (8)**
36:18,20;42:14;
46:14;57:11;82:1;
91:5;118:19
**convicted (1)**
7:16
**conviction (1)**

154:12
**convictions (4)**
25:15,22;26:7;
123:15
**copy (3)**
73:22;164:24,25
**corporation (1)**
142:2
**correctly (1)**
12:4
**correspondence (1)**
20:13
**couch (2)**
55:5;152:19
**council (7)**
16:9;46:17;59:19;
93:8,12,18;134:3
**Councilor (2)**
18:2,4
**counsel (5)**
131:15,15;147:4;
148:16;166:21
**counselor (1)**
93:22
**counter (1)**
33:25
**counterpart (3)**
26:13;27:2,3
**countersigned (3)**
158:21;163:5,7
**counting (1)**
95:9
**County (25)**
4:11;6:17,18,19;
10:9,13;12:7;14:15,
23,24;16:21,25;17:1,
4,7,9,9;25:25;29:9;
30:5;166:2,4,12;
168:10.5,12
**couple (8)**
15:6;32:11;52:15;
67:1;71:8,21;99:23;
160:24
**course (2)**
96:19;100:21
**court (9)**
4:21;44:15;68:18;
80:8;117:15;132:16;
133:17;136:3;168:5
**cover (2)**
38:17;65:5
**covered (3)**
23:4;100:20;
108:11
**covet (1)**
24:15
**COVID (1)**
50:20
**COVID-19 (1)**
100:3
**Cox (5)**
54:5;76:18;77:14;
79:18,20;80:11

**crazy (4)**
31:18,22;78:2;
154:13
**crime (1)**
7:21
**criminal (6)**
26:1,2;27:15;34:3,
22;147:15
**criminally (1)**
87:10
**criticisms (1)**
143:17
**criticizing (2)**
89:25;90:1
**crossed (1)**
83:17
**CROSS-EXAMINATION (2)**
146:23;161:9
**current (1)**
93:22
**currently (4)**
14:22;19:9;20:8;
44:14
**custody (1)**
73:6
**cut (2)**
51:22;111:17
**CYNTHIA (4)**
4:1;6:4;165:8;
166:5;168:17.5

# D

**da (3)**
100:23,23,24
**dad (1)**
49:1
**damn (1)**
85:7
**Danny (9)**
68:1,17;69:5,18,
21;73:2;79:22;84:12,
25
**Danny's (1)**
68:15
**date (13)**
6:7;47:21;88:25;
108:10,16,23;109:4;
118:5;138:24;144:3;
148:24;149:1;
168:20.5
**dated (2)**
108:9;118:3
**dates (2)**
8:21;80:23
**David (7)**
135:3,23;136:11;
137:14,15,23;138:3
**day (46)**
13:4,4;20:21;
30:11;33:20,20;34:1;
36:10;45:20;48:8,11;
53:17;57:21;76:10,

12;77:7,18,20;81:2;
83:13;91:24;92:14,
15;100:12,17,18;
101:2,3,12;103:25;
104:13;107:13;
118:1;125:9;127:5;
149:24;155:2;
158:19,21;159:21;
160:17;163:7,8;
166:12;167:3;168:18
**days (1)**
59:25
**deal (6)**
76:5;111:15,17,18;
122:7;144:25
**dealt (1)**
151:20
**death (1)**
77:3
**Decatur (1)**
44:15
**December (1)**
138:25
**decided (4)**
48:25;72:24;
120:21;121:10
**deciding (1)**
71:15
**decision (3)**
71:24;72:18;
164:15
**Defendants (1)**
168:14.5
**degree (18)**
8:11,13,14,15,16,
18,25;28:8;8,9;123:19,
19;124:9;148:14,17,
18,20;163:18,24
**degrees (2)**
8:21;28:4
**delayed (1)**
136:12
**delegate (2)**
14:19,20
**deleted (1)**
59:4
**Democrat (2)**
12:23;162:15
**Democratic (5)**
12:12;13:10,12;
27:8;36:12
**democrats (2)**
12:25;13:2
**denied (2)**
100:25;116:22
**department (3)**
78:23;135:10,19
**depict (1)**
138:17
**depicts (1)**
139:24
**DEPONENT (4)**
165:5;166:6,18,19

**deposed (1)**
4:14
**deposition (9)**
4:13;7:2,7;28:12;
106:2;166:9,14;
168:4,17.5
**Deputy (9)**
12:16;13:6,8,10;
33:7;37:19;38:11;
95:11;96:2
**describe (2)**
40:23;129:10
**described (2)**
23:9;98:6
**describes (2)**
129:21;130:15
**describing (1)**
20:13
**description (8)**
54:12;131:1,2,19,
19,25;134:2,9
**descriptions (1)**
133:2
**desk (1)**
54:7
**destination (1)**
50:21
**destroys (1)**
76:2
**detail (2)**
4:20;130:10
**details (2)**
115:7;130:11
**detergent (1)**
46:19
**determines (4)**
18:24,25;19:1,1
**diamond (1)**
56:6
**dies (2)**
49:3,5
**different (1)**
150:25
**difficult (1)**
5:2
**Dilk (1)**
110:4
**dinner (1)**
124:3
**DIRECT (2)**
4:5;133:3
**directed (1)**
163:10
**direction (2)**
150:16;166:16
**directions (1)**
162:7
**directly (1)**
113:5
**Director (24)**
6:19;13:5,6,8,10,
12;21:18;23:23;24:4,
16,20,25;25:8;26:8;

27:8;28:14;30:3;
60:15,25;63:20;
75:15;95:12;131:1;
164:3
**directors (1)**
131:4
**disagree (5)**
20:14;23:10,13;
26:9;28:14
**disapprove (1)**
145:22
**disciplinary (1)**
130:17
**discipline (6)**
35:12,17;36:7,9;
98:20;120:1
**disclosures (1)**
61:22
**discovery (4)**
72:13;73:9;98:11;
124:17
**discuss (5)**
39:11;55:24;
113:15,16;118:8
**discussed (5)**
43:4;72:23;119:21;
120:7;131:3
**discussion (7)**
26:12;27:3,14;
107:11;161:14;
162:4;164:23
**disinterested (1)**
166:22
**dismiss (1)**
137:10
**dispute (4)**
103:4;116:16;
140:23;141:9
**disputing (1)**
140:25
**district (3)**
94:5;168:5,5.5
**DIVISION (1)**
168:6
**doctor (2)**
29:17,18
**document (17)**
36:20;38:14;41:1;
42:8;45:24;59:3;
104:7;106:18;
126:17;127:10;
129:22;130:14;
132:5;138:17;145:8;
148:4;151:1
**documentation (1)**
119:21
**documented (6)**
45:19;76:8;79:10;
80:3,10;92:4
**documents (7)**
7:6;32:9;40:23;
41:6;60:9;105:13;
106:4

**dog (3)**
65:7,7;78:6
**dollar (2)**
19:8,9;71:2;
138:25,25
**dollars (1)**
67:1
**donate (1)**
142:1
**donation (4)**
46:18;70:5;141:24;
142:1
**donations (1)**
61:20
**done (49)**
12:3;15:21,23,24;
16:1,5,7;26:16,23;
30:16;33:19,24;35:7;
40:11,11,13;41:12,
15;45:12;50:5;56:3,
7;57:15,21;64:6;
65:2,3,4;71:8;78:1,1;
88:2,25;89:2;95:9;
109:13;112:10,10,15,
17;119:15;120:15,
17;151:5;160:3,4,21;
161:16;164:21
**donor (1)**
69:18
**door (3)**
36:14;77:21;
107:19
**doors (2)**
152:6,6
**dot (3)**
54:22,23,23
**double (1)**
98:17
**doubt (2)**
140:9,11
**Dowden (2)**
18:2,4
**down (23)**
4:21;21:9;23:5;
32:18;38:11;44:8;
54:2;64:24;71:20;
78:3;81:9,10;86:13,
16,18,24;98:7;133:1;
134:10;137:17;
138:6;159:11;166:14
**draw (1)**
152:3
**drawn (2)**
66:9;67:23
**drink (1)**
5:19
**drive (3)**
49:25;50:18;51:4
**drop (1)**
50:1
**duly (2)**
4:2;166:6
**Duracell (2)**

9:15,23
**during (4)**
45:23;82:7;155:10,
17
**duties (6)**
11:24;21:17;33:15;
60:2,13;131:21
**duty (2)**
61:22;102:4

**E**

**earlier (6)**
43:18;117:21;
143:19,20;146:3;
161:14
**earn (1)**
142:7
**earring (1)**
56:3
**easier (1)**
36:4
**East (1)**
168:2.5
**edge (1)**
83:12
**edit (3)**
45:21,22;129:19
**edited (2)**
46:1,2
**either (4)**
14:3;51:11;166:24;
167:1
**elaborating (1)**
37:17
**elected (3)**
20:3;135:25;136:7
**election (4)**
33:25;61:23;
141:14;142:10
**elective (1)**
13:21
**eligible (1)**
26:21
**Elliott (1)**
22:4
**else (17)**
15:12;17:21;43:13;
46:14;49:19;54:1,6;
62:11,11;71:17;75:2;
87:6;92:7;99:13;
101:1;122:6;137:25
**Elsener (3)**
133:5,6,14
**else's (2)**
22:18;91:21
**e-mail (18)**
37:9,9;38:15;
40:25;42:3;46:11;
47:12;76:9;78:24;
81:25;89:25;90:7;
100:5;113:14;
115:23;131:14,15;

154:16
**E-mails (5)**
7:8,9;36:23;40:22;
134:3
**embarrassing (1)**
119:1
**emoji (2)**
48:21;152:16
**employ (1)**
167:1
**employed (8)**
6:12,14,15;10:5;
32:15;60:24;89:4,8
**employee (9)**
32:2;38:8,16;
49:10;59:12;61:4;
78:20;123:12;146:4
**employees (11)**
12:14,24;24:10;
35:2;37:1,12;38:1;
65:17;78:10;101:3;
130:6
**employer (1)**
134:3
**employment (2)**
74:6;145:4
**encouraged (1)**
93:17
**end (3)**
21:11,13;142:6
**ended (1)**
89:8
**enemy (2)**
79:5;91:17
**English (1)**
4:25
**enjoyed (1)**
90:9
**enough (6)**
16:2;24:23;42:18;
81:13;87:5;105:18
**enraged (1)**
119:6
**entail (1)**
61:18
**enter (1)**
33:17
**entered (1)**
7:18
**entertainment (2)**
68:24;69:12
**entire (2)**
134:12;155:14
**equal (1)**
12:23
**equipment (2)**
4:23;70:9
**Errata (1)**
168:19
**especially (1)**
30:15
**Esq (1)**
168:1.5

**essentially (2)**
75:14;137:24
**established (1)**
147:13
**estimate (2)**
156:5,9
**E-Tran (3)**
165:1,2,3
**evaluation (1)**
32:10
**evaluations (1)**
35:1
**even (20)**
4:25;5:6;56:10,12;
62:14;75:20;79:13;
82:6,7;85:20;87:23;
96:11;105:22;
111:18;115:9;124:2;
126:15;140:5;152:7;
164:16
**evening (2)**
46:17;117:24
**event (13)**
21:9;30:13;57:19;
62:15,19;68:9,10,15;
139:11,16,21,24;
166:25
**events (1)**
21:12
**Everybody (5)**
33:21;100:25;
101:13;137:25;140:5
**Everyone (2)**
71:17;83:24
**everywhere (2)**
56:10,11
**evidence (2)**
30:24;145:3
**exact (1)**
155:16
**exactly (4)**
34:23;39:14;51:19;
111:5
**exaggerating (1)**
31:10
**EXAMINATION (2)**
4:5;163:15
**examples (2)**
15:7;152:10
**Excuse (9)**
13:9;20:16;59:20;
96:20;115:15;123:8;
132:25;143:19;
144:20
**executive (17)**
21:18;23:22;24:4,
16,20,25;25:8;26:8;
28:14;30:2;60:14,25;
63:20;75:15;131:1,6;
164:3
**exempt (1)**
48:17
**exempted (1)**

72:15

**Exhibit (57)**
106:6,7,8,20,21,25;
107:4,6;113:11,13;
115:12,13,21;117:14,
16,17,19;121:12,13;
122:17,19,21,24;
124:11,13,14,19,21;
128:21,22,24;129:1;
130:19,22,23,25;
132:13,14,21;135:13,
16;137:14;138:12,13,
15;142:22,23;143:2;
147:6,6,7,13;148:3,
22;154:7,9;159:5

**exhibits (1)**
147:10

**expect (2)**
34:2;111:9;138:3

**expectations (1)**
123:12

**expenditures (2)**
18:22;61:21

**Expires (1)**
167:9

**explain (3)**
150:14;151:11,22

**explained (1)**
28:12

**explanation (1)**
105:4

**expunged (4)**
26:25;27:16;123:3;
148:2

**expungement (4)**
26:15,21;123:1;
147:11

**expungements (1)**
27:13

**extend (1)**
83:5

**extended (2)**
22:23;100:11

**extent (5)**
22:20;55:1,14;
66:12;133:23

**extreme (1)**
77:2

**F**

**face (4)**
48:20,21;151:17;
152:15

**Facebook (7)**
49:11;55:20;57:3,
3;119:3;153:9,23

**fact (11)**
26:25;32:11;34:19;
37:16;62:18;63:3,21;
120:9;122:9;147:5,5

**Fair (83)**
16:21,24,25;17:1,4,

16;18:5,16;20:16,17;
21:21;25:25;27:25;
30:11;36:18;38:23;
44:5;45:17;47:11;
51:17,20;55:4;59:23;
60:24;61:24;65:2;
68:16;70:8;71:20;
72:22;73:2;74:13;
76:5,21;79:25;80:1,
14;81:3,16;82:6,12,
14,15,19;83:5;88:11,
14;89:14;95:1,4,4,6;
107:1;108:20;110:2;
112:6;113:22,24;
117:11,23;118:8,18,
21;119:14;120:15;
125:23;126:19;
127:11,12;131:4;
134:4;150:10;
151:12;152:21,24;
154:18,25;155:11,14,
14,18;158:25;
168:12.5

**fairground (1)**
64:1

**Fairgrounds (50)**
4:11;17:19;18:24;
19:5;28:20;44:19;
47:20;57:18;59:13;
62:24;63:4;65:16;
66:10,15;67:23;
69:16;70:10,12,19,
23;74:6;77:7;78:18,
19;87:13;89:4;
110:20;111:2,22;
112:10,18,24,25;
114:3,17;118:25;
119:11;134:13;
140:16,17,18,22;
141:22;142:1;
150:25;157:8,17;
158:12,15;162:6

**fairs (3)**
17:7,9,15

**fair's (1)**
23:6

**fall (3)**
74:5,10,17

**false (2)**
134:4,5

**familiar (5)**
4:18;16:2;65:14;
89:3;116:11

**family (11)**
32:21;49:2,3,11;
50:2;52:1,6;54:5;
77:5;123:24;151:12

**fan (5)**
67:8,9,10,12,16

**fans (1)**
107:19

**far (4)**
17:11;61:20;75:5;

120:16

**farm (1)**
23:2

**fault (1)**
119:10

**favorable (1)**
71:5

**fearful (1)**
136:16

**February (4)**
147:14;148:7,7,19

**Federal (1)**
168:16.5

**feel (4)**
5:16;31:1;38:24;
145:2

**fellow (1)**
20:4

**felonies (2)**
124:6,7

**felony (4)**
25:15,22;26:6;
123:14

**felt (2)**
77:15;133:16

**female (1)**
146:4

**Ferris (1)**
68:25

**few (6)**
17:12;27:2;80:18;
93:3;146:25;161:11

**field (1)**
57:20

**figure (1)**
84:25

**figured (1)**
111:14

**file (9)**
102:11;105:2;
125:1;126:20;
128:15;135:8;136:5;
137:15;138:4

**filed (2)**
125:18;137:16

**files (2)**
60:13;126:19

**filing (2)**
133:17;168:4

**fill (1)**
61:22

**final (5)**
35:21;45:24;46:3;
118:6;120:14

**finally (3)**
22:25;51:21;91:18

**financial (2)**
11:13;141:15

**financially (1)**
71:4

**find (9)**
72:8;79:15;84:8,9,
21,23;85:14;92:11;

160:21

**fine (5)**
82:18;85:5;105:19,
20;165:2

**finish (3)**
5:10,11;28:6

**finished (3)**
5:5;9:24;145:24

**finishing (1)**
109:15

**fire (14)**
18:15;28:23,24;
32:23;91:1,15,22,24,
25;92:4;96:5;120:22;
130:5;145:6

**fired (12)**
28:19;32:11;83:18;
87:12;88:10;91:10,
23;92:24;104:8;
116:21;122:5,8

**firing (1)**
90:23

**first (25)**
4:2;18:1;21:24;
24:21;30:15;35:19;
77:10;86:8;102:8;
103:18;106:22;
108:14;113:12,12;
114:4;116:12,13;
118:6;125:8;134:8;
136:10;143:10;
151:12;161:13;166:6

**fits (1)**
75:25

**five (7)**
9:19;12:15;37:19;
56:18;59:25;86:3;
161:4

**fix (1)**
76:2

**fixed (1)**
119:19

**flight (1)**
50:15

**flood (1)**
101:8

**Florida (1)**
31:3

**folder (1)**
163:12

**follow (2)**
127:3;162:7

**followed (1)**
100:9

**follow-on (1)**
161:11

**follows (1)**
4:4

**follow-up (2)**
153:22;154:24

**food (1)**
69:1

**forced (1)**

51:22

**foregoing (1)**
166:9

**forget (1)**
19:10

**forgive (2)**
80:19;144:15

**forgot (1)**
20:15

**form (23)**
17:22;28:16,21,25;
43:20,23;54:24;
62:25;64:16;66:11;
78:22;88:16,21;96:7;
101:20;103:6;
112:12;120:25;
121:5;133:21;
141:10,16;164:10

**formal (1)**
78:24

**forms (1)**
141:15

**for-profit (1)**
17:19

**found (7)**
49:10,11;92:5;
128:10;147:25;
148:21;152:7

**four (5)**
8:14;15:22;53:21;
56:17;136:17

**Fox (2)**
166:3;167:6.5

**Frank (1)**
83:13

**Franklin (5)**
6:10;8:4;13:24,25;
14:7

**frankly (2)**
30:25;78:10

**free (5)**
5:17;70:19;123:21,
22,23

**Freeman (3)**
15:15;27:6,15

**frequent (1)**
69:18

**Friday (2)**
109:4,6

**friend (4)**
18:2,3;52:23,25

**friends (17)**
30:10,17;31:13,20;
32:17;34:16;40:10;
45:14,15;53:2;64:23;
78:16;79:3;82:5;
124:4;153:23;154:3

**friendship (1)**
46:15

**front (2)**
21:11;54:7

**frozen (2)**
47:8,9

**full (7)**
6:2;53:14;59:23;
84:4;85:20,20;
163:12
**full-time (5)**
59:16,21;61:4;
65:20;74:8
**fully (1)**
120:3
**fun (3)**
39:15;42:21;
129:16
**function (1)**
136:2
**functioning (1)**
75:14
**functions (2)**
94:8,12
**fund (4)**
63:19;69:22;
140:22;141:23
**funded (2)**
17:13;142:4
**fundraiser (8)**
15:17;62:6;63:4,
23;64:2;70:3;139:11;
140:1
**fundraisers (1)**
62:1
**funds (7)**
62:24;63:5;64:1,1;
66:10;67:23;141:8
**furniture (1)**
108:5
**further (7)**
126:3;146:21;
162:23;164:18,20;
165:5;166:22

## G

**garage (3)**
67:17;152:6,6
**gardener (1)**
160:2
**gas (1)**
52:8
**Gator (2)**
83:12;84:13
**gave (18)**
66:22,23;67:12,16;
71:2;85:20;91:25;
109:25;112:5;125:2,
5,25;127:7;135:5;
144:1;156:11,12,20
**Gees (1)**
52:24
**general (2)**
60:13;109:24
**generally (1)**
19:4
**genitalia (1)**
53:6

**gestures (1)**
5:3
**getaway (1)**
50:11
**gift (1)**
52:12
**girl (7)**
37:18;53:11,18,20,
21;88:5;127:15
**girlfriends (1)**
129:14
**given (11)**
45:19;96:1;105:7;
125:16,19;129:5,8,
20,22;158:21;166:17
**giving (2)**
67:1;145:12
**Gmail (2)**
115:25;116:1
**goal (2)**
51:18;52:2
**God (2)**
56:8;142:18
**goes (3)**
37:20;52:18;97:7
**Goins (3)**
29:2,6;84:6
**good (11)**
4:22;24:22;30:6;
34:9;40:10;44:16;
46:23;52:17;120:16;
121:10;123:23
**GOP (2)**
94:8;142:20
**government (4)**
17:4,10,13;142:3
**governor (1)**
15:13
**graduate (4)**
8:5;123:22;124:1,8
**graduation (1)**
8:7
**grapes (1)**
42:19
**grass (2)**
24:12;120:12
**Great (2)**
106:1;147:12
**Greater (1)**
16:6
**Gretchen (2)**
166:3;167:6.5
**ground (1)**
134:13
**grounds (2)**
119:4,15
**groundskeeper (10)**
21:10,13;22:22;
23:6,20;24:22;61:9,
10;87:16;163:19
**group (4)**
16:23;41:23,23;
83:9

**groups (2)**
16:6,8
**grow (1)**
7:23
**guess (11)**
27:17;50:25;53:5;
54:11;67:13;69:15;
70:17;116:17;134:7;
153:21;154:24
**guilty (3)**
7:21;39:20;58:15
**guy (5)**
24:2,12;56:6;
57:13;79:6
**guys (8)**
56:4,13,17,25;
85:12;98:12;108:7;
154:10

## H

**half (5)**
71:2;85:20,20;
103:15;107:24
**halfway (1)**
133:1
**hand (6)**
5:3;79:1;81:14;
111:7;117:15;167:3
**handed (5)**
106:23;111:5;
122:18;124:12;
128:22
**handful (1)**
98:9
**handyman (3)**
107:8,10,12
**hang (3)**
52:18;65:5;107:19
**hanging (1)**
108:4
**happen (4)**
10:8;23:25;29:11;
58:4
**happened (15)**
18:16;33:1;58:3;
85:19,24;89:17;
94:23;95:17;104:2,
14,17,17;113:9;
160:6;161:23
**happening (1)**
31:17
**happens (1)**
29:25
**happy (2)**
46:15;142:19
**harassed (11)**
43:14;58:21,22;
96:25;99:1;127:11;
149:11,16,20,23;
150:2
**harassing (9)**
39:21,24;40:1;

43:9;58:25;128:8,8;
146:5;149:9
**harassment (23)**
39:18,20;40:4;
52:24;57:25;58:11,
12,15,16;59:7;81:12;
82:9;96:21,23;99:22;
125:18,24,25;126:5;
127:21;128:2;
129:12;161:16
**Hargraves (3)**
57:5,8;153:14
**Hart (3)**
93:20,22,25
**Hart's (1)**
93:24
**hate (2)**
6:5;18:8
**head (2)**
143:13;152:11
**health (6)**
29:15;30:3,6,7,22;
31:6
**healthcare (1)**
34:17
**hearing (3)**
136:20,24;137:4
**heavy (1)**
77:19
**held (6)**
14:10,13;19:19,23;
139:18;164:23
**help (10)**
17:2;29:21;30:18;
33:24;34:16;36:24;
62:11;121:16;
122:25;148:1
**helped (8)**
9:24;15:13,13;
31:15;62:9,10;65:5;
79:7
**helpful (1)**
62:14
**helping (1)**
15:16
**hereby (1)**
166:5
**herein (1)**
166:6
**here's (2)**
38:12;100:23
**hereunto (1)**
167:2
**hey (13)**
37:3;41:22;52:15;
65:3,9,23;76:16;
90:22;102:8;112:21;
119:18;160:2,20
**hide (1)**
63:11
**high (4)**
8:1,3,4;9:3
**highlighted (1)**

147:5
**highly (1)**
148:15
**himself (3)**
20:14;91:17;145:1
**hire (15)**
18:22;21:17;22:25;
24:4;29:8;38:10;
53:11;54:1,10,13;
64:14,21;75:18;
159:13;164:15
**hired (17)**
21:20,21,23,25;
23:6,16,18;24:25;
25:17;26:17;34:19;
53:11,16,22;54:8;
65:23;163:21
**hires (1)**
22:16
**hiring (3)**
22:15;23:17;74:15
**his/her (1)**
166:19
**history (1)**
147:15
**hit (1)**
79:23
**holds (1)**
148:14
**hole (4)**
51:18;52:2;76:1;
77:21
**home (2)**
9:25;21:10
**homeless (1)**
54:2
**Hopefully (1)**
146:25
**horror (1)**
144:23
**horse (1)**
23:2
**Hoss (212)**
22:12,16;23:19;
25:1,14;26:5,20;28:2,
11,19;29:8,14;30:10,
22;31:5,12,13,23;
32:1;33:4;34:16;
35:7,11;36:6,17,24;
38:13,22;39:23;40:1;
41:4;43:6,8;45:1;
46:4,9;49:22;52:11;
53:16,22;54:13,18;
55:18;56:13;57:9,19,
24;58:10,13;59:6;
60:14,25;61:9;62:14,
15,18,23;63:3,9,10,
18,21;64:1,18,21,23;
65:19;66:22,25;
67:19;70:22;75:11,
12,17,20;76:10,23;
77:13,16,17,19,23,
24;78:4,25;79:2,2,19;

80:10;81:7,23;82:3;
84:17,17,19;85:1,22;
86:15;87:4,16,20;
89:3,25;90:1,11,19,
23;91:1,9;92:4,9,16,
24;93:7;94:7,20;
95:11;96:16,20,21,
23,25;97:15;98:20,
23;99:5,11,21;100:4,
10;101:14,17;102:9,
13,25;103:3,21;
104:12;105:4;
106:10;107:7,10,14;
108:25;109:1,13,20;
110:15,24;111:9,20;
112:8;113:4,19;
114:1,17;116:7,14;
118:9,11,14;119:8,
22,25;120:14,22;
121:18,23;122:9;
124:24;126:5,13;
127:17;129:5,11,20;
130:15,17;131:18,21;
132:23;133:4,10,17;
134:16;137:16;
138:18;139:9,21;
140:1,7,17,21;141:7,
12;143:7,12,14,17;
144:22,24;145:14,17,
19;146:5,10;158:4;
160:1;163:12,21;
164:2,2

**Hoss' (10)**
27:15;33:15;40:6;
42:11;55:20;56:15;
86:7;94:18;98:25;
145:22

**host (1)**
142:21

**hosted (2)**
62:1,9

**hot (2)**
57:13;77:19

**hotel (1)**
50:13

**hotheaded (1)**
79:6

**hour (5)**
86:2;100:12;
101:11;103:14;105:9

**hours (9)**
61:12;103:15;
105:10;143:20,25;
144:9,13;155:10,16

**house (45)**
64:6,10,15,19,22;
65:1,10,13,24,25;
66:6,9,21;67:24;
78:3;86:13,15,18,23;
91:24;107:18,21,24;
109:21;110:9,18;
112:11,19;114:2,2,4,
15;137:17;138:6;

153:7;155:22,24;
156:9;157:3;159:9,
12,13,24;160:9,13

**houses (2)**
67:19;134:10

**HR (17)**
12:18;34:11;38:17;
95:20,22;96:20;
98:25;99:19;102:7;
125:2,6,16;127:14;
128:19;147:20;
161:18,19

**huge (3)**
56:21;68:11;69:4

**human (6)**
78:23;96:19;
104:12,24;127:8;
146:16

**humble (1)**
92:2

**humor (1)**
42:18

**hurt (4)**
36:25;56:9,19;
128:15

**husband (8)**
18:3,4,9;64:15;
65:17;77:6;120:12;
134:24

**husband's (1)**
18:6

**Huston (11)**
68:1,4,6,8,17,18;
69:5,9,18,21;70:2

**hysterical (1)**
84:11

**I**

**ice (2)**
84:2;85:15

**idea (18)**
27:1;31:7;55:3,6,7;
56:3;57:6;63:24;
67:10;71:12;85:24;
110:11;112:4;114:5;
138:2;140:14;
141:12;145:23

**identification (12)**
106:7,21;115:13;
117:14;121:12;
122:17;124:11;
128:21;130:22;
132:13;138:12;
142:22

**identified (1)**
149:1

**identify (3)**
43:16;113:12;
119:24

**ignore (1)**
54:19

**image (1)**

119:3

**imagine (3)**
52:8;65:11;144:1

**immediately (2)**
9:2;137:10

**IMPD (2)**
135:23;136:5

**important (3)**
4:24;5:4,9

**improper (2)**
141:24,25

**improve (2)**
82:20;122:13

**improvement (1)**
122:15

**inappropriate (8)**
53:8;57:10;63:25;
78:19;79:19;80:1;
88:20;162:19

**inappropriately (1)**
130:16

**incident (4)**
98:6;133:2;134:2,9

**includes (1)**
122:21

**incurred (1)**
71:10

**independently (1)**
144:7

**Indiana (14)**
6:10;7:25;8:10,11,
19;17:7;123:19;
148:14,18;166:1,4,
12;168:5,5,16

**Indianapolis (16)**
4:11;6:10;15:9;
16:6;18:15;29:9;
59:18;125:3;127:8;
135:10,21;142:5;
166:12;168:3,6,24.5

**INDIANAPOLIS-MARION (1)**
168:10.5

**individually (1)**
4:12

**Industrial (1)**
168:17

**indygov (1)**
116:3

**infer (1)**
150:1

**inferring (1)**
149:18

**info (1)**
125:25

**inform (1)**
116:7

**informal (1)**
24:13

**information (4)**
9:22;134:5,5;
145:17

**initially (1)**
156:16

**initiated (1)**
107:11

**inquired (1)**
119:6

**inside (1)**
138:16

**instead (3)**
93:12;96:10;136:7

**instruct (2)**
113:19;114:19

**instructed (1)**
70:22

**Insurance (4)**
9:7;30:3,6,7

**intelligent (1)**
148:15

**intent (2)**
26:18;55:8

**interest (1)**
47:13

**interested (1)**
166:25

**interlude (1)**
50:12

**interpreted (1)**
55:11

**interrupting (1)**
5:11

**interview (3)**
99:3,8,13

**interviewed (3)**
99:5,10,15

**interviewer (1)**
99:15

**intimidate (2)**
81:18,19

**intimidated (1)**
80:16

**into (7)**
4:19;6:23;7:18;
30:19;76:12;141:21;
162:20

**introduced (3)**
4:7;94:13,17

**investigate (1)**
87:1

**investigated (2)**
98:25;138:7

**investigating (2)**
135:10,19

**investigation (1)**
158:10

**invite (2)**
47:6;153:7

**inviting (1)**
153:4

**invoice (2)**
70:22;156:6

**invoices (2)**
156:7;163:12

**involved (6)**
13:4;44:16;62:13;
87:17;118:15;138:10

**ISA (1)**
116:18

**issue (4)**
120:2;127:12;
129:13;163:10

**issued (1)**
157:12

**issues (11)**
24:3;29:15;41:21;
77:18;82:25;118:9,
11;120:6,7,16;162:5

**item (1)**
132:25

**IUPUI (1)**
9:4

**IWU (1)**
123:22

**J**

**Jack (2)**
15:14,14

**January (4)**
147:14;166:13;
167:9.5;168:18

**Jeff (2)**
4:8;105:23

**Jefferson (1)**
15:8

**Jeffrey (1)**
168:1.5

**Jeremiah (6)**
4:9;21:24;22:11;
25:21;128:7;168:7.5

**Jeremy (1)**
25:23

**jerk (1)**
5:14

**job (39)**
4:22;23:9;24:22;
30:2,9;33:3;34:3;
35:1;39:11;40:5,6;
41:6;42:2,11;54:11,
12;60:14,23;65:20;
74:8;75:11,18;87:13,
19;89:8;94:18,21;
122:16;130:15;
131:2,18,19,21,25;
147:22;150:9;160:1;
164:5,11

**jobs (1)**
45:11

**Joe (9)**
29:2,6;84:6;133:5,
6,9,10,14;141:4

**John (15)**
39:12,16;41:1;
43:5;44:13,14;45:22;
58:13;59:1,2;98:13;
129:17,18;149:5;
161:1

**JOHNSON (2)**
166:2,4

**joke (1)**
78:13
**judge (3)**
44:15;68:17,18
**juice (1)**
79:23
**July (10)**
20:19,20,20;81:2,
4;90:4;118:3,4;
125:13;154:25
**June (14)**
20:18;46:22;47:7,
10,12,16,19,22;48:1,
15,18;52:22;54:20;
152:13
**Justice (5)**
10:16,20,21;26:1,2

## K

**Kaitlyn (1)**
54:8
**Karen (1)**
51:1
**Kay (1)**
22:4
**keep (8)**
63:8,11,12;65:22;
67:6;79:4;84:23;
140:12
**keeping (5)**
31:23,24,25;63:18;
73:4
**keeps (1)**
73:14
**Keith (3)**
11:23;18:10;49:25
**Kendall (1)**
54:8
**kept (15)**
22:23,24;31:18;
32:2;63:10,12;65:6,
7;71:22;80:13;82:18;
88:4;141:4,5;142:4
**Key (1)**
47:14
**kid (1)**
57:15
**kidded (1)**
129:15
**kids (2)**
84:18;151:14
**kind (31)**
13:19;17:18;18:11;
23:5;31:3;35:11;
36:7;40:14,16,22;
42:21;54:11;55:8;
63:13;65:21;67:22;
76:10;98:8;100:14;
101:5;112:17;
119:25;122:25;
127:19,20,22;140:12;
150:9,14;151:11;

160:18
**kinds (3)**
55:18;136:4;152:9
**knew (26)**
9:22;24:1;30:18;
32:19,19;37:24;
40:13;41:9;54:9;
63:10;68:20;82:16;
83:17;86:22;88:3;
91:2;95:14;103:11;
104:14,14,22;120:3,
9;122:7;134:10;
143:20
**knowing (2)**
140:25;144:12
**knowledge (9)**
87:1;101:10;
137:14;146:19;
155:25;157:13;
158:6,9;159:22
**known (4)**
69:25;70:1;91:4;
97:13
**knows (9)**
17:24;55:1,14;
66:12;130:17,17;
133:23;142:18;
145:14
**Kohl's (1)**
51:13

## L

**LaDonna (3)**
27:6,13,14
**LaDonna's (2)**
36:11;97:8
**lady (4)**
54:3;57:12;99:16,
18
**laid (1)**
81:14
**large (2)**
70:9;166:4
**last (26)**
8:22;10:23;33:20;
39:14,16;42:13,15,
20;54:4,20;59:2;
71:8;74:20;100:17,
18;101:2;106:25;
128:14;135:1,13,14,
16;137:19,19;
144:19;161:3
**late (4)**
8:24;20:18;93:1;
94:19
**later (9)**
6:21;36:4;49:22;
75:8;88:7;93:4;
125:4,5;164:2
**laundry (1)**
46:19
**LAW (1)**

168:2
**lawsuit (3)**
4:10,12;73:18
**LEA (5)**
4:1;6:4;165:8;
166:5;168:17.5
**lead (1)**
155:14
**leader (2)**
15:24;16:4
**leadership (1)**
145:2
**leak (1)**
145:13
**leaking (1)**
145:17
**learn (4)**
25:19;88:4;131:21;
158:14
**learned (3)**
91:18;123:10;
143:11
**learning (1)**
60:12
**lease (1)**
19:3
**least (5)**
115:7;118:1;
147:13;148:19;
159:14
**leave (12)**
36:16;38:6;48:22;
76:16;77:20;95:2,3,
5;101:3;102:16;
104:20;153:2
**leaving (6)**
36:15;48:19,23;
76:13;90:2,8
**led (2)**
68:23;97:25
**left (16)**
25:6,9;36:17;
52:20,21;60:14;
86:10,21;102:14;
104:18,23;111:8;
126:12;144:23;
157:4,4
**leg (1)**
29:16
**legislature (1)**
16:12
**length (1)**
71:11
**lengthy (1)**
123:11
**less (1)**
78:24
**lets (1)**
38:15
**letter (14)**
32:12;90:11,13,19;
91:25;92:5;117:22;
119:25;120:14;

121:19;122:22;
123:8;144:20;147:11
**letters (1)**
13:14
**letting (1)**
32:14
**liar (1)**
145:1
**life (6)**
15:20;31:14;46:13;
136:16;138:9;144:23
**life's (1)**
79:7
**lights (2)**
65:5;107:20
**likes (1)**
97:17
**Lilly (2)**
24:8;49:9
**limitations (1)**
4:23
**line (2)**
83:17;138:23
**list (4)**
54:7;58:24;132:2;
143:21
**listed (1)**
118:12
**listen (1)**
91:19
**listener (1)**
150:1
**literally (1)**
71:21
**little (9)**
41:25;56:2,17;
73:3;108:10;116:1;
130:9;133:1;152:2
**live (4)**
10:1;25:8,12;92:22
**lived (5)**
21:10;25:9;49:12,
24;139:21
**lives (3)**
31:15;49:23;51:1
**living (4)**
47:23;67:8,10;
107:19
**loan (4)**
71:2,4,19;72:15
**loaned (1)**
31:2
**local (1)**
16:3
**lodge (23)**
21:8,11;25:9,10,
12;49:16;62:6,7;
65:12,19;92:22;
109:16,22;111:16;
138:16;139:12,18,20;
150:22;155:23,25;
157:3;160:8
**long (12)**

9:10,18;10:3,21;
11:7;20:6,24;21:3;
23:19;25:20;147:1;
161:6
**longer (1)**
29:20
**look (40)**
7:5;44:6,8;52:17;
56:14,19;72:14,19;
73:15;79:14;80:12,
13,17,17;81:19;92:7;
98:5;105:2;106:12;
113:17;116:1;117:2;
121:15;125:20;
128:5;133:1;134:2,8;
135:1,9;136:10;
138:23;141:21;
142:14,19;144:19;
147:7;148:10;159:7,
17
**looked (3)**
41:24;79:12;97:5
**looking (13)**
22:22;84:8,23;
85:13,17;90:12,16;
107:7,17,25;118:3;
125:9;164:14
**looks (10)**
56:7;108:4,10,11,
24;116:11;118:19;
135:15;154:16;
159:13
**lose (1)**
29:16
**lot (15)**
4:19;27:13;41:21;
62:13;73:2;87:25;
119:18;120:15;
125:1,7;136:5;
155:10,13,17,21
**lots (1)**
118:25
**loud (1)**
132:16
**love (1)**
152:4
**lower (1)**
93:15
**Lowery (1)**
161:11
**LOWREY (15)**
22:17;98:14,17;
105:20,23;115:18;
116:23;147:10;
160:24;161:4,7,10;
162:23;164:20;165:3
**lube (1)**
51:19
**lucky (1)**
130:5
**lunch (12)**
37:12,21,22;38:16;
100:11,19;101:4,6,

11;105:9,15;106:3
**lying (2)**
31:6,10

# M

**Ma'am (25)**
4:7;6:2,5,16;7:13;
11:17;13:3;18:8;
22:19;30:14;33:6;
37:4;41:19;47:24;
68:8;75:21;78:10;
80:7;81:6;112:2;
114:11;115:14,21;
139:5,7
**main (2)**
30:8;61:22
**maintenance (4)**
23:10,15;112:17,
19
**major (1)**
69:15
**makes (1)**
103:13
**making (4)**
39:15;42:21;44:9;
46:5
**Mallory (2)**
9:13,18
**management (2)**
8:17;24:13
**manager (3)**
10:17;11:6,13
**manner (1)**
162:18
**many (15)**
12:14;15:5,20;
24:10;26:19;61:12;
62:4;79:12,13,13;
102:2;118:15;130:5;
133:3;142:18
**Maria (13)**
64:14;65:14;114:9,
17;157:2,17;158:11,
15,20,22;163:4,8,11
**Marion (14)**
4:11;6:17,18,19;
10:13;12:7;14:24;
16:21,25;17:1,4;
68:18;166:12;168:12
**Mark (2)**
46:16;115:12
**marked (18)**
106:6,7,21;115:13;
117:14,16;121:12;
122:17,19;124:11,13,
15;128:21,22;
130:22;132:13;
138:12;142:22
**Market (1)**
168:2.5
**masters' (1)**
124:2

**master's (8)**
8:16,18;28:8;
123:19;148:14,17,20;
163:17
**matter (2)**
131:25;151:16
**matters (1)**
161:12
**may (28)**
5:6,12;11:16;13:5;
19:4;32:13;41:23;
43:18,25;46:10,22;
57:24;58:9;59:7;
78:23;86:25;87:23;
92:6;120:3,4,8,18;
129:6,20;136:13;
148:24,25;155:16
**maybe (13)**
24:11;27:20,21;
29:22;38:14;76:9;
81:24;93:1;118:20;
136:21;152:4;
153:14;159:8
**Mayo (1)**
31:2
**mayor (7)**
12:8;15:9;33:12,
13;93:11,13,15
**MBA (1)**
8:17
**McQUARY (35)**
4:6,8;38:19;61:5;
86:4;98:16;105:12,
16,18,21;106:1,19,
24;107:2;108:14,19;
109:8;112:1;115:17,
19;131:13,16;
135:15;145:24;
146:21;147:8,12;
161:1,5,12;163:1,16;
164:18;165:4;
168:1.5
**McVeigh (2)**
126:8;149:24
**Meador (2)**
79:22;84:12
**mean (73)**
6:15;14:15;17:11,
19;21:21;24:17;
25:17;26:2,20;27:7,
24;30:24;31:11;
32:17;35:16;36:10;
41:19;42:13,17,24;
43:12;44:18;47:3;
48:12;49:5;50:10;
52:7;53:1,18;54:8;
56:6,21;65:4,20;
68:25;72:2;75:21;
79:11;81:11;83:11,
23;86:12,13;87:7,23;
88:23;92:22;93:15;
95:15;99:7;100:2,17;
109:8,25;114:12;

116:3,17;118:18;
120:3;123:6;127:9;
128:17;130:9;131:2,
24;136:5;140:8;
142:19;145:17;
149:22;151:22;
154:24;155:19
**meaning (1)**
55:12
**means (1)**
58:4
**meant (2)**
150:14;151:11
**media (2)**
49:12;54:11
**medications (1)**
6:23
**meet (3)**
21:24;83:8;118:7
**meeting (52)**
12:4;39:11,23;
40:3,6,23;41:7,9,10,
10,14,14,19,20,25;
42:2,10,10,25,25;
43:1,4,6,10,18,25;
45:1,23;46:2,4,17;
53:19;57:24;58:10;
59:7;72:6,24;83:9;
86:25;92:6,6;103:21;
104:2;120:1,3,5,8;
129:6,21;148:24;
149:2,8
**meetings (1)**
60:12
**member (11)**
19:25;21:1;33:7;
44:20,22;59:18;
67:15;82:13;118:16;
126:9;127:11
**members (14)**
16:23;20:4;38:23;
39:3;43:3;45:15;
67:20;90:21;92:12;
117:21,25;125:23;
129:25;154:17
**members' (1)**
112:20
**memo (9)**
45:21;97:1;98:5,6,
10;105:23;124:22,23,
25
**memorandum (1)**
143:3
**memories (1)**
18:9
**memory (2)**
58:7;105:2
**memos (1)**
40:22
**men's (1)**
161:2
**mental (1)**
81:13

**mention (1)**
90:11
**mentioned (5)**
27:2;77:11;86:6;
117:21;122:4
**mentioning (1)**
124:5
**message (4)**
76:10;81:24;
152:13;159:4
**messages (3)**
106:10,15;138:18
**messing (1)**
88:4
**met (4)**
43:3,6;117:25;
125:23
**Metro (2)**
135:10,21
**Michael (3)**
94:5,6,6
**Michael-Paul (4)**
93:20,22,24,25
**Michele (5)**
33:8;95:11,13;
103:21;104:4
**Michelle (1)**
13:11
**middle (3)**
138:24;151:13;
160:1
**midgets (3)**
56:23,24;151:24
**midmorning (1)**
103:4
**midway (5)**
68:2,2,24,25;69:12
**might (18)**
5:1,8;31:5,10;
38:17;39:9;41:24;
47:11;54:4;55:10;
72:14;99:21;112:22;
115:19;121:24;
122:5;125:19;160:12
**Mike (1)**
110:4
**Miles (3)**
68:8,15;69:9
**million (1)**
71:2
**mind (2)**
118:11;161:1
**mine (5)**
18:3;46:13;56:14;
112:5;147:8
**mini (2)**
56:22,22
**miniature (1)**
56:21
**minority (2)**
15:24;16:4
**minute (4)**
59:3;76:16,17;

122:2
**minutes (14)**
27:2,3;2:6;72:1,12,
14;73:4,8,12,20,25;
86:3,3;105:18;161:4
**misconduct (2)**
45:10;129:2
**miss (1)**
46:14
**missing (2)**
83:20;115:19
**misstated (2)**
58:3;112:2
**Misstates (4)**
58:1;111:24;
133:22;141:17
**Misty (8)**
54:4;76:17,20;
77:14;79:17,18,20;
80:11
**moment (2)**
44:24;161:23
**Monday (3)**
46:17;108:24;
138:24
**money (14)**
19:6;54:15;67:7;
83:25;84:2;85:22,24;
90:9;112:25;141:3,3,
6,22;142:3
**monies (1)**
84:14
**month (2)**
72:19;93:5
**months (2)**
48:19;136:17
**more (16)**
15:6;32:22;33:2;
48:22;63:11,12;
80:18;81:7;113:9;
117:13;125:12;
133:1;137:13;
142:19;145:3;154:10
**morning (5)**
100:16;101:18;
103:22,23;152:25
**Most (14)**
17:9;21:23;35:4,6;
36:25;38:12;63:9,10;
87:23;91:12;120:7;
130:9;141:3,5
**mostly (1)**
23:16
**motion (1)**
135:14
**motivation (1)**
22:18
**Mount (2)**
50:7;51:6
**move (1)**
145:14
**moved (1)**
10:17;94:6

**mow (1)**
120:12
**mowed (1)**
24:12
**MOWERY (32)**
4:1;6:4;7:23;16:4,
15;38:22;70:6;86:6;
106:4,8;108:21;
121:13;122:18;
124:12;130:23;
132:14;136:11;
137:20;138:13;
139:14;140:2,15;
141:13;142:23;
146:3;147:3;149:23;
163:17;165:8;166:5;
168:13.5,17.5
**much (11)**
15:16;29:20;47:17;
65:21;66:23;71:10;
75:6;140:13;145:3;
152:3;156:12
**multiple (2)**
53:22;124:6
**must (5)**
13:18;68:19;
123:16;128:14;139:8
**myself (2)**
39:13;160:25

**N**

**Najarro (1)**
13:14
**name (32)**
4:8;6:3;8:3;13:14,
15,18;15:5;16:2;
25:21;37:8;43:11;
53:14;54:4,4;69:13,
14,15,15;70:8,17,18,
23;71:18;72:1,7,15;
95:7;113:18;114:6,8,
25;116:2
**names (2)**
12:18;16:2
**narcissistic (1)**
150:16
**narrative (3)**
135:2;136:11;
137:19
**nay (1)**
91:13
**near (2)**
77:1;146:13
**nearly (2)**
74:8,8
**necessarily (1)**
7:12
**necessary (1)**
143:13
**neck (2)**
34:17;71:20
**need (33)**

5:14,16,18;19:4;
29:24;35:23;40:11;
52:22;57:15;64:25;
65:3,3,13;75:17;
81:22;82:24;86:14;
88:1;107:10;108:2,7;
114:22;119:18;
128:3;143:12;
151:18;159:9,12,13;
160:3,21;164:24,25
**needed (21)**
29:21;30:18;31:4;
34:17;64:8;67:17;
73:17;88:2;95:18;
100:15;112:17,21;
113:14,16;122:15;
123:2;129:18;132:2;
135:8;145:3;155:20
**needs (3)**
42:19;46:19;84:9
**neighbor (1)**
65:7
**nephew (2)**
16:18;139:14
**New (10)**
9:22;10:1;31:2;
38:10;94:5;107:19;
116:7,15;120:5;
127:16
**next (7)**
20:21;41:13;68:23;
76:10;81:2;100:24;
108:23
**night (2)**
30:11;140:19
**nine (1)**
13:13
**nipples (1)**
56:12
**nobody (6)**
54:9,11;76:4;
91:21;100:18,19
**Nodding (4)**
35:22;45:18;60:1;
129:9
**none (3)**
56:4;95:24;120:5
**nonprofit (3)**
17:20,25;142:3
**nor (1)**
128:8
**normally (4)**
70:12;101:6;
159:25;163:12
**north (7)**
50:9;68:2,11,24;
69:12;166:11;
168:23.5
**nose (2)**
56:2,7
**notarial (1)**
167:3
**Notary (1)**

166:3
**notation (3)**
72:5;102:11;159:1
**notations (2)**
158:3,5
**note (4)**
44:9;82:6;100:15;
141:13
**noted (2)**
128:6;142:8
**notes (3)**
82:15;129:23;
166:15
**notice (2)**
160:12;168:4
**notified (3)**
135:3;136:11;
168:17
**notify (1)**
95:11
**no-tolerance (1)**
58:23
**November (3)**
108:24;109:4,7,8;
159:17
**number (3)**
12:23;114:24;
167:8
**numbered (1)**
147:9
**numbers (1)**
124:15
**numerous (1)**
92:1

**O**

**Object (5)**
43:20,23;64:16;
96:7;103:6
**Objection (27)**
17:22;22:17;28:16,
21,25;54:24;55:13;
58:1;62:25;66:11;
80:25;88:16,21;89:5,
9;101:20;111:23;
112:12;114:20;
116:23;120:25;
121:5;133:21,21;
141:10,16;145:8
**obliterate (1)**
93:16
**obtain (3)**
10:15;63:22;64:1
**obvious (3)**
5:1,6,8
**obviously (5)**
84:23;88:7;99:8;
125:12;127:12
**occasion (3)**
33:2;80:16;88:10
**occasions (1)**
92:1

**occupies (1)**
93:25
**occupy (1)**
70:18
**occupying (1)**
70:23
**occur (1)**
125:7
**occurred (1)**
118:21
**October (4)**
100:10;101:15;
102:5;121:20
**odd (1)**
12:18
**off (18)**
23:1;24:6;50:1;
60:23;65:5;73:3;
76:15;82:9;85:2;
95:3,13;100:14,16,
19;114:4;152:11;
164:22,23
**offense (1)**
128:3
**offensive (1)**
128:10
**offered (2)**
26:8;30:8
**office (48)**
7:19;9:17;10:6,17,
19;11:3,4,8,11;13:21;
14:10;15:2,18;19:17;
24:1;36:11,17;37:11,
20;53:4,17;59:11;
60:2,13;61:11;74:9;
76:13;83:25;84:14,
18,20;85:10;87:17;
89:1;95:18;97:2,6,7,
9,10,15;102:19,25;
103:16,22;127:16;
156:6;157:4
**officer (1)**
44:24
**officers (2)**
136:5;152:8
**offices (6)**
14:1,13;19:19,24;
36:13;166:10
**official (1)**
74:2
**officials (1)**
16:9
**often (1)**
5:3
**old (3)**
6:5;57:12;81:21
**omitted (1)**
162:24
**Once (7)**
24:25;37:9;54:3;
65:15;95:19;113:9;
118:1
**one (88)**

8:22;14:3,7;15:24;
24:11;30:10,15,17;
31:13,14,16,19;
32:16,22;33:2;34:9,
16;35:7;36:10;38:3,
6,6;46:18;47:4;48:5,
7;49:8,11;51:18;
53:17;54:20,20;57:5,
7;59:3;61:10;66:18;
67:16;69:24;70:4;
76:12,17;77:7,10,20;
78:5,10;79:3;82:4,
23;83:8,8,11,11,14,
14,16;87:18;88:14;
91:24;92:12;93:25;
113:23;115:17;
116:11,12;118:19,24;
120:9;123:25;
125:23;126:19;
127:4;129:14;133:1;
134:8,23;137:13,19;
147:8;148:11;
150:10;151:24;
153:16;154:12;
157:9;162:24;163:21
**ones (2)**
7:10;56:22
**only (7)**
5:21;59:24;63:6,8;
71:8;86:17;105:12
**open (4)**
29:22;47:17;94:3,4
**opinion (7)**
91:2,4,14;92:2;
93:19;145:12;154:2
**opportunity (1)**
105:7
**orange (1)**
79:23
**order (2)**
132:22;137:11
**ordinary (1)**
5:1
**organization (2)**
17:18;24:8
**organize (3)**
62:9,10,12
**organized (2)**
15:17;70:3
**organizers (1)**
16:24
**orientation (1)**
38:17
**original (1)**
168:17.5
**originally (1)**
75:7
**Originating (2)**
168:1,18.5
**Ort (9)**
53:15;60:16;74:11;
77:11;84:1;86:20;
120:10;134:21,23

**O-r-t (1)**
53:15
**others (2)**
71:16;80:13
**otherwise (1)**
166:24
**Ours (1)**
82:2
**out (68)**
8:23;12:2,10;
15:13,13;21:12;
23:16,17,18;29:18;
31:16;32:18;34:17;
48:6,12,20;49:12,13,
14,21;50:1;52:8,16;
54:25;57:4,20;59:5;
61:22;62:23;63:13,
15;65:21;76:23;
78:15,25;79:7;80:13;
81:16;83:15;84:25;
85:22;86:6;91:6,6;
92:11;95:7,7;97:6,7,
9;112:24,25;113:5;
114:24;127:2;
129:18,19;130:18;
132:16;140:9,22;
141:1,22;147:25;
148:21;152:8;160:5;
161:24
**Outlook (2)**
116:8,15
**outside (4)**
65:1;77:7;111:6;
158:25
**outweigh (1)**
120:16
**over (37)**
10:18,20,24;41:25;
47:3,6;52:13;54:21;
58:20;62:4;65:4;
68:9,10,13;72:12;
74:1;90:17;91:23;
94:6;109:1,25;110:4,
4;112:6;119:4;
126:20;127:14;
150:9;153:4,7;
159:18,22;160:4,6,
16;162:8,25
**overreacted (1)**
76:11
**oversee (2)**
12:1,2
**overseeing (1)**
23:4
**oversees (3)**
18:24;19:4;68:15
**overwhelming (1)**
30:15
**owes (1)**
77:4
**own (10)**
65:18;79:5;91:17;
110:9;113:5,5;125:1;
150:24;157:12;158:6
**owner (1)**
69:5
**owns (2)**
23:2;68:2

**P**

**page (33)**
55:20;98:19;
108:14,23;109:3,10;
113:12;115:19;
116:13;117:2,5;
118:6;121:15;
122:22;125:21;
129:16;131:10;
132:25,25;134:6,8;
135:1,13,14,16;
138:24;143:22;
148:3,4;154:1,4;
159:7,17
**pageant (1)**
87:19
**pages (3)**
106:22;132:6;
135:17
**paid (28)**
24:3;66:9,14,15;
67:4,7;74:22;75:9;
84:2;85:14;96:16;
109:5,11;110:8;
112:4,4,25;139:10;
140:3,6,7,13,18,20,
21;142:20;157:7,7
**pain (1)**
56:3
**painful (1)**
18:9
**pains (1)**
57:12
**paint (9)**
65:10,12,13,24;
66:1;110:18;159:23;
160:9,13
**painted (8)**
65:1,19,25;107:21;
108:2;159:9,12,13
**painter (1)**
114:12
**painters (11)**
108:25;110:16;
111:12,21;159:5,18,
21;160:2,7,10,16
**painting (16)**
109:5,10,20,24;
110:7;111:3;155:22,
22,24,24;156:4,9;
157:3,8,13;160:7
**paper (3)**
104:8;154:10;
156:5
**papers (2)**
79:13;136:3

**paragraph (6)**
123:8;125:21;
128:6;143:11;
144:20;148:10
**park (2)**
70:9;119:5
**part (18)**
4:12;9:4;24:12;
25:9,11;50:24;51:24;
52:1;63:20;73:18;
99:3,8;106:19;120:2;
129:13;130:9;
139:20,21
**particular (7)**
7:11;98:18;119:5;
122:14;151:19;
160:17;162:11
**particularly (1)**
33:20
**parties (1)**
166:20
**party (7)**
14:11,13;94:12;
166:24;167:1;168:1,
18.5
**pass (2)**
42:5;146:16
**passed (3)**
18:4;39:22;49:25
**passing (3)**
65:9;144:9;146:1
**password (3)**
116:8,15,21
**past (2)**
16:23;123:10
**paternal (1)**
16:18
**path (1)**
24:18
**patrols (1)**
87:3
**Paul (39)**
16:5,19;59:10;
60:24;61:10;62:2;
64:2;69:21;70:4,6;
73:10;74:5;75:11,14;
80:19;83:25;84:15,
19;85:10;87:12,16,
16,20,21;139:12;
140:2;142:15;
143:20,25;144:10,16;
154:18;155:4,4,6,6,
10,13,20
**pay (27)**
25:3;54:15;62:23;
63:15;66:20;67:17,
18;70:20;71:9,13,18;
77:4;109:11,20;
110:8;111:10,11,16,
21;112:3,9,23;114:1,
6;140:1;141:1,6
**paying (4)**
111:15;113:4;

120:12,13
**payment (6)**
67:22;109:15;
110:9;140:16;
141:13;163:10
**pays (1)**
71:17
**Pearl (1)**
46:17
**Pence (1)**
119:1
**pending (1)**
5:22
**Pennsylvania (2)**
166:11;168:23.5
**people (69)**
16:3;18:23;21:23;
23:14;24:3,9,15;
27:13;29:14;33:17,
25;40:19;41:24;
45:12;48:13;49:24;
53:7,22;54:3,13;
55:11,24;56:1;57:11;
60:4;62:13;66:1;
70:9;75:18;76:22;
77:9,25;80:16;81:17;
82:23,25;83:2;84:3;
85:3;86:18;87:23;
94:9,15;95:20;101:8;
109:5,10,20;110:7;
111:18;112:6,19,22;
114:25;121:11;
129:24;134:10,11,19,
20;136:20,22;142:4;
151:9;152:4,5;
157:25;162:11,15
**perceived (1)**
43:9
**perceives (1)**
77:2
**percent (3)**
37:10;71:3;103:2
**perceptive (1)**
125:13
**performance (13)**
24:22;32:9;35:1;
39:12;40:5,7;41:6;
42:3,11;117:6;
145:22;150:9;162:5
**performed (1)**
34:4
**performing (1)**
35:1
**perhaps (5)**
39:8;60:25;64:8;
90:4;115:7
**period (9)**
20:9;22:23;64:12;
72:13;80:24;94:24;
142:6;150:10;155:17
**permission (5)**
95:12;100:11;
113:21;114:18;115:1

120:12,13
**Perry (2)**
84:13;135:25
**person (10)**
34:2;44:17;79:16;
114:14;134:11;
137:24;138:8;146:8;
152:2;166:23
**personal (12)**
45:6,7;67:24,24;
109:21;111:3,22;
112:20,23;113:5;
157:13;158:6
**petty (12)**
63:8,10,16,18;
140:9,12,22;141:2,4,
8,12,23
**phone (2)**
104:25;127:5
**photograph (1)**
138:16
**Phrases (1)**
4:25
**pick (2)**
50:6;118:24
**picking (1)**
119:7
**picture (5)**
119:1;139:16;
153:8,10,11
**pictures (3)**
50:3;55:22,24
**piece (1)**
156:5
**pits (1)**
56:11
**place (4)**
18:6;27:19;47:25;
99:19
**placed (1)**
100:7
**places (2)**
46:19;51:22
**Plaintiff (1)**
166:10;168:8.5
**plaintiff's (1)**
147:4
**plan (1)**
51:4
**planned (1)**
160:5
**Planting (1)**
153:10
**play (1)**
18:11
**played (1)**
19:22
**please (10)**
51:16;58:3;78:4,5,
5;84:14;112:2;
126:23;165:3,4
**pleased (1)**
95:24
**pled (1)**

7:21
**pm (2)**
106:2,3
**point (17)**
10:5;23:22;26:12;
38:22;46:4;59:1,8;
74:24;81:25;82:5;
87:13;93:7;94:19;
98:8;105:13;130:14;
150:10
**pointed (1)**
97:8
**points (1)**
147:3
**police (15)**
78:12,14,16;86:7,9,
11;87:1,7,7;135:2,10,
17,21;136:17;152:8
**policeman (1)**
135:5
**policy (7)**
37:12,15;38:1;
45:2,5;58:23;129:2
**political (1)**
14:10
**politics (1)**
16:3
**Pool (2)**
47:17;65:5
**poorly (1)**
130:15
**pops (2)**
49:4,6
**popular (1)**
93:19
**position (14)**
9:10,16;10:15,23;
11:5,12;23:19;26:8;
29:21;30:2;59:16,21,
23;163:18
**positive (2)**
37:10;120:15
**possible (2)**
123:17;125:2
**possibly (2)**
11:20;118:7
**post (1)**
144:21
**posted (1)**
119:2
**PR (3)**
9:13,18,21
**practical (1)**
131:24
**practice (1)**
35:1
**preapproved (4)**
95:2,3,5,8
**precinct (2)**
14:17,18
**precise (2)**
115:7;125:9
**precisely (1)**

143:24
**prepare (2)**
7:2,6
**prepared (1)**
78:22
**prescriptions (1)**
29:19
**present (3)**
45:23;133:7;144:2
**presented (2)**
45:1;166:18
**preserved (1)**
81:24
**presidency (1)**
22:7
**president (25)**
19:6,20,20;20:2,3,
6,8,10,14,25;21:19,
22,23,25;22:3,15;
29:3;44:25;69:6;
89:13,19,21;91:6,15;
121:25
**presidents (1)**
71:21
**pretrial (3)**
10:18,24;11:1
**pretty (8)**
15:16;24:13;49:4;
65:20;98:14;105:3;
110:23;123:23
**price (2)**
156:4,9
**primary (2)**
40:18;136:2
**princess (1)**
88:14
**princesses (1)**
87:18
**prior (3)**
24:2;159:22;
160:10
**prisoner (1)**
5:17
**private (2)**
70:16;142:2
**probably (45)**
9:1,11,19;10:4,10,
11;20:1;21:5;22:10;
36:23;37:17;40:21;
42:3;46:21;47:18,22;
48:10,16;56:17;
61:14;62:5;64:23,25;
65:11;69:20;73:10,
19;81:3,4;82:24;
83:14;84:3;94:25;
96:18;98:12,13;
102:6;113:10,17;
117:24;126:18;
131:11;139:10;
162:13;164:1
**problem (4)**
23:17;104:22;
119:22;162:8

**problems (6)**
30:23;31:6;118:13;
119:24;151:19;
162:20
**Procedure (2)**
168:16.5,16.5
**process (3)**
4:19;33:18,23
**processed (1)**
12:2
**production (2)**
9:16;12:18
**profanity (1)**
162:19
**professional (1)**
44:18
**progressive (4)**
35:12,17;36:7;
120:1
**project (1)**
131:1
**prominent (2)**
15:6;18:11
**promoted (3)**
24:23;28:13;164:3
**promoting (1)**
31:24
**pronounce (2)**
13:15,20
**proper (1)**
38:16
**property (8)**
19:3;70:24;92:20;
110:20;111:4;
112:18,20,24
**prosecute (1)**
7:19
**prosecutor's (2)**
7:19;10:19
**protect (1)**
91:17
**protective (2)**
132:22;137:11
**proven (1)**
145:1
**provide (9)**
30:3,7;62:16,18;
63:3,21;73:22;127:2,
3
**provided (3)**
98:10,15;105:24
**provides (1)**
69:2
**PS (1)**
145:13
**psychology (1)**
163:18
**public (3)**
6:7;76:6;166:3
**pull (3)**
60:10;154:5,9
**Pulling (2)**
153:11,25

**punched (2)**
76:1;77:22
**purchased (1)**
18:25
**purely (1)**
52:5
**purpose (1)**
40:23
**pursuant (1)**
166:13
**pursue (1)**
126:2
**pushed (1)**
30:19
**put (22)**
16:25;17:1,4,9;
21:14;29:22;30:11,
12;52:20;59:3;60:9;
67:8;76:22;78:8;
107:19;111:5,7;
124:22;130:3,8;
151:1,3
**putting (7)**
39:13;44:8;55:5;
60:3;133:16;152:19,
23

**Q**

**queen (2)**
87:19;88:14
**questionable (1)**
31:9
**quick (1)**
161:2
**QuickBooks (7)**
24:1;60:13;88:3;
157:22;158:3,5;
159:1
**Quicken (1)**
88:3
**quicker (1)**
83:15
**quickly (2)**
103:19;163:17
**quit (8)**
75:11;76:14;77:13;
81:2,6;121:24,24;
128:9
**quite (5)**
30:25;118:25;
125:12;128:15;
144:24
**quote (1)**
152:7
**quotes (1)**
156:6

**R**

**raise (2)**
15:18;43:8
**raised (3)**

57:25;58:10;
161:12
**ran (5)**
13:24,24;14:1,6;
15:9
**rather (1)**
53:16
**read (1)**
148:13
**readable (1)**
5:15
**ready (7)**
37:21;48:22;54:21;
76:15,22;77:20;
153:2
**real (2)**
37:6;38:20
**realize (3)**
24:7;47:23;102:18
**really (18)**
4:24;5:4;13:20;
21:25;22:1;31:1;
32:23;41:3;53:9;
58:4;64:7;78:25;
90:24;98:3;100:9;
115:22;160:5;162:13
**rearranging (1)**
108:5
**reason (8)**
30:8,22;49:20;
101:19;103:4;
116:16;141:8;143:10
**recall (34)**
22:2;23:21;25:5,7;
41:3;45:9;46:20;
66:18;72:5;74:15;
86:8;90:18;100:6,7;
102:11;103:8,23;
116:9;123:16;124:5;
126:16;134:7;137:4;
138:20;143:9;
146:12;147:20;
149:14;156:12,24;
158:24;159:2;
160:11;164:14
**receipt (2)**
66:25;156:21
**receive (4)**
36:6,9;41:4;123:18
**received (3)**
33:23;61:20;
168:20.5
**receiving (1)**
138:21
**recent (1)**
31:16
**recently (4)**
96:21;143:11;
148:21;164:17
**recess (4)**
38:21;86:5;146:2;
161:8
**recessed (1)**

106:2
**recognize (17)**
106:8,15;107:4;
115:21;116:5;117:3,
16;121:13;122:21;
124:13,19;128:24;
130:23;132:14;
138:13,20;142:23
**recollection (1)**
121:20
**recommend (2)**
93:23;94:15
**recommendation (2)**
21:19,22
**recommended (1)**
144:16
**recommending (1)**
107:14
**record (11)**
4:8;6:3,7;26:14,24;
27:15;34:22;74:2;
138:5;164:23;166:17
**recorded (3)**
142:9;157:21;
158:2
**Recorder's (2)**
11:3,11
**records (8)**
25:22;37:5;78:17,
18;127:1,2,6;157:4
**RECROSS-EXAMINATION (1)**
163:2
**red (1)**
56:8
**redacted (1)**
131:15
**redaction (2)**
131:12,13
**REDIRECT (1)**
163:15
**redone (1)**
152:6
**reduced (1)**
166:15
**refer (2)**
22:11;123:7
**reference (1)**
97:20;122:25
**referenced (1)**
90:19
**referencing (1)**
105:24
**referring (2)**
110:8;129:3
**reflected (3)**
32:6,8;71:25
**reflections (1)**
74:1
**refresh (1)**
105:2
**refreshments (4)**
62:16,19;63:4,22
**refused (2)**

51:21;81:15
**regard (1)**
31:22
**regarding (6)**
27:15;116:13;
117:7;118:21;
123:11;154:17
**regardless (1)**
150:18
**Registration (33)**
6:20;10:6,12;
11:15,18,25;19:16;
27:12,24;28:1;29:22;
30:1,20;33:4,5,14,16,
21;34:2,25,25;37:11;
94:21;100:18;101:2,
9;115:24;127:16;
146:4;154:10;
161:15;162:9;
168:11.5
**registrations (4)**
12:1;33:17,18,23
**regular (2)**
61:4;144:20
**regularly (2)**
43:1;133:19
**reimbursing (1)**
113:2
**related (4)**
16:15,17,19;68:17
**relation (1)**
68:21
**relationship (3)**
44:18;88:19,20
**relative (1)**
166:24
**release (1)**
10:25
**relief (1)**
144:24
**relive (1)**
144:23
**remained (1)**
32:15
**remark (1)**
97:25
**remember (19)**
8:21;22:5;39:14;
42:21;48:8;49:21;
51:19;61:1,7;72:17;
73:24;90:12;96:11,
22;103:20;130:3;
133:15;156:11;158:7
**remind (4)**
4:20;5:12;11:17;
80:23
**remotely (4)**
99:25;100:2;137:2,
8
**removed (2)**
26:14;116:21
**rent (6)**
21:12;70:19;72:1,

4,7,15
**repainted (1)**
64:8
**repairs (1)**
67:23
**rephrase (2)**
63:17;157:15
**replaced (2)**
46:12;60:19
**report (15)**
12:6,8;25:1;33:4;
78:12,14;86:7,9,11;
135:6,17;136:13;
138:4;142:11;161:19
**reported (5)**
33:7,8;101:14;
102:4;161:18
**reporter (6)**
4:21;80:8;117:15;
132:17;164:24;165:1
**Reporting (4)**
61:20;166:11;
168:20.5,23
**represent (2)**
4:9;121:18
**represented (1)**
166:20
**reprimands (1)**
36:21
**Republican (15)**
6:19;11:24;12:1,7,
16,19,20;13:8;14:14,
25;15:15;16:7;19:16;
69:19;94:12
**request (3)**
124:17;132:22;
137:11
**requested (2)**
7:10;73:8
**required (3)**
149:25;163:18,25
**requires (1)**
110:1
**residence (2)**
111:22;112:24
**residential (1)**
21:15
**resign (4)**
20:15,25;118:4;
122:9
**resignation (2)**
21:3;121:19
**resigned (4)**
20:22,24;89:22;
117:23
**resigning (1)**
89:24
**resolve (1)**
127:25
**resources (6)**
78:23;96:19;
104:12,24;127:8;
146:17

**respected (1)**
92:2
**response (5)**
95:19;105:24;
124:17;143:7,16
**responsibilities (1)**
75:12
**responsible (2)**
63:18;73:4
**rest (5)**
31:17,21;95:21;
132:5;142:6
**restrictions (2)**
99:19;100:7
**resubmit (1)**
164:8
**results (1)**
34:6
**resume (4)**
28:3;164:12,14,16
**retaliation (2)**
77:2,3
**retired (3)**
18:18;49:9;68:19
**return (3)**
98:23;102:25;
132:7
**returned (2)**
103:3,17
**reverse (1)**
154:12
**RFP (1)**
105:25
**ride (4)**
50:9;123:21,22,23
**rides (1)**
19:2
**right (139)**
4:18;6:2,9;7:23;
8:5;9:10,20;11:7,12;
12:8,11;15:20;16:14;
17:3;18:21;20:5,6,
12;21:8,20;23:15;
25:8,14;28:11,19;
32:25;34:6,12,23,24;
35:11,16;36:13;
37:24;42:13;43:7;
44:5,11;47:7,23;
48:18;51:14;52:11;
54:20,22;59:10,12,
14,21,22;60:20;
63:25;66:5;68:1,12;
70:12,15;71:7;72:9,
17;73:22;74:4;75:4;
82:25;87:10;88:13;
89:19,21;91:20;
95:16,25;98:22;99:7;
102:19;105:12;
106:15;107:6;108:9,
15,17;109:3;110:24;
111:5;113:11;114:7,
23;115:2,11;116:13;
117:2;120:17,20;

122:3,18;123:7;
124:12;126:4;127:9,
13,15;128:11;132:10,
12,21;134:20;
135:18;137:10,13;
138:23;139:25;
143:24;144:11,14,19;
145:6;146:21;147:2,
6,24;148:1,4;149:22;
151:6;152:11;154:6,
19,23;156:1;158:23;
159:1,15,16;161:17,
20,21,22;163:24;
164:19,22
**Road (2)**
6:10;64:24
**role (4)**
13:1;18:11,21,23
**roles (1)**
19:22
**romantic (2)**
50:11;51:3
**room (4)**
67:9,10;107:19;
161:2
**roughly (3)**
19:23;22:5;72:19
**Route (1)**
47:13
**RPR (1)**
166:3
**rule (2)**
101:5;113:24
**rules (5)**
5:12;166:13;
168:16,16.5,17
**run (12)**
13:21,23,23;93:8,
11,12,15,17,23;
136:22;147:22;
162:20
**running (9)**
15:18;29:18;49:8;
65:21;93:13;94:7,17;
140:3,4
**runs (1)**
15:15
**Rushmore (2)**
50:8;51:6

**S**

**safety (1)**
136:16
**SAITH (1)**
165:5
**same (9)**
21:6;26:19;37:24;
66:3;89:9;112:18;
155:25;162:8;165:4
**Sandlin (2)**
15:14,14
**sangria (1)**

46:23
**sat (2)**
18:5;32:18
**save (1)**
72:20
**saved (1)**
71:19
**saw (5)**
30:24;46:1;155:6,
6;156:5
**saying (20)**
31:18;38:24;39:9;
46:20;47:3;67:4;
76:10;78:2,24;82:18;
98:20;110:2,24;
139:6;141:4;149:14,
22,25;151:25;159:21
**scale (1)**
30:14
**scared (2)**
77:3;127:17
**schedule (1)**
60:12
**scheduled (4)**
42:2;43:1;57:19;
67:19
**scholarship (1)**
123:25
**school (6)**
8:1,3,4,7,24;9:3
**screen (1)**
107:19
**script (1)**
144:21
**seal (1)**
167:3
**sealed (1)**
168:18.5
**searched (2)**
84:10;156:6
**searching (1)**
84:20
**seat (6)**
18:19;19:11,14;
93:18,23;94:3
**Seattle (6)**
49:23,24;50:1,22,
24;51:4
**second (12)**
4:7;14:6;22:7;
35:21;79:16;106:19;
116:11;117:2,5;
121:15;123:7;148:10
**secondhand (1)**
133:11
**secondly (1)**
114:5
**second-to-last (1)**
128:6
**secretaries (1)**
120:10
**secretary (9)**
9:17;10:17;14:16;

53:12;73:5,7,10;
76:13;77:11
**section (2)**
39:18;58:12
**seeing (1)**
137:4
**seem (1)**
5:6
**seemed (1)**
103:14
**seems (1)**
108:9
**self-employed (1)**
9:21
**Senator (2)**
15:14,14
**send (6)**
89:25;90:13;122:2;
139:4,9;160:4
**sending (3)**
128:8,9;138:20
**sense (1)**
42:18
**sent (18)**
7:10;32:12;37:9;
46:21;82:6;83:15;
90:7;100:15,21;
109:12;113:14;
115:23;116:4;
121:19;134:3;139:6,
8;154:17
**sentence (7)**
118:6;120:14;
128:14;136:10;
137:19;148:11,13
**sentiment (1)**
32:8
**September (7)**
21:5;108:10,12;
136:25;159:8,14,15
**serious (4)**
31:6;40:14;42:22;
128:3
**serve (4)**
14:7;18:16;98:11;
136:3
**services (3)**
10:18,24;11:2
**set (3)**
82:9;136:24;167:2
**Several (12)**
15:3;25:14;29:14;
32:3;33:1;36:18;
42:14;53:2;86:17;
115:4;134:3,17
**severe (1)**
29:15
**sexual (31)**
38:25;39:18,19,20;
40:4;46:6;52:24;
55:8,11,19;57:25;
58:10,12,14,15,16,
21;59:6;81:12;82:9;

88:20;96:21,23;
99:22;125:18,24,25;
126:5;127:21;128:2;
129:12
**sexually (16)**
39:21,24;40:1;
43:9,14;58:22,25;
96:25;99:1;146:5;
149:9,11,16,20,23;
150:1
**Shabazz (5)**
20:13;29:2;43:6;
44:21;149:6
**share (2)**
111:2;115:18
**sheets (2)**
144:5;168:19
**shelter (1)**
54:2
**shirtless (1)**
55:22
**shirts (8)**
51:11,17,20;52:4,4,
5,12,15
**shoes (3)**
55:5;152:20,23
**short (1)**
38:20
**shortly (5)**
86:10,24;89:24;
159:8,14
**shot (2)**
23:3;32:22
**show (5)**
56:4;95:17;96:1;
105:13;106:5
**showed (2)**
25:21;112:7
**showing (1)**
56:15
**Shreve's (1)**
15:8
**sign (17)**
60:11;66:16;
109:18;110:2,3;
112:7;113:19,21;
114:6,8;119:2;
138:25;139:1;157:9,
19;158:20;163:13
**signature (2)**
113:23;166:19
**signatures (1)**
110:1
**signed (9)**
24:6;42:22;95:6;
113:17;114:25;
157:24;158:18;
163:7;168:17.5
**signing (1)**
66:18
**silly (1)**
93:14
**similar (1)**

149:20
**Similarly (1)**
5:3
**Simply (3)**
89:12,16;144:9
**simultaneously (2)**
111:21;112:3
**sister-in-law (2)**
49:23;51:1
**sister-in-law's (1)**
50:4
**sit (1)**
146:14
**sits (1)**
38:11
**sitting (4)**
36:10;55:5;97:2;
146:15
**situation (1)**
40:21
**situations (2)**
125:7;143:4
**Six (2)**
12:15;37:19
**sleeve (1)**
51:24
**slick (1)**
87:5
**small (7)**
24:7,19;25:25;
41:23;44:15;70:17;
136:3
**smaller (1)**
56:5
**smelled (1)**
48:11
**smelling (1)**
48:6
**smiley (2)**
48:21;152:15
**Smily (1)**
48:20
**Smith (1)**
18:10
**social (1)**
49:12
**socks (3)**
55:5;152:20,23
**software (1)**
24:2
**somebody (17)**
39:21;43:13;65:10;
78:9;84:9;86:14;
87:6;88:2;89:1;
111:7;149:9,11,16,
20;150:1;153:4;
160:12
**someday (1)**
64:23
**someone (12)**
15:18;22:18;43:12,
15;46:14;64:21;
65:24;75:2;107:17;

145:19;153:25;
159:23
**someone's (1)**
153:25
**sometime (2)**
81:4;125:5
**sometimes (4)**
40:19;150:11,12,
13
**Somewhat (1)**
23:12
**somewhere (7)**
47:15;64:24;67:9;
71:25;97:1;112:15;
126:18
**son (3)**
68:9,9,15
**soon (4)**
49:4;62:7;92:24;
104:23
**sorry (9)**
13:15;41:12,17;
42:9;68:8;77:15;
109:6;115:15;155:9
**sort (1)**
162:19
**sounded (1)**
41:17
**sounds (3)**
4:18;46:23;74:8
**South (1)**
6:10
**SOUTHERN (1)**
168:5.5
**space (4)**
21:12,15;139:22,
24
**speak (3)**
4:24;105:7;132:16
**speaks (2)**
17:23;145:8
**specific (4)**
42:8;72:5;93:23;
122:15
**specifically (4)**
37:8;78:17;149:1,
13
**speculation (4)**
22:17;55:13;
114:20;116:24
**speech (1)**
162:18
**speed (1)**
154:14
**spend (1)**
19:6
**spite (1)**
34:19
**split (1)**
70:5
**spoke (1)**
45:12
**sponsor (1)**

62:12
**spray (1)**
  65:4
**spring (1)**
  125:9
**square (1)**
  131:9
**SS (1)**
  166:1.5
**staff (2)**
  12:3;35:4
**stage (1)**
  119:5
**stamp (1)**
  108:16
**stand (3)**
  56:13;81:16,18
**standing (4)**
  56:18;83:11;111:6;
  151:13
**stare (1)**
  81:17
**start (1)**
  10:14
**started (11)**
  10:9;11:17;25:4;
  32:23;39:21;48:5;
  49:2;58:16;83:18,20;
  85:2
**starting (2)**
  20:6;106:20
**state (8)**
  6:2;14:16;16:12;
  17:15,16,16;166:1,4
**stated (2)**
  134:12;162:6
**statement (1)**
  128:12
**statements (3)**
  127:18;133:3,19
**States (3)**
  9:7,8;168:5
**station (1)**
  52:8
**status (1)**
  74:6
**stay (2)**
  9:10;92:20
**stayed (1)**
  122:10
**staying (1)**
  122:11
**stenograph (1)**
  166:15
**step (2)**
  13:5;22:15
**stepped (1)**
  77:25
**Steve (3)**
  84:12;85:1;134:23
**still (9)**
  11:23;20:8;37:24;
  65:25;67:9;77:4;

89:1;111:16;148:20
**stipend (1)**
  142:6
**stole (1)**
  85:22
**stone (1)**
  107:24
**stood (2)**
  77:5;114:13
**stop (1)**
  51:6
**stored (1)**
  73:12
**stories (1)**
  85:3
**story (3)**
  48:3,4;142:6
**stream (1)**
  119:5
**Street (1)**
  168:2.5
**string (2)**
  82:20,21
**strive (1)**
  119:3
**stuck (1)**
  34:17
**student (1)**
  8:24
**stuff (26)**
  9:23;17:12;23:2;
  40:16;48:13;55:18,
  19;56:8;60:5,6;
  63:20;65:2;69:17;
  76:3;80:6;85:15,25;
  86:1;88:1;100:25;
  127:19;129:25;
  130:3;136:4;150:12;
  152:5
**stuffed (1)**
  84:5
**Sturgill (8)**
  39:12,16;43:5;
  44:13,14;45:22;
  129:17;149:5
**subject (1)**
  86:11
**submit (1)**
  164:12
**submitted (2)**
  154:21;168:18.5
**subordinate (1)**
  151:4
**sudden (1)**
  49:3
**suddenly (1)**
  97:15
**suggest (5)**
  72:13;90:25;93:7;
  150:23,23
**suggested (1)**
  32:1
**Suite (2)**

166:11;168:24
**summarize (1)**
  129:10
**summarizing (1)**
  154:14
**summer (5)**
  74:10,17;94:19,25;
  118:22
**Sunday (2)**
  100:15,21
**super (1)**
  161:2
**Superior (1)**
  68:18
**supervise (2)**
  12:14;23:14
**supervising (1)**
  13:1
**supervisor (1)**
  23:10
**supposed (4)**
  39:17;41:1;53:11;
  58:5
**Supposedly (2)**
  49:8;138:9
**sure (40)**
  12:3;33:19,22;
  35:18;37:7;41:18;
  42:24;44:2;57:23;
  62:21;72:11;73:15,
  21;78:15;86:4;92:8;
  93:9;96:11,12,15,24;
  98:12,14;99:6;
  101:16;102:6,6;
  103:2;105:3;118:5;
  119:15;120:6;124:6;
  135:12;141:25;
  142:11;143:5;
  146:20;163:1;164:16
**surprise (1)**
  160:15
**surprised (2)**
  128:15;155:19
**Susie (10)**
  83:12;92:14,15;
  110:3;149:23;
  158:19,21;163:6,7,8
**suspect (1)**
  137:21
**suspend (1)**
  94:20
**suspended (1)**
  96:11
**suspending (1)**
  96:13
**suspension (1)**
  96:17
**Suzanne (2)**
  126:8;149:24
**sworn (2)**
  4:2;166:6
**system (3)**
  26:1,2;37:10

---

**T**

**tables (1)**
  46:16
**tactics (1)**
  144:25
**Taft (1)**
  99:18
**talk (20)**
  42:2;46:8,12;
  52:23;82:7,8,16,24;
  83:3,4;85:3,6;90:15,
  21;91:11;94:18;
  97:24;118:16;
  127:23;148:23
**talked (25)**
  27:16;31:14,15;
  32:18;40:19;45:23;
  77:6;79:21;82:13,23;
  104:25;117:25;
  120:4;122:12;124:3;
  125:24;126:24;
  127:4;128:1;129:23,
  24;135:7;147:19;
  163:4;164:6
**talking (28)**
  7:3;22:13;24:8,9;
  39:13;42:9;47:15;
  52:25;53:4,6;55:7;
  83:1;85:5;91:8;97:3,
  8,16;103:15;109:22,
  24;110:10;117:20;
  122:6;127:20;
  130:19;142:17;
  149:2;151:9
**tantrums (2)**
  76:4,8
**Tarrytown (1)**
  9:22
**Taylor (11)**
  13:9;83:13;135:3,
  23;136:12;137:15,15,
  23;138:3;146:9;
  161:14
**tearing (1)**
  84:20
**teeth (3)**
  97:5,17,21
**telling (9)**
  38:1;41:6;54:5;
  57:13;90:2;91:24;
  111:20;142:4;145:19
**tells (2)**
  42:14;49:10
**temper (2)**
  76:4,8
**ten (3)**
  24:9;86:4;129:14
**tend (1)**
  35:3
**term (1)**
  14:7

**terminate (4)**
  89:11;94:20;145:4,
  11
**terminated (3)**
  92:9;126:1;134:14
**terrible (4)**
  45:12;79:21,22;
  123:24
**terrified (3)**
  80:4,6;84:11
**test (1)**
  31:3
**testified (10)**
  4:3;26:6;28:12;
  36:6;43:18;111:24;
  117:3;129:5;143:19;
  146:3
**testify (5)**
  112:1;116:14;
  140:21;141:7;145:9
**testimony (6)**
  58:2;111:24;
  133:22;141:17;
  154:14;166:17
**Tevebaugh (14)**
  4:9;21:24;22:12;
  123:14;148:16;
  149:5,8;153:23;
  156:3,8;157:2;
  159:18;161:16;
  168:7.5
**Tevebaugh's (4)**
  123:10;147:15;
  153:9;162:5
**texted (4)**
  108:24,25;159:21;
  160:15
**texts (3)**
  79:13;128:8;
  138:21
**Thanks (1)**
  147:12
**thereafter (1)**
  166:18
**thinking (6)**
  58:17;66:24;76:21;
  90:22;108:19;136:21
**third (6)**
  109:3,10;123:8;
  143:22;148:11,13
**third-to-the-last (1)**
  125:21
**though (9)**
  5:1,6;34:9;35:10;
  46:15;47:11;87:23;
  94:3;107:24
**thought (20)**
  29:15;30:5;31:21;
  32:21;37:9;39:8;
  43:12;44:10;75:7;
  78:12;81:20,20;
  83:16;91:9;96:4;
  98:7;122:14;123:22;

136:19;150:19

**thoughts (2)**
118:2;124:23
**thousand (1)**
67:1
**threat (2)**
86:19;136:12
**threaten (1)**
86:15
**threatened (1)**
77:15
**threatening (7)**
75:22;78:11,20;
80:15;82:3;137:17;
138:9
**threatens (1)**
86:13
**Three (5)**
11:9;15:22;51:11;
53:21;106:22
**three-ring (1)**
73:14
**threw (3)**
79:22,23;80:11
**throughout (1)**
155:13
**throw (2)**
75:25;151:14
**throwing (1)**
83:18
**thrown (1)**
24:14
**throws (2)**
75:25;76:2
**till (1)**
59:2
**timelines (1)**
12:4
**timers (1)**
9:15
**times (9)**
15:20;32:3,11;
33:1;41:21;53:21;
79:12;125:1;134:17
**tired (1)**
152:11
**title (3)**
15:25;24:17;54:12
**titles (2)**
12:16;24:14
**titties (3)**
97:4,17,20
**today (12)**
5:25;6:24;37:8;
40:12;94:1;102:9;
105:10;109:5,11,11,
16;110:8
**together (15)**
30:11,12,13;36:13;
38:13;41:24;55:18;
59:3;60:9,10;79:4;
124:22;151:2,3;
161:24

**told (51)**
26:6;29:14;31:16;
32:17,20;34:8,10;
40:8;48:11,25;65:19;
75:8;78:2,3,4;84:12;
85:5,10;86:17,23;
88:1;91:9,23;92:16;
95:18,20;100:15,21;
102:6;103:3;104:16,
18,20;109:14;
113:14;116:15;
119:17;120:10;
123:17;124:8;
127:16;129:12,17;
131:25;133:9,10,14;
134:17,19;144:10;
146:13
**tolerance (3)**
45:2,3,4
**tomorrow (1)**
48:19
**TOMPKINS (1)**
168:2
**tone (2)**
40:20,21
**tonight (1)**
46:23
**took (12)**
18:19;19:14;48:2;
52:13,16,20;66:2;
94:12;109:25;
112:16;129:11;161:1
**top (4)**
107:9;131:9;
143:21;152:11
**topic (4)**
43:8;57:25;58:10;
73:3
**tore (1)**
21:9
**totally (1)**
53:8
**touch (1)**
26:18
**toward (1)**
97:8
**Township (9)**
13:24,25;14:7,22;
44:15;135:25;136:2,
3,7
**track (3)**
29:24;63:18;79:7
**tractor (2)**
41:23;52:14
**trademark (1)**
9:23
**transaction (2)**
71:5,11
**transcribe (3)**
5:2;80:8;153:21
**transcript (2)**
5:15;166:17
**transferred (1)**

9:21
**transition (1)**
96:3
**treasurer (7)**
14:23;20:1;29:7;
61:15,18;63:7;
142:15
**treasurer's (1)**
83:25
**Treated (1)**
79:21
**treating (1)**
83:2
**treatment (1)**
83:4
**tried (3)**
26:13;91:16;94:8
**triggered (1)**
40:6
**trip (4)**
48:19;50:11;51:8;
52:15
**trouble (4)**
79:6;86:22;162:12,
14
**Troy (3)**
68:4,6;119:2
**truck (1)**
31:2
**true (3)**
21:20;142:5;
166:17
**trust (1)**
120:17
**trusted (3)**
31:19;79:2;156:23
**Trustee (3)**
13:25;14:6,8
**truth (6)**
4:2,3,3;166:7,7,7
**try (4)**
63:11;91:22;148:1;
164:7
**trying (13)**
5:13;15:25;27:16;
30:11;36:24,25;79:8;
81:17;91:16;101:9;
122:25;131:23;
154:14
**Tuesday (1)**
108:11
**turn (4)**
72:12;113:11;
131:17;148:3
**turned (5)**
46:16;74:1;84:10;
85:21;126:20
**TV (1)**
108:5
**two (17)**
10:4;16:1;48:18;
51:11;62:5;70:5;
77:4;103:15;105:10;

106:25;110:1;
113:23;124:2;
135:17;142:17;
148:11;157:25
**two-thirds (1)**
107:24
**Tyler (3)**
57:5,8;153:13
**type (2)**
116:2;128:16
**typewriting (1)**
166:15
**typewritten (1)**
166:16
**typical (2)**
34:1;110:23
**typically (3)**
21:21;22:16;97:2
**Typist (1)**
9:9

**U**

**uh-uh (4)**
4:25;68:22;115:25;
124:10
**ultimate (1)**
33:12
**ultimately (3)**
24:6;33:10;96:16
**unacceptable (1)**
117:6
**unanimously (1)**
145:22
**unapproachable (1)**
75:22
**unclear (2)**
108:15,17
**uncomfortable (4)**
38:24;39:10;46:5,
10
**under (7)**
25:22;108:23;
109:3;132:25;
138:24;156:10;
166:16
**unfiltered (1)**
151:15
**unfortunately (2)**
100:22;120:16
**UNITED (1)**
168:5
**University (3)**
8:10;123:20;
148:15
**unless (2)**
38:6;64:13
**unsecured (1)**
47:25
**unsuccessfully (1)**
15:10
**untrue (3)**
133:3,8,17

**untruths (1)**
102:2
**unusual (1)**
17:7
**unwelcome (1)**
38:25
**unwritten (1)**
101:5
**up (51)**
7:24;9:23;10:17;
18:8;19:8;23:4;42:1;
43:11;49:4,6,15,16;
50:6,8,9;52:14,20;
54:7;56:4,20;60:3;
72:2;77:25;79:24,25;
85:17;88:5;91:12,13;
95:17;96:3,13;97:14,
25;100:20;107:19;
108:11;109:15;
114:13;122:11;
127:3;147:3,17,21;
151:14;153:11,25;
154:5,9;155:14;
161:24
**update (2)**
33:17;41:1
**upset (2)**
84:24;85:12
**upstairs (2)**
53:19;104:23
**use (3)**
19:1;40:21;106:19;
113:23;115:25
**used (6)**
19:2;24:2;59:3;
63:22;70:21;134:11
**uses (1)**
40:20
**using (3)**
63:4;148:25;
162:19
**utilities (2)**
70:20;71:13

**V**

**v- (1)**
168:9.5
**various (3)**
16:8;19:24;114:25;
154:17
**vendor (2)**
68:3;69:15
**vendors (9)**
19:1;45:13,17;
70:13,17;71:16;
129:24;151:19,23
**Verbal (3)**
81:11;82:2,4
**verbally (1)**
81:23
**version (4)**
46:1,2,3;85:11

**via (1)**
100:5
**vice (8)**
14:16,17,21;19:20;
21:25;22:3,15;44:25
**violent (3)**
78:11,20;80:10
**VIP (1)**
124:3
**visiting (1)**
50:5
**voice (1)**
40:20
**vote (1)**
72:6
**voted (1)**
75:4
**Voter (33)**
6:20;10:6,12;
11:15,18,25;19:16;
27:12,24;28:1;29:22;
30:1,19;33:4,5,13,15,
18,21;34:2,24,25;
37:11;94:21;100:18;
101:2;115:24;
127:15;146:4;
154:10;161:15;
162:9;168:11.5
**VR (1)**
36:7
**VRB (1)**
162:21

**W**

**wait (6)**
5:4;35:23;59:2;
76:16,16;122:2
**waited (1)**
136:17
**waiting (1)**
132:7
**walked (5)**
52:14;53:17;60:22;
76:12;102:19
**walking (3)**
33:25;52:9;53:7
**walks (3)**
36:14;56:20;85:9
**wall (3)**
76:1,1;79:23
**Wanamaker (1)**
7:25
**wants (5)**
76:3,4,6;77:9;
142:2
**ward (3)**
14:21,21;54:8
**warned (1)**
126:1
**warning (6)**
35:19,21,21;45:5,
7;76:9

**warnings (3)**
36:21;41:4;78:7
**Washington (1)**
50:25
**watch (1)**
90:9
**watched (1)**
77:6
**water (1)**
5:19
**way (31)**
15:16;22:11;40:18;
48:1;51:4;52:7,23;
65:10;77:5;83:1;
91:20;92:3;94:7;
97:24;106:12;
108:25;144:12;
149:25;150:18,18,19,
20,21,24;151:2,3;
159:18,22;160:10,16,
18
**wear (4)**
51:20,21,22;52:2
**weeds (5)**
118:25;119:4,11,
18,22
**week (5)**
59:25;61:12;95:4,
4,5
**weekend (3)**
47:20;85:15;95:6
**weeks (1)**
93:3
**weeks' (1)**
77:4
**weren't (6)**
34:12;58:24;78:1;
99:8;142:15;153:4
**Wesleyan (6)**
8:10,11,19;123:19;
148:14,18
**West (2)**
47:14;49:13
**What's (11)**
9:14;18:25;37:15;
47:21;48:4;57:3;
58:3;84:25;113:12;
124:13;128:22
**whatsoever (1)**
130:11
**wheels (1)**
69:1
**Whenever (1)**
27:23
**WHEREOF (1)**
167:2
**whip (2)**
15:25;16:5
**whole (5)**
4:3;54:7;106:18;
127:9;166:7
**who's (1)**
35:3

**Whose (1)**
15:4
**widow (1)**
31:16
**Williams (4)**
13:9;146:9;161:14,
19
**win (1)**
14:3
**wind (1)**
122:11
**wish (2)**
90:10;137:20
**within (1)**
39:17
**without (6)**
5:11;19:7;53:24;
114:18;115:1;118:8
**witness (33)**
17:23;28:21;29:12;
35:25;36:5;41:16;
42:10;43:20,22,23;
55:1,14;58:5;64:16;
66:11;88:17,22;89:6;
90:16;101:20;103:6;
106:23;114:21;
120:25;126:6,24;
127:4;141:10,18;
145:9;146:1;147:11;
167:2
**woman (1)**
87:18
**women (3)**
97:4,17;162:13
**Women's (1)**
16:7
**won (1)**
14:4
**words (2)**
4:21;116:5
**wore (1)**
51:17
**work (45)**
9:4,6;13:16;29:8;
64:6,10,15,19,21;
65:16;66:5,8,20;
67:19,24;72:20;
87:17;88:25;89:2;
98:23;99:21;101:14,
18;107:18;109:1,21;
111:3,21;112:9,10,
23;114:2,14;115:24;
120:11;142:7;
154:21;155:10,13;
159:19,22;160:11,16;
162:8,20
**worked (15)**
10:16;15:1,4,8;
27:23;30:10;60:22;
61:10;105:10;
143:21,25;144:13;
154:22;160:18;164:2
**workers (2)**

112:9;113:4
**working (17)**
10:12;30:5;35:14;
48:12,14;59:14;60:3;
74:13;96:19;99:25;
100:2;101:1;155:4,6,
17;162:12,14
**works (4)**
18:25;59:24;60:4;
69:9
**world (1)**
68:13
**worst (2)**
79:5;91:17
**worth (1)**
75:8
**wound (1)**
96:13
**wracked (1)**
55:6
**wrestler (1)**
56:16
**wrestlers (4)**
56:2,2;57:5,7,17;
153:16
**wrestling (2)**
57:19;152:2
**write (4)**
29:19;60:10;
104:10;139:3
**writes (1)**
60:11
**writing (6)**
5:8;41:11;78:8;
130:1,4,8
**written (7)**
28:3;36:21;37:5;
38:1,3;39:17;41:4;
45:5,7;76:9;78:7;
157:16,22;158:11,15
**wrong (6)**
43:17;81:15;
101:19;129:21;
130:2;149:4
**wrote (12)**
98:7;112:6;117:22;
125:5,8,13;143:3,7;
148:3,4,6;163:4

**Y**

**yea (1)**
91:13
**year (16)**
9:11;10:4;21:6;
22:2,7;29:23;32:13;
65:8;69:24;72:3,19;
74:20;82:13;87:25,
25;136:13
**years (13)**
8:23,23;9:19;
10:11,22;11:9,19;
37:19;62:4;71:9;

81:21;82:17;142:17
**year's (1)**
118:8
**yelling (1)**
111:6
**yesterday (2)**
76:11;79:1
**York (2)**
9:22;10:1
**young (2)**
87:18;127:15

**Z**

**zero (3)**
45:2,3,4
**zip (1)**
84:5

**0**

**0661154 (1)**
167:8

**1**

**1 (12)**
46:22;105:17;
106:6,7,8;107:4,6;
125:21;148:7,19;
159:5,7
**1:23-CV-121-JMS-TAB (1)**
168:10
**1:30 (2)**
105:21,22
**1:39 (1)**
106:3
**10 (15)**
43:18,25;57:24;
58:9;59:7;86:25;
92:6;120:8;129:6,20;
132:13,14,21;148:25;
151:14
**100 (2)**
37:10;103:2
**11 (6)**
100:10;101:15;
102:5;138:12,13,15
**11th (2)**
32:13;103:1
**12 (12)**
8:23;10:22;90:4;
109:8;118:3,4;
136:13;142:22,23;
143:2;154:7,9
**12:54 (1)**
106:2
**125-acre (1)**
23:2
**135 (2)**
166:11;168:23.5
**15 (1)**
8:23

**1500 (1)**
 75:8
**17 (1)**
 47:16
**1720 (2)**
 166:11;168:24
**19 (5)**
 22:10;27:20,20;
 47:19,22
**1987 (2)**
 10:9,15

---

**2**

**2 (9)**
 106:20,21,25;
 113:11,13;122:22;
 148:3,4;159:17
**20 (6)**
 10:11;11:19;22:10;
 86:3;138:25;151:13
**2002 (1)**
 11:19
**2004 (1)**
 11:20
**2016 (2)**
 19:12,25
**2017 (1)**
 19:25
**2018 (1)**
 20:1
**2019 (4)**
 20:1,7,10;125:10
**2020 (3)**
 22:9;27:21;121:20
**2021 (6)**
 27:21;64:6,15;
 147:14;148:8,19
**2022 (32)**
 21:6;43:19;46:10,
 22;47:7,10,12,16,19,
 22;48:1,18;52:22;
 54:20;58:9;59:7;
 74:5,10,17,24;90:5;
 94:20,25;100:10;
 102:5;118:4,22;
 125:14;136:25;
 148:24;152:13;
 154:25
**2024 (3)**
 166:13;167:4;
 168:18
**2031 (1)**
 167:9.5
**21 (7)**
 48:1,15;108:10,12;
 159:8,14,15
**22 (3)**
 20:16;74:20;
 118:19
**23 (1)**
 74:20
**25 (3)**

 66:24;125:14;
 167:9.5
**250 (1)**
 141:5
**2500 (1)**
 156:17
**25th (2)**
 166:12;168:18
**26 (5)**
 48:18;52:22;54:20;
 136:25;152:13

---

**3**

**3 (8)**
 109:4,7;115:12,13,
 21;121:20;132:25;
 134:8
**30 (2)**
 61:14;105:18
**31 (1)**
 46:10
**317 (1)**
 168:25
**35 (2)**
 156:13,14
**3500 (2)**
 156:17,19

---

**4**

**4 (8)**
 47:7;59:24;71:3;
 117:14,16,17,19;
 148:7
**4,000 (1)**
 156:10
**40s (1)**
 9:1
**4340 (1)**
 6:10
**46202 (1)**
 168:3
**46204 (1)**
 168:24.5
**46239 (1)**
 6:11

---

**5**

**5 (6)**
 20:20;81:4;105:17,
 25;121:12,13
**501c3 (1)**
 17:25
**5th (1)**
 83:5

---

**6**

**6 (9)**
 20:20;122:17,19,
 21,24;147:6,6,7,13

**6:30 (3)**
 101:18,18,23
**608 (1)**
 168:2.5
**63 (1)**
 81:21
**635-7857 (1)**
 168:25
**64 (1)**
 81:21
**65 (1)**
 6:8
**66 (1)**
 47:13

---

**7**

**7 (7)**
 47:10,12;124:11,
 13,14,19,21
**7/25/22 (1)**
 125:11
**7th (1)**
 20:20

---

**8**

**8 (10)**
 108:24;128:21,22,
 24;129:1;130:19;
 132:25,25;136:14;
 159:17
**80s (1)**
 14:2
**8A (1)**
 134:6

---

**9**

**9 (4)**
 59:24;130:22,23,
 25
**9:30 (1)**
 102:17
**90s (1)**
 68:19