```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF INDIANA
                 INDIANAPOLIS DIVISION


JEREMIAH TEVEBAUGH,            )
                              )
           Plaintiff,          )
                              )
        -v-                    ) CAUSE NO.
                              ) 1:23-CV-121-JMS-TAB
INDIANAPOLIS-MARION COUNTY,    )
ACTING BY AND THROUGH ITS      )
BOARD OF VOTER REGISTRATION,   )
THE MARION COUNTY              )
AGRICULTURAL FAIR             )
ASSOCIATION, AND CINDY        )
MOWERY,                        )
                              )
           Defendants.         )
```

The deposition upon oral examination of

CYNTHIA LEA MOWERY, a witness produced and sworn

before me, Gretchen Fox, RPR, Notary Public in and for

the County of Johnson, State of Indiana, taken on

behalf of the Plaintiff at the offices of Circle City

Reporting, 135 North Pennsylvania Street, Suite 1720,

Indianapolis, Indiana, on January 25, 2024, at 9:58

a.m., pursuant to all applicable rules.



```
              CIRCLE CITY REPORTING
              135 North Pennsylvania
                    Suite 1720
              Indianapolis, IN  46204
                  (317) 635-7857
```

Exhibit 1

APPEARANCES

FOR THE PLAINTIFF:

  Jeffrey S. McQuary, Esq.
  TOMPKINS LAW
  608 East Market Street
  Indianapolis, IN  46202
  jmcquary@tlawindy.com


FOR THE DEFENDANT:
INDIANAPOLIS-MARION COUNTY, ACTING BY AND THROUGH ITS
BOARD OF VOTER REGISTRATION

  John P. Lowrey, Esq.
  CITY OF INDIANAPOLIS OFFICE OF CORPORATION
  COUNSEL
  200 East Washington Street
  Room 1601
  Indianapolis, IN  46204
  john.lowrey@indy.gov


FOR THE DEFENDANTS:
THE MARION COUNTY AGRICULTURAL FAIR ASSOCIATION AND
CINDY MOWERY

  Alexander P. Will, Esq.
  FROST BROWN TODD, LLC
  111 Monument Circle
  Suite 4500
  Indianapolis, IN  46244
  awill@fbtlaw.com


ALSO PRESENT: Jeremiah Tevebaugh

Exhibit 1

```
 1                      INDEX OF EXAMINATION
 2
                                                        PAGE
 3   DIRECT EXAMINATION

 4        Questions By Mr. McQuary:                        4

 5   CROSS-EXAMINATION

 6        Questions By Mr. Will:                         146

 7   CROSS-EXAMINATION

 8        Questions By Mr. Lowrey:                       161

 9   RECROSS-EXAMINATION

10        Questions By Mr. Will:                         163

11   REDIRECT EXAMINATION

12        Questions By Mr. McQuary:                      163

13
                        INDEX OF EXHIBITS
14
     NUM.           DESCRIPTION                        PAGE
15
     Exhibit 1      Copy of text messages              106
16   Exhibit 2      E-mail Monday, November 22, 2021   106
     Exhibit 3      E-mail chain beginning with an     115
17                  e-mail on Monday, July 11, 2022
     Exhibit 4      E-mail, Tuesday, July 12, 2022     117
18   Exhibit 5      E-mail, Monday, October 5, 2020    121
     Exhibit 6      E-mail, Tuesday, February 2,       122
19                  2021
     Exhibit 7      Copy of memo                       124
20   Exhibit 8      Zero Tolerance Policy              128
     Exhibit 9      E-mail, Friday, May 13, 2022       130
21   Exhibit 10     Notice to Appear                   132
     Exhibit 11     Copy of text messages              138
22   Exhibit 12     E-mail, Friday, July 29, 2022      142

23

24

25
```

# Exhibit 1

1          CYNTHIA LEA MOWERY,

2   having been first duly sworn to tell the truth, the

3   whole truth, and nothing but the truth, testified as

4   follows:

5   DIRECT EXAMINATION

6   BY MR. McQUARY:

7   Q   Ma'am, I know we were just introduced a second ago,

8       but for the record, my name is Jeff McQuary.  I'm

9       an attorney.  I represent Jeremiah Tevebaugh who

10      has brought a lawsuit against the City of

11      Indianapolis, the Marion County Fairgrounds, and

12      you individually.  As part of that lawsuit, we are

13      here to take your deposition.  Have you been

14      deposed before --

15  A   Yes.

16  Q   -- in a civil case?

17  A   Yes.

18  Q   All right.  Well, it sounds like you're familiar

19      with it, with the process, so I won't go into a lot

20      of detail, but I do want to remind you that we have

21      a court reporter here taking down our words.  And

22      she's very good at her job, but there are some

23      limitations with the equipment she has.  It's

24      really important that you speak all your answers in

25      English.  Phrases like uh-huh and uh-uh, even

**Exhibit 1**

```
 1        though they might be obvious in ordinary
 2        conversation, are difficult for her to transcribe.
 3        Similarly, hand gestures are often ambiguous.  It's
 4        also really important that you wait until I'm
 5        finished asking my question before you begin
 6        answering it even though it may seem obvious what
 7        my question is going to be because when you see it
 8        in writing, it might not be obvious what the
 9        question is going to be.  So it's important to let
10        me finish my question before you answer, and I will
11        do my best to let you finish without interrupting
12        you.  I may remind you of these rules from time to
13        time.  If I do that, it's not because I'm trying to
14        be a jerk.  It's just something that we need to do
15        to have a readable transcript afterwards.
16             If you need to take a break at any time, feel
17        free to do so.  You're not a prisoner here.  Just
18        let me know that you need to go to the bathroom or
19        want to take a drink of water or want to consult
20        with your attorney, Mr. Will.  Just let me know,
21        and we will take the break.  The only thing I would
22        ask is that if there's a question pending, that you
23        answer that question before we take the break.  Do
24        you have any questions for me about what we're
25        going to do today?
```

Exhibit 1

| | | |
|---|---|---|
| 1 | A | No, I don't think so. |
| 2 | Q | All right.  Well, ma'am, could you state your full |
| 3 | | name for the record. |
| 4 | A | Cynthia Lea Mowery. |
| 5 | Q | Okay.  And how old are you, ma'am?  And I hate to |
| 6 | | ask that question, but it's better than getting |
| 7 | | your date of birth in a public record. |
| 8 | A | 65. |
| 9 | Q | All right.  And what is your address? |
| 10 | A | 4340 South Franklin Road, Indianapolis, Indiana |
| 11 | | 46239. |
| 12 | Q | Okay.  Are you employed? |
| 13 | A | Yes, I am. |
| 14 | Q | How are you employed? |
| 15 | A | Do you mean where am I employed? |
| 16 | Q | Yes, ma'am. |
| 17 | A | Marion County. |
| 18 | Q | Okay.  What do you do for Marion County? |
| 19 | A | I'm the Republican Director for the Marion County |
| 20 | | Board of Voter Registration. |
| 21 | Q | Okay.  And we'll go through that a bit later, but I |
| 22 | | do have some basic background questions before we |
| 23 | | can get into that.  Are you taking any medications |
| 24 | | today that would affect your ability to understand |
| 25 | | my questions or answer them? |

Exhibit 1

1   A   No.

2   Q   Okay.  How did you prepare for this deposition?

3   A   By talking to my attorneys and...

4   Q   Okay.  I don't want to know anything that you said

5       to them or they said to you.  Did you look at any

6       documents before this to prepare for this

7       deposition?

8   A   E-mails.

9   Q   Okay.  What e-mails?

10  A   The ones that you had requested to be sent to you.

11  Q   Okay.  Anything in particular?

12  A   No, not necessarily.

13  Q   And the questions I have to ask, ma'am, have you

14      ever been arrested?

15  A   No.

16  Q   Have you ever been convicted?

17  A   No.

18  Q   Okay.  Have you ever entered into an agreement not

19      to prosecute with the prosecutor's office?

20  A   No.

21  Q   Or pled guilty to any crime?

22  A   No.

23  Q   Okay.  All right.  Ms. Mowery, where did you grow

24      up?

25  A   Wanamaker, Indiana.

**Exhibit 1**

| | | |
|---|---|---|
| 1 | Q | Did you go to high school there? |
| 2 | A | Yes. |
| 3 | Q | What was the name of that high school? |
| 4 | A | Franklin Central High School. |
| 5 | Q | All right.  Did you graduate? |
| 6 | A | Yes. |
| 7 | Q | Did you go to school after graduation? |
| 8 | A | Yes. |
| 9 | Q | Where did you go? |
| 10 | A | Indiana Wesleyan University. |
| 11 | Q | Okay.  Did you get a degree from Indiana Wesleyan? |
| 12 | A | Yes. |
| 13 | Q | Okay.  What was the degree in? |
| 14 | A | I have four of them.  I have an associate's degree, |
| 15 | | which is business, I have a bachelor's degree, |
| 16 | | which is business, I have a master's degree, which |
| 17 | | is management, and then I have an MBA, which is a |
| 18 | | master's degree. |
| 19 | Q | Are these all from Indiana Wesleyan? |
| 20 | A | Yes. |
| 21 | Q | Okay.  Do you remember the dates of these degrees? |
| 22 | A | Well, I think the last one I think I just |
| 23 | | celebrated 12 years or 15 years being out of |
| 24 | | school.  I was a late student. |
| 25 | Q | Well, when did you get the bachelor's degree? |

**Exhibit 1**

| | | |
|---|---|---|
| 1 | A | I will say it was probably in my 40s. |
| 2 | Q | Okay.  Well, what did you do immediately after |
| 3 | | going to high school? |
| 4 | A | I went to work.  I also went to IUPUI part time |
| 5 | | as... |
| 6 | Q | Okay.  Where did you go to work? |
| 7 | A | American States Insurance. |
| 8 | Q | What were you doing for American States? |
| 9 | A | Typist. |
| 10 | Q | All right.  How long did you stay in that position? |
| 11 | A | Probably a year. |
| 12 | Q | What did you do after that? |
| 13 | A | I went to P.R. Mallory. |
| 14 | Q | What's that? |
| 15 | A | They do timers, capacitors, Duracell batteries. |
| 16 | Q | Was this a production position? |
| 17 | A | No.  It was an office.  I was a secretary. |
| 18 | Q | Okay.  How long were you with P.R. Mallory? |
| 19 | A | Probably about five years. |
| 20 | Q | All right.  What did you do after that? |
| 21 | A | I was self-employed.  P.R. had transferred me to |
| 22 | | Tarrytown, New York, because I knew the information |
| 23 | | on their Duracell trademark and stuff, so I went up |
| 24 | | there, helped with that, got that finished, came |
| 25 | | back home. |

Exhibit 1

1    Q   Did you actually live in New York for a while?

2    A   Yes.

3    Q   For how long were you there?

4    A   Probably a year or two.

5    Q   Okay.  At some point, did you become employed by

6        the Office of Voter Registration?

7    A   Yes.

8    Q   Okay.  When did that happen?

9    A   Well, it started with the county in 1987.  That

10       would be, I would say, probably about -- I have

11       probably been there 20 years.

12   Q   Okay.  Always working at Voter Registration?

13   A   No.  I have been with Marion County.

14   Q   Okay.  Well, let's start with that then.  What were

15       you doing -- what position did you obtain in 1987?

16   A   I worked for the Justice Agency.  I was a

17       secretary, and then I moved up to office manager,

18       and then I went over pretrial services.

19   Q   Is that in the Prosecutor's Office?

20   A   No.  That was over the Justice Agency.

21   Q   Okay.  How long were you at the Justice Agency?

22   A   12 years.

23   Q   Okay.  What was your last position there?

24   A   I was over pretrial services, which is conditional

25       release, bail commissioners.

**Exhibit 1**

1   Q   Okay.  And where did you go after pretrial
2       services?
3   A   I believe it was the Recorder's Office.  No.  The
4       Auditor's Office.
5   Q   What was your position there?
6   A   Budget manager.
7   Q   All right.  How long were you at the Auditor's
8       Office?
9   A   Three years.
10  Q   Okay.  What did you do after that?
11  A   I went to the Recorder's Office.
12  Q   All right.  What was your position there?
13  A   Budget manager, financial...
14  Q   Okay.  How about after that?
15  A   That's when I went to Voter Registration.
16  Q   Okay.  And you may have answered this question
17      already, ma'am, but just remind me when you started
18      at Voter Registration.
19  A   Well, it would have been 20 years ago, so 2002.
20  Q   2004, possibly?
21  A   Yeah, it could be.
22  Q   Okay.
23  A   I think Keith was still alive.
24  Q   And what are your duties as Republican codirector
25      of Voter Registration?

# Exhibit 1

```
1    A   I oversee all the Republican registrations that
2        come in and out and oversee how they're processed
3        and make sure that the staff is getting them done
4        correctly and we are meeting the timelines that
5        we're in.
6    Q   Okay.  To whom do you report?
7    A   The Marion County Republican Chair.
8    Q   All right.  So you don't report to the mayor?
9    A   No.
10   Q   Okay.  You're out of that chain of command?
11   A   Right.
12   Q   And there is also a Democratic codirector?
13   A   Yes.
14   Q   Okay.  How many employees do you supervise?
15   A   Six or five.
16   Q   Are these -- are their titles Republican Deputy
17       Clerks or --
18   A   HR has, like, odd names for them, production
19       analyst, you know, but they are Republican clerks,
20       Republican analysts.
21   Q   Okay.
22   A   Things like that.
23   Q   And then there are equal number of Democrat
24       employees?
25   A   As are democrats.
```

Exhibit 1

1   Q   Okay.  Do you have any role in supervising them?

2   A   The Democrats?

3   Q   Yes, ma'am.

4   A   Yeah, I think I'm involved with some day to day.

5       When their director isn't there, I may step in.

6   Q   Okay.  Are there -- is there a deputy director?

7   A   Yes.

8   Q   Who is the Republican deputy director?

9   A   Excuse me.  Taylor Williams.

10  Q   Okay.  Who is the Democratic deputy director?

11  A   Michelle Brezeke.

12  Q   Who is the Democratic director?

13  A   Alexander, and then he's got like nine characters,

14      letters, after his name like Najarro or something.

15      I don't know how to pronounce his name.  I'm sorry.

16  Q   But you work with him?

17  A   Uh-huh.

18  Q   That must be a complicated name.

19  A   It kind of -- he doesn't think it is, but I don't

20      think any of us can really pronounce it.

21  Q   Okay.  Have you ever run for elective office?

22  A   Yes.

23  Q   When did you run, and what did you run for?

24  A   I ran for Franklin Township Board, and I ran for

25      Franklin Township Trustee.

Exhibit 1

1   Q   Do you know when you ran for those offices?

2   A   They would be back in the '80s.

3   Q   Okay.  Did you win either one of them?

4   A   I won both of them.

5   Q   Oh, okay.

6   A   The second time I ran for trustee I did not.

7   Q   But you did serve one term as the Franklin Township

8       Trustee?

9   A   Yes.

10  Q   Okay.  Have you ever held an office in a political

11      party?

12  A   Yes.

13  Q   What party offices have you held?

14  A   Republican.

15  Q   Yes, but, I mean, is it like county chairman?

16      State vice chairman?  Secretary?

17  A   I have been a vice precinct committeeman.  I have

18      been a precinct committeeman.  I have been a

19      delegate.  I have been --

20  Q   A convention delegate?

21  A   Yes.  A ward chair.  I have been a vice ward chair,

22      I have been a township chair, and I am currently

23      the county treasurer.

24  Q   Of Marion County?

25  A   Republican.

Exhibit 1

```
 1    Q   Okay.  Have you worked on the campaign of a
 2        candidate for office?
 3    A   Several.
 4    Q   Okay.  Whose campaigns have you worked on?
 5    A   Too many to name.
 6    Q   Can you give a couple of the more prominent
 7        examples?
 8    A   Yeah.  I just worked on Jefferson Shreve's.
 9    Q   And he ran for mayor of Indianapolis
10        unsuccessfully?
11    A   Yes.
12    Q   Anyone else?
13    A   I have helped out with the governor.  I helped out
14        with Jack Sandlin, Senator Jack Sandlin, Senator
15        Aaron Freeman.  You know, any Republican that runs
16        I pretty much have some way of helping.
17    Q   Okay.  Have you ever organized a fundraiser to
18        raise contributions for someone running for office?
19    A   Yes.
20    Q   All right.  How many times in your life have you
21        done that?
22    A   Three or four.
23    Q   Okay.  Who have you done it for?
24    A   I have done one for the minority leader, and I'm
25        trying to think what his title is -- and whip.  I
```

Exhibit 1

| | | |
|---|---|---|
| 1 | | have done two for them. |
| 2 | Q | Can you name the names?  I'm not familiar enough |
| 3 | | with local politics to know who those people are. |
| 4 | A | Okay.  Brian Mowery is the minority leader, and |
| 5 | | Paul Annee is the whip.  I have done them for -- |
| 6 | | with groups along with the Greater Indianapolis |
| 7 | | Republican Women's Club.  I have done them with |
| 8 | | just various groups. |
| 9 | Q | Okay.  So these are city council officials, |
| 10 | | correct? |
| 11 | A | Yes, they are. |
| 12 | Q | Not state legislature or congress or anything like |
| 13 | | that? |
| 14 | A | Right. |
| 15 | Q | Okay.  Are you related to Brian Mowery? |
| 16 | A | Yes, I am. |
| 17 | Q | How are you related to him? |
| 18 | A | He is my paternal nephew. |
| 19 | Q | Okay.  Are you related to Paul Annee? |
| 20 | A | No. |
| 21 | Q | What is the Marion County Agricultural Fair |
| 22 | | Association? |
| 23 | A | It's an auxiliary group that -- of past members and |
| 24 | | organizers of the fair. |
| 25 | Q | Okay.  It put on the Marion County Fair? |

# Exhibit 1

| | | |
|---|---|---|
| 1 | A | Well, the Marion County Fair Board put it on, but, |
| 2 | | yes, they also help. |
| 3 | Q | Okay.  All right.  Then just to be clear, the |
| 4 | | Marion County Fair is not put on by a government |
| 5 | | agency? |
| 6 | A | No. |
| 7 | Q | Is that unusual among Indiana county fairs? |
| 8 | A | No. |
| 9 | Q | Most county fairs are not put on by the county |
| 10 | | government? |
| 11 | A | As far as I know.  I mean, when I have gone to |
| 12 | | conventions and stuff, there are very few that are |
| 13 | | government funded. |
| 14 | Q | Okay. |
| 15 | A | Now, state fairs, you know... |
| 16 | Q | The state fair is a state agency? |
| 17 | A | Yeah. |
| 18 | Q | Okay.  What kind of organization is the |
| 19 | | fairgrounds?  And by that I mean is it a for-profit |
| 20 | | business?  Is it a nonprofit charity or something |
| 21 | | else? |
| 22 | | MR. WILL:  Objection to the form of the |
| 23 | | question.  That speaks for itself.  The witness can |
| 24 | | answer if she knows. |
| 25 | A | It's a 501(c)(3) nonprofit. |

Exhibit 1

1    Q   How did you first become affiliated with it?

2    A   The Councilor Bill Dowden was a close friend of

3        mine, and he was also a close friend of my husband.

4        And when my husband passed away, Councilor Dowden

5        sat on the Fair Board, and he called me and asked

6        me if I would assume my husband's place, and that's

7        how I got on there.

8    Q   Okay.  I hate to ask, ma'am, if this brings up

9        painful memories, but who was your husband?

10   A   Keith Smith.

11   Q   Okay.  Did he play some kind of prominent role in

12       the community?

13   A   Yes.

14   Q   What was that?

15   A   He was the Indianapolis fire chief.

16   Q   Okay.  And he also happened to serve on the Fair

17       Board?

18   A   Yes, after he retired.

19   Q   Okay.  So you took a seat on the board?

20   A   Yes.

21   Q   All right.  What is the role of the board?  Does it

22       approve the budget and expenditures?  Does it hire

23       people?  Just what is the board's role there?

24   A   The board oversees the fairgrounds.  It determines

25       who works there.  It determines what's purchased.

**Exhibit 1**

It determines what vendors we use.  It determines
the concessionaires that are used, the rides that
are brought in, any lease of property that we have
or that we may need.  It just generally oversees
the fairgrounds and any business.

Q  Okay.  Can the president of the board spend money
without board approval?

A  Up to a certain dollar amount, I believe.

Q  Do you know what that dollar amount is currently?

A  I forget.

Q  Okay.  When did you take the seat on the board?

A  It would have been 2016 --

Q  Okay.

A  -- when I took a seat on the board.

Q  Okay.  And by this time, you were also the
Republican codirector of the Voter Registration
Office?

A  Yes.

Q  Okay.  Have you held offices on the board such as
president or vice president?

A  Yes.

Q  Okay.  Can you tell me what roles you have played
on the board and roughly when you held those
various offices?

A  I was a board member in 2016 and 2017, and I was a

Exhibit 1

```
 1        treasurer in probably 2018, and then 2019 I became
 2        president.
 3   Q    Okay.  And to be president, you were elected by
 4        your fellow board members?
 5   A    Right.
 6   Q    All right.  How long were you president starting in
 7        2019?
 8   A    I'm currently president still.
 9   Q    Was there ever a period where -- or where you were
10        not president since 2019?
11   A    No.
12   Q    All right.  If I were to tell you that I have
13        correspondence from Abdul-Hakim Shabazz describing
14        himself as president, would you disagree with that?
15   A    No.  I apologize.  I forgot.  I did resign --
16        excuse me -- from the Fair Board after the '22
17        fair.
18   Q    Okay.  And would be in late June, beginning of
19        July?
20   A    It would have been like July 5 or July 6 or 7th,
21        the very next day.
22   Q    Okay.  That you resigned?
23   A    Yes.
24   Q    Okay.  How long were you -- now, when you resigned
25        as president, did you also resign as a board
```

Exhibit 1

```
 1        member?
 2   A    Yes.
 3   Q    Okay.  How long after your resignation did it take
 4        for you to get back on the board?
 5   A    I think it was probably August or September.
 6   Q    Okay.  Of that same year of 2022?
 7   A    Yes.
 8   Q    All right.  What is the lodge?
 9   A    It's an event center that we built.  We tore down a
10        home where the groundskeeper lived and built -- we
11        call it the lodge -- but the front end of it is for
12        events.  We rent out that space, and then the back
13        end is for the groundskeeper or whatever we so
14        choose to put in there.
15   Q    But it's a residential space?
16   A    It could be, yes.
17   Q    Are among the duties of the board is to hire the
18        executive director?
19   A    With the recommendation of the president.
20   Q    All right.  And would that be true of anyone hired
21        by the fair?  I mean, they're typically hired at
22        the recommendation of the president?
23   A    Yeah.  Most people are hired by the president.
24   Q    Okay.  When did you first meet Jeremiah Tevebaugh?
25   A    I really don't know.  The vice president hired him
```

Exhibit 1

```
 1        at the time, so I really don't know.  I don't
 2        recall what year that was.
 3    Q   Okay.  Who was the vice president?
 4    A   Kay Elliott.
 5    Q   Okay.  And do you remember roughly when that --
 6        what time that would have been?
 7    A   It would have been my second year of presidency, I
 8        think.
 9    Q   So that would be 2020?
10    A   Probably '19 or '20, something like that, yeah.
11    Q   Why was -- and by the way, if I refer to Jeremiah
12        Tevebaugh as Hoss, do you understand who I'm
13        talking about?
14    A   Yes.
15    Q   Why did the vice president take the step of hiring
16        Hoss if hires are typically made --
17            MR. LOWREY:  Objection.  Calls for speculation
18        as to someone else's motivation.
19    Q   You can answer the question, ma'am.
20            MR. WILL:  You can answer to the extent you
21        know.
22    A   We had been looking for a groundskeeper for an
23        extended period of time, and he kept, according to
24        her, he kept calling her.  He was not calling me.
25        And finally she said, let's just hire him and get
```

<p style="text-align:center; color:red;">Exhibit 1</p>

```
 1        him off our back, and he says he can do all this
 2        stuff.  He says he owns a 125-acre horse farm and
 3        whatever.  Let's give him a shot.  And I said,
 4        well, you're overseeing him because I'm covered up,
 5        and that's kind of how that came down.
 6   Q    Okay.  So he was hired as the fair's groundskeeper,
 7        you said?
 8   A    Yes.
 9   Q    If I tell you that I have seen his job described as
10        a maintenance supervisor, would you disagree with
11        that characterization?
12   A    Somewhat.
13   Q    Why would you disagree?
14   A    You have to have people to supervise.
15   Q    All right.  But he did do maintenance?
16   A    Some.  He mostly hired it out.  We --
17   Q    Was there a problem with him hiring it out?
18   A    Well, we could have hired it out.
19   Q    Okay.  How long was Hoss in the position of
20        groundskeeper?
21   A    I don't know.  I don't recall.
22   Q    At some point, did he become the executive
23        director?
24   A    Yes.
25   Q    How did that happen?
```

Exhibit 1

```
1    A   He said that he knew QuickBooks and other office
2        software that we used, and the guy prior to him did
3        not, and we were having issues getting people paid.
4    Q   Okay.  So did you hire him as executive director?
5    A   Yes.
6    Q   Okay.  And ultimately the board signed off on that?
7    A   Yeah.  You got to realize this is a small
8        organization.  You're not talking Lilly, you know.
9        You're talking ten people at the board.
10   Q   Okay.  And how many employees?
11   A   At the time, I think it was just him or maybe one
12       guy that mowed the grass part time.
13   Q   Okay.  So the management was pretty informal?
14   A   Yeah.  And it's -- you know, titles are just thrown
15       around, like, you know, some people would covet,
16       you know, executive director.  They would --
17   Q   The title, you mean?
18   A   Yeah.  That would be their career path.  But at a
19       small agency like that, it's, you know, here, just
20       be the executive director, you know.
21   Q   Okay.  Do you know -- first of all, was -- I assume
22       that his job performance as groundskeeper was good
23       enough to be promoted?
24   A   It was average.
25   Q   Okay.  Once hired as executive director, who did
```

Exhibit 1

```
 1        Hoss report to?
 2   A    Me.
 3   Q    Okay.  Do you know what his pay was at the time you
 4        started?
 5   A    I don't recall.
 6   Q    Okay.  How about when he left?
 7   A    I don't recall.
 8   Q    All right.  Where did the executive director live?
 9   A    When he left, he lived in the lodge, the back part
10        of the lodge.
11   Q    Okay.  Was that part of his compensation was to be
12        allowed to live in the lodge?
13   A    Yes.
14   Q    All right.  Were you aware that Hoss has several
15        felony convictions?
16   A    Not at the time.
17   Q    Okay.  And not at the time he was hired, you mean?
18   A    No.
19   Q    Okay.  When did you learn about them?
20   A    Well, actually, not too long ago because everything
21        we had showed him name to be Jeremiah, and his
22        felony convictions and records are all under
23        Jeremy.
24   Q    Okay.
25   A    We're a small county fair.  We don't have a
```

Exhibit 1

```
 1        criminal justice system.
 2    Q   Uh-huh.  By criminal justice system, do you mean
 3        the ability to do background checks?
 4    A   Uh-huh.
 5    Q   Okay.  If I were to tell you that Hoss has
 6        testified that he told you about his felony
 7        convictions at the time or around the time he was
 8        offered the position as executive director, would
 9        you disagree with that?
10    A   Yes.
11    Q   Okay.
12    A   There was a point in time that we had a discussion,
13        and my counterpart tried to do a -- where you get
14        them removed from your record.
15    Q   An expungement?
16    A   Yes.  But she couldn't get them done, and the
17        attorney that he hired had said he wasn't going to
18        touch it because it wasn't -- it was with intent
19        with so many of the same thing.
20    Q   You mean the attorney said that Hoss wasn't
21        eligible for expungement?
22    A   Yeah.  He said he didn't think he could get it
23        done.
24    Q   Okay.  Do you know if he had -- if his record was,
25        in fact, expunged?
```

Exhibit 1

```
 1   A   I have no idea.
 2   Q   You mentioned a counterpart a few minutes ago.  You
 3       had a discussion with your counterpart?
 4   A   Yes.
 5   Q   Who was that?
 6   A   LaDonna Freeman.
 7   Q   And how was she -- oh, you mean she's the
 8       Democratic director?
 9   A   Yes.
10   Q   Or was at the time --
11   A   Yes.
12   Q   -- of Voter Registration?
13   A   And LaDonna did a lot of expungements for people.
14   Q   Okay.  And what was the discussion with LaDonna
15       Freeman regarding Hoss' criminal record?
16   A   He talked to her about trying to get it expunged,
17       which I would have too, I guess.
18   Q   Okay.  And about when would this conversation have
19       taken place?
20   A   Well, I would say like in '19.  Not '19.  Maybe
21       2020 or 2021, maybe.
22   Q   Okay.
23   A   Whenever he worked for the agency.
24   Q   And by agency, you mean Voter Registration or the
25       fair?
```

Exhibit 1

1   A  Voter Registration.

2   Q  Okay.  Did Hoss also tell you that contrary to what

3       was written on his resume, he did not have

4       bachelor's degrees from --

5   A  No.

6   Q  -- from -- let me finish my question.

7   A  Okay.

8   Q  He did not have a bachelor's degree and a master's

9       degree.  Did he tell you that?

10   A  No.

11   Q  All right.  If I were to tell you that Hoss

12       testified at his deposition that he explained all

13       this to you around the time that he was promoted to

14       executive director, would you disagree with that?

15   A  Yes.

16          MR. WILL:  Objection as to form.  Go ahead.

17       You can answer.

18   A  Yes, I would.

19   Q  All right.  Why was Hoss fired from the

20       fairgrounds?

21          MR. WILL:  Objection as to form.  The witness

22       can answer.

23   A  I don't know.  I didn't fire him.

24   Q  Okay.  Who did fire him?

25          MR. WILL:  Objection as to form.  You can

Exhibit 1

```
 1        answer.
 2   A    I believe it was Abdul-Hakim Shabazz and Joe Goins.
 3   Q    Okay.  And Abdul was president of the board at the
 4        time?
 5   A    Yes.
 6   Q    What was Joe Goins?
 7   A    Treasurer.
 8   Q    Okay.  Did you hire Hoss to work for you at the
 9        City of Indianapolis or the County?
10   A    Yes, I did.
11   Q    Okay.  How did that happen?
12            THE WITNESS:  Is it okay to answer?
13            MR. WILL:  Yes.  Go ahead.
14   A    Hoss had told me and several other people that he
15        had severe health issues, that he thought that he
16        was going to lose his leg, and that he had cancer.
17        He had a doctor that I believe was in the Chicago
18        area and that this doctor was running out of the
19        ability to write him prescriptions and things.  And
20        he didn't know how much longer he was going to be
21        around and needed help, so I said I have a position
22        open in Voter Registration.  Maybe we can put you
23        in there, and that will give you, you know, a year
24        or whatever time you need to get yourself on track.
25        And I said, let's see what happens there, and
```

Exhibit 1

| | | |
|---|---|---|
| 1 | | that's how he came about to Voter Registration. |
| 2 | Q | Okay.  The job at the -- the position as executive |
| 3 | | director, did that provide health insurance? |
| 4 | A | No. |
| 5 | Q | Okay.  So you thought that working for the County |
| 6 | | that he would have good health insurance? |
| 7 | A | Would provide him with health insurance. |
| 8 | Q | Okay.  And that was the main reason you offered him |
| 9 | | the job? |
| 10 | A | Yes.  Hoss was one of my best friends.  We worked |
| 11 | | night and day together trying to put a fair |
| 12 | | together.  I don't know if you have ever put an |
| 13 | | event like that together. |
| 14 | Q | Not on that scale, ma'am. |
| 15 | A | But it's overwhelming, especially your first one. |
| 16 | | And there wasn't anything that I wouldn't have done |
| 17 | | for him because he was one of my best friends, and |
| 18 | | I knew that he needed help, or that's what he said. |
| 19 | | And that was why I pushed to get him into Voter |
| 20 | | Registration. |
| 21 | Q | Okay.  Just for clarification, do you have any |
| 22 | | reason to believe that Hoss didn't have health |
| 23 | | problems? |
| 24 | A | We never saw any evidence of it.  I mean, no, I -- |
| 25 | | quite frankly, I've never seen anything and didn't |

**Exhibit 1**

| | | |
|---|---|---|
| 1 | | feel like, you know, you could really ask that.  My |
| 2 | | brother loaned him a brand new truck to go to Mayo |
| 3 | | in Florida to get some kind of test that he said he |
| 4 | | needed that I don't know if he ever had or not. |
| 5 | Q | Okay.  Are you concerned that Hoss might have been |
| 6 | | lying about having serious health problems? |
| 7 | A | I have no idea. |
| 8 | Q | You don't know whether you're concerned? |
| 9 | A | It's questionable. |
| 10 | Q | That he might have been lying or exaggerating? |
| 11 | A | I mean, who would do that? |
| 12 | Q | But, well, did you think Hoss was? |
| 13 | A | Like I said, Hoss was one of my best friends.  We |
| 14 | | confided in one another.  We talked about life, our |
| 15 | | lives.  We talked about things going on.  We helped |
| 16 | | one another out.  I was a recent widow.  If he told |
| 17 | | me it was happening, I believed it.  The rest of |
| 18 | | the board kept saying, Cindy, you're crazy, but I |
| 19 | | believed him because I trusted him.  He was one of |
| 20 | | my best friends. |
| 21 | Q | Okay.  When you say the rest of the board thought |
| 22 | | you were crazy, with regard to what? |
| 23 | A | To keeping Hoss. |
| 24 | Q | To keeping him or promoting him? |
| 25 | A | Keeping him. |

Exhibit 1

1  Q  Okay.  Was there anything suggested that Hoss
2     should not be kept on as an employee?
3  A  Yes.  Several times.
4  Q  Who said that?
5  A  All the board.
6  Q  Okay.  Is that reflected in any board minutes?
7  A  I don't know.
8  Q  Okay.  Would that sentiment be reflected in any
9     other documents such as, say, a performance
10     evaluation or a --
11  A  Oh, I fired him a couple times.  In fact, I just
12     came across the letter I sent him.  I think it was
13     the 11th of May of some year where it said I was
14     letting him go.
15  Q  Okay.  And, yet, he remained employed?
16  A  I'll tell you again.  He was one of my best
17     friends.  I mean, he -- I believed what he told me.
18     And when he and I sat down and talked it out, I
19     knew that he didn't have anywhere to go.  I knew
20     that he didn't have anything.  He told me he didn't
21     have any family, and I thought, well, we'll give it
22     one more shot.
23  Q  So you started to fire him but didn't really go
24     through with it?
25  A  Right.

**Exhibit 1**

1   Q   And that happened several times?

2   A   More than one occasion.

3   Q   Okay.  Let's -- I want to get back a bit to the job

4       at Voter Registration.  To whom did Hoss report?

5   A   At Voter Registration?

6   Q   Yes, ma'am.

7   A   He reported to the deputy board member, which was

8       Michele Cash at the time, but he also reported to

9       me.

10  Q   Okay.  Ultimately you were his boss?

11  A   Yes.

12  Q   Okay.  And the mayor was not his ultimate boss?

13  A   No.  The mayor has nothing do with Voter

14      Registration.

15  Q   Okay.  What were Hoss' duties at Voter

16      Registration?

17  A   To enter registrations from people to update and

18      correct, to process voter registrations, to be

19      there to make sure everything was done,

20      particularly the day before -- the last day of

21      voter registration.  Everybody was on call because

22      you had to be able to make sure all those

23      registrations were received, and we can process

24      them and get them done.  He was to help with the

25      counter, which is people walking in.  On election

Exhibit 1

```
 1        day, we're busy, things like that, the typical
 2        Voter Registration person that you would expect.
 3   Q    Okay.  To get that job, did a criminal background
 4        check have to be performed?
 5   A    Yes.
 6   Q    All right.  Did you get the results of that
 7        background check?
 8   A    No, I didn't see it.  They told me that he did not
 9        have a good one, though.
10   Q    Okay.  Who told you that?
11   A    HR.
12   Q    All right.  So you weren't allowed to see it
13        yourself?
14   A    I could have.
15   Q    Why didn't you see it?
16   A    Hoss was one of my best friends.  I wanted to help
17        him.  He needed healthcare.  I stuck my neck out
18        for him.
19   Q    Okay.  So you hired him in spite of the fact that
20        he had --
21   A    Yes.
22   Q    -- a bad criminal record?
23   A    That's exactly right.
24   Q    Okay.  All right.  While -- did Voter
25        Registration -- or does Voter Registration have any
```

Exhibit 1

1      practice of performing job performance evaluations

2      on the employees?

3   A  Yes.  They tend to change with who's in charge.

4      Most of the time we don't do them because the staff

5      changes, you know.  It's just not -- we don't do

6      them most of the time.

7   Q  Okay.  Was one ever done on Hoss?

8   A  I don't think so.

9   Q  Okay.

10  A  I don't know, though.

11  Q  All right.  Did Hoss ever get any kind of

12     progressive discipline while he was --

13  A  Oh, yeah.

14  Q  -- working for you?

15  A  Oh, yeah.

16  Q  All right.  And do you know what I mean by

17     progressive discipline?

18  A  I sure do.

19  Q  First warning?

20  A  Uh-huh.

21  Q  Second warning, final warning?

22  A  (Nodding.)

23         MR. WILL:  You need to wait for him to ask the

24     question before you answer.

25         THE WITNESS:  Okay.

Exhibit 1

```
 1            MR. WILL:  It's just for her benefit so that
 2       she can get the question and the answer.  Then it's
 3       for your benefit so we know what was said by whom
 4       later.  It's just easier.
 5            THE WITNESS:  Okay.
 6   Q   I believe you testified that Hoss did receive some
 7       kind of progressive discipline while he was at VR?
 8   A   Yes.
 9   Q   What discipline did he receive?
10   A   Well, there's one day that, I mean, I'm sitting in
11       LaDonna's office.
12   Q   And this would be the Democratic codirector?
13   A   Yeah.  Our offices are right there together, and he
14       just walks by the door with his backpack on.  And I
15       go, where are you going?  He said, I'm leaving.
16       And I said, you just can't leave like that.  And he
17       just left.  I said, Hoss, this is an office.  It's
18       not like the fair.  We had several conversations
19       like that.
20   Q   Did you document any of these conversations with,
21       you know, written warnings or reprimands or
22       anything like that?
23   A   Probably in e-mails or whatever, but I'm going to
24       say again Hoss was -- I was trying to help him.  I
25       wasn't trying to hurt him.  And with most of my
```

Exhibit 1

```
 1        employees, well, all of them, if they were doing
 2        something like that, I would take them aside and
 3        say, hey, you know, you can't do that here.
 4    Q   And I believe you, ma'am.  I'm just asking are
 5        there any written records of that?
 6    A   Well, I'm -- I think there are, but I'm not real
 7        sure.
 8    Q   Okay.  Anything you can specifically name today?
 9    A   I thought I sent him an e-mail once on our e-mail
10        system, but I'm not 100 percent positive.
11    Q   Okay.  Does the Office of Voter Registration have
12        any policy on when employees can take their lunch
13        breaks?
14    A   Yes.
15    Q   What's the policy?
16    A   You're assigned a time, you know.  In fact -- and
17        I'm elaborating here, and I probably shouldn't --
18        but I just brought a girl back that was my chief
19        deputy, and she had been gone five or six years.
20        And she came in to my office and she goes, I'm
21        getting ready to take lunch.  And I said, oh, okay.
22        And I said, what time is your lunch?  She said,
23        well, you know, I go from whatever time it is.  I
24        still have the same time, right?  So she knew what
25        her time was because she had had it before.
```

Exhibit 1

1  Q  So is there a written policy telling employees

2     this?

3  A  I don't know if there's a written one, but they all

4     know.

5  Q  Okay.

6  A  Because one can't leave unless the other one is

7     back.

8  Q  Uh-huh.  How does the employee know what his

9     assigned time is?

10 A  We tell them.  When you're a new hire, you go

11    through all that, and the chief deputy sits down

12    and says, here's your time, and most of the time

13    Hoss and I went together.

14 Q  Okay.  So is there some document where -- or maybe

15    an e-mail or something like that that lets an

16    employee know what the proper time for lunch is?

17 A  I don't know.  HR orientation might cover that, but

18    I don't know.

19       MR. McQUARY:  Okay.  Why don't we just take a

20    real short break.

21       (A brief recess was taken.)

22 Q  Ms. Mowery, at some point, did Hoss complain to the

23    fair board members that things you were doing or

24    saying to him made him feel uncomfortable and that

25    he believed were unwelcome sexual advances?

## Exhibit 1

1    A   Not that I'm aware of.

2    Q   You're not aware that he complained about board

3        members to this --

4    A   No.

5    Q   -- ever?

6    A   No.

7    Q   Okay.  How about in a conversation with you?  Did

8        he ever tell you that he thought perhaps some of

9        the things that you were saying to him might make

10       him uncomfortable?

11   A   No.  We had a meeting.  It was to discuss his job

12       performance.  It was with Abdul and John Sturgill

13       and myself, and we were talking about putting him

14       on the last chance.  I can't remember exactly what

15       it was, but he was making fun of it.  Like, this is

16       the last chance thing.  And John Sturgill was

17       supposed to have written it, and within the text of

18       it there was a sexual harassment section, and they

19       had something about sexual -- I said, he is not

20       guilty of any sexual harassment.  And then he

21       started going on about somebody sexually harassing

22       him, but it was just passed on.

23   Q   In that meeting, Hoss never said that you were

24       sexually harassing him?

25   A   No.

**Exhibit 1**

1  Q  Did you say that Hoss was sexually harassing you?

2  A  No.

3  Q  Okay.  So do you believe the meeting had nothing to

4     do with sexual harassment?

5  A  No.  It was his job performance.

6  Q  Okay.  What triggered a meeting about Hoss' job

7     performance?

8  A  Well, he wasn't doing anything, and if he was told

9     to do something, you know, again, we were, like,

10    good friends, so he would tell me -- I would say,

11    you need to get this done or get that done.  He'd

12    say, I'm not going to do it today or whatever.  I

13    knew he would get it done or whatever, but some of

14    it he was kind of serious about, and we would go

15    around about it.  But, you know, it was about that

16    kind of stuff.

17 Q  Okay.

18 A  And the way he -- the primary thing was how he

19    talked to people, and sometimes I think he says

20    things that -- the tone of voice he uses is not

21    probably the best tone to use for the situation.

22 Q  Are there any e-mails or memos or any kind of

23    documents that describe the purpose of that meeting

24    and what you wanted to accomplish by having it?

25 A  I think there was an e-mail, and I think that the

**Exhibit 1**

```
 1        attached document that John was supposed to update
 2        and I don't believe that he ever did, but I don't
 3        recall really.
 4   Q    Okay.  Did Hoss receive any written warnings or --
 5   A    Oh.
 6   Q    -- other documents telling him your job performance
 7        is bad, and so we're going to have a meeting about
 8        it?
 9   A    Yeah.  He knew why we were having the meeting.  We
10        were having the meeting after the board meeting.
11   Q    But did he get anything in writing?
12             MR. WILL:  I'm sorry.  Was your answer done
13        before he asked the next question?  You said you
14        were having a meeting after the board meeting.  I
15        didn't know if your answer was done.
16             THE WITNESS:  Yeah.
17             MR. WILL:  Sorry.  It sounded too close.  I
18        just wanted to make sure she got all her answer in.
19   Q    And, ma'am, what did you mean by a meeting after
20        the meeting?
21   A    A lot of times if there's issues going on with
22        something about, like, hey, we're going to buy a
23        tractor, the group may get -- a small group of
24        people might get together.  I looked at these bids,
25        or I'm going over here, have a little meeting
```

Exhibit 1

| | |
|---|---|
| 1 | afterwards, and then break it up. But we had |
| 2 | scheduled a meeting with him to talk about his job |
| 3 | performance, and I probably do have an e-mail on |
| 4 | that. |
| 5 | Q  If you could get that to Mr. Will so he could pass |
| 6 | that on to me, I would appreciate that. |
| 7 | A  Okay. |
| 8 | MR. WILL:  What specific document are you |
| 9 | talking about?  I'm sorry. |
| 10 | THE WITNESS:  The meeting after the meeting |
| 11 | about Hoss' job performance and that. |
| 12 | MR. WILL:  Okay. |
| 13 | A  This is his last chance.  Well, I mean, right there |
| 14 | tells you we had several conversations when we |
| 15 | called it the last, and he would -- |
| 16 | Q  He would what? |
| 17 | A  He would go around -- I mean, I know him well |
| 18 | enough to know it was a sense of humor, but he |
| 19 | would say, you know, he needs grapes because this |
| 20 | is my last chance, you know, or whatever it is.  I |
| 21 | can't remember, but kind of making fun of it, and |
| 22 | it was a very serious thing, but he hadn't signed |
| 23 | anything. |
| 24 | Q  Let me make sure I understand what you mean by |
| 25 | meeting after the meeting.  So there was a |

Exhibit 1

| 1 | | regularly scheduled board meeting? |
|---|---|---|
| 2 | A | Uh-huh. |
| 3 | Q | Where you -- where the board members met and |
| 4 | | discussed what was on the agenda for that meeting, |
| 5 | | and then you and John Sturgill and Abdul-Hakim |
| 6 | | Shabazz met with Hoss after that board meeting? |
| 7 | A | Right. |
| 8 | Q | Okay.  Did Hoss raise the topic of what he |
| 9 | | perceived to be you sexually harassing him at that |
| 10 | | meeting? |
| 11 | A | No.  My name wasn't brought up.  He said there was |
| 12 | | someone, and, I mean, if it was me, I thought it |
| 13 | | was somebody else so... |
| 14 | Q | Oh, he said he was being sexually harassed by |
| 15 | | someone, but he didn't say who? |
| 16 | A | He didn't identify them. |
| 17 | Q | Okay.  And correct me if I'm wrong, but I think you |
| 18 | | testified earlier that this meeting was on May 10, |
| 19 | | 2022? |
| 20 | | MR. WILL:  Object to the form.  Witness can |
| 21 | | answer.  Go ahead. |
| 22 | | THE WITNESS:  What did you say? |
| 23 | | MR. WILL:  I said object to the form.  Witness |
| 24 | | can answer. |
| 25 | A | That I said that meeting was May 10? |

Exhibit 1

```
 1   Q   I think so.  I think you said that, but I'm asking
 2       to make sure.
 3   A   I don't know.
 4   Q   Okay.
 5   A   But it was right before the fair, so it very well
 6       could have, but I will look.
 7   Q   Were you checking your calendar just now?
 8   A   No.  I was putting that down so I would look.
 9           MR. WILL:  She's making a note.
10   Q   Okay.  I thought you were consulting your calendar.
11       All right.
12   A   No.
13   Q   Okay.  Who is John Sturgill?
14   A   John Sturgill is an attorney.  He's currently now
15       the small claims court judge for Decatur Township.
16       He's very involved with his children.  He's a good
17       person.
18   Q   But, I mean, what was his professional relationship
19       to the board or to the fairgrounds?
20   A   Board member.
21   Q   Okay.  And who -- Abdul-Hakim Shabazz was a board
22       member at that time?
23   A   Yes.
24   Q   Was he an officer of the board at this moment?
25   A   I think was vice president.
```

# Exhibit 1

```
 1   Q   Okay.  At that meeting, was Hoss presented with a
 2       zero tolerance policy?
 3   A   That's what it was, zero tolerance.
 4   Q   Okay.  Was this a -- was the zero tolerance a
 5       policy, or was it a written warning about his
 6       personal conduct?
 7   A   His -- it was a written warning about his personal
 8       conduct.
 9   Q   Okay.  Do you recall what it said his conduct or
10       misconduct was?
11   A   Well, that, you know, he wasn't getting his jobs
12       done.  He, you know, spoke to people terrible.
13       Vendors were complaining.  Let's just say he didn't
14       have any friends.
15   Q   Okay.  Friends among the board members or the --
16   A   Anyone.
17   Q   -- vendors of the fair?
18   A   (Nodding.)
19   Q   Okay.  And all that is documented in what was given
20       to him that day?
21   A   I think that's that memo, and he was going to edit
22       it.  John Sturgill was going to edit what he had
23       talked about during the meeting and then present it
24       to him as a final document.
25   Q   Well, did you see it?
```

Exhibit 1

1    A    I saw the edited version, but I didn't see the

2         edited version until the meeting, but I haven't

3         seen the final version.  I don't think he did it.

4    Q    Okay.  Did Hoss at any point in this meeting say

5         that you were making him uncomfortable through

6         sexual advances?

7    A    No.

8    Q    Okay.  I would like to talk to you about some of

9         the things that Hoss believes that you did or said

10        that made him uncomfortable.  On May 31, 2022, did

11        you say something, text or e-mail him, to say, "You

12        have replaced me.  We don't talk about everything

13        in your life or mine anymore.  You're having those

14        conversations with someone else, and I miss our

15        friendship.  I'm happy for you, though, as I know

16        you would be if the tables were turned.  Mark your

17        calendar for Monday evening council meeting.  Pearl

18        asked if you were going to one of your donation

19        places.  She needs laundry detergent."  Do you

20        recall saying anything like that?

21   A    I probably sent that to him.

22   Q    Okay.  On June 1, 2022, you said, "I just may have

23        a sangria tonight.  Sounds good."

24   A    Yeah.  I...

25   Q    You said that?

**Exhibit 1**

1    A    Yeah.

2    Q    Okay.

3    A    That -- I mean, that's not saying come over and

4         have one.

5    Q    Okay.

6    A    I don't invite anybody over.

7    Q    All right.  On June 4, 2022, did you say, "Do you

8         want a frozen Coke?"

9    A    I don't think I had a frozen Coke, no.

10   Q    On June 7, 2022, did you ever --

11   A    That might have been at the fair, though, too.

12   Q    Okay.  On June 7, 2022, did you text or e-mail him

13        to say, "Ever been on Route 66?  Any interest?

14        Been to Key West?"

15   A    Well, we had been talking about going somewhere.

16   Q    Okay.  On June 17, 2022, did you say, "You'll never

17        know how much I appreciate you.  Pool is open."?

18   A    Yeah.  That's -- I probably said that.

19   Q    Okay.  On June 19, 2022, did you say, "Where have

20        you been all weekend?  Are you at the fairgrounds?"

21   A    What's the date on that?

22   Q    June 19, 2022.  I probably did ask that.

23   A    You realize he's living there, right?

24   Q    Oh, yes, ma'am.

25   A    So the place is unsecured.

# Exhibit 1

1   Q   Okay.  On June 21, 2022, did you say, "By the way,
2       I just took my bath."?
3   A   Yeah, and there's a story behind that too.
4   Q   What's the story?
5   A   We had an agreement that if one of us started
6       smelling because we were out in those barns, we
7       were to tell the other one.  And he says to me that
8       day -- he said, do you remember that agreement we
9       had?  And I said, yeah.  And he said, well, you
10      probably want to take a bath.
11  Q   He told you you smelled bad that day?
12  A   Yeah.  I mean, that was -- we're working out in
13      barns and stuff at -- around people.
14  Q   Okay.  Well, had you been working in the barn on
15      June 21?
16  A   Probably so.  We do it all.  There isn't anybody
17      that's exempt from anything.
18  Q   All right.  On June 26, 2022, did you say, "Two
19      months from tomorrow we'll be leaving for our trip
20      if you don't back out.  Smily face."?  I think
21      smiley face is an emoji.  Did you say that?
22  A   I was more than ready to leave, but did he tell you
23      why we were leaving?
24  Q   Well, you tell me.
25  A   We decided -- or, well, he told me that he had

Exhibit 1

```
 1        never -- he didn't know who his dad was.  He had no
 2        family.  This was when he started, and then all of
 3        a sudden, his aunt dies.  Well, that's family to
 4        me.  And then pretty soon another aunt pops up.
 5   Q    You mean dies?
 6   A    No.  She pops up.
 7   Q    Oh.
 8   A    Supposedly running one of these companies he has.
 9        Then he has another aunt that's a retired Lilly
10        employee.  Well, then he tells me that he's found
11        family that have found him from Facebook or one of
12        those social media things, and they all lived out
13        west.  So I said, well, are you going out there, or
14        are they coming out?  He said, no.  No.  They're
15        coming up.  We're going to have a big barbecue at
16        the lodge.  Come on up.  Well, I didn't know if I
17        wanted to do that or not --
18   Q    Okay.
19   A    -- because I had something else going on.  Well,
20        that didn't -- they didn't -- for some reason, he
21        said they didn't come out.  I don't remember what
22        it was.  So I said later, Hoss, I have a
23        sister-in-law that lives in Seattle because these
24        people lived in Seattle, and I said, I haven't seen
25        her since Keith passed away.  Why don't we drive
```

Exhibit 1

```
 1      out to Seattle?  I'll drop you off where your
 2      family is at.  It was a brother, I think, and I
 3      think I had pictures of him.  It was a brother.
 4      And I said, and I'll go on to my sister-in-law's,
 5      and then when we're done visiting with them, we'll
 6      come back.  I'll pick you up and come back.  And
 7      then he said something about he'd never seen Mount
 8      Rushmore.  And I said, well, that's up that --
 9      you're up north.  We can just ride through there.
10      I mean, while you're there.  Why not?  That's what
11      the trip was about.  There was no romantic getaway
12      or interlude or anything like that.
13  Q   Okay.  Well, did you book a hotel?
14  A   No.
15  Q   Okay.  Did you book a flight?
16  A   No.
17  Q   Okay.
18  A   We were going to drive.
19  Q   Okay.
20  A   And that was because of the COVID.
21  Q   Okay.  Where was the destination?  What --
22  A   Seattle.
23  Q   Okay.
24  A   He was going to Seattle in the city part of it, I
25      guess, and I was going to Arlington, Washington,
```

Exhibit 1

```
 1        where Karen lives, my sister-in-law.
 2   Q    Okay.
 3   A    There was nothing romantic about it at all.
 4   Q    But the plan was to drive all the way to Seattle?
 5   A    Yeah.
 6   Q    And stop at Mount Rushmore?
 7   A    If we wanted to.
 8   Q    Okay.  Did you buy him some clothes for the trip?
 9   A    Yes, I did.
10   Q    Okay.  What did you buy him?
11   A    I think it was either two or three shirts.
12   Q    Okay.  Where did you buy them from?
13   A    I think Kohl's.
14   Q    All right.
15   A    Would you like to know why?
16   Q    Yes, please.
17   A    Because he wore shirts around the fair that said
18        "your hole is my goal."  There was another one
19        about lube.  I can't remember exactly what that
20        was.  We had fair shirts.  I asked him to wear
21        them.  He refused to wear them.  When we finally
22        forced him to wear it, he cut big places here.
23   Q    On his armpits?
24   A    Yeah, so this sleeve part wasn't there.
25   Q    Uh-huh.
```

Exhibit 1

1   A   And if he was going to see any part of my family,

2       he was not going to wear "your hole is my goal,"

3       and I didn't care what he said.  So I bought

4       shirts, yes.  I bought shirts.

5   Q   So the shirts were purely for him to be seen by

6       your family in?

7   A   Yeah, or anybody that we -- along the way.  I mean,

8       can you imagine getting out at the gas station or

9       whatever and he's walking around like that?  Who

10      does that?

11  Q   All right.  Okay.  Do you know if Hoss accepted the

12      gift of the shirts?

13  A   Yeah.  I took them over there.  I bought them.  He

14      was on the tractor.  I walked up there, and I said,

15      hey, I bought you a couple shirts for our trip.

16      And he said, okay.  I took them out of the bag, and

17      I said, do these look good to you?  He said, yeah.

18      He goes, just go hang them in my closet in there

19      where the -- I think the bathroom is.  I did.  I

20      took them up there, put them in there and left, got

21      back in my car and left.

22  Q   Okay.  On June 26, 2022, did you text him, "I need

23      my friend with benefits.  By the way, talk about

24      sexual harassment.  What about Ashley?  Gees."?

25  A   Yes.  But I wasn't talking about he was my friend

Exhibit 1

| | | |
|---|---|---|
| 1 | | with benefits.  Anybody -- I mean, you can have |
| 2 | | several friends with benefits. |
| 3 | Q | Uh-huh. |
| 4 | A | But Ashley was in the office, and she was talking |
| 5 | | about -- and I guess it was something they did all |
| 6 | | the time -- but talking about genitalia and things |
| 7 | | like that and people that were walking by and |
| 8 | | totally inappropriate, and I was bringing it to his |
| 9 | | attention, really. |
| 10 | Q | Just to clarify, Ashley -- |
| 11 | A | Was the girl he hired he wasn't supposed to hire. |
| 12 | Q | She was the secretary? |
| 13 | A | Uh-huh. |
| 14 | Q | Do you know her full name? |
| 15 | A | Ashley Ort, O-r-t. |
| 16 | Q | So Hoss hired her rather than you? |
| 17 | A | Yeah.  We walked in the office one day, and there |
| 18 | | she is.  We're, like, who is that girl?  I mean, we |
| 19 | | go upstairs to a board meeting, and we're all, |
| 20 | | like, who is that girl?  I said, I don't know who |
| 21 | | that girl is.  He did that three or four times. |
| 22 | Q | Hoss hired multiple people? |
| 23 | A | Yes. |
| 24 | Q | Without approval? |
| 25 | A | Yes.  Yes. |

Exhibit 1

1  Q  Who else did he hire?

2  A  He went down to the homeless shelter and got a

3     bunch of people once.  He had another lady.  Her

4     name was Misty, and I think her last name might be

5     Cox.  But she and her family -- I'm telling you.

6     They were something else, and they were at the

7     front desk.  I could come up with a whole list.  I

8     mean, he just -- he hired Kaitlyn Kendall Ward, and

9     nobody knew she was on the books.

10 Q  What did he hire her to do?

11 A  Some kind of media.  I guess nobody seen a job

12    description, job title, nothing.

13 Q  Did Hoss have the authority to hire people?

14 A  No.

15 Q  And pay them money?

16 A  No.  No.

17 Q  Was there ever any consequence to this?  Did you

18    tell Hoss you don't have the authority?

19 A  Oh, yeah, we tell him.  He just chose to ignore us.

20 Q  Okay.  All right.  One last one.  On June 26, 2022,

21    did you text him, "I'm getting ready to come over

22    there, but if you were here right now, I would, dot

23    dot, dot"?

24        MR. WILL:  Objection to the form of the

25    question.  Again, it takes it out of context.  The

Exhibit 1

```
 1        witness can answer to the extent she knows.  Go
 2        ahead.  You can answer.
 3   A    I've got no idea.  I can tell you that was at the
 4        beginning of the fair.  I can tell you I was
 5        sitting on the couch putting on my shoes and socks,
 6        but I got no idea.  I have wracked my brain what we
 7        were talking about, and I got no idea.
 8   Q    Do you believe it had any kind of sexual intent?
 9   A    No.
10   Q    Okay.  Do you understand why it might be
11        interpreted by other people as having a sexual
12        meaning?
13             MR. WILL:  Objection.  Calls for speculation.
14        The witness can answer to the extent she knows.  Go
15        ahead.
16   A    I don't know.
17   Q    Okay.
18   A    Hoss and I did all kinds of stuff together.  There
19        was never any sexual stuff going on.
20   Q    Okay.  Did you ever go on to Hoss' Facebook page?
21   A    Yes.
22   Q    Okay.  Did you see pictures of him shirtless?
23   A    Yes.
24   Q    Did you discuss those pictures with other people?
25   A    Yes.
```

Exhibit 1

1    Q    Okay.  Who were the other people?

2    A    Wrestlers, little wrestlers.  I had had a nose

3         earring done, and I had no idea of the pain that

4         that would cause, none.  Well, these guys show up,

5         and they were -- we were at the smaller -- like a

6         ball diamond thing.  And, I mean, this guy says, it

7         looks like you just got your nose done.  It's all

8         red and all this stuff.  I said, oh my God.  I've

9         never had anything hurt like that.  He said, well,

10        I've got them everywhere.  And he said, I even got,

11        you know, like in his pits and everywhere.  And he

12        says, I even got them on my nipples.  And I said,

13        so does Hoss.  I don't know how you guys stand

14        that.  And he said, yeah, look at mine.  And he was

15        showing me, and I got on Hoss' --

16   Q    This is the wrestler?

17   A    Yeah, the little guys.  There were probably four or

18        five of us standing there.  And I got on there, and

19        I said, see?  Doesn't that look like that hurt?

20        And they were, like, yeah.  Then he walks up, and

21        he's, like, huge.  I mean, these are miniature,

22        like, they're not like the mini, mini ones.

23   Q    Were they midgets?

24   A    Well, I wouldn't say midgets, but they're not big

25        guys.

**Exhibit 1**

```
 1    Q   Uh-huh.
 2    A   But it wasn't -- there wasn't any -- it's on
 3        Facebook.  If you don't want it on Facebook, what's
 4        it out there for?
 5    Q   Was one of the wrestlers Tyler Hargraves?
 6    A   I have no idea.
 7    Q   Okay.  Is it -- did one of the wrestlers -- I think
 8        it was Tyler Hargraves, but I'll let you confirm
 9        this -- comment that he was attracted to Hoss?
10    A   No, no, no, not -- there wasn't any inappropriate
11        conversations.  You know, to these people -- and it
12        pains me to say it -- but I'm an old lady.  They're
13        not telling me they're hot for some guy or
14        whatever, you know.  They just want to know what I
15        need done so I can get away, and they can kid
16        around and do whatever it is they're doing.
17    Q   Uh-huh.  Why were there wrestlers on the
18        fairgrounds?
19    A   Hoss had scheduled a wrestling event, and I think
20        they were doing it out there on that field that
21        day, and they have also done them in the Coliseum.
22        You can't believe -- that's a big attraction.
23    Q   Oh, I believe it.  I just want to make sure I
24        understand that at the May 10 meeting Hoss never
25        raised the topic of sexual harassment?
```

Exhibit 1

```
 1              MR. WILL:  Objection.  Misstates her
 2      testimony.  She can answer the question.
 3   Q  If I misstated what's happened, please, by all
 4      means, tell me what really did happen.
 5              THE WITNESS:  Am I supposed to answer that?
 6              MR. WILL:  Answer it to the best of your
 7      ability from your memory.
 8   A  Okay.  So what did you ask me?
 9   Q  I just want to be clear that at the May 10, 2022,
10      meeting, Hoss never raised the topic of sexual
11      harassment?
12   A  Now, there was that sexual harassment section that
13      John had in there, and Hoss said something about
14      well, this has sexual -- I said, no.  He's not
15      guilty of any sexual harassment.  And then he
16      started to say something about sexual harassment,
17      and I'm thinking, you know, that ain't me because I
18      never did it.
19   Q  So he did say that he was --
20   A  But it was over this --
21   Q  -- being sexual harassed?
22   A  He didn't say he was being sexually harassed, but
23      he said this -- you know, this no-tolerance policy
24      was a list of things we weren't accepting anymore.
25      He was not sexually harassing anyone, and that was
```

Exhibit 1

1  my point with John.  This should not be in here.

2  And I think what John did was wait till the last

3  minute to put that document together or used one

4  from another case and just didn't get it deleted

5  out.

6  Q  Okay.  If Hoss did not complain about sexual

7  harassment at the May 10, 2022, meeting, was there

8  some point afterward where he did?

9  A  Not that I'm aware of.

10  Q  Okay.  All right.  Who is Paul Annee?

11  A  He is our office assistant.

12  Q  All right.  So he's an employee at the --

13  A  Fairgrounds.

14  Q  All right.  Working in a clerical capacity?

15  A  Yes.

16  Q  Is that a full-time position?

17  A  Uh-huh.

18  Q  Okay.  Is he also a member of the Indianapolis City

19  Council?

20  A  Excuse me.  Yes, he is.

21  Q  Okay.  Which is a full-time position, right?

22  A  Right.

23  Q  Is his position with the fair a full time?

24  A  Yes.  Well, no.  He only works 9 to 4.

25  Q  But five days a week?

Exhibit 1

1    A    (Nodding.)

2    Q    Okay.  What are his duties as office assistant?

3    A    We're putting a billboard up, so he's working with

4         people on that.  He works with the attorneys on all

5         this stuff.

6    Q    On what stuff?

7    A    The case with --

8    Q    This case?

9    A    You know, he'll put together the documents that I

10        asked him to pull together.  He'll write checks.

11        He does not sign checks, but he writes checks.

12        He'll schedule meetings.  He does -- he's learning

13        QuickBooks.  He files, just general office duties.

14   Q    Did he take this job after Hoss left as executive

15        director?

16   A    Well, no.  Ashley was there, Ashley Ort.

17   Q    Okay.  But now she's gone too, isn't she?

18   A    Yes.

19   Q    He replaced her?

20   A    Right.

21   Q    Okay.

22   A    He worked with her for a while, but then she walked

23        off of her job and...

24   Q    Was Paul Annee employed by the fair in some other

25        capacity perhaps while Hoss was executive director?

# Exhibit 1

```
1   A   I don't remember.
2   Q   Okay.
3           MR. WILL:  Let me clarify the question.  Were
4       you asking as a like a regular full-time employee?
5           MR. McQUARY:  In any capacity or amount of
6       time.
7   A   I don't remember if he did or not.
8   Q   Okay.
9   A   Yes, when he was a groundskeeper.  When Hoss was a
10      groundskeeper, Paul was the one that worked in the
11      office.
12  Q   Okay.  Do you know about how many hours a week that
13      was?
14  A   Probably 30.
15  Q   Okay.  Are you the treasurer of Annee's campaign
16      committee?
17  A   Yes, I am.
18  Q   Okay.  What does that entail to be the treasurer of
19      a campaign committee?
20  A   Reporting what he's received as far as donations
21      and expenditures.
22  Q   So the main duty is to fill out those disclosures
23      that go to the Election Commission?
24  A   Yeah.  But that has nothing to do with the fair or
25      any of this.
```

# Exhibit 1

1  Q  Okay.  Have you hosted campaign fundraisers for
2     Paul Annee?
3  A  Yes, I have.
4  Q  About how many would you say over the years?
5  A  Probably two.
6  Q  Okay.  Was there a fundraiser for him at the lodge
7     soon after the lodge was built?
8  A  Uh-huh.
9  Q  You hosted or helped organize?
10 A  I helped organize.
11 Q  Okay.  Who else -- did anyone else help you
12    organize it or sponsor it?
13 A  Oh, yeah.  There were a lot of people involved with
14    that.  Hoss was even helpful with it.
15 Q  Okay.  Did you tell Hoss to cater the event, to
16    provide refreshments?
17 A  No.
18 Q  Okay.  Do you know if Hoss did, in fact, provide
19    refreshments for that event?
20 A  No.
21 Q  You don't know, or you're sure that he didn't?
22 A  I don't know.
23 Q  Did you ever tell Hoss to pay for catering out of
24    the fairgrounds funds?
25        MR. WILL:  Objection to the form of the

**Exhibit 1**

```
 1        question.  You can answer it.
 2    A   I don't know.  No, I don't think so, but, no.
 3    Q   Okay.  Do you know if Hoss did, in fact, provide
 4        refreshments for the fundraiser using fairgrounds
 5        funds?
 6    A   No.  No.  I don't know how he could have.  We only
 7        had, according to our treasurer because I called
 8        and asked him, we only keep $100 in the petty cash.
 9        And at the most, he said Hoss -- or he said what he
10        knew of, the most Hoss kept in petty cash was $250
11        and if -- he said he would try to keep more, hide
12        more, and he kept on him that -- no, we don't keep
13        that kind of cash out here.
14    Q   Okay.
15    A   So I don't know how he could pay for it out of
16        petty cash.
17    Q   Do you know -- let me rephrase the question.  Was
18        Hoss responsible for keeping track of the petty
19        cash fund?
20    A   As part of his executive director stuff.
21    Q   Okay.  Do you know if Hoss did, in fact, provide --
22        obtain refreshments that were used at the
23        fundraiser?
24    A   I have no idea.
25    Q   All right.  Would it have been inappropriate for
```

Exhibit 1

```
 1        Hoss to obtain funds for the fairground funds for
 2        Paul Annee's fundraiser?
 3    A   Not if the board approved it.
 4    Q   Did the board approve it?
 5    A   Not that I'm aware of.
 6    Q   Were you having work done on your house in 2021?
 7    A   Not really.
 8    Q   Perhaps it needed to be repainted?
 9    A   Yes.
10    Q   Okay.  Any other work on your house --
11    A   No.
12    Q   -- around that time period?
13    A   Unless you can think of it.
14    Q   Okay.  Well, did you hire Maria Banuelos and her
15        husband to do any work on your house around 2021?
16            MR. WILL:  Object to the form.  Witness can
17        answer.
18    A   Hoss did.
19    Q   Okay.  To do work on your house?
20    A   Yes.
21    Q   Why would Hoss hire someone to do work on your
22        house?
23    A   Hoss and I were best friends, and probably someday
24        when we were going down the road somewhere or doing
25        something, I probably said, I need to get the
```

Exhibit 1

```
 1          outside of the house painted.  So when he was

 2          having stuff done at the fair, he'd call me and

 3          say, hey, do you need this done, or do you need

 4          that done?  I mean, he would come over and spray

 5          off the pool cover.  He helped me hang lights in

 6          the backyard.  You know, this isn't -- I kept his

 7          dog.  My neighbor and I kept his dog for almost a

 8          year, you know.  It's not -- it's just like in

 9          passing.  It's not like, hey, you know, give me

10          somebody to paint my house.  It wasn't that way,

11          you know.  And he probably -- I would imagine he

12          said, you know, they're going to paint the lodge.

13          Do you need them to paint your house?

14     Q    Okay.  Are you familiar with Maria Banuelos?

15     A    No.  I think I've seen her once.

16     Q    Did she do any work for the fairgrounds, she and

17          her husband?  And I think they have some employees

18          of their own.

19     A    I don't know.  Hoss told me she painted the lodge,

20          but I have a full-time job.  I mean, he was pretty

21          much kind of running things out there for me and

22          would keep me apprised.

23     Q    Okay.  So did he ever tell you that, hey, I hired

24          someone to go paint your house?

25     A    He said, do you still want your house painted?
```

Exhibit 1

| | |
|---|---|
| 1 | Yeah.  He said, I got these people that can paint |
| 2 | it, and then he just took it from there.  He said, |
| 3 | what color do you want?  And I said, the same color |
| 4 | that's on there. |
| 5 | Q  All right.  Did the Banueloses do any other work on |
| 6 | your house? |
| 7 | A  Not that I'm aware of. |
| 8 | Q  Okay.  Was that work that they did, the Banueloses |
| 9 | did on your house, paid for on a check drawn on |
| 10 | fairgrounds funds? |
| 11 | MR. WILL:  Objection to the form.  The witness |
| 12 | can answer to the extent she knows.  You can go |
| 13 | ahead and answer if you know. |
| 14 | A  I don't know how he paid them. |
| 15 | Q  Okay.  Well, if he paid with a fairgrounds check, |
| 16 | wouldn't you have to sign it? |
| 17 | A  You would think so. |
| 18 | Q  Okay.  You don't recall signing one? |
| 19 | A  I didn't. |
| 20 | Q  Okay.  Did you ever pay the Banueloses for work on |
| 21 | your house? |
| 22 | A  Yes.  I gave Hoss cash. |
| 23 | Q  Okay.  Do you know how much cash you gave him? |
| 24 | A  I'm thinking it's between 25 and $3,500. |
| 25 | Q  Okay.  Did you get a receipt or anything from Hoss |

**Exhibit 1**

```
 1        for giving him a couple thousand dollars?
 2    A   No.
 3    Q   Okay.  Did you get anything from the Banueloses
 4        saying we have been paid?
 5    A   No.
 6    Q   Okay.  But they didn't keep coming after you for
 7        money, so they appear to have been paid?
 8    A   No.  No.  He was going to put a fan in my living
 9        room that he got somewhere, and the fan is still in
10        my living room.  I have no idea where the fan came
11        from.
12    Q   So he gave you a fan?
13    A   I guess.
14    Q   Okay.
15    A   He said something to another board member that he
16        gave her a fan, and I said, take this one in my
17        garage, and you got to pay her because he needed to
18        pay her.
19    Q   Do you know if Hoss scheduled work on the houses of
20        any other board members?
21    A   No, I don't.
22    Q   Okay.  Did the board approve any kind of payment
23        drawn on fairgrounds funds for repairs to your
24        personal -- for work on your personal house?
25    A   Yeah, because -- no, because they didn't.
```

Exhibit 1

```
 1   Q   Okay.  All right.  Who is Danny Huston?

 2   A   He owns North American Midway, and he is our midway

 3       vendor that does our carnival.

 4   Q   Who is Troy Huston?

 5   A   Who?

 6   Q   Troy Huston?

 7   A   I don't know.

 8   Q   I'm sorry, ma'am.  Miles Huston.

 9   A   It's his son, and his son is over our event.

10   Q   Over your event?

11   A   Well, North American is a huge company.

12   Q   All right.

13   A   They're all over the world.

14   Q   Uh-huh.

15   A   And so Danny's son Miles oversees our event, our

16       fair.

17   Q   Okay.  Any chance Danny Huston is related to Judge

18       Huston who was a Marion Superior Court judge?  I

19       think he must have retired in the '90s?

20   A   I knew him, but, no.

21   Q   No relation?

22   A   Uh-uh.

23   Q   Well, that led me to my next question.  What is

24       North American Midway entertainment?

25   A   Midway, amusement.  I mean carnivals, Ferris
```

# Exhibit 1

```
 1      wheels, food, concessions.
 2  Q   So it's a big company that provides all these
 3      things?
 4  A   It's huge, yeah.
 5  Q   Okay.  And Danny Huston is the owner?  Is he the
 6      president?
 7  A   He's -- I think he's like chairman of the board or
 8      something.
 9  Q   Okay.  And Miles Huston also works for that
10      company?
11  A   Yes.
12  Q   Okay.  And North American Midway Entertainment, can
13      we just call it NAME?
14  A   Yeah, NAME.
15  Q   NAME.  Okay.  NAME is, I guess, a major vendor for
16      the fairgrounds?
17  A   Yes.  They do all of our carnival stuff.
18  Q   Okay.  Is Danny Huston a frequent donor to
19      Republican causes?
20  A   Probably.
21  Q   Okay.  Has Danny Huston ever contributed to Paul
22      Annee's campaign fund?
23  A   $750.
24  Q   In just one year, or is that all the time you have
25      known him?
```

Exhibit 1

1   A   All the time I have known him.

2   Q   Okay.  Has Huston ever made a contribution at a

3       fundraiser that you organized?

4   A   Yeah, the one for Brian and Paul.  It was a $1,500

5       donation that was split between the two.

6   Q   For Paul Annee and Brian Mowery?

7   A   Yes.

8   Q   Okay.  When NAME comes to the fair, do they bring a

9       large amount of equipment and people and park all

10      this on the fairgrounds?

11  A   Yes.

12  Q   All right.  Does the fairgrounds normally charge

13      vendors for that?

14  A   No.

15  Q   All right.

16  A   We do if it's a private citizen, or, you know, I

17      guess we do small vendors but not NAME.

18  Q   Okay.  So NAME is allowed to come and occupy the

19      fairgrounds, campgrounds, rent free?

20  A   They pay for any utilities or things like that that

21      they have used.

22  Q   Okay.  Have you ever instructed Hoss not to invoice

23      NAME for occupying the fairgrounds, campgrounds,

24      and other property?

25  A   Yes, I have.

Exhibit 1

```
 1   Q   Okay.  Why did you do that?
 2   A   Because they gave us a half a million dollar loan
 3       at 4 percent.
 4   Q   Okay.  So you believe that loan was a financially
 5       favorable transaction?
 6   A   Yes.
 7   Q   All right.  That --
 8   A   And they have only done it the last couple of
 9       years, and they would pay if I asked them to.
10   Q   Do you know how much that they would have incurred
11       if they -- in an arm's length transaction?
12   A   I have no idea.
13   Q   Okay.  Were they -- did they pay utilities?
14   A   Yes.
15   Q   Okay.  How do you go about deciding that some
16       vendors get charged and others don't?
17   A   Everyone else pays.
18   Q   Okay.  Why does NAME not pay?
19   A   Because we have got that loan, and it saved our
20       neck when the fair was about to go down.  This was
21       a couple of presidents before me, and it literally
22       kept the bank from coming in and taking them.
23   Q   Okay.
24   A   And that is a board decision.
25   Q   Okay.  Is it reflected somewhere in the board
```

# Exhibit 1

```
 1        minutes that NAME is not to be charged rent?
 2   A    It should be.  I mean, where it's brought up every
 3        year they wanted, you know -- do you want to charge
 4        them rent or what?
 5   Q    Can you recall a specific notation in the board
 6        meeting where there's a vote to, you know, we're
 7        not going to charge NAME rent?
 8   A    I'll see if I can find it.
 9   Q    All right.  If you could get that to your attorney,
10        I would appreciate it.
11   A    Sure.
12   Q    And since you did turn over the board minutes in
13        discovery, can you suggest a time period where we
14        might look at the minutes we have already got where
15        NAME was exempted from rent because of that loan?
16   A    Okay.  I'll see what we have got.
17   Q    I'm just asking you right now.  Do you remember
18        when that decision was made?  You can tell me
19        roughly the month and year, and I'll go look and
20        save your attorney the work.
21            MR. WILL:  He's asking you now if you know.
22   A    No, I don't.  It could be around fair time but...
23   Q    Okay.  But you believe this is actually discussed
24        and decided at a board meeting?
25   A    Yes.  Yes.
```

Exhibit 1

1  Q  Okay.

2  A  Danny does a lot for the fair.

3  Q  Okay.  And a little off topic, but the -- who is

4     responsible for keeping the board minutes?

5  A  The secretary.

6  Q  Okay.  Do you have custody of them yourself?

7  A  No.  The secretary does.

8  Q  Okay.  When we requested the board minutes in

9     discovery, who actually got them?

10  A  Paul probably called the secretary.

11  Q  Okay.  Do you ever -- did you ever have access to

12     the minutes themselves?  Like, are they stored in a

13     book or on a computer?

14  A  I think she keeps them in a three-ring binder, but

15     if you wanted to look at them, she would say sure.

16  Q  Did you ever do that?

17  A  If I needed to.

18  Q  As part of this lawsuit?

19  A  Probably.

20  Q  Okay.  So you have had access to the minutes?

21  A  I'm sure I have.

22  Q  All right.  Did you copy them yourself, provide

23     them to your attorney?

24  A  I don't remember.  I don't know.

25  Q  Okay.  Are you confident that the minutes that you

Exhibit 1

```
 1        turned over are accurate reflections of the
 2        official record?
 3   A    Yes.
 4   Q    Okay.  All right.  I would like to go back to the
 5        fall of 2022 and ask you what was Paul Annee's
 6        employment status at the fairgrounds back then?  I
 7        know you have -- apparently since then he's got a
 8        nearly -- it sounds like a nearly full-time job as
 9        the office assistant, but what was he doing in the
10        summer and fall of 2022?
11   A    I don't know.  I don't know because Ashley Ort was
12        in there.
13   Q    Okay.  Was he working at the fair in any capacity?
14   A    I don't know.
15   Q    Okay.  Do you recall hiring him --
16   A    Yeah.
17   Q    -- in the summer or fall of 2022 or --
18   A    Yeah.
19   Q    Okay.
20   A    Let's see.  Last year was -- I get '22 and '23
21        confused.
22   Q    Do you know what he was paid?
23   A    No.
24   Q    Okay.  At any point in 2022, did you give him a
25        bonus?
```

Exhibit 1

1    A    No, I did not.

2    Q    Okay.  Did someone else give him a bonus?

3    A    The board.

4    Q    All right.  So the board voted to give him a bonus?

5    A    As far as I know.

6    Q    How much was the bonus?

7    A    I thought originally it was $2,500, but then I was

8         told later it was 1500, but he was worth anything

9         they paid.

10   Q    Well, how so?

11   A    Because Hoss had quit doing his job, and Paul

12        assumed the responsibilities that Hoss was to be

13        doing.

14   Q    So Paul Annee was essentially functioning as the

15        executive director?

16   A    Uh-huh.

17   Q    Okay.  Did anyone tell Hoss, you know, you need to

18        do your job so we don't have to hire other people

19        to do it for you?

20   A    You couldn't even approach Hoss.

21   Q    What do you mean by that, ma'am?

22   A    He was very threatening, very unapproachable.

23   Q    What would he do if you approached him and said

24        something?

25   A    He throws fits.  He'll throw anything.  We got a

Exhibit 1

```
 1        hole in the wall where he punched the wall that
 2        we've got to fix.  He throws things.  He destroys
 3        stuff.  He calls you anything he wants.  He has
 4        what we call temper tantrums, and nobody wants to
 5        deal with that.  We have a fair going on, and who
 6        wants that to -- any of the public to see any of
 7        that?
 8    Q   Have these temper tantrums been documented anywhere
 9        in a written warning, in an e-mail, or maybe a text
10        message the next day saying, Hoss, you kind of
11        overreacted yesterday?
12    A   Well, I called him on it.  One day I walked into
13        the office, and the secretary was leaving.  I said,
14        where are you going?  She said, I quit.  I'm not
15        taking anymore off him.  And she was getting ready
16        to leave, and I said, hey.  Wait a minute.  Wait a
17        minute.  I had another call from one of them, Misty
18        Cox.
19    Q   Well --
20    A   I said, Misty, you know, are you -- are you
21        thinking about coming back to the fair?  Because we
22        were getting ready to put some people on.  And she
23        said, is Hoss out there?  I said, no.  She said, is
24        he anywhere around?  I said, I don't know where he
25        is.  She said, I'm not doing anything where he's
```

Exhibit 1

```
 1        near or anything.  She said, he will go to any
 2        extreme for retaliation or what he perceives is
 3        retaliation.  She said, I'm scared to death of him.
 4        She said, he still owes me two weeks' pay, and she
 5        said the way that he did my family -- we all stood
 6        there and watched how he talked to her husband
 7        outside of the fairgrounds one day, and he thinks
 8        just because he's big he can say or do whatever he
 9        wants to people.
10   Q    Well, let me take the first one.  I think you
11        mentioned secretary.  Would that be Ashley Ort?
12   A    Uh-huh.
13   Q    You said she quit because of Hoss?
14   A    Well, no.  That was Misty Cox.
15   Q    I'm sorry.  Ashley said that she felt threatened by
16        Hoss?
17   A    Ashley just didn't like Hoss, but Ashley has other
18        issues, I think.  But the day that I went in there,
19        she and Hoss were going at it hot and heavy.  And
20        one day I was getting ready to leave, and she said,
21        did you see that hole behind the door?  I said,
22        yeah.  And she said, that's where he punched it.  I
23        said, Hoss did that?  And she said, yeah.  And I
24        said, I never seen Hoss do any of that.  Other
25        people have stepped up now that he's gone and said
```

Exhibit 1

```
 1      he's done this.  He's done that.  Why weren't you
 2      saying anything?  Are you crazy?  He told her and
 3      he told me that he could have my house burnt down.
 4      And when he told me that, I said, please, Hoss,
 5      just one thing.  Please, please do not do that when
 6      my dog is in there.
 7   Q  Are there any written warnings or --
 8   A  Are you going to put something in writing about
 9      somebody like that?
10   Q  Well, yes, ma'am.  Frankly, if one of my employees
11      became violent or threatening, I would.
12   A  Well, we did do a police report.  He thought it was
13      a big joke.
14   Q  When did you do the police report?
15   A  Oh, I don't know.  It's out there, I'm sure.  He
16      thinks he's friends with the police too.
17   Q  I do want to ask specifically about records at the
18      fairgrounds.  Are there any records of the
19      fairgrounds that say this is inappropriate behavior
20      in an employee to become violent or threatening?
21      And it doesn't have to be -- I'm not just asking
22      about, you know, a form carefully prepared by the
23      human resources department.  It may be something
24      less formal than that like an e-mail saying, you
25      know, Hoss, you really shouldn't have gotten out of
```

Exhibit 1

| | | |
|---|---|---|
| 1 | | hand yesterday. |
| 2 | A | Like I said, Hoss -- I trusted Hoss.  I considered |
| 3 | | him to be one of my closest friends.  I was doing |
| 4 | | everything I could to keep it together for him |
| 5 | | because he was his own worst enemy.  I have a |
| 6 | | hotheaded brother who got in trouble, and a guy |
| 7 | | helped him out and got him back on life's track. |
| 8 | | That's what I was trying to do for him but |
| 9 | | they're -- |
| 10 | Q | So this behavior is not documented? |
| 11 | A | I don't know if it is or not.  I mean, I could go |
| 12 | | through.  I looked through so many times and so |
| 13 | | many papers and so many texts I can't even tell |
| 14 | | you, but I will look and again and see if I can |
| 15 | | find anything. |
| 16 | Q | Okay.  And the second person, is it -- did you say |
| 17 | | Misty? |
| 18 | A | Misty Cox. |
| 19 | Q | What inappropriate thing did Hoss do around her, |
| 20 | | around Misty Cox? |
| 21 | A | Treated her terrible, talked to her, like, |
| 22 | | terrible, threw a -- Danny Meador was there when he |
| 23 | | threw an orange juice at her.  It hit the wall, and |
| 24 | | he said he cleaned it up, and she said she cleaned |
| 25 | | it up.  This was while the fair is going on. |

Exhibit 1

```
 1        Whether it's the fair or not, it's inappropriate

 2        behavior.

 3   Q    Again, is this -- is it documented?

 4   A    She's terrified of him.  She's not going to do

 5        anything.  That's how he's getting by with all this

 6        stuff.  She's terrified.

 7   Q    Let me just ask the question, ma'am, because the

 8        court reporter has got to transcribe it.

 9   A    I understand.

10   Q    Is it documented anywhere that Hoss became violent

11        and threw something at Misty Cox?

12   A    I don't know, but I will look, and I will ask

13        others to look, but there's nothing kept out at the

14        fair.

15   Q    Okay.  Or that he became threatening on any

16        occasion, and people were intimidated by it?

17   A    I will look.  I will look.

18   Q    Okay.  I have a few more questions to ask you about

19        Paul Annee.  Now, forgive me if I already asked

20        this, but did the board approve the bonus?

21   A    I don't know because I wasn't on the board at the

22        time.

23   Q    Okay.  Remind me.  What were the dates of this

24        brief period when you were not on the board?

25            MR. WILL:  Objection.  Asked and answered.  Go
```

Exhibit 1

1    ahead and answer.

2  A  I think it was like July.  I quit the very next day

3     after the fair, so I would say it was probably like

4     July 5, and I probably came back on sometime in

5     August.

6  Q  Okay.  Why did you quit, ma'am?

7  A  I couldn't take any more of Hoss.  I just couldn't

8     do it anymore.  I just couldn't do it.  He had

9     beaten me down.  I couldn't do it anymore.

10 Q  Okay.  Beat you down with what?

11 A  Verbal, I mean.  It's almost comical that you think

12    there's sexual harassment because I had just had

13    enough.  It was mental abuse.  It was -- he never

14    laid a hand on me.  He always -- but just

15    everything you did was wrong.  He refused to do

16    anything out at the fair, would stand and just

17    stare at you when you're trying to get people -- to

18    intimidate you -- would stand there like this and

19    just look at you, you know, and intimidate them as

20    well.  I had just -- and I thought -- I thought --

21    at the time, I'm 63 or 64 years old, and I don't

22    need this.

23 Q  Did any of the verbally abusive things that Hoss

24    said to you get preserved maybe in a text message

25    or an e-mail?  Can you point me to some

# Exhibit 1

```
 1       conversations where --
 2    A  Ours were always verbal.
 3    Q  -- Hoss was threatening?
 4    A  We were always verbal.  We were always going at one
 5       another because we were friends, but at that point
 6       at the fair, I even sent him a note and said,
 7       you're not even going to talk to me during -- or
 8       you're not not going to talk to me.  And I can tell
 9       you what set him off about the sexual harassment
10       too.
11    Q  What?
12    A  I went around -- I went around the fair as I do
13       every year and talked to every board member and
14       said, how do you think the fair is going?  How do
15       you think the fair is going?  And I take notes
16       because we talk about it there.  He knew he wasn't
17       doing anything.  The years he was doing anything he
18       was fine, so I went around, and I kept saying, how
19       do you think the fair is doing?  What can we do to
20       improve?  So he was on my string, you know.
21    Q  On your string?
22    A  Yeah, you know, the --
23    Q  Oh, one of the people you talked to?
24    A  Yeah.  So I said, we probably need to talk about
25       this right away because people had issues with how
```

# Exhibit 1

| | |
|---|---|
| 1 | he wasn't doing anything and the way he was talking |
| 2 | to people and treating them. So I said, okay. |
| 3 | They want to talk about, you know -- I can come |
| 4 | around, and they want to talk about the treatment |
| 5 | or if we're going to extend the fair to the 5th, I |
| 6 | think is what it was or something. I don't think |
| 7 | it had nothing to do with him. So I said, do you |
| 8 | want me to come by and meet with you one on one, or |
| 9 | do you want to have a group meeting? And Abdul, |
| 10 | who does not like confrontation, says, just do it |
| 11 | one on one. I mean, I was standing there at the |
| 12 | edge of the thing. Abdul is in the Gator. Susie |
| 13 | Day is there. Frank Taylor is there, and they said |
| 14 | just do a one on one. It would probably be |
| 15 | quicker, so I sent a text out. And I said, okay, |
| 16 | I'll just come around and do a one on. He thought, |
| 17 | because he knew he crossed the line, that he was |
| 18 | getting fired, and that's when he started throwing |
| 19 | all these accusations around, and that's when the |
| 20 | brown bag started missing too. |
| 21 | Q  Brown bag? |
| 22 | A  Yeah. |
| 23 | Q  I don't know what you mean by that. |
| 24 | A  We had -- I had called and asked for everyone to |
| 25 | bring in the money to the treasurer's office. Paul |

Exhibit 1

1    Annee and Ashley Ort, they had a brown bag in there

2    that the concessionaires paid money and the ice and

3    all these people.  There was probably $10,000 in

4    there cash, and the brown bag was so full it could

5    not zip, so it was just stuffed.  So I called them

6    and I said, Joe Goins says he doesn't have the

7    brown bag.  Who has got it?  And they said, well,

8    we're looking here, and we can't find it.  And I

9    said, somebody needs to find this brown bag.  It's

10   got to be turned in.  They searched.  They are

11   almost hysterical.  They're terrified.  They don't

12   know what to do, so I told Danny Meador and Steve

13   Perry who were on the Gator, also collecting the

14   monies, I said, please go to the office and get the

15   brown bag from Ashley and Paul.  They said they

16   went in, and they said, we don't have the brown

17   bag.  So I asked Hoss where the brown bag is.  Hoss

18   didn't know.  The kids in the office asked him,

19   which is Ashley and Paul.  Hoss didn't know.  So

20   they're searching, tearing the office apart, which

21   anyone would, and they couldn't find it.  They're

22   calling me, Cindy, we don't know what to do.  Just

23   keep looking.  Couldn't find it.  They're obviously

24   upset.  So I said, well, we're going to have to

25   figure out what's going on.  And I said, Danny and

**Exhibit 1**

1    Steve, go back to Hoss and ask where the brown bag
2    is.  That's when he started off with all these
3    stories, taking people aside.  He had to talk to
4    them about this and about that and about that.  And
5    I told him.  I said, I'm fine with him talking to
6    you about whatever you want to talk about, but I
7    want the damn brown bag.
8  Q  Uh-huh.
9  A  He didn't have it, and then he comes in and walks
10    in the office, and he told Paul and Ashley -- now,
11    this is their version coming through to him.  And
12    he said, what are you guys so upset about?  And
13    they said, we're looking for the brown bag.  We
14    can't find that brown bag where they paid for their
15    ice and all this stuff all weekend.  And he said,
16    well, I have it.  So they said, well, Cindy and
17    them is looking for it.  So they went up there.  He
18    said, I'll get it for you.  I believe that's how
19    that happened, and he brings the bag back to them,
20    and it's half full, not even half full, and gave it
21    to them, and they turned it in.
22  Q  So you believe that Hoss stole money out of the
23    brown bag?
24  A  I have no idea what happened to the money in the
25    brown bag, but all this stuff, all these

Exhibit 1

1    accusations and stuff --

2    　　　　MR. WILL:  We have been going about an hour

3    and 20 minutes.  Can we take five minutes?

4    　　　　MR. McQUARY:  Sure.  Why don't we take ten.

5    　　　　(A brief recess was taken.)

6  Q  Ms. Mowery, you mentioned that you had taken out

7    some police report because of some of Hoss'

8    behavior.  Do you recall, first of all, when you

9    made that police report?

10 A  It would have been shortly after he left.

11 Q  Okay.  What was the subject of the police report?

12   I mean, what did you say he was doing?

13 A  When he threatens to burn your house down, I mean,

14   you need to let somebody know.

15 Q  Okay.  When did Hoss threaten to burn your house

16   down?

17 A  Well, he not only did that to me.  He told several

18   people that he would have my house burned down.

19 Q  Okay.  When did he make that threat?

20 A  Well, I know he said it to Ashley Ort because she

21   confirmed it to me.  That was before he left, and

22   then when he knew that he was in trouble, he had

23   told me that he was going to have my house burned

24   down shortly before he was -- we were having that

25   meeting on May 10.

**Exhibit 1**

1    Q   To your knowledge, did the police investigate
2        the --
3    A   Yeah.  They had patrols going by there for a while.
4    Q   Okay.  Was Hoss arrested or charged with anything?
5    A   No.  He's -- he would be slick enough to have
6        somebody else do it.
7    Q   But, I mean, did the police act?  Did the police
8        arrest him?
9    A   I don't know.
10   Q   All right.  Or was he criminally charged?
11   A   I don't know.
12   Q   Okay.  I would like to -- was Paul Annee fired from
13       his job at the fairgrounds at any point?
14   A   Yes.
15   Q   Tell me about that.
16   A   Paul Annee, when Hoss was groundskeeper and Paul
17       was there doing the office work, he got involved
18       with a young woman that was one of the princesses
19       in the queen pageant and just wasn't doing his job.
20   Q   Paul did or Hoss did?
21   A   Paul did.
22   Q   Okay.
23   A   So, you know, I mean, even though most people may
24       think, boy, there's nothing going on there all
25       year, there's a lot going on there all year.  And I

Exhibit 1

```
 1        told him, you know, you need to get your stuff
 2        done, and he didn't.  And we needed somebody that
 3        knew Quicken -- or QuickBooks -- and he didn't
 4        learn it, and so he kept messing around with this
 5        girl and taking time, company time up with that, so
 6        I just let him go.
 7    Q   Okay.  But obviously he later came back, is that
 8        correct?
 9    A   Uh-huh.
10    Q   Okay.  Has he been fired on any other occasion by
11        the fair?
12    A   No.
13    Q   All right.  But he was -- he was having an affair
14        with one of the princess candidates or fair queen
15        candidates?
16            MR. WILL:  Objection to the form of the
17        question.  The witness can answer.
18    A   It wouldn't be an affair.  It would be a
19        relationship.
20    Q   Okay.  An inappropriate sexual relationship?
21            MR. WILL:  Objection to the form of the
22        question.  The witness can answer.
23    A   I don't know about that.  I mean...
24    Q   What were you concerned about?
25    A   Well, him getting his work done.  You can date
```

Exhibit 1

```
 1         somebody in your office, but you still get your
 2         work done.
 3    Q    Okay.  Let's see.  Are you familiar with how Hoss
 4         ceased to be employed by the fairgrounds?
 5              MR. WILL:  Objection.  Asked and answered.
 6         The witness can answer.
 7    A    How he what?
 8    Q    He ceased to be employed, how his job ended?
 9              MR. WILL:  Same objection.  You can answer if
10         you know.
11    A    I didn't terminate him.
12    Q    Well, and that's what I'm getting at.  Simply what
13         do you know about it?  You were not president of
14         the fair at the time?
15    A    No.
16    Q    I'm simply asking what you know about it, how it
17         happened.
18    A    I don't know.
19    Q    All right.  Who was president at the time?
20    A    Abdul.
21    Q    All right.  Did he become president when you
22         resigned?
23    A    Uh-huh.
24    Q    Okay.  Shortly before resigning from the board, did
25         you send an e-mail to the board criticizing Hoss?
```

Exhibit 1

| | | |
|---|---|---|
| 1 | A | I don't know that it was criticizing Hoss.  It was |
| 2 | | telling them why I was leaving and what to be aware |
| 3 | | of. |
| 4 | Q | Okay.  And would this perhaps be on July 12, |
| 5 | | 2022 -- |
| 6 | A | It could be. |
| 7 | Q | -- you sent an e-mail?  What did you tell them? |
| 8 | A | Well, that I was leaving and that, you know, I |
| 9 | | enjoyed having the time and to watch the money, and |
| 10 | | I wish them all well. |
| 11 | Q | Okay.  Did the letter mention Hoss? |
| 12 | A | I don't remember.  I have been looking for the |
| 13 | | letter, so if you have it and would send it to my |
| 14 | | attorney, I would appreciate it. |
| 15 | | MR. WILL:  We have it.  We can talk about it. |
| 16 | | THE WITNESS:  Okay.  I have been looking all |
| 17 | | over for it. |
| 18 | Q | Okay.  But you don't recall whether or not you |
| 19 | | referenced Hoss in that letter? |
| 20 | A | No, I don't. |
| 21 | Q | Okay.  Did any of the board members ever talk to |
| 22 | | you and let you know, hey, we're thinking about |
| 23 | | firing Hoss? |
| 24 | A | No, not really. |
| 25 | Q | Okay.  Did you suggest to anyone on the board you |

Exhibit 1

```
 1        should fire Hoss?
 2   A    Oh, they knew that was my opinion.  That didn't,
 3        you know...
 4   Q    How did you make that opinion known to the board?
 5   A    We had conversations.  You know, like when you're
 6        out there -- when I was president and you're out
 7        there doing something or whatever, and they're
 8        talking to you about things, you know.
 9   Q    So you -- who had you told that you thought Hoss
10        should be fired?
11   A    Whoever would talk to me about it, you know.  It
12        wasn't like I brought him up.  Most of them would
13        bring him up, and I would say yea or nay, whatever
14        my opinion was.
15   Q    Why didn't you fire him when you were president?
16   A    I tried, but like I said, he -- I was trying to
17        protect him from himself.  He's his own worst enemy
18        and he -- I finally learned he wasn't going to
19        listen to anybody.  He wasn't going to do what was
20        right.  He wasn't -- it was going to be his way and
21        nobody else's.
22   Q    And how did you try to fire him?
23   A    Well, I told him he was fired.  And he came over to
24        my house one day telling me, don't fire me.  Don't
25        fire me.  I gave him that letter I had.  I had
```

Exhibit 1

```
 1        numerous occasions of, you know, he wanted to be --
 2        in my humble opinion, he wanted to be respected and
 3        was never going to get it the way he went about it.
 4   Q    Are any of these attempts to fire Hoss documented?
 5   A    Yeah.  I just found that letter.  Well, in the
 6        meeting with -- that May 10 meeting -- and I'll
 7        have to look to see if there's anything else.  I'm
 8        not sure.
 9   Q    Okay.  Were you aware when Hoss was terminated?
10   A    Yes.
11   Q    How did you find out?
12   A    One of the board members called me.
13   Q    Who was it that called?
14   A    Susie Day.
15   Q    What did Susie Day say about it?
16   A    She just told me that they let Hoss go.
17   Q    Was he for it or against it?
18   A    Oh, he was for it.
19   Q    Okay.
20   A    That he was going to stay on the property, I think,
21        but I didn't know anything about that.
22   Q    You mean continue to live in the lodge?
23   A    Uh-huh.
24   Q    Okay.  How soon after Hoss was fired did you come
25        back to the board?
```

Exhibit 1

```
 1   A   I think it was late August, maybe.  I'm not
 2       absolutely certain.
 3   Q   So a few weeks?
 4   A   Yeah.  Later, yeah.
 5   Q   A month?
 6   A   Yeah.
 7   Q   Okay.  At some point, did you suggest to Hoss that
 8       he run for the City Council?
 9   A   I sure did.
10   Q   Why did you do that?
11   A   Because he was going to run for mayor.
12   Q   So you got him to run for City Council instead of
13       running for mayor?
14   A   If he was going to do something silly like that, go
15       for lower -- I mean, don't run for mayor and just
16       obliterate yourself.
17   Q   But you -- so you encouraged him to run for a City
18       Council seat?
19   A   Yes.  And contrary to popular opinion, it had
20       nothing to do with Michael-Paul Hart.
21   Q   With who?
22   A   Michael-Paul Hart, the current counselor there.
23   Q   Did you recommend a specific seat that he run for?
24   A   Michael-Paul Hart's.
25   Q   Okay.  The one that Michael-Paul Hart occupies
```

Exhibit 1

```
 1        today?
 2    A   Uh-huh.
 3    Q   Would this have been -- the seat was open, though,
 4        wasn't it?  It was open?
 5    A   No.  Michael -- well, it's a new district that
 6        Michael was in.  They just moved Michael over.
 7    Q   Okay.  Did you assist Hoss in any way in running?
 8    A   I tried to get him to go to GOP functions because
 9        you have to know those people.
10    Q   Uh-huh.
11    A   And he went.
12    Q   So you took him to Republican Party functions and
13        introduced him around?
14    A   Uh-huh.
15    Q   Did you recommend him to other people?
16    A   Well, I never said anything about what he was
17        running for, but I introduced him.
18    Q   Okay.  I would like to talk a bit about Hoss' job
19        at the City.  At some point in the late summer of
20        2022, did you suspend or attempt to terminate Hoss
21        from his job at Voter Registration?
22    A   Yes, I did.
23    Q   Okay.  Tell me what happened.
24    A   What period of time of this?
25    Q   The summer of 2022, probably around the time of the
```

<span style="color:red">Exhibit 1</span>

1    fair.

2  A  Okay.  You have to have preapproved leave.  You

3     can't just take off.  He had preapproved leave the

4     week before the fair and the week of the fair.  He

5     did not have preapproved leave for the week after

6     the fair.  He came in on that weekend and signed

7     his name out on our -- we have an out board -- like

8     he had been preapproved.  No.  You're here because

9     we're counting on you.  And he had done other

10    things like that, and that's what it was.

11 Q  Okay.  Did Hoss notify Michele Cash, the deputy

12    director, that and ask her permission?

13 A  He could have, but Michele didn't approve time off,

14    and he knew that too.

15 Q  You mean she didn't have the authority?

16 A  That's right.

17 Q  Okay.  So what happened when he didn't show up?

18 A  Well, I told him he needed to come in the office,

19    but once again, no answer, no response.  He didn't

20    have to answer to people.  And I told HR, and

21    that's, you know, the rest.

22 Q  What did HR tell you?

23 A  Well, they didn't understand why he just came and

24    went as he pleased.  None of us did.

25 Q  All right.  Did they consider them to be no call,

Exhibit 1

```
 1        no show, given that he had contacted the chief
 2        deputy?
 3    A   They were going through transition as well up
 4        there, and I don't know what they thought.
 5    Q   Okay.  Did they allow you to fire him?
 6    A   No.
 7            MR. WILL:  I want to object to the form of the
 8        question.  You can go ahead and answer.
 9    A   No, they didn't.
10    Q   Okay.  What did they tell you instead?
11    A   I don't remember, and I'm not even sure I suspended
12        him at that time.  I'm not sure.
13    Q   Okay.  So you wound up suspending him, is that
14        correct?
15    A   I'm not sure, but I think so.
16    Q   Okay.  Do you know if Hoss was ultimately paid for
17        that suspension?
18    A   Probably.
19    Q   In the course of working with human resources, did
20        you tell Hoss that you -- excuse me -- tell HR that
21        Hoss had recently accused you of sexual harassment?
22    A   I don't remember, but I know that I accused him.
23    Q   You accused Hoss of sexual harassment?
24    A   I sure did.
25    Q   How do you believe that Hoss sexually harassed you?
```

Exhibit 1

```
 1    A    And I've got it in a memo somewhere.  He was
 2         sitting in my office, as he typically did, and we
 3         were just talking about things.  And then he said
 4         something about -- it's like women with big titties
 5         and no teeth.  And I said -- I looked at him and I
 6         said, get out of my office.  And he said, no.  And
 7         I said, I said get out of my office.  He goes, I
 8         was talking about her, pointed toward LaDonna's
 9         office.  And I said, I don't care.  Get out of my
10         office.
11    Q    So you're just --
12    A    And I let it go when I should have had -- had I
13         known we were going to do this, I would have
14         brought it up.
15    Q    So Hoss is in your office and just suddenly says --
16    A    We were just talking.
17    Q    He likes women with big titties and no teeth?
18    A    I don't know if he said he did, but that's what he
19         said was --
20    Q    Uh-huh.  Just made a reference to big titties and
21         no teeth?
22    A    Uh-huh.
23    Q    Okay.
24    A    I don't talk that way.
25    Q    Uh-huh.  What led up to this remark?
```

Exhibit 1

```
 1   A   We were just having a conversation about anything,
 2       you know, and I don't know if we were having a
 3       conversation about -- I don't really know why --
 4       what conversation we were having.  I'll have to
 5       look at that memo again.
 6   Q   So you described this incident in the memo?
 7   A   Yeah.  I wrote it down because I thought, you know,
 8       at that point, he was getting to be kind of a
 9       handful.
10   Q   Uh-huh.  Have you provided that memo to your
11       attorneys so they can serve it in discovery?
12   A   I'm sure you guys have it.  Yeah.  It's probably --
13       John probably --
14           MR. LOWREY:  Yeah.  I'm pretty sure that we
15       have provided that to you.
16           MR. McQUARY:  Okay.
17           MR. LOWREY:  But I can double check.
18   A   And that particular comment is at the bottom of the
19       page.
20   Q   But you chose not to discipline Hoss for saying
21       that?
22   A   That's right.
23   Q   Okay.  Did Hoss return to work?
24   A   Yeah.
25   Q   Okay.  Do you know if HR investigated Hoss'
```

Exhibit 1

```
 1        allegation that you had sexually harassed him?
 2   A    Yes, they did.
 3   Q    Did they interview you as part of that?
 4   A    Yes.
 5   Q    Do you know if they interviewed Hoss?
 6   A    I'm sure.
 7   Q    All right.  But you don't know -- I mean,
 8        obviously, you weren't part of that interview?
 9   A    No.
10   Q    Okay.  Do you know if they interviewed anyone
11        besides you or Hoss?
12   A    Uh-huh.
13   Q    Who else did they interview?
14   A    There was an -- well, no.  I don't know who they
15        interviewed.  I know there was an interviewer or --
16        the lady, Adriana Burrows or something.
17   Q    Burgos?
18   A    Yeah.  And then there was the lady at Taft.
19   Q    Okay.  Did HR place any restrictions on your -- on
20        you after this accusation such as where you could
21        work and how you might communicate with Hoss?
22   A    Well, I had to take a sexual harassment class.
23        There were a couple things that I did, but that
24        was, you know, it.
25   Q    Okay.  Did they have you working remotely for a
```

Exhibit 1

1    while?

2  A  No.  I mean, we when were working remotely was

3     because of COVID-19.

4  Q  Okay.  Did they tell you to communicate with Hoss

5     via e-mail?

6  A  I don't recall.

7  Q  Do you recall any of the restrictions they placed

8     on you?

9  A  Not really, but I would have followed them.

10 Q  Uh-huh.  Let's go to October 11, 2022.  Did Hoss

11    ask you for permission to take an extended lunch

12    hour that day?

13 A  No.

14 Q  Did he ask for any kind of time off?

15 A  On a Sunday, he sent me a note, told me he needed

16    to take some time off in the morning or something.

17    And I said, this is the last day before -- I mean,

18    this is the last day of voter registration.  Nobody

19    takes time off, nobody.  They get their lunch, and

20    they bring it back because we're covered up.  And,

21    of course, he sent it on a Sunday, and I told him I

22    had -- unfortunately, I'm not -- I can't approve

23    that.  And I said, here's -- you know why, da, da

24    da.  The next thing I know he's complaining that

25    he's being denied all this stuff when everybody

Exhibit 1

1      else was there working there because it was the

2      last day before voter registration.

3   Q  So on that day, employees aren't allowed to leave

4      for lunch?

5   A  It's just kind of an unwritten rule where we all --

6      you know, if we're going to have lunch, we normally

7      just bring it in, and we're there just in case

8      there's a flood because, you know, people are

9      trying to get in to get their registration in.

10  Q  Uh-huh.   To your knowledge, did anyone not take a

11     lunch hour other than just to go get something and

12     bring it back that day?

13  A  No.   Everybody was there.

14  Q  Okay.   Do you know what time Hoss reported for work

15     on October 11?

16  A  I'm not sure.

17  Q  If I were to tell you that Hoss says he came to

18     work at about 6:30 that morning, 6:30 a.m., would

19     you have any reason to say that's wrong?

20         MR. WILL:   Objection.   Form.   Witness can

21     answer.

22  A  Yeah, I would.

23  Q  Were you there at 6:30, and you could say, no, I

24     know I didn't see him at that time?

25  A  No.

**Exhibit 1**

1    Q    Okay.  How do you know he wasn't there then?

2    A    Because he had been caught in so many untruths that

3         we couldn't believe anything he said.

4    Q    Okay.  When did you believe he reported for duty on

5         October 11, 2022?

6    A    I'm not sure.  I'm sure that probably he told City

7         HR something, but I don't know.

8    Q    Did you ever ask anyone, hey, when did you first

9         see Hoss today?

10   A    Yeah, I think that we did.  I think that there is a

11        notation in the file, but I don't recall what it

12        is.

13   Q    How did you become aware that Hoss -- well, do you

14        know when he left for --

15   A    Yeah.

16   Q    What time did he leave?

17   A    About 9:30.

18   Q    Okay.  How did you realize that?

19   A    He walked right by my office with his backpack on.

20   Q    Okay.  Did you say anything to him or he to you?

21   A    No, because I couldn't believe anybody would

22        have -- would do that.

23   Q    Did you know where he was going?

24   A    No.

25   Q    Okay.  What time did Hoss return to the office on

Exhibit 1

1      the 11th?

2    A  I'm not 100 percent sure.  I don't know.

3    Q  Okay.  If I told you that Hoss says he returned

4      midmorning, would you have any reason to dispute

5      that?

6          MR. WILL:  Object as to form.  The witness can

7      answer.

8    A  I don't know that he did.  I don't recall that.  I

9      think, you know...

10   Q  How do you know that?

11   A  I didn't say that I knew it.  I said I don't think

12      that he did.

13   Q  Okay.  What makes you think that he didn't?

14   A  Because it seemed to me like it was an hour and a

15      half to two hours that we were talking about in the

16      office and what to do.

17   Q  Okay.  What did you do when he returned?

18   A  I don't think I said anything at first.

19   Q  How quickly did you say something?

20   A  I don't remember.

21   Q  Okay.  Did you have a meeting with Hoss and Michele

22      Cash and yourself in your office that morning?

23   A  I don't recall if it was that morning, but I think

24      it was --

25   Q  Or that day?

Exhibit 1

1    A    Yeah, I think it was.

2    Q    Okay.  What happened at that meeting?

3    A    I let him go.

4    Q    Did you say that to him yourself, or did Michele

5         Cash say that?

6    A    I said that.

7    Q    Okay.  Did you give him any document, you know,

8         like a paper that says you're fired?

9    A    Uh-huh.

10   Q    Okay.  Did you write that yourself?

11   A    Uh-huh.

12   Q    Okay.  Did you tell human resources that Hoss had

13        come back that day?

14   A    Uh-huh.  They knew.  They knew before it happened.

15   Q    How did they know?

16   A    Because I told them.

17   Q    How did you know it happened before it happened?

18   A    Well, I told you that he left.

19   Q    Uh-huh.

20   A    And I told him not to leave.

21   Q    Uh-huh.

22   A    So they knew there was a problem already.

23   Q    Okay.  So as soon as he left, you went upstairs to

24        human resources and --

25   A    We just talked on the phone.

Exhibit 1

1    Q  Okay.

2    A  I have to look at the file to refresh my memory

3       but, yeah, I'm pretty sure.

4    Q  Okay.  Did Hoss give an explanation for his

5       absence?

6    A  No.

7    Q  Okay.  Was he given an opportunity to speak?

8    A  Oh, yeah.

9    Q  Did he say, I was just taking my lunch hour; I

10      already worked two hours today?

11   A  No.

12          MR. McQUARY:  All right.  Well, I only have

13      documents to show you at this point.  Why don't we

14      take a break.

15          MR. WILL:  Do you want to take a lunch break?

16          MR. McQUARY:  Yeah.  What time is it?

17          MR. WILL:  It's 5 to 1.

18          MR. McQUARY:  Okay.  Is 30 minutes enough?

19          MR. WILL:  That's fine.

20          MR. LOWREY:  Fine with me.

21          MR. McQUARY:  Why don't we say 1:30?  We'll

22      make it an even 1:30.

23          MR. LOWREY:  Also, Jeff, the memo she was

24      referencing, I think it was provided in response to

25      RFP 5.

Exhibit 1

1          MR. McQUARY:  Okay.  Great.

2          (The deposition recessed from 12:54 p.m. to

3     1:39 p.m. for lunch.)

4  Q  Ms. Mowery, I have some documents I would like to

5     show you.

6          I would like to have this marked as Exhibit 1.

7          (Exhibit 1 was marked for identification.)

8     Ms. Mowery, do you recognize Exhibit 1?

9  A  Uh-huh.

10 Q  Are these text messages between you and Hoss?

11 A  Uh-huh.

12         MR. WILL:  Take a look at them all the way

13    through if you want to.

14 A  Okay.

15 Q  All right.  Do you recognize these as text messages

16    between yourself and --

17 A  Uh-huh.

18         MR. WILL:  The whole document?

19         MR. McQUARY:  So let's use the second part

20    starting here, and I will make this Exhibit 2.

21         (Exhibit 2 was marked for identification.)

22         MR. WILL:  Okay.  So the first three pages are

23    what you've handed to the witness --

24         MR. McQUARY:  Yes.

25         MR. WILL:  And the last two are Exhibit 2,

Exhibit 1

1    fair?

2            MR. McQUARY:  Yes.

3            MR. WILL:  Okay.

4    Q  Do you recognize Exhibit 1?

5    A  Uh-huh.

6    Q  All right.  What is Exhibit 1?

7    A  Just text between me and Hoss looking for a

8       handyman or...

9    Q  Okay.  So if you see at the top where it says,

10      "Hoss, I need a handyman, do you know anyone,"

11      would you agree that you initiated the discussion

12      about the handyman?

13   A  Yeah, on that day.

14   Q  Okay.  Well, before that was Hoss recommending the

15      Banueloses?

16   A  I don't know the Banueloses.

17   Q  Okay.  So you're looking for someone to --

18   A  To do some work around my house.

19   Q  Hang living room fans, put up a screen door, new

20      lights in the bathroom, and you also want your

21      house painted?

22   A  Uh-huh.

23   Q  Okay.

24   A  My house, though, is half to two-thirds stone.

25      It's not all -- so it's not like we're looking

Exhibit 1

1    at --

2  Q   It doesn't all need to be painted?

3  A   Yeah.

4  Q   Okay.  It looks like you're also asking for hanging

5      a TV and rearranging your furniture?

6  A   Uh-huh.

7  Q   You need some big guys to do that?

8  A   Uh-huh.

9  Q   All right.  And that seems to be dated

10     September 21, it looks like.  The date is a little

11     bit covered up, but it looks to me like Tuesday,

12     September 21.  Is that a yes?

13         MR. WILL:  Well --

14         MR. McQUARY:  On the first page.

15         MR. WILL:  Right, but it's unclear on this

16     text what the date stamp applies to, what comes

17     after, right?  It's unclear what --

18  Q   Okay.

19         MR. McQUARY:  I'm thinking before.

20         MR. WILL:  Fair.

21  Q   Do you agree with that, Ms. Mowery?

22  A   Yeah.

23  Q   Okay.  And then on the next page under the date,

24     Monday, November 8, it looks like you texted -- is

25     that you or Hoss who texted "painters on the way

Exhibit 1

1     over to work"?  Is that from Hoss?

2  A  Yeah.

3  Q  All right.  And if you go to the third page under

4     the date, Friday November 3, did you text, "The

5     painting people asked to be paid today."?

6         MR. WILL:  I'm sorry.  You said Friday,

7     November 3?

8         MR. McQUARY:  I mean November 12.

9         MR. WILL:  Okay.  Just to clarify.

10 Q  On the third page.  "The painting people asked to

11    be paid today.  Can you pay them today?"

12 A  Yeah, I sent that.

13 Q  Okay.  And then Hoss asked, "Yes.  Are they done?"

14    And you say that, "They will be.  I told them to

15    see you for payment.  I think they're finishing up

16    the lodge today too."

17 A  Uh-huh.

18 Q  "Who is going to sign their check?"

19 A  Uh-huh.

20 Q  Why did you ask Hoss to pay the people painting,

21    doing work on your personal house?

22 A  We were talking about the lodge too.

23 Q  Okay.

24 A  We're talking about painting in general.  And, I

25    mean, I gave him cash.  I took the cash over there,

Exhibit 1

```
 1        so he requires two signatures on a check.  He

 2        cannot sign a fair check, so that's why I'm saying

 3        who is going to sign the check?  Did he call Susie

 4        over there?  Did he call Mike Dilk over there?  Who

 5        was coming?

 6    Q   Okay.  So your contention is that this -- the

 7        question you asked, the painting people asked to be

 8        paid today, can you pay them, you're not referring

 9        to a payment at your own house?

10    A   They were talking about everything, to me.  There

11        was -- I had no idea what any of the agreements

12        were.

13    Q   Uh-huh.

14    A   He did.

15    Q   So Hoss made all the arrangements with the

16        painters?

17    A   Everything.

18    Q   To paint your house?

19    A   Everything.

20    Q   Along with fairgrounds property?

21    A   Yes.

22    Q   Okay.

23    A   And that's pretty typical.

24    Q   All right.  And you're saying that you brought Hoss

25        cash --
```

Exhibit 1

1   A   Yes.

2   Q   -- to compensate the fairgrounds for the share of

3       the painting work that was to your personal

4       property?

5   A   That's exactly right, and I put it -- I handed it

6       to him, and he was standing outside yelling at

7       somebody, and I just put it in his hand, and I

8       left.

9   Q   What did you expect Hoss to do with the cash?

10  A   To pay them.

11  Q   To pay who?

12  A   The painters.

13  Q   Well, they already got a check, didn't they?

14  A   I didn't know.  I figured he was -- I didn't know

15      what the deal was.  I didn't know if he was paying

16      him a check.  He still had to pay for the lodge.

17      I didn't know what their deal was.  He cut that

18      deal.  I don't even know where those people came

19      from.

20  Q   So you're telling me that Hoss arranged completely

21      to pay for the painters simultaneously for work on

22      the fairgrounds and at your personal residence?

23          MR. WILL:  Objection.  That is not what she

24      testified to.  That misstates her testimony.  She

25      said she didn't know.

Exhibit 1

```
 1            MR. McQUARY:  Let her testify what she said.
 2   Q   Ma'am, if I misstated that, please correct me.
 3   A   I did not say pay simultaneously.  I don't know
 4       when he paid them.  I got no idea when he paid for
 5       mine.  I'm assuming he gave them the cash and then
 6       wrote -- had the fair people come over -- but I
 7       didn't sign the check that they showed me.
 8   Q   Okay.  So it's your understanding that Hoss
 9       arranged to pay the Banuelos workers for both work
10       done on the fairgrounds and work done on your
11       house?
12            MR. WILL:  Objection.  Form.
13   A   He always did that.
14   Q   He always did that?
15   A   If we had something done somewhere or some -- he
16       always took care of all that.
17   Q   But if some kind of maintenance needed to be done
18       to fairgrounds property, would he have the same
19       people do maintenance to your house or other board
20       members' personal property?
21   A   If I needed it, he would say, hey, Cindy, these
22       people do whatever, and you might check with them.
23   Q   But would he pay for the work to the personal
24       residence out of fairgrounds property?
25   A   No, not out of fairgrounds money.  I always paid
```

<span style="color:red">Exhibit 1</span>

```
 1        for it.
 2    Q   By reimbursing --
 3    A   I don't know how he did it.
 4    Q   -- bringing cash to Hoss or by paying the workers
 5        directly out of your own -- with your own personal
 6        check?
 7    A   He would tell me just to give it to him, and he
 8        would give it to them.
 9    Q   So this happened more than once?
10    A   Probably.
11    Q   Okay.  All right.  Let's turn to Exhibit 2, the
12        first -- can you identify what's on the first page
13        of Exhibit 2?
14    A   I sent him an e-mail and told him we needed to
15        discuss something.
16    Q   Do you know what it was you needed to discuss?
17    A   Let me look at it.  Probably where he signed my
18        name on this.
19    Q   Did you instruct Hoss to sign that check?
20    A   No.  No, I did not.
21    Q   Did he have your permission to sign the check?
22    A   No.  No, he did not.  And you cannot, with a fair
23        check, just use one signature.  It has to be two.
24    Q   That's a fair board rule?
25    A   Yes.
```

Exhibit 1

```
 1    Q   Why would Hoss go and pay the Banueloses for your
 2        house with a -- work on your house with a
 3        fairgrounds check?
 4    A   First off, I don't know if this is for my house,
 5        and, secondly, I got no idea who it's for.  And I
 6        don't know why he would pay or sign my name.
 7    Q   All right.
 8    A   He had no authority to sign my name on anything.
 9    Q   You don't know who Maria Banuelos is?
10    A   Do I know who she is?
11    Q   Yes, ma'am.
12    A   No.  I mean, I know she's a painter, but I wouldn't
13        know her if she stood up here.
14    Q   Do you know her to be the person who did work on
15        your house?
16    A   Yes.
17    Q   Why would Hoss make a fairgrounds check to Maria
18        Banuelos without your permission if you didn't
19        instruct him to?
20            MR. WILL:  Objection.  Calls for speculation.
21        Witness can answer.
22    A   You need to ask him.  I don't know.
23    Q   All right.
24    A   There are a number of these checks out where he has
25        signed my name on checks to various people.
```

Exhibit 1

1    Q    Without your permission?

2    A    That's right.

3    Q    Okay.  What other checks can you think of?

4    A    Well, there are several.

5    Q    Can you tell me?

6    A    No, I don't have them, but, you know...

7    Q    Perhaps not precise details, but can you at least

8         say who they went to?

9    A    I don't know.  Some of them don't even have who

10        they went to.

11   Q    All right.  Okay.

12             Could you mark this as Exhibit 3?

13             (Exhibit 3 was marked for identification.)

14   Q    Ma'am, do you --

15             MR. WILL:  Excuse me.  I'm sorry.  Do you

16        have --

17             MR. McQUARY:  Did you not get one?

18             MR. LOWREY:  Here.  I can share.

19             MR. McQUARY:  He might be missing this page.

20             MR. WILL:  Okay.  Thank you.

21   Q    Ma'am, do you recognize Exhibit 3?

22   A    Not really.

23   Q    My client believes this is an e-mail you sent to

24        him from your work account at Voter Registration.

25   A    Uh-uh.  We don't use Gmail.

Exhibit 1

1    Q    If you look a little bit below where it says Gmail,

2         do you see your name in bold type?

3    A    Yeah.   And I see at indy.gov, but that doesn't mean

4         I sent this.

5    Q    Do you recognize these words?

6    A    No.

7    Q    Okay.   Did you ever inform Hoss that he had a new

8         password on his Outlook account?

9    A    I don't recall.

10   Q    Okay.

11   A    The second one looks familiar to me but not this

12        first one.

13   Q    Okay.   All right.   Just regarding the first page,

14        if Hoss were to tell you that or testify that you

15        told him he had a new password on his Outlook

16        account, would you have any reason to dispute that?

17   A    I guess not.   I mean, I don't know why I would tell

18        him.   That would come from ISA.   If it came from

19        the City, they wouldn't give me his.

20   Q    Could it be because when you attempted to have him

21        fired, his password was removed, his access was

22        denied?

23            MR. LOWREY:   Objection.   Calls for

24        speculation.

25   Q    You can answer that if you know.

**Exhibit 1**

```
 1   A   I don't know.
 2   Q   All right.  Let's look at the second page.  I know
 3       you testified that you did recognize that.
 4   A   Uh-huh.
 5   Q   What is this?  What is the second page?
 6   A   Where he's got an unacceptable performance.
 7   Q   Okay.  Was that regarding his --
 8   A   Uh-huh.
 9   Q   -- his absence?
10   A   Uh-huh.
11   Q   -- after the fair?
12   A   Uh-huh.
13   Q   Okay.  I don't have any more questions about that.
14            (Exhibit 4 was marked for identification.)
15            The court reporter is going to hand you what
16       has been marked as Exhibit 4.  Do you recognize
17       Exhibit 4?
18   A   Uh-huh.
19   Q   Okay.  What is Exhibit 4?
20   A   This is from me going around talking to each of the
21       board members, as I had mentioned earlier.
22   Q   Okay.  And this is the letter that you wrote around
23       the time you resigned from the fair board?
24   A   Uh-huh.  Well, it was probably the evening that I
25       met and talked to all the board members.  I would
```

Exhibit 1

1    do that at least once a day and capture their

2    thoughts.

3  Q  Looking at the -- so this is dated July 12.  Did

4    you resign around July 12, 2022?

5  A  I'm not sure what the date was.

6  Q  Okay.  And on the first page, the final sentence

7    says, "I don't see how you can possibly meet to

8    discuss this year's fair without addressing the

9    issues with Hoss."  Do you see that?

10 A  Uh-huh.

11 Q  What are the issues with Hoss that you had in mind?

12 A  Well, they're all listed in here.

13 Q  Okay.  So do you believe all of these problems were

14    caused by Hoss?

15 A  I just -- he was involved with many of them, yes.

16 Q  Okay.  Did you talk to every board member about

17    this?

18 A  Oh, yeah.  I mean, we're all at the fair and having

19    conversations.  This one looks like it's from '22,

20    maybe.

21 Q  Yes, this is regarding the fair that occurred in

22    the summer of 2022, isn't it?

23 A  Uh-huh.

24 Q  Okay.  So I'm just going to pick one.  "The

25    fairgrounds had lots of weeds.  It was quite

**Exhibit 1**

```
 1        embarrassing when Congressman Pence had his picture
 2        taken by our sign on Troy and posted it to
 3        Facebook.  Is that the image we all strive for?
 4        There were weeds all over the grounds and in
 5        particular the stream by the park stage.  When I
 6        inquired with him about it, he became enraged and
 7        said I was just picking on him."
 8             I assume that "him" is Hoss?
 9    A   Uh-huh.
10    Q   Okay.  Do you believe it was his fault that there
11        were -- the fairgrounds had weeds?
12    A   Yes.
13    Q   How so?
14    A   He was taking -- he was in charge of the fair.  He
15        was to make sure the grounds were done and
16        everything.
17    Q   Okay.  Had anyone -- had you told him before that
18        that, hey, there are a lot of weeds, and those need
19        to be fixed?
20    A   Yes.
21    Q   Is there any documentation that you discussed the
22        problem of weeds with Hoss?
23    A   I do not know.
24    Q   Have any of the problems you identify in this
25        letter been addressed with Hoss in any kind of
```

Exhibit 1

1        meeting where a progressive discipline was applied?

2   A    This would have been part of the issue after that

3        May meeting.  I mean, he knew.  He was fully aware

4        of all this.  We talked to him about the May

5        meeting, these things.  None of this is new.

6   Q    Okay.  Let me make sure I understand.  These issues

7        or most of these issues were discussed at the

8        May 10 meeting?

9   A    He knew he wasn't doing things.  In fact, one of

10       the secretaries, Ashley Ort, told me he was never

11       there, said he never came to work, said that he was

12       paying her husband to mow the grass when we were

13       paying him.

14  Q    Okay.  The final sentence of the letter is, "Hoss

15       has done a lot of positive things for the fair, but

16       unfortunately his issues far outweigh any good that

17       he's done.  I trust that you will do the right

18       thing, whatever that may be."

19  A    Uh-huh.

20  Q    What did you consider the right thing to do?

21  A    Whatever they decided.

22  Q    Okay.  Did you want them to fire Hoss?

23  A    I didn't say that.

24  Q    That's what you wanted?

25            MR. WILL:  Objection as to form.  The witness

**Exhibit 1**

1    can answer.

2    A  I didn't say that.

3    Q  Yes, but my question is, what did you want them to

4       do?

5           MR. WILL:  Objection as to form.  You can

6       answer.

7    A  Whatever they wanted to do.

8    Q  Go ahead.

9           MR. WILL:  You can answer.

10   A  Whatever they decided to do.  They're all good,

11      competent people.

12          (Exhibit 5 was marked for identification.)

13   Q  Ms. Mowery, do you recognize Exhibit 5?

14   A  No.

15   Q  Okay.  If you look to the second page, does that

16      help?

17   A  No.

18   Q  Okay.  I'm going to represent to you that Hoss

19      believes he sent you a resignation letter on

20      October 3, 2020.  Do you have any recollection of

21      that?

22   A  No.

23   Q  Okay.  Did Hoss ever tell you that he wanted to

24      quit or might quit?

25   A  No, because I wasn't president then.

Exhibit 1

1   Q   Okay.

2   A   Wait a minute.  Yeah.  Yeah.  He did send this to

3       me, that's right.

4   Q   Okay.  When you mentioned this before, you said

5       that you might have fired him, could this be what

6       you're talking about, or was that something else?

7   A   This is another deal where he knew he was going to

8       get fired.

9   Q   Did Hoss, in fact, resign?

10  A   No.  He stayed.

11  Q   How did he wind up staying?

12  A   We talked about it, and I said, you know, it's got

13      to improve.

14  Q   Was there anything in particular that you thought

15      needed improvement, anything specific?

16  A   Do his job.

17          (Exhibit 6 was marked for identification.)

18  Q   Okay.  All right.  Ms. Mowery, you have been handed

19      what has been marked as Exhibit 6.

20  A   Uh-huh.

21  Q   Do you recognize Exhibit 6, which includes the

22      letter on page 2?

23  A   Uh-huh.

24  Q   What is Exhibit 6?

25  A   It's a reference, kind of -- or it's trying to help

Exhibit 1

1      him get his expungement.

2  Q  Okay.  So -- and what was it that needed to be

3      expunged?

4  A  Oh, he had a boatload of cases.

5  Q  Okay.

6  A  I mean, a boatload.

7  Q  All right.  I want to refer you to the second --

8      excuse me -- the third paragraph of that letter.

9  A  Uh-huh.

10  Q  "I learned of Mr. Tevebaugh's past from him.  We

11      had a lengthy conversation regarding it as well as

12      my expectations of him as an employee."

13  A  Uh-huh.

14  Q  So did Mr. Tevebaugh tell you about the felony

15      convictions?

16  A  He must have.  I didn't recall it.

17  Q  Okay.  Is it possible he also told you that he

18      didn't attend -- or didn't receive a bachelor's

19      degree and a master's degree from Indiana Wesleyan

20      University?

21  A  No, because he said he got a free ride.  And I'm a

22      graduate of IWU, and I thought a free ride, that's

23      pretty good.  But he said he got the free ride

24      because his family was so terrible.

25  Q  Well, it's one thing to get a scholarship and

Exhibit 1

1       another thing to actually graduate?

2   A   Uh-huh.  Oh, no.  He had two masters'.  We even

3       talked about it at our VIP dinner where his aunts

4       were and their friends.

5   Q   Okay.  So you don't recall him mentioning that he

6       had multiple felonies, but you're sure that he --

7       that when he came clean about the felonies, he

8       never told you he didn't actually have a graduate

9       degree?

10  A   Uh-uh.

11          (Exhibit 7 was marked for identification.)

12  Q   All right.  Ms. Mowery, you have just been handed

13      what's been marked as Exhibit 7.  Do you recognize

14      Exhibit 7?  I should tell you, like everything

15      that's been marked with these numbers at the

16      bottom, this came to me from your attorney in

17      response to a discovery request.

18  A   Okay.

19  Q   Do you recognize Exhibit 7?

20  A   Uh-huh.

21  Q   What is Exhibit 7?

22  A   It's a memo that I put together -- or, actually,

23      not a memo -- but it's just thoughts I had about

24      Hoss.

25  Q   And for whom did you make this memo?

**Exhibit 1**

1   A   A lot of times I will make them for my own file.

2   Q   Okay.  Is it possible that you gave this to HR at

3       the City of Indianapolis?

4   A   Not until later.

5   Q   So you wrote it and then sometime later gave it to

6       HR?

7   A   I do that with a lot of situations that occur.

8   Q   Okay.  When do you think you first wrote it?  I'm

9       not looking for a precise day.  You can say spring

10      of 2019 or something like that.

11  A   Well, it says 7/25/22.

12  Q   Okay.  Well, obviously, you're quite a bit more

13      perceptive than I am.  So you wrote this on July

14      25, 2022?

15  A   Uh-huh.

16  Q   And then would you have given it to HR at about

17      that time?

18  A   I think when he filed sexual harassment claims or

19      whatever I might have given it to him then.

20  Q   Okay.  I'd like you to look at the

21      third-to-the-last paragraph on page 1.

22  A   Uh-huh.

23  Q   "One of the fair board members met with me and

24      accused him of sexual harassment.  I talked with

25      him about it, gave him info on sexual harassment,

# Exhibit 1

```
 1      and warned him that he would be terminated if he
 2      did it again.  She did not want to pursue things
 3      any further as she was afraid of him."
 4    A  That's right.
 5    Q  Okay.  Who accused Hoss of sexual harassment?
 6         THE WITNESS:  Am I allowed to --
 7         MR. WILL:  You have to answer the question.
 8    A  Suzanne McVeigh.
 9    Q  And she's a board member?
10    A  She was.
11    Q  Was --
12    A  She left to get away from him.
13    Q  Okay.  Did she say what Hoss did to --
14    A  No.
15    Q  Okay.  She didn't even tell you?
16    A  I don't recall.
17    Q  Did you document this anywhere?
18    A  Well, it's here, and I -- it's probably somewhere
19      in one of my fair files.
20    Q  Okay.  Has that file been turned over to your
21      attorneys?
22    A  I don't know.
23    Q  Could you please give that to them?
24         THE WITNESS:  I think you talked to them,
25      haven't you?
```

Exhibit 1

1    MR. WILL:  I don't have any records that I

2    could provide, so if there are other records out

3    there, we can follow up and provide them.

4    THE WITNESS:  I think you talked to her one

5    day on the phone.

6    MR. WILL:  I don't have any records.

7  Q  I just want to be clear.  You say you gave this to

8    the City of Indianapolis human resources, correct?

9  A  Right.  When this went -- I mean, this whole

10    document went to them.

11  Q  Okay.  But if he harassed a fair board member,

12    obviously, that's a fair issue that --

13  A  Right.

14  Q  -- City HR would not have any control over?

15  A  Right.  I had a young girl come in from my Voter

16    Registration office too.  She was new, and she told

17    me that she had some -- she was scared of Hoss, and

18    he had made some statements to her and all that

19    kind of stuff.  And I said, like, what are you

20    talking about?  And she said, well, just kind of

21    sexual harassment.  And I said, well, like what

22    kind of things were said?  So she said, well, you

23    know -- and I said, do you want me to talk to him?

24    And she said, no.  And I said, well, then how are

25    we going to resolve it?  She said, well, I don't

Exhibit 1

```
 1        know.  I just want you to know.  And we talked
 2        about it, and I said, you know, sexual harassment
 3        is a serious offense, so you need to let me know
 4        what you want to do.
 5    Q   Okay.  I would like you to look at the
 6        second-to-last paragraph.  "It should also be noted
 7        that at no time did Jeremiah ever say I was
 8        harassing him or sending him harassing texts nor
 9        did he ever ask me to quit sending whatever he
10        found offensive."
11    A   Right.
12    Q   Do you believe that statement to be accurate?
13    A   Yes, I do.
14    Q   The very last sentence says, "I must admit that I'm
15        hurt and quite surprised that he would file any
16        type of claim against me."  Was that -- by claim,
17        do you mean the accusation --
18    A   Uh-huh.
19    Q   -- that he made to the City HR?
20    A   To any of this.
21            (Exhibit 8 was marked for identification.)
22    Q   You have been handed what's marked as Exhibit 8.
23    A   Uh-huh.
24    Q   Do you recognize Exhibit 8?
25    A   Uh-huh.
```

Exhibit 1

1    Q    What is Exhibit 8?

2    A    It's a misconduct policy.

3    Q    Is this what you were referring to when you --

4    A    Yes.

5    Q    -- testified that Hoss was given something at the

6         May 10 meeting?

7    A    Yes.

8    Q    This is what he was given?

9    A    (Nodding.)

10   Q    Okay.  Does this summarize or describe any actions

11        that Hoss took or any of his behavior?

12   A    No.  I think I told you that sexual harassment

13        wasn't part of the issue that we had with him.  No

14        one cared if he had ten girlfriends, you know, or

15        whatever.  It didn't -- we all kidded around and

16        had fun but it was -- this was not -- this page is

17        what we told John Sturgill this was not

18        appropriate.  It needed to be taken out, and John

19        said, I'll have it -- I'll edit it and take it out.

20   Q    Okay.  So was Hoss given anything at the May 10

21        meeting that describes what he did wrong?

22   A    Yeah.  He was given this document, I think.  And

23        then I think we had notes, and we talked to him

24        about how he talked to people and vendors and board

25        members and stuff like that.

Exhibit 1

1   Q   But did he get anything in writing that says you

2       did this wrong?

3   A   I don't remember.  Do you put all this stuff in

4       writing for yourself?

5   Q   Well, I'm very lucky not to have had to fire many

6       employees, but when I have, yes.

7   A   Okay.

8   Q   Do you not put it in writing?

9   A   For the most part, but, I mean, every little

10      detail --

11  Q   Well, there are no details whatsoever in this that

12      I can see.

13  A   Okay.

14  Q   Can you point to me anything in this document that

15      describes how Hoss was doing his job poorly or

16      inappropriately?

17  A   Hoss knows, and he also knows it's a disciplinary

18      action out there.

19  Q   But there's nothing talking about it in Exhibit 8,

20      is there?

21  A   I don't know.

22          (Exhibit 9 was marked for identification.)

23  Q   Ms. Mowery, do you recognize Exhibit 9?

24  A   Uh-huh.

25  Q   What is Exhibit 9?

Exhibit 1

1   A   It's an executive director project description.  I

2       mean job description.

3   Q   Okay.  Is this something that was discussed by the

4       fair board of directors?

5   A   Uh-huh.

6   Q   Okay.  And the executive committee is a committee

7       of the board?

8   A   Uh-huh.

9   Q   Okay.  Do you know what the black square at the top

10      of the page is?

11  A   Probably just where it was --

12          MR. WILL:  I'll tell you that's a redaction.

13          MR. McQUARY:  Who made the redaction?

14          MR. WILL:  We did.  That's an e-mail to

15      counsel, so we redacted the e-mail to counsel.

16          MR. McQUARY:  Okay.

17  Q   I want to give you -- actually, before you turn to

18      this, so it said that Hoss has asked for a job

19      description.  Was there no job description before?

20  A   No.

21  Q   Okay.  How would Hoss learn what his job duties

22      are?

23  A   That's what we were trying to do.

24  Q   Okay.  How did he do it?  I mean, as a practical

25      matter when there was no job description, who told

Exhibit 1

1    him --
2  A  We had a list of things he needed to do, and so he
3     just did them as we went along.
4  Q  Okay.  Did you know if the board approved the
5     document that we see in the rest of the other
6     pages?
7  A  No.  We were waiting on him to return it, and he
8     never did.
9  Q  Okay.  So this never got --
10 A  Right.
11 Q  This never got approved?
12 A  Right.
13         (Exhibit 10 was marked for identification.)
14 Q  Ms. Mowery, do you recognize Exhibit 10?
15 A  Uh-huh.
16 Q  Could you speak your answer out loud for the court
17    reporter?
18         MR. WILL:  The "uh-huh" doesn't come across
19    very well.
20 A  Yes.
21 Q  All right.  What is Exhibit 10?
22 A  It's the request for a protective order.
23 Q  Against Hoss to you?
24 A  Yes.
25 Q  On page 8 -- excuse me -- page 3, under item 8, if

Exhibit 1

```
 1        you look about a little more than halfway down, one
 2        of the descriptions of the incident is, "Called my
 3        direct boss and made many untrue statements."  Who
 4        did Hoss call?
 5     A  Joe Elsener.
 6     Q  What did he tell Joe Elsener?
 7     A  Oh, I don't know.  I wasn't present.
 8     Q  How do you know he said something untrue?
 9     A  Because Joe told me.
10     Q  What did Joe tell you that Hoss told him?
11     A  It would be secondhand.  I don't know.
12     Q  I'm asking.
13     A  Well, I don't know.
14     Q  You don't know what Joe Elsener told you?
15     A  No, I don't remember.
16     Q  Okay.  But you felt comfortable putting it in a
17        court filing that Hoss said something untrue?
18     A  Uh-huh.
19     Q  Okay.  So do you regularly make statements about
20        things you don't know?
21            MR. WILL:  Objection as to form and objection
22        that misstates her testimony.  She can answer the
23        question to the extent she knows.
24     Q  Okay.
25            MR. WILL:  You can answer the question.
```

Exhibit 1

```
 1   A   I don't know.

 2   Q   If you look below that, description of incident,

 3       "Has sent several e-mails to my employer, council,

 4       attorney, and fair board that contained false

 5       information."  What was the false information?

 6   A   Well, it said here it's on page 8A.  I don't

 7       recall, I guess.

 8   Q   Okay.  The first one, if you look on page 3 where

 9       it says description of incident it said, "He

10       advised me he knew people that burns houses down,

11       and he used to be the person people called to do

12       it.  Also stated he would burn the entire

13       fairgrounds to the ground if he was ever

14       terminated."

15   A   Uh-huh.

16   Q   Okay.  When did Hoss tell you that?

17   A   He told me that several times.

18   Q   Okay.

19   A   He also told other people.

20   Q   All right.  What other people?

21   A   Ashley Ort.

22   Q   Okay.

23   A   I think Steve Ort was also one.

24   Q   Would that be Ashley's husband?

25   A   Uh-huh.
```

Exhibit 1

```
 1   Q   Okay.  I would like you to look at the last page
 2       where it said police narrative.  Now, it said you
 3       notified Constable David Taylor?
 4   A   Yes.
 5   Q   Okay.  He is the policeman to whom you gave the
 6       report?
 7   A   Yeah.  I talked to him about it, and he said I
 8       needed to file it.
 9   Q   Okay.  So look below that where it says
10       investigating department, Indianapolis Metro Police
11       but -- correct?
12   A   I'm not sure where we are.
13           MR. WILL:  The very last page of the exhibit,
14       so not the last page of the motion.
15           MR. McQUARY:  It looks like this.
16           MR. WILL:  It's the last page of the exhibit.
17       There's a police report on the back two pages.
18   A   Right here?
19   Q   Below that where it says investigating department?
20   A   Uh-huh.
21   Q   Indianapolis Metro Police?
22   A   Uh-huh.
23   Q   But David Taylor is not actually with IMPD, is he?
24   A   No.
25   Q   He's the elected constable of Perry Township?
```

Exhibit 1

1   A   Yes, he is.

2   Q   And the township constable's primary function is to

3       serve papers for the township small claims court?

4   A   Yeah.  But they do all kinds of stuff.  And, I

5       mean, I could have had a lot of IMPD officers file

6       it.

7   Q   Okay.  But instead you went to the elected township

8       constable?

9   A   Yeah, for convenience.

10  Q   Okay.  And if you look at the first sentence of the

11      narrative it said, "Mowery notified Constable David

12      Taylor of a delayed threat made against her on

13      May 12 of this year," but the time the report was

14      made was August 8?

15  A   Uh-huh.

16  Q   So you were so fearful for your life and safety

17      that you waited four months to tell the police

18      about it?

19  A   Well, I actually thought he just said it to me.

20      Then as I'm hearing other people say it, I'm

21      thinking, well, maybe he is going to do something,

22      you know.  I don't run around with people like

23      that, so I don't know.

24  Q   Did you attend the hearing that was set on this for

25      September 26, 2022?

**Exhibit 1**

1    A    No.

2    Q    Did you attend remotely?

3    A    No.

4    Q    Okay.  Do you recall seeing me at the hearing?

5    A    Uh-huh.

6    Q    Okay.  So you were there --

7    A    Uh-huh.

8    Q    -- remotely?

9    A    Uh-huh.

10   Q    Okay.  All right.  Did you immediately dismiss the

11        request for protective order?

12   A    Yes.

13   Q    All right.  Actually, I do have one more question

14        about this exhibit.  To your knowledge, did David

15        Taylor file any charges -- or did David Taylor

16        arrest or were any charges filed against Hoss for

17        threatening to burn down your house?

18   A    No.

19   Q    One last thing, the last sentence in that narrative

20        is, "Complainant Mowery does not wish that the

21        suspect be contacted at this time."

22   A    Uh-huh.

23   Q    Why did you tell David Taylor not to contact the

24        person you were accusing of essentially arson?

25   A    I'm like everybody else.  I'm afraid of him.

Exhibit 1

1    Q    Okay.

2    A    You have no idea.

3    Q    So what did you expect David Taylor to do if --

4    A    Just file a report.

5    Q    You just wanted it on the record?

6    A    Yeah, in case my house burned down.

7    Q    But you didn't want it to be investigated or that

8         any action be taken against the person who is

9         supposedly threatening your life?

10   A    Well, I didn't know because I don't get involved in

11        these things.

12             (Exhibit 11 was marked for identification.)

13   Q    Okay.  Ms. Mowery, do you recognize Exhibit 11?

14   A    Uh-huh.

15   Q    What is Exhibit 11?

16   A    It's a photograph with the inside of the lodge.

17   Q    Well, is this -- does this document depict text

18        messages between you and Hoss?

19   A    Uh-huh.

20   Q    Do you recognize or do you recall sending and

21        receiving these texts?

22   A    Uh-huh.

23   Q    All right.  So I would like you to look at the line

24        in the middle of the page under the date, Monday,

25        December 20.  "Do you have the dollar sign, dollar

Exhibit 1

```
 1       sign, for the caterer?"
 2   A   Uh-huh.
 3   Q   Did you write that?
 4   A   Did I send this?
 5   Q   Yes, ma'am.
 6   A   Are you saying I sent it?
 7   Q   Yes, ma'am.
 8   A   Okay.  Then I must have sent it.
 9   Q   And what -- why did you send that to Hoss?
10   A   I probably wanted to know if he paid the caterer.
11   Q   Okay.  Was this for the event, the fundraiser at
12       the lodge, for Paul Annee and --
13   A   Yes, and Brian.
14   Q   -- Brian Mowery, your nephew?
15   A   Yes.
16   Q   And is that a picture of the event --
17   A   Uh-huh.
18   Q   -- held at the lodge?
19   A   Yeah.
20   Q   And just for clarification, part of the lodge was
21       where Hoss lived, but part of it was also an event
22       space?
23   A   Yes.
24   Q   Okay.  And this depicts the event space?
25   A   Right.
```

Exhibit 1

1   Q  Why would Hoss pay a caterer for a fundraiser for

2       Brian Mowery and Paul Annee?

3   A  I don't know who paid the caterer.  He was running

4       around doing things.  I was running around doing

5       things.  Everybody -- I don't even know if the

6       caterer got paid.

7   Q  Did Hoss tell you he paid the caterer?

8   A  Well, I don't know.  Did he?  I mean, he says it

9       came out of petty cash.  I doubt that, but, you

10      know.

11   Q  Why do you doubt that?

12   A  We don't keep that kind of petty cash.

13   Q  Do you know how much the caterer got paid?

14   A  I have no idea.

15   Q  Did you or the Mowery or Annee campaigns ever

16      compensate the fairgrounds for any payment that

17      Hoss or the fairgrounds made?

18   A  I don't believe that the fairgrounds paid for it.

19      I believe that the cash they collected that night

20      paid for it.

21   Q  Okay.  So if Hoss were to testify that he paid it

22      out of the fairgrounds petty cash fund, would you

23      dispute that?

24   A  Yes.

25   Q  What is your basis for disputing, for knowing --

Exhibit 1

1    how do you know that he didn't pay it out of the

2    petty cash?

3  A  Where would he get the money?  If the most money we

4    kept in petty cash was $100 and Joe was saying that

5    the most he kept there was 250, then where did he

6    get the money to pay for the caterer?

7  Q  Okay.  If Hoss were to testify that there was $500

8    in the petty cash funds, would you have a reason to

9    dispute that?

10       MR. WILL:  Objection to form.  The witness can

11    answer.

12  A  Well, Hoss did the petty cash.  I have no idea.

13  Q  Did the Annee or Mowery campaigns note that payment

14    to the caterer as a contribution on their election

15    financial forms?

16       MR. WILL:  Objection as to the form of the

17    question.  I think it misstates testimony.  The

18    witness can answer.

19  A  I don't know.

20  Q  Okay.

21  A  But I would look into it.

22  Q  Okay.  If the money did come out of the fairgrounds

23    petty cash fund, do you see how that would be a

24    concern as an improper campaign donation?

25  A  Well, sure.  No, it's not an improper campaign

Exhibit 1

```
 1        donation.  The fairgrounds can donate to anyone or
 2        anything it wants to.  It's a private corporation.
 3        It's a nonprofit.  It's not government money.  He
 4        kept telling people we were all funded by the City
 5        of Indianapolis.  That is not true.  We get a
 6        stipend, period, end of story.  The rest of it we
 7        work and earn.
 8   Q    How about if it's not noted in there as a --
 9        recorded as a campaign contribution with the
10        Election Commission?
11   A    You just amend the report and make sure it's in
12        there.
13   Q    Was it ever amended?
14   A    I don't know.  I have to look.
15   Q    You were Paul Annee's campaign treasurer, weren't
16        you?
17   A    Yeah, but you're talking two years ago.  You want
18        me to answer this when I do God knows how many.  I
19        mean, I'll be more than happy to look and amend it.
20        The GOP Club could have paid it because they were
21        actually the host.
22             (Exhibit 12 was marked for identification.)
23   Q    Ms. Mowery, do you recognize Exhibit 12?
24   A    Uh-huh.
25   Q    This came to me from your attorney.
```

Exhibit 1

1    A    This is from -- yeah, I do.

2    Q    What is Exhibit 12?

3    A    It's a memorandum that I wrote to the board and

4         advising them of some situations that I became

5         aware of and wanted to make sure they were aware of

6         them.

7    Q    Is this in response to something that Hoss wrote to

8         the board?

9    A    I don't recall.

10   Q    Okay.  Well, the reason I ask is the very first

11        paragraph says, "I recently learned of some

12        accusations that Hoss made and believe they need

13        addressed.  If necessary, I will go head on with

14        Hoss on his comments."

15   A    Uh-huh.

16   Q    Okay.  So would you agree this is a response to

17        criticisms that Hoss made?

18   A    Uh-huh.

19   Q    And I think I testified earlier or -- excuse me --

20        I asked you earlier if you knew the hours that Paul

21        Annee worked.  You list them there in about the top

22        third of the page.  Do you see that?

23   A    Uh-huh.

24   Q    All right.  How did you know what precisely what

25        hours Paul Annee worked at that time?

Exhibit 1

```
1   A   I would imagine he gave them to me.
2   Q   Because you were not present on the board on this
3       date?
4   A   No.
5   Q   Did you have access to time sheets --
6   A   No.
7   Q   -- independently?
8   A   No.
9   Q   Okay.  So you're simply passing on the hours that
10      Paul Annee told you?
11  A   Right.
12  Q   But you had -- would have no way of knowing for
13      yourself whether he actually worked those hours?
14  A   Right.
15  Q   Forgive me if I already asked this, but did the
16      board approve the bonus you recommended for Paul
17      Annee?
18  A   I believe so, but I don't know.
19  Q   All right.  I would like you to look at the last
20      regular paragraph of this letter or -- excuse me --
21      not the post script but above that.  Do you see
22      where it says, "I could go on and on about Hoss and
23      relive the horror he added to my life.  I left
24      because of Hoss, and it was quite a relief not to
25      have to deal with him and his bullying tactics.  He
```

Exhibit 1

1   has proven himself to be a liar among other things,

2   and I feel for you and that your leadership won't

3   let him go.  How much more evidence is needed to

4   terminate his employment?"

5  A  Uh-huh.

6  Q  All right.  So you were asking the board to fire

7   him?

8      MR. WILL:  Objection.  The document speaks for

9   itself.  The witness can testify.

10  A  No.

11  Q  You were asking the board to terminate him?

12  A  No.  I was giving them my opinion.

13  Q  And then after that is, "P.S., you have a leak on

14   your board.  Hoss knows every move you consider or

15   make."

16  A  Uh-huh.

17  Q  Do you mean that Hoss was leaking information about

18   the board?

19  A  No.  Someone on the board was telling Hoss

20   everything they were doing.

21  Q  Okay.  So the board -- did the board not

22   unanimously disapprove on Hoss' performance?

23  A  I have no idea.

24      MR. McQUARY:  I think I am finished, but I

25   would like to confer with my client before closing,

Exhibit 1

1    before passing the witness.

2         (A brief recess was taken.)

3    Q   Ms. Mowery, I believe that earlier you testified

4        that a female employee at Voter Registration came

5        to you and complained of Hoss sexually harassing

6        her?

7    A   Yes.

8    Q   Who was that person?

9    A   Taylor Williams.

10   Q   And what did she say that Hoss did?

11   A   Something that he said to her, you know.  I don't

12       recall, but she didn't like it.  She didn't want to

13       be near him.  And I just told her.  I said, you

14       know, we've got -- you have to sit with -- where

15       you're sitting.

16   Q   Okay.  Did you pass the complaint on to human

17       resources?

18   A   No.

19   Q   Did she, to your knowledge?

20   A   I don't think so, but I'm not sure.

21         MR. McQUARY:  Okay.  All right.  No further

22       questions.

23   CROSS-EXAMINATION

24   BY MR. WILL:

25   Q   Okay.  I have a few.  Hopefully it won't be too

**Exhibit 1**

```
 1       long.
 2   A   All right.
 3   Q   I just want to clear up some points, Ms. Mowery.
 4       Let's see here.  I think plaintiff's counsel
 5       highlighted the fact that -- in fact, it's in
 6       Exhibit 6, is that right?  Exhibit 6, yeah.  If you
 7       look at Exhibit 6 --
 8            MR. McQUARY:  Which one is that?  Mine aren't
 9       numbered.
10            MR. LOWREY:  They're your exhibits.
11            THE WITNESS:  It's the expungement letter.
12            MR. McQUARY:  Great.  Thanks.
13   Q   I think we established in Exhibit 6 that at least
14       in January or February of 2021 you were aware of
15       Mr. Tevebaugh's criminal history, correct?
16   A   Yes.
17   Q   And that came up when he applied to the City,
18       correct?
19   A   Yes, now that -- when we talked about this, I
20       recall that I was aware from HR.
21   Q   Okay.  And that came up because he applied for a
22       job with the City, and the background check was run
23       by the City?
24   A   Right.
25   Q   And that's where you found out about those?
```

Exhibit 1

```
 1   A   Right, and when we were going to try to help him
 2       get them expunged.
 3   Q   Turn to page 2 of that exhibit.  Now, you wrote
 4       this page 2, right?  You wrote this document?
 5   A   Uh-huh.
 6   Q   And you wrote this -- it would have been on or
 7       around February 4 of -- on or around February 1 of
 8       2021?
 9   A   Uh-huh.
10   Q   Okay.  And if you look in the second paragraph,
11       one, two, third sentence --
12   A   Uh-huh.
13   Q   -- read that third sentence to me.
14   A   "He holds a master's degree from Indiana Wesleyan
15       University and is highly intelligent."
16   Q   Okay.  So counsel asked you if Mr. Tevebaugh came
17       clean about not having a master's degree or
18       bachelor's degree from Indiana Wesleyan.  It
19       appears that, at least by February 1 of 2021, you
20       still believed that he had a master's degree?
21   A   Yes.  We just recently found out.
22   Q   Okay.  That's all I have with that exhibit.  Thank
23       you.  Now, there was talk about -- I think it was a
24       May 2022 meeting.  I think the date we have been
25       using is May 10, but I don't know if you have
```

Exhibit 1

1    specifically identified a date for certain.  Do you
2    know the meeting I'm talking about?
3  A  Uh-huh.
4  Q  You can correct me if I'm wrong, but I believe it
5    was you, Tevebaugh, John Sturgill, and Abdul-Hakim
6    Shabazz, is that correct?
7  A  Yes.
8  Q  And I think you said in that meeting Tevebaugh said
9    somebody was sexually harassing him?
10 A  Yeah.  He said -- he said something about, like,
11   somebody sexually harassed me or something like
12   that.
13 Q  Did he give you any -- what specifically do you
14   recall him saying?
15 A  Like, just like that, you know.  Like, well, it's
16   not like somebody that's sexually harassed me or
17   something like, you know.  It was -- that it was
18   inferring.
19 Q  Okay.  Oh, okay.  So it was -- he said something
20   similar to it's not like somebody sexually harassed
21   me?
22 A  Right.  I mean, it wasn't like he was saying I have
23   been sexually harassed by Cindy Mowery or Susie
24   day, Suzanne McVeigh.
25 Q  He was saying that in a way that it required the

Exhibit 1

1    listener to infer that somebody had sexually

2    harassed him?

3  A  Yeah, because --

4  Q  Did he say who did that?

5  A  No.

6  Q  Okay.  Did he say who he believed did that?

7  A  No, because I didn't think it was me.

8  Q  Okay.  Now, I think you said there were complaints

9    about his job performance kind of over a broad

10    period of his time with the fair.  At one point,

11    you said sometimes he would say he would not do

12    stuff, and then sometimes he would do it, and

13    sometimes he wouldn't and then go on about it.  Can

14    you kind of explain what you meant by that?

15  A  Well, he didn't like authority.  He's very

16    narcissistic.  He didn't want to take direction

17    from anybody.  He wanted to be the boss.  It had to

18    be his way, the way that it was -- regardless what

19    you thought, we're not doing it that way.  We're

20    doing it this way, and I'm in charge, and that's

21    just the way that it is.  Like, there were things

22    with the lodge that he, you know, just -- we would

23    suggest things.  The board would suggest things,

24    and he just went ahead and did them his own way,

25    you know, different things on the fairgrounds he

Exhibit 1

| | | |
|---|---|---|
| 1 | | would do.  If I asked him to put a budget document |
| 2 | | together and said this is the way I want it, he |
| 3 | | would put it together the way he wanted it.  It's |
| 4 | | not -- when you're a subordinate, you do what |
| 5 | | you're asked to do and how they want it done. |
| 6 | Q | Okay.  And he did not do that, right? |
| 7 | A | He wasn't in charge. |
| 8 | Q | You said there were also complaints about how he |
| 9 | | was talking to people? |
| 10 | A | Yes. |
| 11 | Q | Can you kind of explain what you meant by that? |
| 12 | A | Well, first thing, you know, the fair is a family |
| 13 | | thing, and he could be standing in the middle of 20 |
| 14 | | kids and throw up 10 F bombs, you know.  He didn't |
| 15 | | care what he said, when he said it, unfiltered.  It |
| 16 | | just didn't matter.  And, you know, he would just |
| 17 | | tell you to your face.  If you say, you know, I |
| 18 | | need you to do this, he'd say, I'm not doing it. |
| 19 | Q | Did you have particular problems with vendors |
| 20 | | complaining about how he dealt with them? |
| 21 | A | Yes. |
| 22 | Q | Can you explain what you mean by that? |
| 23 | A | We have had vendors that say they will not come |
| 24 | | back.  One of them was the midgets.  Now that they |
| 25 | | know he's gone, they're saying they'll come back if |

Exhibit 1

1    he's gone.

2    Q   The little person wrestling?

3    A   Yeah.  You know, that's a big draw, as much we

4        think, you know, maybe it isn't, but people love

5        that stuff.  And then there were people at the

6        garage doors.  We had the garage doors redone, and

7        they wouldn't even give us a quote until they found

8        out he was gone.  Police officers.  There's been

9        all kinds of things.

10   Q   Okay.  Any other examples you can think of?

11   A   Not right off the top of my head.  I'm tired.

12   Q   That's okay.  Now, there was a -- you were asked

13       about a June 26, 2022, text message where you said

14       something about, you know, if you were here, and

15       you said you were -- and there was a smiley face

16       emoji.

17   A   Uh-huh.

18   Q   You were actually -- I think you actually said I

19       know where it was.  I was on my couch putting on

20       shoes and socks when you said that?

21   A   I had to go to the fair.

22   Q   That was what I was going to say.  Where were you

23       putting shoes on socks on to go?

24   A   To the fair.

25   Q   So this was in morning?  In the afternoon?

**Exhibit 1**

1   A   It was in the afternoon.

2   Q   Okay.  You were getting ready to leave?

3   A   Yeah.

4   Q   You weren't inviting somebody over?

5   A   Oh, no.

6   Q   Okay.

7   A   I don't invite anybody over to my house.

8   Q   Okay.  Now, I think you commented about a picture

9       from Tevebaugh's Facebook, correct?

10  A   Planting a picture?

11  Q   No.  Pulling up a picture.

12  A   Yes.  I did that, yes.

13  Q   Okay.  And it was in a conversation with this Tyler

14      Hargraves, maybe?

15  A   I don't know.  I don't know.

16  Q   Was it one of the wrestlers?

17  A   Uh-huh.

18  Q   Is that yes?

19  A   Yes.

20  Q   You've got to say yes because then she can't

21      transcribe it.  I guess the question -- the

22      follow-up question I have on that is were you

23      Facebook friends with Tevebaugh at the time?

24  A   Oh, yeah.

25  Q   This wasn't someone pulling up access to someone's

**Exhibit 1**

```
 1        page you did not have access to?
 2   A    We were like -- in my opinion, we were best
 3        friends.
 4   Q    Okay.  And so you just had to go to his page to
 5        pull it up?
 6   A    Right.
 7   Q    Okay.  And then you were asked about Exhibit 12?
 8   A    Uh-huh.
 9   Q    And if you could pull up Exhibit 12 --
10   A    You guys have more paper than Voter Registration
11        does.
12   Q    You should see one of these reverse conviction
13        cases.  Crazy.  Okay.  And I believe -- again, I'm
14        summarizing your testimony, but I'm trying to speed
15        things along.  We have been here -- it's been a
16        while.  It says -- it looks like this is an e-mail
17        you sent to various members of the board regarding
18        Paul Annee's time at the fair, correct?
19   A    Right.
20   Q    And I think you said that this was the time that
21        you believe he submitted for work and that he --
22        you believe he worked this time?
23   A    Right.
24   Q    I guess my follow-up question to that is, I mean,
25        you were at the fair in July of 2022?
```

Exhibit 1

1    A   Correct.

2    Q   Were you there every day?

3    A   Uh-huh.

4    Q   Did you see Paul there?  Did you see Paul working?

5    A   Yeah.

6    Q   You saw Paul there, and you saw Paul working?

7    A   Uh-huh.

8    Q   That's a yes?

9    A   Yes.  Sorry.

10   Q   It's okay.  Did Paul work a lot of hours during

11       that fair?

12   A   Yes, he did.

13   Q   Okay.  And was Paul doing a lot of work throughout

14       the entire fair and in the lead up to the fair?

15   A   Yes.

16   Q   Okay.  So you may not know the exact hours, but you

17       did see him working a lot during that time period

18       you were at the fair?

19   A   We all did.  I mean, we were surprised that we

20       needed Paul.

21   Q   Let's see here.  There's been a lot of questions

22       about the painting of your house and painting of

23       the lodge that went on.  To be clear, both the

24       painting of the house and the painting of the

25       lodge, to your knowledge, went on at the same time,

Exhibit 1

1    right?

2  A  Yes.

3  Q  Okay.  Did Tevebaugh give you -- did he tell you

4    what the price for the painting was?

5  A  An estimate.  I never saw a piece of paper, an

6    invoice.  We searched the office for quotes,

7    invoices, whatever, nothing.

8  Q  Okay.  And so what did Tevebaugh tell you about an

9    estimate for the price of painting your house?

10  A  Well, he said, you know, it will be under 4,000.

11  Q  Okay.  And I remember you said you gave him some

12    cash.  Do you recall how much cash you gave him?

13  A  35.

14  Q  35?

15  A  Yes.

16  Q  You think it was -- because I think initially you

17    said it was between 2500 and 3500?

18  A  Yes, something like that.

19  Q  Okay.  But you think it was 3500?

20  A  Whatever he asked me for is what I gave him.

21  Q  Okay.  And you didn't get a receipt or anything for

22    that?

23  A  No, because I trusted him.

24  Q  Do you recall what he asked you for?

25  A  No.

Exhibit 1

1   Q   Okay.  And I think you said you don't know what the

2       arrangement between Maria Banuelos and Tevebaugh

3       was for painting for the lodge or for your house?

4   A   No.  When he left the office, the records left with

5       him.

6   Q   Okay.  And let's see here.  You did make a comment

7       about if you paid -- or if he paid with a

8       fairgrounds check for the painting, you did not

9       sign one, correct?

10  A   No.

11  Q   Okay.  And do you know if there was a -- do you

12      know what checks were issued for, from your own

13      personal knowledge, for the painting?

14  A   For everything?

15  Q   Let me rephrase that.  It was a bad question.  Do

16      you know whether there was a $7500 check written to

17      Maria Banuelos from the fairgrounds account?

18  A   Yes.

19  Q   Okay.  Did you sign that check?

20  A   No.

21  Q   Okay.  Do you know, would a check be recorded in

22      QuickBooks when it was written?

23  A   Yes.

24  Q   Okay.  And I think you said checks should be signed

25      by two people?

Exhibit 1

1   A   Yes.

2   Q   Okay.  And do you know who would have recorded the

3       QuickBooks notations for the checks at the time?

4   A   Hoss.

5   Q   Okay.  Do you know what the QuickBooks notations

6       for that check is, from our own personal knowledge?

7   A   I don't remember.

8   Q   Okay.  Do you know -- I think you said that -- let

9       me ask you this.  From your knowledge or

10      investigation in this case, are you aware of any

11      other checks being written to Maria Banuelos from a

12      fairgrounds account?

13  A   Yes.

14  Q   And what other checks have you come to learn were

15      written to Maria Banuelos from the fairgrounds

16      account?

17  A   There's a $2,500 check.

18  Q   Okay.  And who signed that check?

19  A   Susie Day and I.

20  Q   Okay.  So you did sign a check to Maria Banuelos

21      with Susie Day that was countersigned and given to

22      Maria Banuelos for $2,500?

23  A   Right.

24  Q   Okay.  And do you recall what that check was for?

25  A   The outside fair activity or something like that.

Exhibit 1

1   Q  That's the notation in QuickBooks, right?  You

2       don't recall now what it was for?

3   A  No.

4   Q  Okay.  If you go to the text message about the

5       painters -- I think it's Exhibit 1, actually --

6   A  Uh-huh.

7   Q  I think you said -- if you look at page 1, it says

8       September 21 or around there, maybe shortly before

9       there, you asked about, "I need my house painted

10      too."  Do you see that?

11   A  Down here, yeah.

12   Q  "I need my house painted.  Do you know anyone I can

13      hire?  I need my house painted too."  And it looks

14      like it was at least shortly before September 21,

15      if not on September 21, right?

16   A  Right.

17   Q  If you look at page 2 it says November 8, a text

18      from Tevebaugh to you, "Painters on the way over to

19      work."  Do you see that?

20   A  Uh-huh.

21   Q  Okay.  When he texted you that day saying painters

22      on the way over to work, what prior knowledge did

23      you have that someone was going to paint your

24      house?

25   A  Well, normally if we were going to do something

Exhibit 1

```
 1      like that and Hoss was in the middle of a job he
 2      would say, hey, I've got painters or a gardener or
 3      whatever.  Do you need something done?  And he
 4      would say, I'll send them over when they're done.
 5      It was never really a planned out thing, and then
 6      they come over, and that's what happened with this
 7      painting thing was he said I got these painters
 8      that have been at the lodge.  Do you want them to
 9      paint your house?
10   Q  Okay.  So but prior to this painters on the way to
11      work, do you recall in the circumstance what other
12      notice you might have had that somebody was going
13      to come paint your house?
14   A  No.
15   Q  Was it a surprise to you when he texted you and
16      said painters are on the way over to work?
17   A  Well, that it was that particular day, but, no,
18      because that's kind of the way we worked, you know.
19   Q  Okay.
20   A  Or I would call him and say, hey, I got so and so,
21      and they need something done, and he would find
22      something for them to do.
23          MR. WILL:  Okay.  That's all I have.
24          MR. LOWREY:  I actually have a couple things
25      myself after.
```

Exhibit 1

```
 1          MR. McQUARY:  John, would you mind if we took
 2     a super quick break?  I didn't go to the men's room
 3     on my last break.
 4          MR. LOWREY:  Yeah.  Five minutes?
 5          MR. McQUARY:  I don't think it will take that
 6     long.
 7          MR. LOWREY:  Okay.
 8          (A brief recess was taken.)
 9  CROSS-EXAMINATION
10  BY MR. LOWREY:
11  Q  Ms. Lowery, I just have a few follow-on questions
12     from the matters raised by Mr. McQuary and
13     Mr. Will.  So first of all, there was the
14     discussion earlier about Taylor Williams at the
15     Voter Registration Board having complained to you
16     about harassment done by Mr. Tevebaugh?
17  A  Right.
18  Q  You said you hadn't reported that to HR.  Had
19     Ms. Williams asked you to report that to HR?
20  A  Right.
21  Q  Right, she asked you or asked you --
22  A  She asked me not to say anything right at the
23     moment.  If it happened again, then she was going
24     out there, or we will go up there together.
25  Q  And did she come to you again after that?
```

Exhibit 1

1    A   No.

2    Q   Okay.

3    A   I believe I said something to him about it.

4    Q   And then there were -- there was a discussion with

5        Mr. Will about Mr. Tevebaugh's performance issues

6        at the fairgrounds, and you stated that he didn't

7        like authority and didn't follow directions.  Did

8        you have the same problem with his work over at the

9        Voter Registration Board?

10   A   Oh, yeah.

11   Q   Were there any people in particular that he had

12       trouble working with there?

13   A   I would probably say women, really.

14   Q   Okay.  Did he have trouble working with the

15       Democrat people?

16   A   I don't think so.

17   Q   Okay.  And then there were -- there was also a

18       comment about his manner of speech being

19       inappropriate, using profanity, that sort of thing.

20       Did you run into those problems with his work at

21       the VRB as well?

22   A   Yes.

23           MR. LOWREY:  No further questions.

24           MR. WILL:  I do have one omitted if I can come

25       back over.

Exhibit 1

```
 1              MR. McQUARY:  Sure.
 2   RECROSS-EXAMINATION
 3   BY MR. WILL:
 4   Q  You talked about a check that you wrote to Maria
 5      Banuelos and was countersigned by --
 6   A  Susie.
 7   Q  Susie Day.  You signed that was countersigned by
 8      Susie Day.  Again, did you know Maria Banuelos?
 9   A  No.
10   Q  So who would have directed you to issue a payment
11      to Maria Banuelos?
12   A  Normally Hoss would have a folder full of invoices
13      and checks, and we go through and sign.
14              MR. WILL:  Okay.  That's it.
15   REDIRECT EXAMINATION
16   BY MR. McQUARY:
17   Q  Just very quickly.  Ms. Mowery, was a master's
18      degree in psychology required for the position of
19      groundskeeper?
20   A  I don't know.
21   Q  Okay.  Well, were you the one who hired Hoss at
22      that time?
23   A  No.
24   Q  All right.  How about a bachelor's degree?  Was
25      that required for --
```

<div align="center">Exhibit 1</div>

```
 1    A   Probably not.
 2    Q   Okay.  Now, Hoss worked for -- as -- Hoss was later
 3        promoted to executive director, is that correct?
 4    A   Uh-huh.
 5    Q   Did he actually have -- did he apply for that job?
 6    A   No.  We just talked about it and said we'd give him
 7        a try and that's --
 8    Q   Okay.  So he didn't resubmit a --
 9    A   No.
10    Q   -- an application form?
11    A   No, but he made it clear he wanted the job.
12    Q   Okay.  Did he submit a resume?
13    A   No.
14    Q   Okay.  Do you recall looking at his resume when the
15        decision was made to hire him for --
16    A   I'm not even sure I've ever seen his resume until
17        just recently.
18            MR. McQUARY:  Okay.  No further questions.
19            MR. WILL:  All right.  I have nothing on that.
20            MR. LOWREY:  I have nothing further.
21            MR. WILL:  We're done.
22            We're off, right?
23            (A discussion was held off the record.)
24            THE REPORTER:  Do you need a copy?
25            MR. WILL:  I will need a copy.
```

Exhibit 1

```
1              THE REPORTER:  E-Tran?

2         MR. WILL:  E-Tran is fine.

3         MR. LOWREY:  E-Tran as well, please.

4         MR. McQUARY:  Same for us, please.

5              AND FURTHER THE DEPONENT SAITH NOT.

6

7

8              _____
                    CYNTHIA LEA MOWERY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 1

```
 1   STATE OF INDIANA        )
                             )  SS:
 2   COUNTY OF JOHNSON       )
```

3           I, Gretchen Fox, RPR, a Notary Public in and

4   for the County of Johnson, State of Indiana at large,

5   do hereby certify that CYNTHIA LEA MOWERY, the

6   deponent herein, was by me first duly sworn to tell

7   the truth, the whole truth, and nothing but the truth

8   in above-captioned cause.

9           That the foregoing deposition was taken on

10  behalf of the Plaintiff at the offices of Circle City

11  Reporting, 135 North Pennsylvania, Suite 1720,

12  Indianapolis, Marion County, Indiana, on the 25th day

13  of January, 2024, pursuant to the Applicable Rules.

14          That said deposition was taken down in

15  stenograph notes and afterwards reduced to typewriting

16  under my direction, and that the typewritten

17  transcript is a true record of the testimony given by

18  said deponent; and thereafter presented to said

19  deponent for his/her signature;

20          That the parties were represented by their

21  aforementioned counsel;

22          I do further certify that I am a disinterested

23  person in this cause of action; that I am not a

24  relative or attorney of either party, or otherwise

25  interested in the event of this action, and am not in

Exhibit 1

1    the employ of the attorneys for either party.

2            IN WITNESS WHEREOF, I have hereunto set my

3    hand and affixed my notarial seal this _____ day of

4    _____, 2024.

5

6                        _____

7                                 Gretchen Fox

8    Commission Number 0661154

9    My Commission Expires:
10   January 25, 2031

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 1**

```
 1        (Originating Party)
          Jeffrey S. McQuary, Esq.
 2        TOMPKINS LAW
          608 East Market Street
 3        Indianapolis, IN  46202

 4                NOTICE OF DEPOSITION FILING

 5          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF INDIANA
 6                 INDIANAPOLIS DIVISION

 7
     JEREMIAH TEVEBAUGH,           )
 8                                 )
                Plaintiff,         )
 9                                 )
                -v-                ) CAUSE NO.
10                                 ) 1:23-CV-121-JMS-TAB
     INDIANAPOLIS-MARION COUNTY,   )
11   ACTING BY AND THROUGH ITS     )
     BOARD OF VOTER REGISTRATION,  )
12   THE MARION COUNTY             )
     AGRICULTURAL FAIR             )
13   ASSOCIATION, AND CINDY        )
     MOWERY,                       )
14                                 )
                Defendants.        )
15

16        In compliance with the Indiana Rules of
     Procedure, Federal Rules of Civil Procedure and/or the
17   Rules of the Industrial Board, you are notified that
     the signed original deposition of CYNTHIA LEA MOWERY,
18   taken on the 25th day of January, 2024, has been
     sealed and submitted to the originating party, along
19   with the attached Errata Sheet(s), if applicable.

20        _____
                (Date received by Circle City Reporting)
21

22

23                CIRCLE CITY REPORTING
                  135 North Pennsylvania
24                     Suite 1720
                  Indianapolis, IN  46204
25                   (317) 635-7857
```

Exhibit 1

JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL

CYNTHIA LEA MOWERY
January 25, 2024

**$**

**$1,500 (1)**
70:4
**$10,000 (1)**
84:3
**$100 (2)**
63:8;141:4
**$2,500 (3)**
75:7;158:17,22
**$250 (1)**
63:10
**$3,500 (1)**
66:24
**$500 (1)**
141:7
**$750 (1)**
69:23
**$7500 (1)**
157:16

**A**

**Aaron (1)**
15:15
**Abdul (5)**
29:3;39:12;83:9,
12;89:20
**Abdul-Hakim (5)**
20:13;29:2;43:5;
44:21;149:5
**ability (4)**
6:24;26:3;29:19;
58:7
**able (1)**
33:22
**above (1)**
144:21
**above-captioned (1)**
166:8
**absence (2)**
105:5;117:9
**absolutely (1)**
93:2
**abuse (1)**
81:13
**abusive (1)**
81:23
**accepted (1)**
52:11
**accepting (1)**
58:24
**access (6)**
73:11,20;116:21;
144:5;153:25;154:1
**accomplish (1)**
40:24
**according (2)**
22:23;63:7
**account (6)**
115:24;116:8,16;
157:17;158:12,16

**accurate (2)**
74:1;128:12
**accusation (2)**
99:20;128:17
**accusations (3)**
83:19;86:1;143:12
**accused (5)**
96:21,22,23;
125:24;126:5
**accusing (1)**
137:24
**across (2)**
32:12;132:18
**act (1)**
87:7
**ACTING (1)**
168:11
**action (4)**
130:18;138:8;
166:23,25
**actions (1)**
129:10
**activity (1)**
158:25
**actually (18)**
10:1;25:20;72:23;
73:9;124:1,8,22;
131:17;135:23;
136:19;137:13;
142:21;144:13;
152:18,18;159:5;
160:24;164:5
**added (1)**
144:23
**address (1)**
6:9
**addressed (2)**
119:25;143:13
**addressing (1)**
118:8
**admit (1)**
128:14
**Adriana (1)**
99:16
**advances (2)**
38:25;46:6
**advised (1)**
134:10
**advising (1)**
143:4
**affair (2)**
88:13,18
**affect (1)**
6:24
**affiliated (1)**
18:1
**affixed (1)**
167:3
**aforementioned (1)**
166:21
**afraid (1)**
126:3;137:25
**afternoon (2)**

152:25;153:1
**afterward (1)**
59:8
**afterwards (3)**
5:15;42:1;166:15
**again (13)**
32:16;36:24;40:9;
54:25;79:14;80:3;
95:19;98:5;126:2;
154:13;161:23,25;
163:8
**against (7)**
4:10;92:17;128:16;
132:23;136:12;
137:16;138:8
**Agency (8)**
10:16,20,21;17:5,
16;24:19;27:23,24
**agenda (1)**
43:4
**ago (5)**
4:7;11:19;25:20;
27:2;142:17
**agree (3)**
107:11;108:21;
143:16
**agreement (3)**
7:18;48:5,8
**agreements (1)**
110:11
**Agricultural (2)**
16:21;168:12.5
**ahead (10)**
28:16;29:13;43:21;
55:2,15;66:13;81:1;
96:8;121:8;150:24
**ain't (1)**
58:17
**Alexander (1)**
13:13
**alive (1)**
11:23
**allegation (1)**
99:1
**allow (1)**
96:5
**allowed (5)**
25:12;34:12;70:18;
101:3;126:6
**almost (3)**
65:7;81:11;84:11
**along (6)**
16:6;52:7;110:20;
132:3;154:15;
168:18.5
**Always (9)**
10:12;81:14;82:2,
4,4;112:13,14,16,25
**ambiguous (1)**
5:3
**amend (2)**
142:11,19
**amended (1)**

142:13
**American (6)**
9:7,8;68:2,11,24;
69:12
**among (4)**
17:7;21:17;45:15;
145:1
**amount (4)**
19:8,9;61:5;70:9
**amusement (1)**
68:25
**analyst (1)**
12:19
**analysts (1)**
12:20
**and/or (1)**
168:16.5
**Annee (19)**
16:5,19;59:10;
60:24;62:2;70:6;
75:14;80:19;84:1;
87:12,16;139:12;
140:2,15;141:13;
143:21,25;144:10,17
**Annee's (6)**
61:15;64:2;69:22;
74:5;142:15;154:18
**answered (3)**
11:16;80:25;89:5
**anymore (5)**
46:13;58:24;76:15;
81:8,9
**apart (1)**
84:20
**apologize (1)**
20:15
**apparently (1)**
74:7
**appear (1)**
67:7
**appears (1)**
148:19
**Applicable (2)**
166:13;168:19
**application (1)**
164:10
**applied (3)**
120:1;147:17,21
**applies (1)**
108:16
**apply (1)**
164:5
**appreciate (4)**
42:6;47:17;72:10;
90:14
**apprised (1)**
65:22
**approach (1)**
75:20
**approached (1)**
75:23
**appropriate (1)**
129:18

**approval (2)**
19:7;53:24
**approve (7)**
18:22;64:4;67:22;
80:20;95:13;100:22;
144:16
**approved (3)**
64:3;132:4,11
**area (1)**
29:18
**Arlington (1)**
50:25
**armpits (1)**
51:23
**arm's (1)**
71:11
**around (36)**
24:15;26:7;28:13;
29:21;40:15;42:17;
48:13;51:17;52:9;
57:16;64:12,15;
72:22;76:24;79:19,
20;82:12,12,18;83:4,
16,19;88:4;94:13,25;
107:18;117:20,22;
118:4;129:15;
136:22;140:4,4;
148:7,7;159:8
**arranged (2)**
111:20;112:9
**arrangement (1)**
157:2
**arrangements (1)**
110:15
**arrest (2)**
87:8;137:16
**arrested (2)**
7:14;87:4
**arson (1)**
137:24
**Ashley (18)**
52:24;53:4,10,15;
60:16,16;74:11;
77:11,15,17,17;84:1,
15,19;85:10;86:20;
120:10;134:21
**Ashley's (1)**
134:24
**aside (2)**
37:2;85:3
**assigned (2)**
37:16;38:9
**assist (1)**
94:7
**assistant (3)**
59:11;60:2;74:9
**associate's (1)**
8:14
**Association (2)**
16:22;168:13
**assume (2)**
18:6;24:21;119:8
**assumed (1)**

Exhibit 1

Case 1:23-cv-00121-MPB-TAB    Document 61-1    Filed 05/20/24    Page 170 of 226
PageID #: 1391
JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL
CYNTHIA LEA MOWERY
January 25, 2024

75:12

**assuming (1)**
112:5

**attached (2)**
41:1;168:19

**attempt (1)**
94:20

**attempted (1)**
116:20

**attempts (1)**
92:4

**attend (3)**
123:18;136:24;
137:2

**attention (1)**
53:9

**attorney (13)**
4:9;5:20;26:17,20;
44:14;72:9,20;73:23;
90:14;124:16;134:4;
142:25;166:24

**attorneys (5)**
7:3;60:4;98:11;
126:21;167:1

**attracted (1)**
57:9

**attraction (1)**
57:22

**Auditor's (2)**
11:4,7

**August (4)**
21:5;81:5;93:1;
136:14

**aunt (3)**
49:3,4,9

**aunts (1)**
124:3

**authority (6)**
54:13,18;95:15;
114:8;150:15;162:7

**auxiliary (1)**
16:23

**average (1)**
24:24

**aware (15)**
25:14;39:1,2;59:9;
64:5;66:7;90:2;92:9;
102:13;120:3;143:5,
5;147:14,20;158:10

**away (5)**
18:4;49:25;57:15;
82:25;126:12

**B**

**bachelor's (7)**
8:15,25;28:4,8;
123:18;148:18;
163:24

**back (29)**
9:25;14:2;21:4,12;
23:1;25:9;33:3;
37:18;38:7;48:20;

50:6,6;52:21;74:4,6;
76:21;79:7;81:4;
85:1,19;88:7;92:25;
100:20;101:12;
104:13;135:17;
151:24,25;162:25

**background (5)**
6:22;26:3;34:3,7;
147:22

**backpack (2)**
36:14;102:19

**backyard (1)**
65:6

**bad (4)**
34:22;41:7;48:11;
157:15

**bag (17)**
52:16;83:20,21;
84:1,4,7,9,15,17,17;
85:1,7,13,14,19,23,25

**bail (1)**
10:25

**ball (1)**
56:6

**bank (1)**
71:22

**Banuelos (14)**
64:14;65:14;112:9;
114:9,18;157:2,17;
158:11,15,20,22;
163:5,8,11

**Banueloses (7)**
66:5,8,20;67:3;
107:15,16;114:1

**barbecue (1)**
49:15

**barn (1)**
48:14

**barns (2)**
48:6,13

**basic (1)**
6:22

**basis (1)**
140:25

**bath (2)**
48:2,10

**bathroom (3)**
5:18;52:19;107:20

**batteries (1)**
9:15

**Beat (1)**
81:10

**beaten (1)**
81:9

**became (6)**
20:1;78:11;80:10,
15;119:6;143:4

**become (6)**
10:5;18:1;23:22;
78:20;89:21;102:13

**begin (1)**
5:5

**beginning (2)**

20:18;55:4

**behalf (1)**
166:10

**behavior (5)**
78:19;79:10;80:2;
86:8;129:11

**behind (2)**
48:3;77:21

**believes (3)**
46:9;115:23;
121:19

**below (4)**
116:1;134:2;135:9,
19

**benefit (2)**
36:1,3

**benefits (3)**
52:23;53:1,2

**besides (1)**
99:11

**best (11)**
5:11;30:10,17;
31:13,20;32:16;
34:16;40:21;58:6;
64:23;154:2

**better (1)**
6:6

**bids (1)**
41:24

**big (12)**
49:15;51:22;56:24;
57:22;69:2;77:8;
78:13;97:4,17,20;
108:7;152:3

**Bill (1)**
18:2

**billboard (1)**
60:3

**binder (1)**
73:14

**birth (1)**
6:7

**bit (6)**
6:21;33:3;94:18;
108:11;116:1;125:12

**black (1)**
131:9

**Board (99)**
6:20;13:24;17:1;
18:5,17,19,21,24;
19:6,7,11,14,19,23,
25;20:4,16,25;21:4,
17;24:6,9;29:3;
31:18,21;32:5,6;
33:7;38:23;39:2;
41:10,14;43:1,3,6;
44:19,20,21,24;
45:15;53:19;64:3,4;
67:15,20,22;69:7;
71:24,25;72:5,12,24;
73:4,8;75:3,4;80:20,
21,24;82:13;89:24,
25;90:21,25;91:4;

92:12,25;95:7;
112:19;113:24;
117:21,23,25;118:16;
125:23;126:9;
127:11;129:24;
131:4,7;132:4;134:4;
143:3,8;144:2,16;
145:6,11,14,18,19,21,
21;150:23;154:17;
161:15;162:9;
168:11.5,17

**board's (1)**
18:23

**boatload (2)**
123:4,6

**bold (1)**
116:2

**bombs (1)**
151:14

**bonus (6)**
74:25;75:2,4,6;
80:20;144:16

**book (3)**
50:13,15;73:13

**books (1)**
54:9

**boss (4)**
33:10,12;133:3;
150:17

**both (3)**
14:4;112:9;155:23

**bottom (2)**
98:18;124:16

**bought (4)**
52:3,4,13,15

**boy (1)**
87:24

**brain (1)**
55:6

**brand (1)**
31:2

**break (9)**
5:16,21,23;38:20;
42:1;105:14,15;
161:2,3

**breaks (1)**
37:13

**Brezeke (1)**
13:11

**Brian (7)**
16:4,15;70:4,6;
139:13,14;140:2

**brief (5)**
38:21;80:24;86:5;
146:2;161:8

**bring (6)**
70:8;83:25;91:13;
100:20;101:7,12

**bringing (2)**
53:8;113:4

**brings (2)**
18:8;85:19

**broad (1)**

150:9

**brother (4)**
31:2;50:2,3;79:6

**brought (8)**
4:10;19:3;37:18;
43:11;72:2;91:12;
97:14;110:24

**brown (15)**
83:20,21;84:1,4,7,
9,15,16,17;85:1,7,13,
14,23,25

**Budget (4)**
11:6,13;18:22;
151:1

**built (3)**
21:9,10;62:7

**bullying (1)**
144:25

**bunch (1)**
54:3

**Burgos (1)**
99:17

**burn (4)**
86:13,15;134:12;
137:17

**burned (3)**
86:18,23;138:6

**burns (1)**
134:10

**burnt (1)**
78:3

**Burrows (1)**
99:16

**business (4)**
8:15,16;17:20;19:5

**busy (1)**
34:1

**buy (4)**
41:22;51:8,10,12

**C**

**calendar (3)**
44:7,10;46:17

**call (11)**
21:11;33:21;65:2;
69:13;76:4,17;95:25;
110:3,4;133:4;
160:20

**called (11)**
18:5;42:15;63:7;
73:10;76:12;83:24;
84:5;92:12,13;133:2;
134:11

**calling (3)**
22:24,24;84:22

**Calls (5)**
22:17;55:13;76:3;
114:20;116:23

**came (23)**
9:24;23:5;31:1;
32:12;37:20;67:10;
81:4;88:7;91:23;

Exhibit 1

95:6,23;101:17;
111:18;116:18;
120:11;124:7,16;
140:9;142:25;146:4;
147:17,21;148:16
**campaign (9)**
15:1;61:15,19;
62:1;69:22;141:24,
25;142:9,15
**campaigns (3)**
15:4;140:15;
141:13
**campgrounds (2)**
70:19,23
**can (90)**
6:23;13:20;15:6;
16:2;17:23;19:6,22;
22:19,20;23:1;28:17,
22,25;29:22;33:23;
36:2;37:8,12;43:20,
24;50:9;52:8;53:1;
55:1,2,3,4,14;57:15,
15;58:2;63:1;64:13,
16;66:1,12,12;69:12;
72:5,8,13,18;77:8;
79:14;81:25;82:8,19;
83:3;86:3;88:17,22,
25;89:6,9;90:15;
96:8;98:11,17;
101:20;103:6;
109:11;110:8;
113:12;114:21;
115:3,5,7,18;116:25;
118:7;121:1,5,9;
125:9;127:3;130:12,
14;133:22,25;141:10,
18;142:1;145:9;
149:4;150:13;
151:11,22;152:10;
159:12;162:24
**cancer (1)**
29:16
**candidate (1)**
15:2
**candidates (2)**
88:14,15
**capacitors (1)**
9:15
**capacity (4)**
59:14;60:25;61:5;
74:13
**capture (1)**
118:1
**car (1)**
52:21
**care (4)**
52:3;97:9;112:16;
151:15
**cared (1)**
129:14
**career (1)**
24:18
**carefully (1)**

78:22
**carnival (2)**
68:3;69:17
**carnivals (1)**
68:25
**case (7)**
4:16;59:4;60:7,8;
101:7;138:6;158:10
**cases (2)**
123:4;154:13
**Cash (29)**
33:8;63:8,10,13,16,
19;66:22,23;84:4;
95:11;103:22;104:5;
109:25,25;110:25;
111:9;112:5;113:4;
140:9,12,19,22;
141:2,4,8,12,23;
156:12,12
**cater (1)**
62:15
**caterer (9)**
139:1,10;140:1,3,6,
7,13;141:6,14
**catering (1)**
62:23
**caught (1)**
102:2
**cause (4)**
56:4;166:8,23;
168:9.5
**caused (1)**
118:14
**causes (1)**
69:19
**ceased (2)**
89:4,8
**celebrated (1)**
8:23
**center (1)**
21:9
**Central (1)**
8:4
**certain (3)**
19:8;93:2;149:1
**certify (2)**
166:5,22
**chain (1)**
12:10
**Chair (4)**
12:7;14:21,21,22
**chairman (3)**
14:15,16;69:7
**chance (5)**
39:14,16;42:13,20;
68:17
**change (1)**
35:3
**changes (1)**
35:5
**characterization (1)**
23:11
**characters (1)**

13:13
**charge (7)**
35:3;70:12;72:3,7;
119:14;150:20;151:7
**charged (4)**
71:16;72:1;87:4,10
**charges (2)**
137:15,16
**charity (1)**
17:20
**check (30)**
34:4,7;66:9,15;
98:17;109:18;110:1,
2,3;111:13,16;112:7,
22;113:6,19,21,23;
114:3,17;147:22;
157:8,16,19,21;
158:6,17,18,20,24;
163:4
**checking (1)**
44:7
**checks (13)**
26:3;60:10,11,11;
114:24,25;115:3;
157:12,24;158:3,11,
14;163:13
**Chicago (1)**
29:17
**chief (4)**
18:15;37:18;38:11;
96:1
**children (1)**
44:16
**choose (1)**
21:14
**chose (2)**
54:19;98:20
**Cindy (6)**
31:18;84:22;85:16;
112:21;149:23;
168:13
**Circle (3)**
166:10;168:20.5,
23
**circumstance (1)**
160:11
**citizen (1)**
70:16
**City (22)**
4:10;16:9;29:9;
50:24;59:18;93:8,12,
17;94:19;102:6;
116:19;125:3;127:8,
14;128:19;142:4;
147:17,22,23;166:10;
168:20.5,23
**civil (2)**
4:16;168:16.5
**claim (2)**
128:16,16
**claims (3)**
44:15;125:18;
136:3

**clarification (2)**
30:21;139:20
**clarify (3)**
53:10;61:3;109:9
**class (1)**
99:22
**clean (2)**
124:7;148:17
**cleaned (2)**
79:24,24
**clear (6)**
17:3;58:9;127:7;
147:3;155:23;164:11
**clerical (1)**
59:14
**Clerks (2)**
12:17,19
**client (2)**
115:23;145:25
**close (3)**
18:2,3;41:17
**closest (1)**
79:3
**closet (1)**
52:18
**closing (1)**
145:25
**clothes (1)**
51:8
**Club (2)**
16:7;142:20
**codirector (4)**
11:24;12:12;19:16;
36:12
**Coke (2)**
47:8,9
**Coliseum (1)**
57:21
**collected (1)**
140:19
**collecting (1)**
84:13
**color (2)**
66:3,3
**comfortable (1)**
133:16
**comical (1)**
81:11
**coming (7)**
49:14,15;67:6;
71:22;76:21;85:11;
110:5
**command (1)**
12:10
**comment (4)**
57:9;98:18;157:6;
162:18
**commented (1)**
153:8
**comments (1)**
143:14
**Commission (4)**
61:23;142:10;

167:8,9
**commissioners (1)**
10:25
**committee (4)**
61:16,19;131:6,6
**committeeman (2)**
14:17,18
**communicate (2)**
99:21;100:4
**community (1)**
18:12
**companies (1)**
49:8
**company (4)**
68:11;69:2,10;88:5
**compensate (2)**
111:2;140:16
**compensation (1)**
25:11
**competent (1)**
121:11
**complain (2)**
38:22;59:6
**Complainant (2)**
137:20
**complained (3)**
39:2;146:5;161:15
**complaining (3)**
45:13;100:24;
151:20
**complaint (1)**
146:16
**complaints (2)**
150:8;151:8
**completely (1)**
111:20
**compliance (1)**
168:16
**complicated (1)**
13:18
**computer (1)**
73:13
**concern (1)**
141:24
**concerned (3)**
31:5,8;88:24
**concessionaires (2)**
19:2;84:2
**concessions (1)**
69:1
**conditional (1)**
10:24
**conduct (3)**
45:6,8,9
**confer (1)**
145:25
**confided (1)**
31:14
**confident (1)**
73:25
**confirm (1)**
57:8
**confirmed (1)**

Exhibit 1

Case 1:23-cv-00121-MPB-TAB     Document 61-1     Filed 05/20/24     Page 172 of 226
PageID #: 1393

JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL

CYNTHIA LEA MOWERY
January 25, 2024

86:21
confrontation (1)
  83:10
confused (1)
  74:21
congress (1)
  16:12
Congressman (1)
  119:1
consequence (1)
  54:17
consider (3)
  95:25;120:20;
  145:14
considered (1)
  79:2
Constable (4)
  135:3,25;136:8,11
constable's (1)
  136:2
consult (1)
  5:19
consulting (1)
  44:10
contact (1)
  137:23
contacted (2)
  96:1;137:21
contained (1)
  134:4
contention (1)
  110:6
context (1)
  54:25
continue (1)
  92:22
contrary (2)
  28:2;93:19
contributed (1)
  69:21
contribution (3)
  70:2;141:14;142:9
contributions (1)
  15:18
control (1)
  127:14
convenience (1)
  136:9
convention (1)
  14:20
conventions (1)
  17:12
conversation (8)
  5:2;27:18;39:7;
  98:1,3,4;123:11;
  153:13
conversations (8)
  36:18,20;42:14;
  46:14;57:11;82:1;
  91:5;118:19
convicted (1)
  7:16
conviction (1)

154:12
convictions (4)
  25:15,22;26:7;
  123:15
copy (3)
  73:22;164:24,25
corporation (1)
  142:2
correctly (1)
  12:4
correspondence (1)
  20:13
couch (2)
  55:5;152:19
council (7)
  16:9;46:17;59:19;
  93:8,12,18;134:3
Councilor (2)
  18:2,4
counsel (5)
  131:15,15;147:4;
  148:16;166:21
counselor (1)
  93:22
counter (1)
  33:25
counterpart (3)
  26:13;27:2,3
countersigned (3)
  158:21;163:5,7
counting (1)
  95:9
County (25)
  4:11;6:17,18,19;
  10:9,13;12:7;14:15,
  23,24;16:21,25;17:1,
  4,7,9,9;25:25;29:9;
  30:5;166:2,4,12;
  168:10.5,12
couple (8)
  15:6;32:11;52:15;
  67:1;71:8,21;99:23;
  160:24
course (2)
  96:19;100:21
court (9)
  4:21;44:15;68:18;
  80:8;117:15;132:16;
  133:17;136:3;168:5
cover (2)
  38:17;65:5
covered (3)
  23:4;100:20;
  108:11
covet (1)
  24:15
COVID (1)
  50:20
COVID-19 (1)
  100:3
Cox (5)
  54:5;76:18;77:14;
  79:18,20;80:11

crazy (4)
  31:18,22;78:2;
  154:13
crime (1)
  7:21
criminal (6)
  26:1,2;27:15;34:3,
  22;147:15
criminally (1)
  87:10
criticisms (1)
  143:17
criticizing (2)
  89:25;90:1
crossed (1)
  83:17
CROSS-EXAMINATION (2)
  146:23;161:9
current (1)
  93:22
currently (4)
  14:22;19:9;20:8;
  44:14
custody (1)
  73:6
cut (2)
  51:22;111:17
CYNTHIA (3)
  4:1;6:4;165:8;
  166:5;168:17.5

D

da (3)
  100:23,23,24
dad (1)
  49:1
damn (1)
  85:7
Danny (9)
  68:1,17;69:5,18,
  21;73:2;79:22;84:12,
  25
Danny's (1)
  68:15
date (13)
  6:7;47:21;88:25;
  108:10,16,23;109:4;
  118:5;138:24;144:3;
  148:24;149:1;
  168:20.5
dated (2)
  108:9;118:3
dates (2)
  8:21;80:23
David (7)
  135:3,23;136:11;
  137:14,15,23;138:3
day (46)
  13:4,4;20:21;
  30:11;33:20,20;34:1;
  36:10;45:20;48:8,11;
  53:17;57:21;76:10,

12;77:7,18,20;81:2;
  83:13;91:24;92:14,
  15;100:12,17,18;
  101:2,3,12;103:25;
  104:13;107:13;
  118:1;125:9;127:5;
  149:24;155:2;
  158:19,21;159:21;
  160:17;163:7,8;
  166:12;167:3;168:18
days (1)
  59:25
deal (6)
  76:5;111:15,17,18;
  122:7;144:25
dealt (1)
  151:20
death (1)
  77:3
Decatur (1)
  44:15
December (1)
  138:25
decided (4)
  48:25;72:24;
  120:21;121:10
deciding (1)
  71:15
decision (3)
  71:24;72:18;
  164:15
Defendants (1)
  168:14.5
degree (18)
  8:11,13,14,15,16,
  18,25;28:8,8,9;123:19,
  19;124:9;148:14,17,
  18,20;163:18,24
degrees (2)
  8:21;28:4
delayed (1)
  136:12
delegate (2)
  14:19,20
deleted (1)
  59:4
Democrat (2)
  12:23;162:15
Democratic (5)
  12:12;13:10,12;
  27:8;36:12
democrats (2)
  12:25;13:2
denied (2)
  100:25;116:22
department (3)
  78:23;135:10,19
depict (1)
  138:17
depicts (1)
  139:24
DEPONENT (4)
  165:5;166:6,18,19

deposed (1)
  4:14
deposition (9)
  4:13;7:2,7;28:12;
  106:2;166:9,14;
  168:4,17.5
Deputy (9)
  12:16;13:6,8,10;
  33:7;37:19;38:11;
  95:11;96:2
describe (2)
  40:23;129:10
described (2)
  23:9;98:6
describes (2)
  129:21;130:15
describing (1)
  20:13
description (8)
  54:12;131:1,2,19,
  19,25;134:2,9
descriptions (1)
  133:2
desk (1)
  54:7
destination (1)
  50:21
destroys (1)
  76:2
detail (2)
  4:20;130:10
details (2)
  115:7;130:11
detergent (1)
  46:19
determines (4)
  18:24,25;19:1,1
diamond (1)
  56:6
dies (2)
  49:3,5
different (1)
  150:25
difficult (1)
  5:2
Dilk (1)
  110:4
dinner (1)
  124:3
DIRECT (2)
  4:5;133:3
directed (1)
  163:10
direction (2)
  150:16;166:16
directions (1)
  162:7
directly (1)
  113:5
Director (24)
  6:19;13:5,6,8,10,
  12;21:18;23:23;24:4,
  16,20,25;25:8;26:8;

Exhibit 1

JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL

CYNTHIA LEA MOWERY
January 25, 2024

27:8;28:14;30:3;
60:15,25;63:20;
75:15;95:12;131:1;
164:3
**directors (1)**
131:4
**disagree (5)**
20:14;23:10,13;
26:9;28:14
**disapprove (1)**
145:22
**disciplinary (1)**
130:17
**discipline (6)**
35:12,17;36:7,9;
98:20;120:1
**disclosures (1)**
61:22
**discovery (4)**
72:13;73:9;98:11;
124:17
**discuss (5)**
39:11;55:24;
113:15,16;118:8
**discussed (5)**
43:4;72:23;119:21;
120:7;131:3
**discussion (7)**
26:12;27:3,14;
107:11;161:14;
162:4;164:23
**disinterested (1)**
166:22
**dismiss (1)**
137:10
**dispute (4)**
103:4;116:16;
140:23;141:9
**disputing (1)**
140:25
**district (3)**
94:5;168:5,5.5
**DIVISION (1)**
168:6
**doctor (2)**
29:17,18
**document (17)**
36:20;38:14;41:1;
42:8;45:24;59:3;
104:7;106:18;
126:17;127:10;
129:22;130:14;
132:5;138:17;145:8;
148:4;151:1
**documentation (1)**
119:21
**documented (6)**
45:19;76:8;79:10;
80:3,10;92:4
**documents (7)**
7:6;32:9;40:23;
41:6;60:9;105:13;
106:4

**dog (3)**
65:7,7;78:6
**dollar (5)**
19:8,9;71:2;
138:25,25
**dollars (1)**
67:1
**donate (1)**
142:1
**donation (4)**
46:18;70:5;141:24;
142:1
**donations (1)**
61:20
**done (49)**
12:3;15:21,23,24;
16:1,5,7;26:16,23;
30:16;33:19,24;35:7;
40:11,11,13;41:12,
15;45:12;50:5;56:3,
7;57:15,21;64:6;
65:2,3,4;71:8;78:1,1;
88:2,25;89:2;95:9;
109:13;112:10,10,15,
17;119:15;120:15,
17;151:5;160:3,4,21;
161:16;164:21
**donor (1)**
69:18
**door (3)**
36:14;77:21;
107:19
**doors (2)**
152:6,6
**dot (3)**
54:22,23,23
**double (1)**
98:17
**doubt (2)**
140:9,11
**Dowden (2)**
18:2,4
**down (23)**
4:21;21:9;23:5;
32:18;38:11;44:8;
54:2;64:24;71:20;
78:3;81:9,10;86:13,
16,18,24;98:7;133:1;
134:10;137:17;
138:6;159:11;166:14
**draw (1)**
152:3
**drawn (2)**
66:9;67:23
**drink (1)**
5:19
**drive (3)**
49:25;50:18;51:4
**drop (1)**
50:1
**duly (2)**
4:2;166:6
**Duracell (2)**

9:15,23
**during (4)**
45:23;82:7;155:10,
17
**duties (6)**
11:24;21:17;33:15;
60:2,13;131:21
**duty (2)**
61:22;102:4

**E**

**earlier (6)**
43:18;117:21;
143:19,20;146:3;
161:14
**earn (1)**
142:7
**earring (1)**
56:3
**easier (1)**
36:4
**East (1)**
168:2.5
**edge (1)**
83:12
**edit (3)**
45:21,22;129:19
**edited (2)**
46:1,2
**either (4)**
14:3;51:11;166:24;
167:1
**elaborating (1)**
37:17
**elected (3)**
20:3;135:25;136:7
**election (4)**
33:25;61:23;
141:14;142:10
**elective (1)**
13:21
**eligible (1)**
26:21
**Elliott (1)**
22:4
**else (17)**
15:12;17:21;43:13;
46:14;49:19;54:1,6;
62:11,11;71:17;75:2;
87:6;92:7;99:13;
101:1;122:6;137:25
**Elsener (3)**
133:5,6,14
**else's (2)**
22:18;91:21
**e-mail (18)**
37:9,9;38:15;
40:25;42:3;46:11;
47:12;76:9;78:24;
81:25;89:25;90:7;
100:5;113:14;
115:23;131:14,15;

154:16
**E-mails (5)**
7:8,9;36:23;40:22;
134:3
**embarrassing (1)**
119:1
**emoji (2)**
48:21;152:16
**employ (1)**
167:1
**employed (8)**
6:12,14,15;10:5;
32:15;60:24;89:4,8
**employee (9)**
32:2;38:8,16;
49:10;59:12;61:4;
78:20;123:12;146:4
**employees (11)**
12:14,24;24:10;
35:2;37:1,12;38:1;
65:17;78:10;101:3;
130:6
**employer (1)**
134:3
**employment (2)**
74:6;145:4
**encouraged (1)**
93:17
**end (3)**
21:11,13;142:6
**ended (1)**
89:8
**enemy (2)**
79:5;91:17
**English (1)**
4:25
**enjoyed (1)**
90:9
**enough (6)**
16:2;24:23;42:18;
81:13;87:5;105:18
**enraged (1)**
119:6
**entail (1)**
61:18
**enter (1)**
33:17
**entered (1)**
7:18
**entertainment (2)**
68:24;69:12
**entire (2)**
134:12;155:14
**equal (1)**
12:23
**equipment (2)**
4:23;70:9
**Errata (1)**
168:19
**especially (1)**
30:15
**Esq (1)**
168:1.5

**essentially (2)**
75:14;137:24
**established (1)**
147:13
**estimate (2)**
156:5,9
**E-Tran (3)**
165:1,2,3
**evaluation (1)**
32:10
**evaluations (1)**
35:1
**even (20)**
4:25;5:6;56:10,12;
62:14;75:20;79:13;
82:6,7;85:20;87:23;
96:11;105:22;
111:18;115:9;124:2;
126:15;140:5;152:7;
164:16
**evening (2)**
46:17;117:24
**event (13)**
21:9;30:13;57:19;
62:15,19;68:9,10,15;
139:11,16,21,24;
166:25
**events (1)**
21:12
**Everybody (5)**
33:21;100:25;
101:13;137:25;140:5
**Everyone (2)**
71:17;83:24
**everywhere (2)**
56:10,11
**evidence (2)**
30:24;145:3
**exact (1)**
155:16
**exactly (4)**
34:23;39:14;51:19;
111:5
**exaggerating (1)**
31:10
**EXAMINATION (2)**
4:5;163:15
**examples (2)**
15:7;152:10
**Excuse (9)**
13:9;20:16;59:20;
96:20;115:15;123:8;
132:25;143:19;
144:20
**executive (17)**
21:18;23:22;24:4,
16,20,25;25:8;26:8;
28:14;30:2;60:14,25;
63:20;75:15;131:1,6;
164:3
**exempt (1)**
48:17
**exempted (1)**

Exhibit 1

Case 1:23-cv-00121-MPB-TAB    Document 61-1    Filed 05/20/24    Page 174 of 226
PageID #: 1395
JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL
CYNTHIA LEA MOWERY
January 25, 2024

72:15

**Exhibit (57)**
106:6,7,8,20,21,25;
107:4,6;113:11,13;
115:12,13,21;117:14,
16,17,19;121:12,13;
122:17,19,21,24;
124:11,13,14,19,21;
128:21,22,24;129:1;
130:19,22,23,25;
132:13,14,21;135:13,
16;137:14;138:12,13,
15;142:22,23;143:2;
147:6,6,7,13;148:3,
22;154:7,9;159:5

**exhibits (1)**
147:10

**expect (2)**
34:2;111:9;138:3

**expectations (1)**
123:12

**expenditures (2)**
18:22;61:21

**Expires (1)**
167:9

**explain (3)**
150:14;151:11,22

**explained (1)**
28:12

**explanation (1)**
105:4

**expunged (4)**
26:25;27:16;123:3;
148:2

**expungement (4)**
26:15,21;123:1;
147:11

**expungements (1)**
27:13

**extend (1)**
83:5

**extended (2)**
22:23;100:11

**extent (5)**
22:20;55:1,14;
66:12;133:23

**extreme (1)**
77:2

**F**

**face (4)**
48:20,21;151:17;
152:15

**Facebook (7)**
49:11;55:20;57:3,
3;119:3;153:9,23

**fact (11)**
26:25;32:11;34:19;
37:16;62:18;63:3,21;
120:9;122:9;147:5,5

**Fair (83)**
16:21,24,25;17:1,4,

16;18:5,16;20:16,17;
21:21;25:25;27:25;
30:11;36:18;38:23;
44:5;45:17;47:11;
51:17,20;55:4;59:23;
60:24;61:24;65:2;
68:16;70:8;71:20;
72:22;73:2;74:13;
76:5,21;79:25;80:1,
14;81:3,16;82:6,12,
14,15,19;83:5;88:11,
14;89:14;95:1,4,4,6;
107:1;108:20;110:2;
112:6;113:22,24;
117:11,23;118:8,18,
21;119:14;120:15;
125:23;126:19;
127:11,12;131:4;
134:4;150:10;
151:12;152:21,24;
154:18,25;155:11,14,
14,18;158:25;
168:12.5

**fairground (1)**
64:1

**Fairgrounds (50)**
4:11;17:19;18:24;
19:5;28:20;44:19;
47:20;57:18;59:13;
62:24;63:4;65:16;
66:10,15;67:23;
69:16;70:10,12,19,
23;74:6;77:7;78:18,
19;87:13;89:4;
110:20;111:2,22;
112:10,18,24,25;
114:3,17;118:25;
119:11;134:13;
140:16,17,18,22;
141:22;142:1;
150:25;157:8,17;
158:12,15;162:6

**fairs (3)**
17:7,9,15

**fair's (1)**
23:6

**fall (3)**
74:5,10,17

**false (2)**
134:4,5

**familiar (5)**
4:18;16:2;65:14;
89:3;116:11

**family (11)**
32:21;49:2,3,11;
50:2;52:1,6;54:5;
77:5;123:24;151:12

**fan (5)**
67:8,9,10,12,16

**fans (1)**
107:19

**far (4)**
17:11;61:20;75:5;

120:16

**farm (1)**
23:2

**fault (1)**
119:10

**favorable (1)**
71:5

**fearful (1)**
136:16

**February (4)**
147:14;148:7,7,19

**Federal (1)**
168:16.5

**feel (4)**
5:16;31:1;38:24;
145:2

**fellow (1)**
20:4

**felonies (2)**
124:6,7

**felony (4)**
25:15,22;26:6;
123:14

**felt (2)**
77:15;133:16

**female (1)**
146:4

**Ferris (1)**
68:25

**few (6)**
17:12;27:2;80:18;
93:3;146:25;161:11

**field (1)**
57:20

**figure (1)**
84:25

**figured (1)**
111:14

**file (9)**
102:11;105:2;
125:1;126:20;
128:15;135:8;136:5;
137:15;138:4

**filed (2)**
125:18;137:16

**files (2)**
60:13;126:19

**filing (2)**
133:17;168:4

**fill (1)**
61:22

**final (5)**
35:21;45:24;46:3;
118:6;120:14

**finally (3)**
22:25;51:21;91:18

**financial (2)**
11:13;141:15

**financially (1)**
71:4

**find (9)**
72:8;79:15;84:8,9,
21,23;85:14;92:11;

160:21

**fine (5)**
82:18;85:5;105:19,
20;165:2

**finish (5)**
5:10,11;28:6

**finished (3)**
5:5;9:24;145:24

**finishing (1)**
109:15

**fire (14)**
18:15;28:23,24;
32:23;91:1,15,22,24,
25;92:4;96:5;120:22;
130:5;145:6

**fired (12)**
28:19;32:11;83:18;
87:12;88:10;91:10,
23;92:24;104:8;
116:21;122:5,8

**firing (1)**
90:23

**first (25)**
4:2;18:1;21:24;
24:21;30:15;35:19;
77:10;86:8;102:8;
103:18;106:22;
108:14;113:12,12;
114:4;116:12,13;
118:6;125:8;134:8;
136:10;143:10;
151:12;161:13;166:6

**fits (1)**
75:25

**five (7)**
9:19;12:15;37:19;
56:18;59:25;86:3;
161:4

**fix (1)**
76:2

**fixed (1)**
119:19

**flight (1)**
50:15

**flood (1)**
101:8

**Florida (1)**
31:3

**folder (1)**
163:12

**follow (2)**
127:3;162:7

**followed (1)**
100:9

**follow-on (1)**
161:11

**follows (1)**
4:4

**follow-up (2)**
153:22;154:24

**food (1)**
69:1

**forced (1)**

51:22

**foregoing (1)**
166:9

**forget (1)**
19:10

**forgive (2)**
80:19;144:15

**forgot (1)**
20:15

**form (23)**
17:22;28:16,21,25;
43:20,23;54:24;
62:25;64:16;66:11;
78:22;88:16,21;96:7;
101:20;103:6;
112:12;120:25;
121:5;133:21;
141:10,16;164:10

**formal (1)**
78:24

**forms (1)**
141:15

**for-profit (1)**
17:19

**found (7)**
49:10,11;92:5;
128:10;147:25;
148:21;152:7

**four (5)**
8:14;15:22;53:21;
56:17;136:17

**Fox (2)**
166:3;167:6.5

**Frank (1)**
83:13

**Franklin (5)**
6:10;8:4;13:24,25;
14:7

**frankly (2)**
30:25;78:10

**free (5)**
5:17;70:19;123:21,
22,23

**Freeman (3)**
15:15;27:6,15

**frequent (1)**
69:18

**Friday (2)**
109:4,6

**friend (4)**
18:2,3;52:23,25

**friends (17)**
30:10,17;31:13,20;
32:17;34:16;40:10;
45:14,15;53:2;64:23;
78:16;79:3;82:5;
124:4;153:23;154:3

**friendship (1)**
46:15

**front (2)**
21:11;54:7

**frozen (2)**
47:8,9

Exhibit 1

**full (7)**
6:2;53:14;59:23;
84:4;85:20,20;
163:12
**full-time (5)**
59:16,21;61:4;
65:20;74:8
**fully (1)**
120:3
**fun (3)**
39:15;42:21;
129:16
**function (1)**
136:2
**functioning (1)**
75:14
**functions (2)**
94:8,12
**fund (4)**
63:19;69:22;
140:22;141:23
**funded (2)**
17:13;142:4
**fundraiser (8)**
15:17;62:6;63:4,
23;64:2;70:3;139:11;
140:1
**fundraisers (1)**
62:1
**funds (7)**
62:24;63:5;64:1,1;
66:10;67:23;141:8
**furniture (1)**
108:5
**further (7)**
126:3;146:21;
162:23;164:18,20;
165:5;166:22

## G

**garage (3)**
67:17;152:6,6
**gardener (1)**
160:2
**gas (1)**
52:8
**Gator (2)**
83:12;84:13
**gave (18)**
66:22,23;67:12,16;
71:2;85:20;91:25;
109:25;112:5;125:2,
5,25;127:7;135:5;
144:1;156:11,12,20
**Gees (1)**
52:24
**general (2)**
60:13;109:24
**generally (1)**
19:4
**genitalia (1)**
53:6

**gestures (1)**
5:3
**getaway (1)**
50:11
**gift (1)**
52:12
**girl (7)**
37:18;53:11,18,20,
21;88:5;127:15
**girlfriends (1)**
129:14
**given (11)**
45:19;96:1;105:7;
125:16,19;129:5,8,
20,22;158:21;166:17
**giving (2)**
67:1;145:12
**Gmail (2)**
115:25;116:1
**goal (2)**
51:18;52:2
**God (2)**
56:8;142:18
**goes (3)**
37:20;52:18;97:7
**Goins (3)**
29:2,6;84:6
**good (11)**
4:22;24:22;30:6;
34:9;40:10;44:16;
46:23;52:17;120:16;
121:10;123:23
**GOP (2)**
94:8;142:20
**government (4)**
17:4,10,13;142:3
**governor (1)**
15:13
**graduate (4)**
8:5;123:22;124:1,8
**graduation (1)**
8:7
**grapes (1)**
42:19
**grass (2)**
24:12;120:12
**Great (2)**
106:1;147:12
**Greater (1)**
16:6
**Gretchen (2)**
166:3;167:6,5
**ground (1)**
134:13
**grounds (2)**
119:4,15
**groundskeeper (10)**
21:10,13;22:22;
23:6,20;24:22;61:9,
10;87:16;163:19
**group (4)**
16:23;41:23,23;
83:9

**groups (2)**
16:6,8
**grow (1)**
7:23
**guess (11)**
27:17;50:25;53:5;
54:11;67:13;69:15;
70:17;116:17;134:7;
153:21;154:24
**guilty (3)**
7:21;39:20;58:15
**guy (5)**
24:2,12;56:6;
57:13;79:6
**guys (8)**
56:4,13,17,25;
85:12;98:12;108:7;
154:10

## H

**half (5)**
71:2;85:20,20;
103:15;107:24
**halfway (1)**
133:1
**hand (6)**
5:3;79:1;81:14;
111:7;117:15;167:3
**handed (5)**
106:23;111:5;
122:18;124:12;
128:22
**handful (1)**
98:9
**handyman (3)**
107:8,10,12
**hang (3)**
52:18;65:5;107:19
**hanging (1)**
108:4
**happen (4)**
10:8;23:25;29:11;
58:4
**happened (15)**
18:16;33:1;58:3;
85:19,24;89:17;
94:23;95:17;104:2,
14,17,17;113:9;
160:6;161:23
**happening (1)**
31:17
**happens (1)**
29:25
**happy (2)**
46:15;142:19
**harassed (11)**
43:14;58:21,22;
96:25;99:1;127:11;
149:11,16,20,23;
150:2
**harassing (9)**
39:21,24;40:1;

43:9;58:25;128:8,8;
146:5;149:9
**harassment (23)**
39:18,20;40:4;
52:24;57:25;58:11,
12,15,16;59:7;81:12;
82:9;96:21,23;99:22;
125:18,24,25;126:5;
127:21;128:2;
129:12;161:16
**Hargraves (3)**
57:5,8;153:14
**Hart (3)**
93:20,22,25
**Hart's (1)**
93:24
**hate (2)**
6:5;18:8
**head (2)**
143:13;152:11
**health (6)**
29:15;30:3,6,7,22;
31:6
**healthcare (1)**
34:17
**hearing (3)**
136:20,24;137:4
**heavy (1)**
77:19
**held (6)**
14:10,13;19:19,23;
139:18;164:23
**help (10)**
17:2;29:21;30:18;
33:24;34:16;36:24;
62:11;121:16;
122:25;148:1
**helped (8)**
9:24;15:13,13;
31:15;62:9,10;65:5;
79:7
**helpful (1)**
62:14
**helping (1)**
15:16
**hereby (1)**
166:5
**herein (1)**
166:6
**here's (2)**
38:12;100:23
**hereunto (1)**
167:2
**hey (13)**
37:3;41:22;52:15;
65:3,9,23;76:16;
90:22;102:8;112:21;
119:18;160:2,20
**hide (1)**
63:11
**high (4)**
8:1,3,4;9:3
**highlighted (1)**

147:5
**highly (1)**
148:15
**himself (3)**
20:14;91:17;145:1
**hire (5)**
18:22;21:17;22:25;
24:4;29:8;38:10;
53:11;54:1,10,13;
64:14,21;75:18;
159:13;164:15
**hired (17)**
21:20,21,23,25;
23:6,16,18;24:25;
25:17;26:17;34:19;
53:11,16,22;54:8;
65:23;163:21
**hires (1)**
22:16
**hiring (3)**
22:15;23:17;74:15
**his/her (1)**
166:19
**history (1)**
147:15
**hit (1)**
79:23
**holds (1)**
148:14
**hole (4)**
51:18;52:2;76:1;
77:21
**home (2)**
9:25;21:10
**homeless (1)**
54:2
**Hopefully (1)**
146:25
**horror (1)**
144:23
**horse (1)**
23:2
**Hoss (212)**
22:12,16;23:19;
25:1,14;26:5,20;28:2,
11,19;29:8,14;30:10,
22;31:5,12,13,23;
32:1;33:4;34:16;
35:7,11;36:6,17,24;
38:13,22;39:23;40:1;
41:4;43:6,8;45:1;
46:4,9;49:22;52:11;
53:16,22;54:13,18;
55:18;56:13;57:9,19,
24;58:10,13;59:6;
60:14,25;61:9;62:14,
15,18,23;63:3,9,10,
18,21;64:1,18,21,23;
65:19;66:22,25;
67:19;70:22;75:11,
12,17,20;76:10,23;
77:13,16,17,19,23,
24;78:4,25;79:2,2,19;

Exhibit 1

80:10;81:7,23;82:3;
84:17,17,19;85:1,22;
86:15;87:4,16,20;
89:3,25;90:1,11,19,
23;91:1,9;92:4,9,16,
24;93:7;94:7,20;
95:11;96:16,20,21,
23,25;97:15;98:20,
23;99:5,11,21;100:4,
10;101:14,17;102:9,
13,25;103:3,21;
104:12;105:4;
106:10;107:7,10,14;
108:25;109:1,13,20;
110:15,24;111:9,20;
112:8;113:4,19;
114:1,17;116:7,14;
118:9,11,14;119:8,
22,25;120:14,22;
121:18,23;122:9;
124:24;126:5,13;
127:17;129:5,11,20;
130:15,17;131:18,21;
132:23;133:4,10,17;
134:16;137:16;
138:18;139:9,21;
140:1,7,17,21;141:7,
12;143:7,12,14,17;
144:22,24;145:14,17,
19;146:5,10;158:4;
160:1;163:12,21;
164:2,2

**Hoss' (10)**
27:15;33:15;40:6;
42:11;55:20;56:15;
86:7;94:18;98:25;
145:22

**host (1)**
142:21

**hosted (2)**
62:1,9

**hot (2)**
57:13;77:19

**hotel (1)**
50:13

**hotheaded (1)**
79:6

**hour (5)**
86:2;100:12;
101:11;103:14;105:9

**hours (9)**
61:12;103:15;
105:10;143:20,25;
144:9,13;155:10,16

**house (45)**
64:6,10,15,19,22;
65:1,10,13,24,25;
66:6,9,21;67:24;
78:3;86:13,15,18,23;
91:24;107:18,21,24;
109:21;110:9,18;
112:11,19;114:2,2,4,
15;137:17;138:6;

153:7;155:22,24;
156:9;157:3;159:9,
12,13,24;160:9,13

**houses (2)**
67:19;134:10

**HR (17)**
12:18;34:11;38:17;
95:20,22;96:20;
98:25;99:19;102:7;
125:2,6,16;127:14;
128:19;147:20;
161:18,19

**huge (3)**
56:21;68:11;69:4

**human (6)**
78:23;96:19;
104:12,24;127:8;
146:16

**humble (1)**
92:2

**humor (1)**
42:18

**hurt (4)**
36:25;56:9,19;
128:15

**husband (8)**
18:3,4,9;64:15;
65:17;77:6;120:12;
134:24

**husband's (1)**
18:6

**Huston (11)**
68:1,4,6,8,17,18;
69:5,9,18,21;70:2

**hysterical (1)**
84:11

**I**

**ice (2)**
84:2;85:15

**idea (18)**
27:1;31:7;55:3,6,7;
56:3;57:6;63:24;
67:10;71:12;85:24;
110:11;112:4;114:5;
138:2;140:14;
141:12;145:23

**identification (12)**
106:7,21;115:13;
117:14;121:12;
122:17;124:11;
128:21;130:22;
132:13;138:12;
142:22

**identified (1)**
149:1

**identify (3)**
43:16;113:12;
119:24

**ignore (1)**
54:19

**image (1)**

119:3

**imagine (3)**
52:8;65:11;144:1

**immediately (1)**
9:2;137:10

**IMPD (2)**
135:23;136:5

**important (3)**
4:24;5:4,9

**improper (2)**
141:24,25

**improve (2)**
82:20;122:13

**improvement (1)**
122:15

**inappropriate (8)**
53:8;57:10;63:25;
78:19;79:19;80:1;
88:20;162:19

**inappropriately (1)**
130:16

**incident (4)**
98:6;133:2;134:2,9

**includes (1)**
122:21

**incurred (1)**
71:10

**independently (1)**
144:7

**Indiana (14)**
6:10;7:25;8:10,11,
19;17:7;123:19;
148:14,18;166:1,4,
12;168:5,5,16

**Indianapolis (16)**
4:11;6:10;15:9;
16:6;18:15;29:9;
59:18;125:3;127:8;
135:10,21;142:5;
166:12;168:3,6,24.5

**INDIANAPOLIS-MARION (1)**
168:10.5

**individually (1)**
4:12

**Industrial (1)**
168:17

**indygov (1)**
116:3

**infer (1)**
150:1

**inferring (1)**
149:18

**info (1)**
125:25

**inform (1)**
116:7

**informal (1)**
24:13

**information (4)**
9:22;134:5,5;
145:17

**initially (1)**
156:16

**initiated (1)**
107:11

**inquired (1)**
119:6

**inside (1)**
138:16

**instead (3)**
93:12;96:10;136:7

**instruct (2)**
113:19;114:19

**instructed (1)**
70:22

**Insurance (4)**
9:7;30:3,6,7

**intelligent (1)**
148:15

**intent (2)**
26:18;55:8

**interest (1)**
47:13

**interested (1)**
166:25

**interlude (1)**
50:12

**interpreted (1)**
55:11

**interrupting (1)**
5:11

**interview (3)**
99:3,8,13

**interviewed (3)**
99:5,10,15

**interviewer (1)**
99:15

**intimidate (2)**
81:18,19

**intimidated (1)**
80:16

**into (7)**
4:19;6:23;7:18;
30:19;76:12;141:21;
162:20

**introduced (3)**
4:7;94:13,17

**investigate (1)**
87:1

**investigated (2)**
98:25;138:7

**investigating (2)**
135:10,19

**investigation (1)**
158:10

**invite (2)**
47:6;153:7

**inviting (1)**
153:4

**invoice (2)**
70:22;156:6

**invoices (2)**
156:7;163:12

**involved (6)**
13:4;44:16;62:13;
87:17;118:15;138:10

**ISA (1)**
116:18

**issue (4)**
120:2;127:12;
129:13;163:10

**issued (1)**
157:12

**issues (11)**
24:3;29:15;41:21;
77:18;82:25;118:9,
11;120:6,7,16;162:5

**item (1)**
132:25

**IUPUI (1)**
9:4

**IWU (1)**
123:22

**J**

**Jack (2)**
15:14,14

**January (4)**
147:14;166:13;
167:9.5;168:18

**Jeff (2)**
4:8;105:23

**Jefferson (1)**
15:8

**Jeffrey (1)**
168:1.5

**Jeremiah (6)**
4:9;21:24;22:11;
25:21;128:7;168:7.5

**Jeremy (1)**
25:23

**jerk (1)**
5:14

**job (39)**
4:22;23:9;24:22;
30:2,9;33:3;34:3;
35:1;39:11;40:5,6;
41:6;42:2,11;54:11,
12;60:14,23;65:20;
74:8;75:11,18;87:13,
19;89:8;94:18,21;
122:16;130:15;
131:2,18,19,21,25;
147:22;150:9;160:1;
164:5,11

**jobs (1)**
45:11

**Joe (9)**
29:2,6;84:6;133:5,
6,9,10,14;141:4

**John (15)**
39:12;16;41:1;
43:5;44:13,14;45:22;
58:13;59:1,2;98:13;
129:17,18;149:5;
161:1

**JOHNSON (2)**
166:2,4

Exhibit 1

**joke (1)**
78:13
**judge (3)**
44:15;68:17,18
**juice (1)**
79:23
**July (10)**
20:19,20,20;81:2,
4;90:4;118:3,4;
125:13;154:25
**June (14)**
20:18;46:22;47:7,
10,12,16,19,22;48:1,
15,18;52:22;54:20;
152:13
**Justice (5)**
10:16,20,21;26:1,2

## K

**Kaitlyn (1)**
54:8
**Karen (1)**
51:1
**Kay (1)**
22:4
**keep (8)**
63:8,11,12;65:22;
67:6;79:4;84:23;
140:12
**keeping (5)**
31:23,24,25;63:18;
73:4
**keeps (1)**
73:14
**Keith (3)**
11:23;18:10;49:25
**Kendall (1)**
54:8
**kept (15)**
22:23,24;31:18;
32:2;63:10,12;65:6,
7;71:22;80:13;82:18;
88:4;141:4,5;142:4
**Key (1)**
47:14
**kid (1)**
57:15
**kidded (1)**
129:15
**kids (2)**
84:18;151:14
**kind (31)**
13:19;17:18;18:11;
23:5;31:3;35:11;
36:7;40:14,16,22;
42:21;54:11;55:8;
63:13;65:21;67:22;
76:10;98:8;100:14;
101:5;112:17;
119:25;122:25;
127:19,20,22;140:12;
150:9,14;151:11;

160:18
**kinds (3)**
55:18;136:4;152:9
**knew (26)**
9:22;24:1;30:18;
32:19,19;37:24;
40:13;41:9;54:9;
63:10;68:20;82:16;
83:17;86:22;88:3;
91:2;95:14;103:11;
104:14,14,22;120:3,
9;122:7;134:10;
143:20
**knowing (2)**
140:25;144:12
**knowledge (9)**
87:1;101:10;
137:14;146:19;
155:25;157:13;
158:6,9;159:22
**known (4)**
69:25;70:1;91:4;
97:13
**knows (9)**
17:24;55:1,14;
66:12;130:17,17;
133:23;142:18;
145:14
**Kohl's (1)**
51:13

## L

**LaDonna (3)**
27:6,13,14
**LaDonna's (2)**
36:11;97:8
**lady (4)**
54:3;57:12;99:16,
18
**laid (1)**
81:14
**large (2)**
70:9;166:4
**last (26)**
8:22;10:23;33:20;
39:14,16;42:13,15,
20;54:4,20;59:2;
71:8;74:20;100:17,
18;101:2;106:25;
128:14;135:1,13,14,
16;137:19,19;
144:19;161:3
**late (4)**
8:24;20:18;93:1;
94:19
**later (9)**
6:21;36:4;49:22;
75:8;88:7;93:4;
125:4,5;164:2
**laundry (1)**
46:19
**LAW (1)**

168:2
**lawsuit (3)**
4:10,12;73:18
**LEA (5)**
4:1;6:4;165:8;
166:5;168:17.5
**lead (1)**
155:14
**leader (2)**
15:24;16:4
**leadership (1)**
145:2
**leak (1)**
145:13
**leaking (1)**
145:17
**learn (4)**
25:19;88:4;131:21;
158:14
**learned (3)**
91:18;123:10;
143:11
**learning (1)**
60:12
**lease (1)**
19:3
**least (5)**
115:7;118:1;
147:13;148:19;
159:14
**leave (12)**
36:16;38:6;48:22;
76:16;77:20;95:2,3,
5;101:3;102:16;
104:20;153:2
**leaving (6)**
36:15;48:19,23;
76:13;90:2,8
**led (2)**
68:23;97:25
**left (16)**
25:6,9;36:17;
52:20,21;60:14;
86:10,21;102:14;
104:18,23;111:8;
126:12;144:23;
157:4,4
**leg (1)**
29:16
**legislature (1)**
16:12
**length (1)**
71:11
**lengthy (1)**
123:11
**less (1)**
78:24
**lets (1)**
38:15
**letter (14)**
32:12;90:11,13,19;
91:25;92:5;117:22;
119:25;120:14;

121:19;122:22;
123:8;144:20;147:11
**letters (1)**
13:14
**letting (1)**
32:14
**liar (1)**
145:1
**life (6)**
15:20;31:14;46:13;
136:16;138:9;144:23
**life's (1)**
79:7
**lights (2)**
65:5;107:20
**likes (1)**
97:17
**Lilly (2)**
24:8;49:9
**limitations (1)**
4:23
**line (2)**
83:17;138:23
**list (4)**
54:7;58:24;132:2;
143:21
**listed (1)**
118:12
**listen (1)**
91:19
**listener (1)**
150:1
**literally (1)**
71:21
**little (9)**
41:25;56:2,17;
73:3;108:10;116:1;
130:9;133:1;152:2
**live (4)**
10:1;25:8,12;92:22
**lived (5)**
21:10;25:9;49:12,
24;139:21
**lives (3)**
31:15;49:23;51:1
**living (4)**
47:23;67:8,10;
107:19
**loan (4)**
71:2,4,19;72:15
**loaned (1)**
31:2
**local (1)**
16:3
**lodge (23)**
21:8,11;25:9,10,
12;49:16;62:6,7;
65:12,19;92:22;
109:16,22;111:16;
138:16;139:12,18,20;
150:22;155:23,25;
157:3;160:8
**long (12)**

9:10,18;10:3,21;
11:7;20:6,24;21:3;
23:19;25:20;147:1;
161:6
**longer (1)**
29:20
**look (40)**
7:5;44:6,8;52:17;
56:14,19;72:14,19;
73:15;79:14;80:12,
13,17,17;81:19;92:7;
98:5;105:2;106:12;
113:17;116:1;117:2;
121:15;125:20;
128:5;133:1;134:2,8;
135:1,9;136:10;
138:23;141:21;
142:14,19;144:19;
147:7;148:10;159:7,
17
**looked (3)**
41:24;79:12;97:5
**looking (13)**
22:22;84:8,23;
85:13,17;90:12,16;
107:7,17,25;118:3;
125:9;164:14
**looks (10)**
56:7;108:4,10,11,
24;116:11;118:19;
135:15;154:16;
159:13
**lose (1)**
29:16
**lot (15)**
4:19;27:13;41:21;
62:13;73:2;87:25;
119:18;120:15;
125:1,7;136:5;
155:10,13,17,21
**lots (1)**
118:25
**loud (1)**
132:16
**love (1)**
152:4
**lower (1)**
93:15
**Lowery (1)**
161:11
**LOWREY (15)**
22:17;98:14,17;
105:20,23;115:18;
116:23;147:10;
160:24;161:4,7,10;
162:23;164:20;165:3
**lube (1)**
51:19
**lucky (1)**
130:5
**lunch (12)**
37:12,21,22;38:16;
100:11,19;101:4,6,

Exhibit 1

11;105:9,15;106:3
**lying (2)**
31:6,10

## M

**Ma'am (25)**
4:7;6:2,5,16;7:13;
11:17;13:3;18:8;
22:19;30:14;33:6;
37:4;41:19;47:24;
68:8;75:21;78:10;
80:7;81:6;112:2;
114:11;115:14,21;
139:5,7
**main (2)**
30:8;61:22
**maintenance (4)**
23:10,15;112:17,
19
**major (1)**
69:15
**makes (1)**
103:13
**making (4)**
39:15;42:21;44:9;
46:5
**Mallory (2)**
9:13,18
**management (2)**
8:17;24:13
**manager (3)**
10:17;11:6,13
**manner (1)**
162:18
**many (15)**
12:14;15:5,20;
24:10;26:19;61:12;
62:4;79:12,13,13;
102:2;118:15;130:5;
133:3;142:18
**Maria (13)**
64:14;65:14;114:9,
17;157:2,17;158:11,
15,20,22;163:4,8,11
**Marion (14)**
4:11;6:17,18,19;
10:13;12:7;14:24;
16:21,25;17:1,4;
68:18;166:12;168:12
**Mark (2)**
46:16;115:12
**marked (18)**
106:6,7,21;115:13;
117:14,16;121:12;
122:17,19;124:11,13,
15;128:21,22;
130:22;132:13;
138:12;142:22
**Market (1)**
168:2.5
**masters' (1)**
124:2

**master's (8)**
8:16,18;28:8;
123:19;148:14,17,20;
163:17
**matter (2)**
131:25;151:16
**matters (1)**
161:12
**may (28)**
5:6,12;11:16;13:5;
19:4;32:13;41:23;
43:18,25;46:10,22;
57:24;58:9;59:7;
78:23;86:25;87:23;
92:6;120:3,4,8,18;
129:6,20;136:13;
148:24,25;155:16
**maybe (13)**
24:11;27:20,21;
29:22;38:14;76:9;
81:24;93:1;118:20;
136:21;152:4;
153:14;159:8
**Mayo (1)**
31:2
**mayor (7)**
12:8;15:9;33:12,
13;93:11,13,15
**MBA (1)**
8:17
**McQUARY (35)**
4:6,8;38:19;61:5;
86:4;98:16;105:12,
16,18,21;106:1,19,
24;107:2;108:14,19;
109:8;112:1;115:17,
19;131:13,16;
135:15;145:24;
146:21;147:8,12;
161:1,5,12;163:1,16;
164:18;165:4;
168:1.5
**McVeigh (2)**
126:8;149:24
**Meador (2)**
79:22;84:12
**mean (73)**
6:15;14:15;17:11,
19;21:21;24:17;
25:17;26:2,20;27:7,
24;30:24;31:11;
32:17;35:16;36:10;
41:19;42:13,17,24;
43:12;44:18;47:3;
48:12;49:5;50:10;
52:7;53:1,18;54:8;
56:6,21;65:4,20;
68:25;72:2;75:21;
79:11;81:11;83:11,
23;86:12,13;87:7,23;
88:23;92:22;93:15;
95:15;99:7;100:2,17;
109:8,25;114:12;

116:3,17;118:18;
120:3;123:6;127:9;
128:17;130:9;131:2,
24;136:5;140:8;
142:19;145:17;
149:22;151:22;
154:24;155:19
**meaning (1)**
55:12
**means (1)**
58:4
**meant (2)**
150:14;151:11
**media (2)**
49:12;54:11
**medications (1)**
6:23
**meet (3)**
21:24;83:8;118:7
**meeting (52)**
12:4;39:11,23;
40:3,6,23;41:7,9,10,
10,14,14,19,20,25;
42:2,10,10,25,25;
43:1,4,6,10,18,25;
45:1,23;46:2,4,17;
53:19;57:24;58:10;
59:7;72:6,24;83:9;
86:25;92:6,6;103:21;
104:2;120:1,3,5,8;
129:6,21;148:24;
149:2,8
**meetings (1)**
60:12
**member (11)**
19:25;21:1;33:7;
44:20,22;59:18;
67:15;82:13;118:16;
126:9;127:11
**members (14)**
16:23;20:4;38:23;
39:3;43:3;45:15;
67:20;90:21;92:12;
117:21,25;125:23;
129:25;154:17
**members' (1)**
112:20
**memo (9)**
45:21;97:1;98:5,6,
10;105:23;124:22,23,
25
**memorandum (1)**
143:3
**memories (1)**
18:9
**memory (2)**
58:7;105:2
**memos (1)**
40:22
**men's (1)**
161:2
**mental (1)**
81:13

**mention (1)**
90:11
**mentioned (5)**
27:2;77:11;86:6;
117:21;122:4
**mentioning (1)**
124:5
**message (4)**
76:10;81:24;
152:13;159:4
**messages (3)**
106:10,15;138:18
**messing (1)**
88:4
**met (4)**
43:3,6;117:25;
125:23
**Metro (2)**
135:10,21
**Michael (3)**
94:5,6,6
**Michael-Paul (4)**
93:20,22,24,25
**Michele (5)**
33:8;95:11,13;
103:21;104:4
**Michelle (1)**
13:11
**middle (3)**
138:24;151:13;
160:1
**midgets (3)**
56:23,24;151:24
**midmorning (1)**
103:4
**midway (5)**
68:2,2,24,25;69:12
**might (18)**
5:1,8;31:5,10;
38:17;39:9;41:24;
47:11;54:4;55:10;
72:14;99:21;112:22;
115:19;121:24;
122:5;125:19;160:12
**Mike (1)**
110:4
**Miles (3)**
68:8,15;69:9
**million (1)**
71:2
**mind (2)**
118:11;161:1
**mine (5)**
18:3;46:13;56:14;
112:5;147:8
**mini (2)**
56:22,22
**miniature (1)**
56:21
**minority (2)**
15:24;16:4
**minute (4)**
59:3;76:16,17;

122:2
**minutes (14)**
27:2;32:6;72:1,12,
14;73:4,8,12,20,25;
86:3,3;105:18;161:4
**misconduct (2)**
45:10;129:2
**miss (1)**
46:14
**missing (2)**
83:20;115:19
**misstated (2)**
58:3;112:2
**Misstates (4)**
58:1;111:24;
133:22;141:17
**Misty (8)**
54:4;76:17,20;
77:14;79:17,18,20;
80:11
**moment (2)**
44:24;161:23
**Monday (3)**
46:17;108:24;
138:24
**money (14)**
19:6;54:15;67:7;
83:25;84:2;85:22,24;
90:9;112:25;141:3,3,
6,22;142:3
**monies (1)**
84:14
**month (2)**
72:19;93:5
**months (2)**
48:19;136:17
**more (16)**
15:6;32:22;33:2;
48:22;63:11,12;
80:18;87:7;113:9;
117:13;125:12;
133:1;137:13;
142:19;145:3;154:10
**morning (5)**
100:16;101:18;
103:22,23;152:25
**Most (14)**
17:9;21:23;35:4,6;
36:25;38:12;63:9,10;
87:23;91:12;120:7;
130:9;141:3,5
**mostly (1)**
23:16
**motion (1)**
135:14
**motivation (1)**
22:18
**Mount (2)**
50:7;51:6
**move (1)**
145:14
**moved (2)**
10:17;94:6

Exhibit 1

**mow (1)**
  120:12
**mowed (1)**
  24:12
**MOWERY (32)**
  4:1;6:4;7:23;16:4,
  15;38:22;70:6;86:6;
  106:4,8;108:21;
  121:13;122:18;
  124:12;130:23;
  132:14;136:11;
  137:20;138:13;
  139:14;140:2,15;
  141:13;142:23;
  146:3;147:3;149:23;
  163:17;165:8;166:5;
  168:13.5,17.5
**much (11)**
  15:16;29:20;47:17;
  65:21;66:23;71:10;
  75:6;140:13;145:3;
  152:3;156:12
**multiple (2)**
  53:22;124:6
**must (5)**
  13:18;68:19;
  123:16;128:14;139:8
**myself (2)**
  39:13;160:25

**N**

**Najarro (1)**
  13:14
**name (32)**
  4:8;6:3;8:3;13:14,
  15,18;15:5;16:2;
  25:21;37:8;43:11;
  53:14;54:4,4;69:13,
  14,15,15;70:8,17,18,
  23;71:18;72:1,7,15;
  95:7;113:18;114:6,8,
  25;116:2
**names (2)**
  12:18;16:2
**narcissistic (1)**
  150:16
**narrative (3)**
  135:2;136:11;
  137:19
**nay (1)**
  91:13
**near (2)**
  77:1;146:13
**nearly (2)**
  74:8,8
**necessarily (1)**
  7:12
**necessary (1)**
  143:13
**neck (2)**
  34:17;71:20
**need (33)**

  5:14,16,18;19:4;
  29:24;35:23;40:11;
  52:22;57:15;64:25;
  65:3,3,13;75:17;
  81:22;82:24;86:14;
  88:1;107:10;108:2,7;
  114:22;119:18;
  128:3;143:12;
  151:18;159:9,12,13;
  160:3,21;164:24,25
**needed (21)**
  29:21;30:18;31:4;
  34:17;64:8;67:17;
  73:17;88:2;95:18;
  100:15;112:17,21;
  113:14,16;122:15;
  123:2;129:18;132:2;
  135:8;145:3;155:20
**needs (3)**
  42:19;46:19;84:9
**neighbor (1)**
  65:7
**nephew (2)**
  16:18;139:14
**New (10)**
  9:22;10:1;31:2;
  38:10;94:5;107:19;
  116:7,15;120:5;
  127:16
**next (7)**
  20:21;41:13;68:23;
  76:10;81:2;100:24;
  108:23
**night (2)**
  30:11;140:19
**nine (1)**
  13:13
**nipples (1)**
  56:12
**nobody (6)**
  54:9,11;76:4;
  91:21;100:18,19
**Nodding (4)**
  35:22;45:18;60:1;
  129:9
**none (3)**
  56:4;95:24;120:5
**nonprofit (3)**
  17:20,25;142:3
**nor (1)**
  128:8
**normally (4)**
  70:12;101:6;
  159:25;163:12
**north (7)**
  50:9;68:2,11,24;
  69:12;166:11;
  168:23.5
**nose (2)**
  56:2,7
**notarial (1)**
  167:3
**Notary (1)**

  166:3
**notation (3)**
  72:5;102:11;159:1
**notations (2)**
  158:3,5
**note (4)**
  44:9;82:6;100:15;
  141:13
**noted (2)**
  128:6;142:8
**notes (3)**
  82:15;129:23;
  166:15
**notice (2)**
  160:12;168:4
**notified (3)**
  135:3;136:11;
  168:17
**notify (1)**
  95:11
**no-tolerance (1)**
  58:23
**November (3)**
  108:24;109:4,7,8;
  159:17
**number (3)**
  12:23;114:24;
  167:8
**numbered (1)**
  147:9
**numbers (1)**
  124:15
**numerous (1)**
  92:1

**O**

**Object (5)**
  43:20,23;64:16;
  96:7;103:6
**Objection (27)**
  17:22;22:17;28:16,
  21,25;54:24;55:13;
  58:1;62:25;66:11;
  80:25;88:16,21;89:5,
  9;101:20;111:23;
  112:12;114:20;
  116:23;120:25;
  121:5;133:21,21;
  141:10,16;145:8
**obliterate (1)**
  93:16
**obtain (3)**
  10:15;63:22;64:1
**obvious (3)**
  5:1,6,8
**obviously (5)**
  84:23;88:7;99:8;
  125:12;127:12
**occasion (3)**
  33:2;80:16;88:10
**occasions (2)**
  92:1

**occupies (1)**
  93:25
**occupy (1)**
  70:18
**occupying (1)**
  70:23
**occur (1)**
  125:7
**occurred (1)**
  118:21
**October (4)**
  100:10;101:15;
  102:5;121:20
**odd (1)**
  12:18
**off (18)**
  23:1;24:6;50:1;
  60:23;65:5;73:3;
  76:15;82:9;85:2;
  95:3,13;100:14,16,
  19;114:4;152:11;
  164:22,23
**offense (1)**
  128:3
**offensive (1)**
  128:10
**offered (2)**
  26:8;30:8
**office (48)**
  7:19;9:17;10:6,17,
  19;11:3,4,8,11;13:21;
  14:10;15:2,18;19:17;
  24:1;36:11,17;37:11,
  20;53:4,17;59:11;
  60:2,13;61:11;74:9;
  76:13;83:25;84:14,
  18,20;85:10;87:17;
  89:1;95:18;97:2,6,7,
  9,10,15;102:19,25;
  103:16,22;127:16;
  156:6;157:4
**officer (1)**
  44:24
**officers (2)**
  136:5;152:8
**offices (6)**
  14:1,13;19:19,24;
  36:13;166:10
**official (1)**
  74:2
**officials (1)**
  16:9
**often (1)**
  5:3
**old (3)**
  6:5;57:12;81:21
**omitted (1)**
  162:24
**Once (7)**
  24:25;37:9;54:3;
  65:15;95:19;113:9;
  118:1
**one (88)**

  8:22;14:3,7;15:24;
  24:11;30:10,15,17;
  31:13,14,16,19;
  32:16,22;33:2;34:9,
  16;35:7;36:10;38:3,
  6,6;46:18;47:4;48:5,
  7;49:8,11;51:18;
  53:17;54:20,20;57:5,
  7;59:3;61:10;66:18;
  67:16;69:24;70:4;
  76:12,17;77:7,10,20;
  78:5,10;79:3;82:4,
  23;83:8,8,11,11,14,
  14,16;87:18;88:14;
  91:24;92:12;93:25;
  113:23;115:17;
  116:11,12;118:19,24;
  120:9;123:25;
  125:23;126:19;
  127:4;129:14;133:1;
  134:8,23;137:13,19;
  147:8;148:11;
  150:10;151:24;
  153:16;154:12;
  157:9;162:24;163:21
**ones (2)**
  7:10;56:22
**only (7)**
  5:21;59:24;63:6,8;
  71:8;86:17;105:12
**open (4)**
  29:22;47:17;94:3,4
**opinion (7)**
  91:2,4,14;92:2;
  93:19;145:12;154:2
**opportunity (1)**
  105:7
**orange (1)**
  79:23
**order (2)**
  132:22;137:11
**ordinary (1)**
  5:1
**organization (2)**
  17:18;24:8
**organize (3)**
  62:9,10,12
**organized (2)**
  15:17;70:3
**organizers (1)**
  16:24
**orientation (1)**
  38:17
**original (1)**
  168:17.5
**originally (1)**
  75:7
**Originating (2)**
  168:1,18.5
**Ort (9)**
  53:15;60:16;74:11;
  77:11;84:1;86:20;
  120:10;134:21,23

Exhibit 1

Case 1:23-cv-00121-MPB-TAB    Document 61-1    Filed 05/20/24    Page 180 of 226
PageID #: 1401
JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL
CYNTHIA LEA MOWERY
January 25, 2024

**O-r-t (1)**
53:15

**others (2)**
71:16;80:13

**otherwise (1)**
166:24

**Ours (1)**
82:2

**out (68)**
8:23;12:2,10;
15:13,13;21:12;
23:16,17,18;29:18;
31:16;32:18;34:17;
48:6,12,20;49:12,13,
14,21;50:1;52:8,16;
54:25;57:4,20;59:5;
61:22;62:23;63:13,
15;65:21;76:23;
78:15,25;79:7;80:13;
81:16;83:15;84:25;
85:22;86:6;91:6,6;
92:11;95:7,7;97:6,7,
9;112:24,25;113:5;
114:24;127:2;
129:18,19;130:18;
132:16;140:9,22;
141:1,22;147:25;
148:21;152:8;160:5;
161:24

**Outlook (2)**
116:8,15

**outside (4)**
65:1;77:7;111:6;
158:25

**outweigh (1)**
120:16

**over (37)**
10:18,20,24;41:25;
47:3,6;52:13;54:21;
58:20;62:4;65:4;
68:9,10,13;72:12;
74:1;90:17;91:23;
94:6;109:1,25;110:4,
4;112:6;119:4;
126:20;127:14;
150:9;153:4,7;
159:18,22;160:4,6,
16;162:8,25

**overreacted (1)**
76:11

**oversee (2)**
12:1,2

**overseeing (1)**
23:4

**oversees (3)**
18:24;19:4;68:15

**overwhelming (1)**
30:15

**owes (1)**
77:4

**own (10)**
65:18;79:5;91:17;
110:9;113:5,5;125:1;
150:24;157:12;158:6

**owner (1)**
69:5

**owns (2)**
23:2;68:2

## P

**page (33)**
55:20;98:19;
108:14,23;109:3,10;
113:12;115:19;
116:13;117:2,5;
118:6;121:15;
122:22;125:21;
129:16;131:10;
132:25,25;134:6,8;
135:1,13,14,16;
138:24;143:22;
148:3,4;154:1,4;
159:7,17

**pageant (1)**
87:19

**pages (3)**
106:22;132:6;
135:17

**paid (28)**
24:3;66:9,14,15;
67:4,7;74:22;75:9;
84:2;85:14;96:16;
109:5,11;110:8;
112:4,4,25;139:10;
140:3,6,7,13,18,20,
21;142:20;157:7,7

**pain (1)**
56:3

**painful (1)**
18:9

**pains (1)**
57:12

**paint (9)**
65:10,12,13,24;
66:1;110:18;159:23;
160:9,13

**painted (8)**
65:1,19,25;107:21;
108:2;159:9,12,13

**painter (1)**
114:12

**painters (11)**
108:25;110:16;
111:12,21;159:5,18,
21;160:2,7,10,16

**painting (16)**
109:5,10,20,24;
110:7;111:3;155:22,
22,24,24;156:4,9;
157:3,8,13;160:7

**paper (3)**
104:8;154:10;
156:5

**papers (2)**
79:13;136:3

**paragraph (6)**
123:8;125:21;
128:6;143:11;
144:20;148:10

**park (2)**
70:9;119:5

**part (18)**
4:12;9:4;24:12;
25:9,11;50:24;51:24;
52:1;63:20;73:18;
99:3,8;106:19;120:2;
129:13;130:9;
139:20,21

**particular (7)**
7:11;98:18;119:5;
122:14;151:19;
160:17;162:11

**particularly (1)**
33:20

**parties (1)**
166:20

**party (7)**
14:11,13;94:12;
166:24;167:1;168:1,
18.5

**pass (2)**
42:5;146:16

**passed (3)**
18:4;39:22;49:25

**passing (3)**
65:9;144:9;146:1

**password (3)**
116:8,15,21

**past (2)**
16:23;123:10

**paternal (1)**
16:18

**path (1)**
24:18

**patrols (1)**
87:3

**Paul (39)**
16:5,19;59:10;
60:24;61:10;62:2;
64:2;69:21;70:4,6;
73:10;74:5;75:11,14;
80:19;83:25;84:15,
19;85:10;87:12,16,
16,20,21;139:12;
140:2;142:15;
143:20,25;144:10,16;
154:18;155:4,4,6,6,
10,13,20

**pay (27)**
25:3;54:15;62:23;
63:15;66:20;67:17,
18;70:20;71:9,13,18;
77:4;109:11,20;
110:8;111:10,11,16,
21;112:3,9,23;114:1,
6;140:1;141:1,6

**paying (4)**
111:15;113:4;

**paragraph**

**payment (6)**
67:22;109:15;
110:9;140:16;
141:13;163:10

**pays (1)**
71:17

**Pearl (1)**
46:17

**Pence (1)**
119:1

**pending (1)**
5:22

**Pennsylvania (2)**
166:11;168:23.5

**people (69)**
16:3;18:23;21:23;
23:14;24:3,9,15;
27:13;29:14;33:17,
25;40:19;41:24;
45:12;48:13;49:24;
53:7,22;54:3,13;
55:11,24;56:1;57:11;
60:4;62:13;66:1;
70:9;75:18;76:22;
77:9,25;80:16;81:17;
82:23,25;83:2;84:3;
85:3;86:18;87:23;
94:9,15;95:20;101:8;
109:5,10,20;110:7;
111:18;112:6,19,22;
114:25;121:11;
129:24;134:10,11,19,
20;136:20,22;142:4;
151:9;152:4,5;
157:25;162:11,15

**perceived (1)**
43:9

**perceives (1)**
77:2

**percent (3)**
37:10;71:3;103:2

**perceptive (1)**
125:13

**performance (13)**
24:22;32:9;35:1;
39:12;40:5,7;41:6;
42:3,11;117:6;
145:22;150:9;162:5

**performed (1)**
34:4

**performing (1)**
35:1

**perhaps (5)**
39:8;60:25;64:8;
90:4;115:7

**period (9)**
20:9;22:23;64:12;
72:13;80:24;94:24;
142:6;150:10;155:17

**permission (5)**
95:12;100:11;
113:21;114:18;115:1

**Perry (2)**
84:13;135:25

**person (10)**
34:2;44:17;79:16;
114:14;134:11;
137:24;138:8;146:8;
152:2;166:23

**personal (12)**
45:6,7;67:24,24;
109:21;111:3,22;
112:20,23;113:5;
157:13;158:6

**petty (12)**
63:8,10,16,18;
140:9,12,22;141:2,4,
8,12,23

**phone (2)**
104:25;127:5

**photograph (1)**
138:16

**Phrases (1)**
4:25

**pick (2)**
50:6;118:24

**picking (1)**
119:7

**picture (5)**
119:1;139:16;
153:8,10,11

**pictures (3)**
50:3;55:22,24

**piece (1)**
156:5

**pits (1)**
56:11

**place (4)**
18:6;27:19;47:25;
99:19

**placed (1)**
100:7

**places (2)**
46:19;51:22

**Plaintiff (1)**
166:10;168:8.5

**plaintiff's (1)**
147:4

**plan (1)**
51:4

**planned (1)**
160:5

**Planting (1)**
153:10

**play (1)**
18:11

**played (1)**
19:22

**please (10)**
51:16;58:3;78:4,5,
5;84:14;112:2;
126:23;165:3,4

**pleased (1)**
95:24

**pled (1)**

**Exhibit 1**

Case 1:23-cv-00121-MPB-TAB    Document 61-1    Filed 05/20/24    Page 181 of 226
PageID #: 1402

JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL

CYNTHIA LEA MOWERY
January 25, 2024

7:21
**pm (2)**
106:2,3
**point (17)**
10:5;23:22;26:12;
38:22;46:4;59:1,8;
74:24;81:25;82:5;
87:13;93:7;94:19;
98:8;105:13;130:14;
150:10
**pointed (1)**
97:8
**points (1)**
147:3
**police (15)**
78:12,14,16;86:7,9,
11;87:1,7,7;135:2,10,
17,21;136:17;152:8
**policeman (1)**
135:5
**policy (7)**
37:12,15;38:1;
45:2,5;58:23;129:2
**political (1)**
14:10
**politics (1)**
16:3
**Pool (2)**
47:17;65:5
**poorly (1)**
130:15
**pops (2)**
49:4,6
**popular (1)**
93:19
**position (14)**
9:10,16;10:15,23;
11:5,12;23:19;26:8;
29:21;30:2;59:16,21,
23;163:18
**positive (2)**
37:10;120:15
**possible (2)**
123:17;125:2
**possibly (2)**
11:20;118:7
**post (1)**
144:21
**posted (1)**
119:2
**PR (3)**
9:13,18,21
**practical (1)**
131:24
**practice (1)**
35:1
**preapproved (4)**
95:2,3,5,8
**precinct (2)**
14:17,18
**precise (2)**
115:7;125:9
**precisely (1)**

143:24
**prepare (2)**
7:2,6
**prepared (1)**
78:22
**prescriptions (1)**
29:19
**present (3)**
45:23;133:7;144:2
**presented (2)**
45:1;166:18
**preserved (1)**
81:24
**presidency (1)**
22:7
**president (25)**
19:6,20,20;20:2,3,
6,8,10,14,25;21:19,
22,23,25;22:3,15;
29:3;44:25;69:6;
89:13,19,21;91:6,15;
121:25
**presidents (1)**
71:21
**pretrial (3)**
10:18,24;11:1
**pretty (8)**
15:16;24:13;49:4;
65:20;98:14;105:3;
110:23;123:23
**price (2)**
156:4,9
**primary (2)**
40:18;136:2
**princess (1)**
88:14
**princesses (1)**
87:18
**prior (3)**
24:2;159:22;
160:10
**prisoner (1)**
5:17
**private (2)**
70:16;142:2
**probably (45)**
9:1,11,19;10:4,10,
11;20:1;21:5;22:10;
36:23;37:17;40:21;
42:3;46:21;47:18,22;
48:10,16;56:17;
61:14;62:5;64:23,25;
65:11;69:20;73:10,
19;81:3,4;82:24;
83:14;84:3;94:25;
96:18;98:12,13;
102:6;113:10,17;
117:24;126:18;
131:11;139:10;
162:13;164:1
**problem (4)**
23:17;104:22;
119:22;162:8

**problems (6)**
30:23;31:6;118:13;
119:24;151:19;
162:20
**Procedure (2)**
168:16,5,16.5
**process (3)**
4:19;33:18,23
**processed (1)**
12:2
**production (2)**
9:16;12:18
**profanity (1)**
162:19
**professional (1)**
44:18
**progressive (4)**
35:12,17;36:7;
120:1
**project (1)**
131:1
**prominent (2)**
15:6;18:11
**promoted (3)**
24:23;28:13;164:3
**promoting (1)**
31:24
**pronounce (2)**
13:15,20
**proper (1)**
38:16
**property (8)**
19:3;70:24;92:20;
110:20;111:4;
112:18,20,24
**prosecute (1)**
7:19
**prosecutor's (2)**
7:19;10:19
**protect (1)**
91:17
**protective (2)**
132:22;137:11
**proven (1)**
145:1
**provide (9)**
30:3;7;62:16,18;
63:3,21;73:22;127:2,
3
**provided (3)**
98:10,15;105:24
**provides (1)**
69:2
**PS (1)**
145:13
**psychology (1)**
163:18
**public (3)**
6:7;76:6;166:3
**pull (3)**
60:10;154:5,9
**Pulling (2)**
153:11,25

**punched (2)**
76:1;77:22
**purchased (1)**
18:25
**purely (1)**
52:5
**purpose (1)**
40:23
**pursuant (1)**
166:13
**pursue (1)**
126:2
**pushed (1)**
30:19
**put (22)**
16:25;17:1,4,9;
21:14;29:22;30:11,
12;52:20;59:3;60:9;
67:8;76:22;78:8;
107:19;111:5,7;
124:22;130:3,8;
151:1,3
**putting (7)**
39:13;44:8;55:5;
60:3;133:16;152:19,
23

### Q

**queen (2)**
87:19;88:14
**questionable (1)**
31:9
**quick (1)**
161:2
**QuickBooks (7)**
24:1;60:13;88:3;
157:22;158:3,5;
159:1
**Quicken (2)**
88:3
**quicker (1)**
83:15
**quickly (2)**
103:19;163:17
**quit (8)**
75:11;76:14;77:13;
81:2,6;121:24,24;
128:9
**quite (5)**
30:25;118:25;
125:12;128:15;
144:24
**quote (1)**
152:7
**quotes (1)**
156:6

### R

**raise (2)**
15:18;43:8
**raised (3)**

57:25;58:10;
161:12
**ran (5)**
13:24,24;14:1,6;
15:9
**rather (1)**
53:16
**read (1)**
148:13
**readable (1)**
5:15
**ready (7)**
37:21;48:22;54:21;
76:15,22;77:20;
153:2
**real (2)**
37:6;38:20
**realize (1)**
24:7;47:23;102:18
**really (18)**
4:24;5:4;13:20;
21:25;22:1;31:1;
32:23;41:3;53:9;
58:4;64:7;78:25;
90:24;98:3;100:9;
115:22;160:5;162:13
**rearranging (1)**
108:5
**reason (8)**
30:8,22;49:20;
101:19;103:4;
116:16;141:8;143:10
**recall (34)**
22:2;23:21;25:5,7;
41:3;45:9;46:20;
66:18;72:5;74:15;
86:8;90:18;100:6,7;
102:11;103:8,23;
116:9;123:16;124:5;
126:16;134:7;137:4;
138:20;143:9;
146:12;147:20;
149:14;156:12,24;
158:24;159:2;
160:11;164:14
**receipt (2)**
66:25;156:21
**receive (4)**
36:6,9;41:4;123:18
**received (4)**
33:23;61:20;
168:20.5
**receiving (1)**
138:21
**recent (1)**
31:16
**recently (4)**
96:21;143:11;
148:21;164:17
**recess (4)**
38:21;86:5;146:2;
161:8
**recessed (1)**

Exhibit 1

Case 1:23-cv-00121-MPB-TAB    Document 61-1    Filed 05/20/24    Page 182 of 226
PageID #: 1403

JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL

CYNTHIA LEA MOWERY
January 25, 2024

106:2
**recognize (17)**
106:8,15;107:4;
115:21;116:5;117:3,
16;121:13;122:21;
124:13,19;128:24;
130:23;132:14;
138:13,20;142:23
**recollection (1)**
121:20
**recommend (2)**
93:23;94:15
**recommendation (2)**
21:19,22
**recommended (1)**
144:16
**recommending (1)**
107:14
**record (11)**
4:8;6:3,7;26:14,24;
27:15;34:22;74:2;
138:5;164:23;166:17
**recorded (3)**
142:9;157:21;
158:2
**Recorder's (2)**
11:3,11
**records (8)**
25:22;37:5;78:17,
18;127:1,2,6;157:4
**RECROSS-EXAMINATION (1)**
163:2
**red (1)**
56:8
**redacted (1)**
131:15
**redaction (2)**
131:12,13
**REDIRECT (1)**
163:15
**redone (1)**
152:6
**reduced (1)**
166:15
**refer (2)**
22:11;123:7
**reference (2)**
97:20;122:25
**referenced (1)**
90:19
**referencing (1)**
105:24
**referring (2)**
110:8;129:3
**reflected (3)**
32:6,8;71:25
**reflections (1)**
74:1
**refresh (1)**
105:2
**refreshments (4)**
62:16,19;63:4,22
**refused (2)**

51:21;81:15
**regard (1)**
31:22
**regarding (6)**
27:15;116:13;
117:7;118:21;
123:11;154:17
**regardless (1)**
150:18
**Registration (33)**
6:20;10:6,12;
11:15,18,25;19:16;
27:12,24;28:1;29:22;
30:1,20;33:4,5,14,16,
21;34:2,25,25;37:11;
94:21;100:18;101:2,
9;115:24;127:16;
146:4;154:10;
161:15;162:9;
168:11.5
**registrations (4)**
12:1;33:17,18,23
**regular (2)**
61:4;144:20
**regularly (2)**
43:1;133:19
**reimbursing (1)**
113:2
**related (4)**
16:15,17,19;68:17
**relation (1)**
68:21
**relationship (3)**
44:18;88:19,20
**relative (1)**
166:24
**release (1)**
10:25
**relief (1)**
144:24
**relive (1)**
144:23
**remained (1)**
32:15
**remark (1)**
97:25
**remember (19)**
8:21;22:5;39:14;
42:21;48:8;49:21;
51:19;61:1,7;72:17;
73:24;90:12;96:11,
22;103:20;130:3;
133:15;156:11;158:7
**remind (4)**
4:20;5:12;11:17;
80:23
**remotely (4)**
99:25;100:2;137:2,
8
**removed (2)**
26:14;116:21
**rent (6)**
21:12;70:19;72:1,

4,7,15
**repainted (1)**
64:8
**repairs (1)**
67:23
**rephrase (2)**
63:17;157:15
**replaced (2)**
46:12;60:19
**report (15)**
12:6,8;25:1;33:4;
78:12,14;86:7,9,11;
135:6,17;136:13;
138:4;142:11;161:19
**reported (5)**
33:7,8;101:14;
102:4;161:18
**reporter (6)**
4:21;80:8;117:15;
132:17;164:24;165:1
**Reporting (5)**
61:20;166:11;
168:20.5,23
**represent (2)**
4:9;121:18
**represented (1)**
166:20
**reprimands (1)**
36:21
**Republican (15)**
6:19;11:24;12:1,7,
16,19,20;13:8;14:14,
25;15:15;16:7;19:16;
69:19;94:12
**request (3)**
124:17;132:22;
137:11
**requested (2)**
7:10;73:8
**required (3)**
149:25;163:18,25
**requires (1)**
110:1
**residence (2)**
111:22;112:24
**residential (1)**
21:15
**resign (4)**
20:15,25;118:4;
122:9
**resignation (2)**
21:3;121:19
**resigned (4)**
20:22,24;89:22;
117:23
**resigning (1)**
89:24
**resolve (1)**
127:25
**resources (6)**
78:23;96:19;
104:12,24;127:8;
146:17

**respected (1)**
92:2
**response (5)**
95:19;105:24;
124:17;143:7,16
**responsibilities (1)**
75:12
**responsible (2)**
63:18;73:4
**rest (5)**
31:17,21;95:21;
132:5;142:6
**restrictions (2)**
99:19;100:7
**resubmit (1)**
164:8
**results (1)**
34:6
**resume (4)**
28:3;164:12,14,16
**retaliation (2)**
77:2,3
**retired (3)**
18:18;49:9;68:19
**return (3)**
98:23;102:25;
132:7
**returned (2)**
103:3,17
**reverse (1)**
154:12
**RFP (1)**
105:25
**ride (4)**
50:9;123:21,22,23
**rides (1)**
19:2
**right (139)**
4:18;6:2,9;7:23;
8:5;9:10,20;11:7,12;
12:8,11;15:20;16:14;
17:3;18:21;20:5,6,
12;21:8,20;23:15;
25:8,14;28:11,19;
32:25;34:6,12,23,24;
35:11,16;36:13;
37:24;42:13;43:7;
44:5,11;47:7,23;
48:18;51:14;52:11;
54:20,22;59:10,12,
14,21,22;60:20;
63:25;66:5;68:1,12;
70:12,15;71:7;72:9,
17;73:22;74:4;75:4;
82:25;87:10;88:13;
89:19,21;91:20;
95:16,25;98:22;99:7;
102:19;105:12;
106:15;107:6;108:9,
15,17;109:3;110:24;
111:5;113:11;114:7,
23;115:2,11;116:13;
117:2;120:17,20;

122:3,18;123:7;
124:12;126:4;127:9,
13,15;128:11;132:10,
12,21;134:20;
135:18;137:10,13;
138:23;139:25;
143:24;144:11,14,19;
145:6;146:21;147:2,
6,24;148:1,4;149:22;
151:6;152:11;154:6,
19,23;156:1;158:23;
159:1,15,16;161:17,
20,21,22;163:24;
164:19,22
**Road (2)**
6:10;64:24
**role (4)**
13:1;18:11,21,23
**roles (1)**
19:22
**romantic (2)**
50:11;51:3
**room (4)**
67:9,10;107:19;
161:2
**roughly (3)**
19:23;22:5;72:19
**Route (1)**
47:13
**RPR (1)**
166:3
**rule (2)**
101:5;113:24
**rules (5)**
5:12;166:13;
168:16,16.5,17
**run (12)**
13:21,23,23;93:8,
11,12,15,17,23;
136:22;147:22;
162:20
**running (9)**
15:18;29:18;49:8;
65:21;93:13;94:7,17;
140:3,4
**runs (1)**
15:15
**Rushmore (2)**
50:8;51:6

---

**S**

**safety (1)**
136:16
**SAITH (1)**
165:5
**same (9)**
21:6;26:19;37:24;
66:3;89:9;112:18;
155:25;162:8;165:4
**Sandlin (2)**
15:14,14
**sangria (1)**

46:23
**sat (2)**
  18:5;32:18
**save (1)**
  72:20
**saved (1)**
  71:19
**saw (5)**
  30:24;46:1;155:6,
  6;156:5
**saying (20)**
  31:18;38:24;39:9;
  46:20;47:3;67:4;
  76:10;78:2,24;82:18;
  98:20;110:2,24;
  139:6;141:4;149:14,
  22,25;151:25;159:21
**scale (1)**
  30:14
**scared (2)**
  77:3;127:17
**schedule (1)**
  60:12
**scheduled (4)**
  42:2;43:1;57:19;
  67:19
**scholarship (1)**
  123:25
**school (6)**
  8:1,3,4,7,24;9:3
**screen (1)**
  107:19
**script (1)**
  144:21
**seal (1)**
  167:3
**sealed (1)**
  168:18.5
**searched (2)**
  84:10;156:6
**searching (1)**
  84:20
**seat (6)**
  18:19;19:11,14;
  93:18,23;94:3
**Seattle (6)**
  49:23,24;50:1,22,
  24;51:4
**second (12)**
  4:7;14:6;22:7;
  35:21;79:16;106:19;
  116:11;117:2,5;
  121:15;123:7;148:10
**secondhand (1)**
  133:11
**secondly (1)**
  114:5
**second-to-last (1)**
  128:6
**secretaries (1)**
  120:10
**secretary (9)**
  9:17;10:17;14:16;

53:12;73:5,7,10;
76:13;77:11
**section (2)**
  39:18;58:12
**seeing (1)**
  137:4
**seem (1)**
  5:6
**seemed (1)**
  103:14
**seems (1)**
  108:9
**self-employed (1)**
  9:21
**Senator (2)**
  15:14,14
**send (6)**
  89:25;90:13;122:2;
  139:4,9;160:4
**sending (3)**
  128:8,9;138:20
**sense (1)**
  42:18
**sent (18)**
  7:10;32:12;37:9;
  46:21;82:6;83:15;
  90:7;100:15,21;
  109:12;113:14;
  115:23;116:4;
  121:19;134:3;139:6,
  8;154:17
**sentence (7)**
  118:6;120:14;
  128:14;136:10;
  137:19;148:11,13
**sentiment (1)**
  32:8
**September (7)**
  21:5;108:10,12;
  136:25;159:8,14,15
**serious (4)**
  31:6;40:14;42:22;
  128:3
**serve (4)**
  14:7;18:16;98:11;
  136:3
**services (3)**
  10:18,24;11:2
**set (3)**
  82:9;136:24;167:2
**Several (12)**
  15:3;25:14;29:14;
  32:3;33:1;36:18;
  42:14;53:2;86:17;
  115:4;134:3,17
**severe (1)**
  29:15
**sexual (31)**
  38:25;39:18,19,20;
  40:4;46:6;52:24;
  55:8,11,19;57:25;
  58:10,12,14,15,16,
  21;59:6;81:12;82:9;

88:20;96:21,23;
99:22;125:18,24,25;
126:5;127:21;128:2;
129:12
**sexually (16)**
  39:21,24;40:1;
  43:9,14;58:22,25;
  96:25;99:1;146:5;
  149:9,11,16,20,23;
  150:1
**Shabazz (5)**
  20:13;29:2;43:6;
  44:21;149:6
**share (2)**
  111:2;115:18
**sheets (2)**
  144:5;168:19
**shelter (1)**
  54:2
**shirtless (1)**
  55:22
**shirts (8)**
  51:11,17,20;52:4,4,
  5,12,15
**shoes (3)**
  55:5;152:20,23
**short (1)**
  38:20
**shortly (5)**
  86:10,24;89:24;
  159:8,14
**shot (2)**
  23:3;32:22
**show (5)**
  56:4;95:17;96:1;
  105:13;106:5
**showed (2)**
  25:21;112:7
**showing (1)**
  56:15
**Shreve's (1)**
  15:8
**sign (17)**
  60:11;66:16;
  109:18;110:2,3;
  112:7;113:19,21;
  114:6,8;119:2;
  138:25;139:1;157:9,
  19;158:20;163:13
**signature (2)**
  113:23;166:19
**signatures (1)**
  110:1
**signed (9)**
  24:6;42:22;95:6;
  113:17;114:25;
  157:24;158:18;
  163:7;168:17.5
**signing (1)**
  66:18
**silly (1)**
  93:14
**similar (1)**

149:20
**Similarly (1)**
  5:3
**Simply (3)**
  89:12,16;144:9
**simultaneously (2)**
  111:21;112:3
**sister-in-law (2)**
  49:23;51:1
**sister-in-law's (1)**
  50:4
**sit (1)**
  146:14
**sits (1)**
  38:11
**sitting (4)**
  36:10;55:5;97:2;
  146:15
**situation (1)**
  40:21
**situations (2)**
  125:7;143:4
**Six (2)**
  12:15;37:19
**sleeve (1)**
  51:24
**slick (1)**
  87:5
**small (7)**
  24:7,19;25:25;
  41:23;44:15;70:17;
  136:3
**smaller (1)**
  56:5
**smelled (1)**
  48:11
**smelling (1)**
  48:6
**smiley (2)**
  48:21;152:15
**Smily (1)**
  48:20
**Smith (1)**
  18:10
**social (1)**
  49:12
**socks (3)**
  55:5;152:20,23
**software (1)**
  24:2
**somebody (17)**
  39:21;43:13;65:10;
  78:9;84:9;86:14;
  87:6;88:2;89:1;
  111:7;149:9,11,16,
  20;150:1;153:4;
  160:12
**someday (1)**
  64:23
**someone (12)**
  15:18;22:18;43:12,
  15;46:14;64:21;
  65:24;75:2;107:17;

145:19;153:25;
159:23
**someone's (1)**
  153:25
**sometime (2)**
  81:4;125:5
**sometimes (4)**
  40:19;150:11,12,
  13
**Somewhat (1)**
  23:12
**somewhere (7)**
  47:15;64:24;67:9;
  71:25;97:1;112:15;
  126:18
**son (3)**
  68:9,9,15
**soon (4)**
  49:4;62:7;92:24;
  104:23
**sorry (9)**
  13:15;41:12,17;
  42:9;68:8;77:15;
  109:6;115:15;155:9
**sort (1)**
  162:19
**sounded (1)**
  41:17
**sounds (3)**
  4:18;46:23;74:8
**South (1)**
  6:10
**SOUTHERN (1)**
  168:5.5
**space (4)**
  21:12,15;139:22,
  24
**speak (3)**
  4:24;105:7;132:16
**speaks (2)**
  17:23;145:8
**specific (4)**
  42:8;72:5;93:23;
  122:15
**specifically (4)**
  37:8;78:17;149:1,
  13
**speculation (4)**
  22:17;55:13;
  114:20;116:24
**speech (1)**
  162:18
**speed (1)**
  154:14
**spend (1)**
  19:6
**spite (1)**
  34:19
**split (1)**
  70:5
**spoke (1)**
  45:12
**sponsor (1)**

**Exhibit 1**

62:12
**spray (1)**
  65:4
**spring (1)**
  125:9
**square (1)**
  131:9
**SS (1)**
  166:1.5
**staff (2)**
  12:3;35:4
**stage (1)**
  119:5
**stamp (1)**
  108:16
**stand (3)**
  56:13;81:16,18
**standing (4)**
  56:18;83:11;111:6;
  151:13
**stare (1)**
  81:17
**start (1)**
  10:14
**started (11)**
  10:9;11:17;25:4;
  32:23;39:21;48:5;
  49:2;58:16;83:18,20;
  85:2
**starting (2)**
  20:6;106:20
**state (8)**
  6:2;14:16;16:12;
  17:15,16,16;166:1,4
**stated (2)**
  134:12;162:6
**statement (1)**
  128:12
**statements (3)**
  127:18;133:3,19
**States (3)**
  9:7,8;168:5
**station (1)**
  52:8
**status (1)**
  74:6
**stay (2)**
  9:10;92:20
**stayed (1)**
  122:10
**staying (1)**
  122:11
**stenograph (1)**
  166:15
**step (2)**
  13:5;22:15
**stepped (1)**
  77:25
**Steve (3)**
  84:12;85:1;134:23
**still (9)**
  11:23;20:8;37:24;
  65:25;67:9;77:4;

89:1;111:16;148:20
**stipend (1)**
  142:6
**stole (1)**
  85:22
**stone (1)**
  107:24
**stood (2)**
  77:5;114:13
**stop (1)**
  51:6
**stored (1)**
  73:12
**stories (1)**
  85:3
**story (3)**
  48:3,4;142:6
**stream (1)**
  119:5
**Street (1)**
  168:2.5
**string (2)**
  82:20,21
**strive (1)**
  119:3
**stuck (1)**
  34:17
**student (1)**
  8:24
**stuff (26)**
  9:23;17:12;23:2;
  40:16;48:13;55:18,
  19;56:8;60:5,6;
  63:20;65:2;69:17;
  76:3;80:6;85:15,25;
  86:1;88:1;100:25;
  127:19;129:25;
  130:3;136:4;150:12;
  152:5
**stuffed (1)**
  84:5
**Sturgill (8)**
  39:12,16;43:5;
  44:13,14;45:22;
  129:17;149:5
**subject (1)**
  86:11
**submit (1)**
  164:12
**submitted (2)**
  154:21;168:18.5
**subordinate (1)**
  151:4
**sudden (1)**
  49:3
**suddenly (1)**
  97:15
**suggest (5)**
  72:13;90:25;93:7;
  150:23,23
**suggested (1)**
  32:1
**Suite (2)**

166:11;168:24
**summarize (1)**
  129:10
**summarizing (1)**
  154:14
**summer (5)**
  74:10,17;94:19,25;
  118:22
**Sunday (2)**
  100:15,21
**super (1)**
  161:2
**Superior (1)**
  68:18
**supervise (2)**
  12:14;23:14
**supervising (1)**
  13:1
**supervisor (1)**
  23:10
**supposed (4)**
  39:17;41:1;53:11;
  58:5
**Supposedly (2)**
  49:8;138:9
**sure (40)**
  12:3;33:19,22;
  35:18;37:7;41:18;
  42:24;44:2;57:23;
  62:21;72:11;73:15,
  21;78:15;86:4;92:8;
  93:9;96:11,12,15,24;
  98:12,14;99:6;
  101:16;102:6,6;
  103:2;105:3;118:5;
  119:15;120:6;124:6;
  135:12;141:25;
  142:11;143:5;
  160:20;163:1;164:16
**surprise (1)**
  160:15
**surprised (2)**
  128:15;155:19
**Susie (10)**
  83:12;92:14,15;
  110:3;149:23;
  158:19,21;163:6,7,8
**suspect (1)**
  137:21
**suspend (1)**
  94:20
**suspended (1)**
  96:11
**suspending (1)**
  96:13
**suspension (1)**
  96:17
**Suzanne (2)**
  126:8;149:24
**sworn (2)**
  4:2;166:6
**system (3)**
  26:1,2;37:10

| **T** |
| :---: |

**tables (1)**
  46:16
**tactics (1)**
  144:25
**Taft (1)**
  99:18
**talk (20)**
  42:2;46:8,12;
  52:23;82:7,8,16,24;
  83:3,4;85:3,6;90:15,
  21;91:11;94:18;
  97:24;118:16;
  127:23;148:23
**talked (25)**
  27:16;31:14,15;
  32:18;40:19;45:23;
  77:6;79:21;82:13,23;
  104:25;117:25;
  120:4;122:12;124:3;
  125:24;126:24;
  127:4;128:1;129:23,
  24;135:7;147:19;
  163:4;164:6
**talking (28)**
  7:3;22:13;24:8,9;
  39:13;42:9;47:15;
  52:25;53:4,6;55:7;
  83:1;85:5;91:8;97:3,
  8,16;103:15;109:22,
  24;110:10;117:20;
  122:6;127:20;
  130:19;142:17;
  149:2;151:9
**tantrums (2)**
  76:4,8
**Tarrytown (1)**
  9:22
**Taylor (11)**
  13:9;83:13;135:3,
  23;136:12;137:15,15,
  23;138:3;146:9;
  161:14
**tearing (1)**
  84:20
**teeth (3)**
  97:5,17,21
**telling (9)**
  38:1;41:6;54:5;
  57:13;90:2;91:24;
  111:20;142:4;145:19
**tells (2)**
  42:14;49:10
**temper (2)**
  76:4,8
**ten (3)**
  24:9;86:4;129:14
**tend (1)**
  35:3
**term (1)**
  14:7

**terminate (3)**
  89:11;94:20;145:4,
  11
**terminated (3)**
  92:9;126:1;134:14
**terrible (4)**
  45:12;79:21,22;
  123:24
**terrified (3)**
  80:4,6;84:11
**test (1)**
  31:3
**testified (10)**
  4:3;26:6;28:12;
  36:6;43:18;111:24;
  117:3;129:5;143:19;
  146:3
**testify (5)**
  112:1;116:14;
  140:21;141:7;145:9
**testimony (6)**
  58:2;111:24;
  133:22;141:17;
  154:14;166:17
**Tevebaugh (14)**
  4:9;21:24;22:12;
  123:14;148:16;
  149:5,8;153:23;
  156:3,8;157:2;
  159:18;161:16;
  168:7.5
**Tevebaugh's (4)**
  123:10;147:15;
  153:9;162:5
**texted (4)**
  108:24,25;159:21;
  160:15
**texts (3)**
  79:13;128:8;
  138:21
**Thanks (1)**
  147:12
**thereafter (1)**
  166:18
**thinking (6)**
  58:17;66:24;76:21;
  90:22;108:19;136:21
**third (6)**
  109:3,10;123:8;
  143:22;148:11,13
**third-to-the-last (1)**
  125:21
**though (9)**
  5:1,6;34:9;35:10;
  46:15;47:11;87:23;
  94:3;107:24
**thought (20)**
  29:15;30:5;31:21;
  32:21;37:9;39:8;
  43:12;44:10;75:7;
  78:12;81:20,20;
  83:16;91:9;96:4;
  98:7;122:14;123:22;

Exhibit 1

Case 1:23-cv-00121-MPB-TAB    Document 61-1    Filed 05/20/24    Page 185 of 226
PageID #: 1406

JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL

CYNTHIA LEA MOWERY
January 25, 2024

136:19;150:19

**thoughts (2)**
118:2;124:23

**thousand (1)**
67:1

**threat (2)**
86:19;136:12

**threaten (1)**
86:15

**threatened (1)**
77:15

**threatening (7)**
75:22;78:11,20;
80:15;82:3;137:17;
138:9

**threatens (1)**
86:13

**Three (6)**
11:9;15:22;51:11;
53:21;106:22

**three-ring (1)**
73:14

**threw (3)**
79:22,23;80:11

**throughout (1)**
155:13

**throw (2)**
75:25;151:14

**throwing (1)**
83:18

**thrown (1)**
24:14

**throws (2)**
75:25;76:2

**till (1)**
59:2

**timelines (1)**
12:4

**timers (1)**
9:15

**times (9)**
15:20;32:3,11;
33:1;41:21;53:21;
79:12;125:1;134:17

**tired (1)**
152:11

**title (3)**
15:25;24:17;54:12

**titles (2)**
12:16;24:14

**titties (3)**
97:4,17,20

**today (12)**
5:25;6:24;37:8;
40:12;94:1;102:9;
105:10;109:5,11,11,
16;110:8

**together (15)**
30:11,12,13;36:13;
38:13;41:24;55:18;
59:3;60:9,10;79:4;
124:22;151:2,3;
161:24

**told (51)**
26:6;29:14;31:16;
32:17,20;34:8,10;
40:8;48:11,25;65:19;
75:8;78:2,3,4;84:12;
85:5,10;86:17,23;
88:1;91:9,23;92:16;
95:18,20;100:15,21;
102:6;103:3;104:16,
18,20;109:14;
113:14;116:15;
119:17;120:10;
123:17;124:8;
127:16;129:12,17;
131:25;133:9,10,14;
134:17,19;144:10;
146:13

**tolerance (3)**
45:2,3,4

**tomorrow (1)**
48:19

**TOMPKINS (1)**
168:2

**tone (2)**
40:20,21

**tonight (1)**
46:23

**took (12)**
18:19;19:14;48:2;
52:13,16,20;66:2;
94:12;109:25;
112:16;129:11;161:1

**top (4)**
107:9;131:9;
143:21;152:11

**topic (4)**
43:8;57:25;58:10;
73:3

**tore (1)**
21:9

**totally (1)**
53:8

**touch (1)**
26:18

**toward (1)**
97:8

**Township (9)**
13:24,25;14:7,22;
44:15;135:25;136:2,
3,7

**track (3)**
29:24;63:18;79:7

**tractor (2)**
41:23;52:14

**trademark (1)**
9:23

**transaction (2)**
71:5,11

**transcribe (3)**
5:2;80:8;153:21

**transcript (2)**
5:15;166:17

**transferred (1)**

9:21

**transition (1)**
96:3

**treasurer (7)**
14:23;20:1;29:7;
61:15,18;63:7;
142:15

**treasurer's (1)**
83:25

**Treated (1)**
79:21

**treating (1)**
83:2

**treatment (1)**
83:4

**tried (3)**
26:13;91:16;94:8

**triggered (1)**
40:6

**trip (4)**
48:19;50:11;51:8;
52:15

**trouble (4)**
79:6;86:22;162:12,
14

**Troy (3)**
68:4,6;119:2

**truck (1)**
31:2

**true (3)**
21:20;142:5;
166:17

**trust (1)**
120:17

**trusted (3)**
31:19;79:2;156:23

**Trustee (3)**
13:25;14:6,8

**truth (6)**
4:2,3,3;166:7,7,7

**try (4)**
63:11;91:22;148:1;
164:7

**trying (13)**
5:13;15:25;27:16;
30:11;36:24,25;79:8;
81:17;91:16;101:9;
122:25;131:23;
154:14

**Tuesday (1)**
108:11

**turn (4)**
72:12;113:11;
131:17;148:3

**turned (5)**
46:16;74:1;84:10;
85:21;126:20

**TV (1)**
108:5

**two (17)**
10:4;16:1;48:18;
51:11;62:5;70:5;
77:4;103:15;105:10;

106:25;110:1;
113:23;124:2;
135:17;142:17;
148:11;157:25

**two-thirds (1)**
107:24

**Tyler (3)**
57:5,8;153:13

**type (2)**
116:2;128:16

**typewriting (1)**
166:15

**typewritten (1)**
166:16

**typical (2)**
34:1;110:23

**typically (3)**
21:21;22:16;97:2

**Typist (1)**
9:9

## U

**uh-uh (4)**
4:25;68:22;115:25;
124:10

**ultimate (1)**
33:12

**ultimately (3)**
24:6;33:10;96:16

**unacceptable (1)**
117:6

**unanimously (1)**
145:22

**unapproachable (1)**
75:22

**unclear (2)**
108:15,17

**uncomfortable (4)**
38:24;39:10;46:5,
10

**under (7)**
25:22;108:23;
109:3;132:25;
138:24;156:10;
166:16

**unfiltered (1)**
151:15

**unfortunately (2)**
100:22;120:16

**UNITED (1)**
168:5

**University (3)**
8:10;123:20;
148:15

**unless (2)**
38:6;64:13

**unsecured (1)**
47:25

**unsuccessfully (1)**
15:10

**untrue (3)**
133:3,8,17

**untruths (1)**
102:2

**unusual (1)**
17:7

**unwelcome (1)**
38:25

**unwritten (1)**
101:5

**up (51)**
7:24;9:23;10:17;
18:8;19:8;23:4;42:1;
43:11;49:4,6,15,16;
50:6,8,9;52:14,20;
54:7;56:4,20;60:3;
72:2;77:25;79:24,25;
85:17;88:5;91:12,13;
95:17;96:3,13;97:14,
25;100:20;107:19;
108:11;109:15;
114:13;122:11;
127:3;147:3,17,21;
151:14;153:11,25;
154:5,9;155:14;
161:24

**update (2)**
33:17;41:1

**upset (2)**
84:24;85:12

**upstairs (2)**
53:19;104:23

**use (3)**
19:1;40:21;106:19;
113:23;115:25

**used (6)**
19:2;24:2;59:3;
63:22;70:21;134:11

**uses (1)**
40:20

**using (3)**
63:4;148:25;
162:19

**utilities (2)**
70:20;71:13

## V

**v- (1)**
168:9.5

**various (3)**
16:8;19:24;114:25;
154:17

**vendor (2)**
68:3;69:15

**vendors (9)**
19:1;45:13,17;
70:13,17;71:16;
129:24;151:19,23

**Verbal (3)**
81:11;82:2,4

**verbally (1)**
81:23

**version (4)**
46:1,2,3;85:11

Exhibit 1

via (1)
    100:5
vice (8)
    14:16,17,21;19:20;
    21:25;22:3,15;44:25
violent (3)
    78:11,20;80:10
VIP (1)
    124:3
visiting (1)
    50:5
voice (1)
    40:20
vote (1)
    72:6
voted (1)
    75:4
Voter (33)
    6:20;10:6,12;
    11:15,18,25;19:16;
    27:12,24;28:1;29:22;
    30:1,19;33:4,5,13,15,
    18,21;34:2,24,25;
    37:11;94:21;100:18;
    101:2;115:24;
    127:15;146:4;
    154:10;161:15;
    162:9;168:11.5
VR (1)
    36:7
VRB (1)
    162:21

**W**

wait (6)
    5:4;35:23;59:2;
    76:16,16;122:2
waited (1)
    136:17
waiting (1)
    132:7
walked (5)
    52:14;53:17;60:22;
    76:12;102:19
walking (3)
    33:25;52:9;53:7
walks (3)
    36:14;56:20;85:9
wall (3)
    76:1,1;79:23
Wanamaker (1)
    7:25
wants (5)
    76:3,4,6;77:9;
    142:2
ward (3)
    14:21,21;54:8
warned (1)
    126:1
warning (6)
    35:19,21,21;45:5,
    7;76:9

warnings (3)
    36:21;41:4;78:7
Washington (1)
    50:25
watch (1)
    90:9
watched (1)
    77:6
water (1)
    5:19
way (31)
    15:16;22:11;40:18;
    48:1;51:4;52:7,23;
    65:10;77:5;83:1;
    91:20;92:3;94:7;
    97:24;106:12;
    108:25;144:12;
    149:25;150:18,18,19,
    20,21,24;151:2,3;
    159:18,22;160:10,16,
    18
wear (4)
    51:20,21,22;52:2
weeds (5)
    118:25;119:4,11,
    18,22
week (5)
    59:25;61:12;95:4,
    4,5
weekend (3)
    47:20;85:15;95:6
weeks (1)
    93:3
weeks' (1)
    77:4
weren't (6)
    34:12;58:24;78:1;
    99:8;142:15;153:4
Wesleyan (6)
    8:10,11,19;123:19;
    148:14,18
West (2)
    47:14;49:13
What's (11)
    9:14;18:25;37:15;
    47:21;48:4;57:3;
    58:3;84:25;113:12;
    124:13;128:22
whatsoever (1)
    130:11
wheels (1)
    69:1
Whenever (1)
    27:23
WHEREOF (1)
    167:2
whip (2)
    15:25;16:5
whole (5)
    4:3;54:7;106:18;
    127:9;166:7
who's (1)
    35:3

Whose (1)
    15:4
widow (1)
    31:16
Williams (4)
    13:9;146:9;161:14,
    19
win (1)
    14:3
wind (1)
    122:11
wish (2)
    90:10;137:20
within (1)
    39:17
without (6)
    5:11;19:7;53:24;
    114:18;115:1;118:8
witness (33)
    17:23;28:21;29:12;
    35:25;36:5;41:16;
    42:10;43:20,22,23;
    55:1,14;58:5;64:16;
    66:11;88:17,22;89:6;
    90:16;101:20;103:6;
    106:23;114:21;
    120:25;126:6,24;
    127:4;141:10,18;
    145:9;146:1;147:11;
    167:2
woman (1)
    87:18
women (3)
    97:4,17;162:13
Women's (1)
    16:7
won (1)
    14:4
words (2)
    4:21;116:5
wore (1)
    51:17
work (45)
    9:4,6;13:16;29:8;
    64:6,10,15,19,21;
    65:16;66:5,8,20;
    67:19,24;72:20;
    87:17;88:25;89:2;
    98:23;99:21;101:14,
    18;107:18;109:1,21;
    111:3,21;112:9,10,
    23;114:2,14;115:24;
    120:11;142:7;
    154:21;155:10,13;
    159:19,22;160:11,16;
    162:8,20
worked (15)
    10:16;15:1,4,8;
    27:23;30:10;60:22;
    61:10;105:10;
    143:21,25;144:13;
    154:22;160:18;164:2
workers (2)

112:9;113:4
working (17)
    10:12;30:5;35:14;
    48:12,14;59:14;60:3;
    74:13;96:19;99:25;
    100:2;101:1;155:4,6,
    17;162:12,14
works (4)
    18:25;59:24;60:4;
    69:9
world (1)
    68:13
worst (2)
    79:5;91:17
worth (1)
    75:8
wound (1)
    96:13
wracked (1)
    55:6
wrestler (1)
    56:16
wrestlers (6)
    56:2,2;57:5,7,17;
    153:16
wrestling (2)
    57:19;152:2
write (4)
    29:19;60:10;
    104:10;139:3
writes (1)
    60:11
writing (6)
    5:8;41:11;78:8;
    130:1,4,8
written (15)
    28:3;36:21;37:5;
    38:1,3;39:17;41:4;
    45:5,7;76:9;78:7;
    157:16,22;158:11,15
wrong (6)
    43:17;81:15;
    101:19;129:21;
    130:2;149:4
wrote (12)
    98:7;112:6;117:22;
    125:5,8,13;143:3,7;
    148:3,4,6;163:4

**Y**

yea (1)
    91:13
year (16)
    9:11;10:4;21:6;
    22:2,7;29:23;32:13;
    65:8;69:24;72:3,19;
    74:20;82:13;87:25,
    25;136:13
years (13)
    8:23,23;9:19;
    10:11,22;11:9,19;
    37:19;62:4;71:9;

81:21;82:17;142:17
year's (1)
    118:8
yelling (1)
    111:6
yesterday (2)
    76:11;79:1
York (2)
    9:22;10:1
young (2)
    87:18;127:15

**Z**

zero (3)
    45:2,3,4
zip (1)
    84:5

**0**

0661154 (1)
    167:8

**1**

1 (12)
    46:22;105:17;
    106:6,7,8;107:4,6;
    125:21;148:7,19;
    159:5,7
1:23-CV-121-JMS-TAB (1)
    168:10
1:30 (2)
    105:21,22
1:39 (1)
    106:3
10 (15)
    43:18,25;57:24;
    58:9;59:7;86:25;
    92:6;120:8;129:6,20;
    132:13,14,21;148:25;
    151:14
100 (2)
    37:10;103:2
11 (6)
    100:10;101:15;
    102:5;138:12,13,15
11th (2)
    32:13;103:1
12 (12)
    8:23;10:22;90:4;
    109:8;118:3,4;
    136:13;142:22,23;
    143:2;154:7,9
12:54 (1)
    106:2
125-acre (1)
    37:24
135 (2)
    166:11;168:23.5
15 (1)
    8:23

Exhibit 1

Case 1:23-cv-00121-MPB-TAB    Document 61-1    Filed 05/20/24    Page 187 of 226
PageID #: 1408

JEREMIAH TEVEBAUGH VS
INDIANAPOLIS-MARION COUNTY, ET AL

CYNTHIA LEA MOWERY
January 25, 2024

**1500 (1)**
  75:8
**17 (1)**
  47:16
**1720 (2)**
  166:11;168:24
**19 (5)**
  22:10;27:20,20;
  47:19,22
**1987 (2)**
  10:9,15

---

### 2

**2 (9)**
  106:20,21,25;
  113:11,13;122:22;
  148:3,4;159:17
**20 (6)**
  10:11;11:19;22:10;
  86:3;138:25;151:13
**2002 (1)**
  11:19
**2004 (1)**
  11:20
**2016 (2)**
  19:12,25
**2017 (1)**
  19:25
**2018 (1)**
  20:1
**2019 (4)**
  20:1,7,10;125:10
**2020 (3)**
  22:9;27:21;121:20
**2021 (6)**
  27:21;64:6,15;
  147:14;148:8,19
**2022 (32)**
  21:6;43:19;46:10,
  22;47:7,10,12,16,19,
  22;48:1,18;52:22;
  54:20;58:9;59:7;
  74:5,10,17,24;90:5;
  94:20,25;100:10;
  102:5;118:4,22;
  125:14;136:25;
  148:24;152:13;
  154:25
**2024 (3)**
  166:13;167:4;
  168:18
**2031 (1)**
  167:9.5
**21 (7)**
  48:1,15;108:10,12;
  159:8,14,15
**22 (3)**
  20:16;74:20;
  118:19
**23 (1)**
  74:20
**25 (3)**

**66:24;125:14;**
  167:9.5
**250 (1)**
  141:5
**2500 (1)**
  156:17
**25th (2)**
  166:12;168:18
**26 (5)**
  48:18;52:22;54:20;
  136:25;152:13

---

### 3

**3 (8)**
  109:4,7;115:12,13,
  21;121:20;132:25;
  134:8
**30 (2)**
  61:14;105:18
**31 (1)**
  46:10
**317 (1)**
  168:25
**35 (2)**
  156:13,14
**3500 (2)**
  156:17,19

---

### 4

**4 (8)**
  47:7;59:24;71:3;
  117:14,16,17,19;
  148:7
**4,000 (1)**
  156:10
**40s (1)**
  9:1
**4340 (1)**
  6:10
**46202 (1)**
  168:3
**46204 (1)**
  168:24.5
**46239 (1)**
  6:11

---

### 5

**5 (6)**
  20:20;81:4;105:17,
  25;121:12,13
**501c3 (1)**
  17:25
**5th (1)**
  83:5

---

### 6

**6 (9)**
  20:20;122:17,19,
  21,24;147:6,6,7,13

**6:30 (3)**
  101:18,18,23
**608 (1)**
  168:2.5
**63 (1)**
  81:21
**635-7857 (1)**
  168:25
**64 (1)**
  81:21
**65 (1)**
  6:8
**66 (1)**
  47:13

---

### 7

**7 (7)**
  47:10,12;124:11,
  13,14,19,21
**7/25/22 (1)**
  125:11
**7th (1)**
  20:20

---

### 8

**8 (10)**
  108:24;128:21,22,
  24;129:1;130:19;
  132:25,25;136:14;
  159:17
**80s (1)**
  14:2
**8A (1)**
  134:6

---

### 9

**9 (4)**
  59:24;130:22,23,
  25
**9:30 (1)**
  102:17
**90s (1)**
  68:19

Exhibit 1

16:35

**C-**

Cindy Mowery

Hoss, I need a handyman.  Do you know anyone?

What'd the dr say?

Scraped off one, gave me a shot and said to wash everything well and get in a hot tub

Do, what are they?

What is broken

Want new fans hung in living room, screen door put up, new lights in bathroom to start off with.

That's all simple enough

Know anyone I can hire?  Need my house painted, too.

Yes I'll get his number

Thanks.

Tue, Sep 24, 16:42

Plus my tv hung on the wall and rearranging my furniture.  More handyman stuff.

iMessage

**EXHIBIT**
1

Exhibit 1

16:19

< 4        C-        ◻

Cindy Mowery >

Sun, Nov 7, 21:26

Be sure to send me the Treasurer's
Report first thing in the morning.
No excuses.

Ok

Mon, Nov 8, 08:48

Painters on the way over to work

Ok, I'm about ready to leave.

Did you get your signon fixed?

No waiting on callback

Mon, Nov 8, 11:20

Anything for Ron

🖤

Mon, Nov 8, 15:07

Did you get your password fixed?

Yes

🔘  🅐  iMessage  🎙

❀  🅐  😀  😀  Cash  🔍  🎵

Exhibit 1

16:52

1

**C-**

Cindy Mowery ›

Fri, Nov 12, 04:23

Yes

Forgot what I wanted now.

Fri, Nov 12, 09:08

The painting people asked to be paid today. Can you pay them today?

Yes are they done?

They will be. I told them to see you for payment. I think they're finishing up the Lodge today, too.

Fri, Nov 12, 19:47

Who's going to sign their check?

Sat, Nov 13, 21:31

The lights are great!! I

Sat, Nov 13, 22:57

How do you know

I was there.

iMessage

**Cash**

Exhibit 1

 Gmail

Jeremiah Tevebaugh <hosstevebaugh@gmail.com>

**Fwd: Message from "RNP002673BF6B16"**
1 message

**Cindy Mowery** <clmowery@aol.com>                                    Mon, Nov 22, 2021 at 11:03 AM
Reply-To: Cindy Mowery <clmowery@aol.com>
To: "hosstevebaugh@gmail.com" <hosstevebaugh@gmail.com>

We need to discuss...

📄 **20211122095645470.pdf**
    252K



Exhibit 1

11/22/21, 10:15 AM                                  Indiana Members Credit Union

| NOV 15 2021 | ⊞ Check 1418 - 1418 | ($7,500.00) $124,685.67 | ⋮ |

---

Details

**Statement Description:**
Check 1418

**Date:**
11/15/2021

**Type:**
Debit - Check 1418



⟨            1 of 2            ⟩

---

| NOV 15 2021 | ⊞ Check 1412 - 1412 | ($5,200.00) $132,185.67 | ⋮ |

| NOV 15 2021 | ⊞ Check 1413 - 1413 | ($1,287.50) $137,385.67 | ⋮ |

| NOV 13 2021 | Withdrawal Debit Card MASTERCARD DEBIT, MEMO: ADT SECURITY*403005754 800-238-2727 FLDate 11/12/21 | ($179.97) $138,673.17 | ⋮ |

| NOV 12 2021 | Deposit by Check, MEMO: Check Received 4,283.50 | $4,283.50 $138,853.14 | ⋮ |

| NOV 12 2021 | Deposit, MEMO: COIN FEE REFUND | $20.09 $134,569.64 | ⋮ |

| NOV 12 2021 | Deposit, MEMO: COIN DEPOSIT | $180.82 $134,549.55 | ⋮ |

| NOV 12 2021 | Withdrawal ACH CITIZENS ENERGY, MEMO: ID: 9000000471 CO: CITIZENS ENERGYEntry Class Code: PPDACH Trace Number: | ($4,014.72) $134,368.73 | ⋮ |

| NOV 12 2021 | Withdrawal ACH PAYCHEX TPS, MEMO: ID: 1161124166 CO: PAYCHEX TPSEntry Class Code: CCDACH Trace Number: | ($1,250.93) $138,383.45 | ⋮ |

| NOV 12 2021 | Withdrawal ACH PAYCHEX EIB, MEMO: ID: 1161124166 CO: PAYCHEX EIBEntry Class Code: CCDACH Trace Number: | ($43.65) $139,634.38 | ⋮ |

**Exhibit 1**

 Gmail

Jeremiah Tevebaugh <hosstevebaugh@gmail.com>

## New Outlook Password

1 message

**Mowery, Cindy** <Cindy.Mowery@indy.gov>                    Mon, Jul 11, 2022 at 4:30 PM
To: "Tevebaugh, Jeremiah" <Jeremiah.Tevebaugh@indy.gov>, "jeremiah@marioncountyfair.org"
<jeremiah@marioncountyfair.org>, "hosstevebaugh@gmail.com" <hosstevebaugh@gmail.com>

Jeremiah,


Please be advised that you have a new password on your Outlook account.  It is limbsabsorbcometmitts


Let me know if you have any questions or comments.


Thanks,

Cindy



Exhibit 1

 Gmail

**Jeremiah Tevebaugh <hosstevebaugh@gmail.com>**

## FW: Message from "RNP002673BF6B16"

1 message

**Mowery, Cindy** <Cindy.Mowery@indy.gov>                                Mon, Jul 11, 2022 at 4:27 PM
To: "Tevebaugh, Jeremiah" <Jeremiah.Tevebaugh@indy.gov>, "jeremiah@marioncountyfair.org"
<jeremiah@marioncountyfair.org>, "hosstevebaugh@gmail.com" <hosstevebaugh@gmail.com>

Jeremiah,

Attached is a Notice of Unacceptable Performance or Conduct that I have signed as your supervisor.  Please read it
carefully and note that you are on unpaid, suspended leave this week.  I am also not approving any pay that you submit
for last week as you did not have my approval for any time off - whether it be in the office or telecommute.  Also, not
speaking to me or ignoring me in the office will not be tolerated and could result in further action.

If you have any questions or comments, please let me know.

Cindy

**20220711152743782.pdf**
31K

**Exhibit 1**

From: clmowery@aol.com,
To: ladonnafreeman42@yahoo.com, mikedilk@sbcglobal.net, wanamakerin@att.net, teveperry@gmail.com, susieday20@yahoo.com,
Bcc: dhuston@namidway.com,
Subject: Fair Report
Date: Tue, Jul 12, 2022 11:39 am
Attachments: 2022 Fair Report.docx (17K)

Good Morning,

As I promised, attached is my findings report from this year's Fair. I can only hope that you have the opportunity to discuss them. I don't see how you can possibly meet to discuss this year's fair without addressing the issues with Hoss.

Fondly,
Cindy



FAIRGROUNDS_000166



Good Morning,

I am writing this email to you in response to some of your inquiries as to what I learned visiting with each of the Board Members during this year's Fair. Most of it focuses on Hoss – which makes sense since he is the Executive Director. It is somewhat random but is how I collected the information.

Hoss was not prepared for this year's Fair. The concessionaire's spots were not marked. As you know they are marked and numbered/lettered so that they know which spot they are in and how much space they have to stay in.

The Treasury bank was not done. Joe asked well in advance for his usual $45,000 cash in various denominations and Hoss could only provide $17,000. I was advised that he had ordered the funds but failed to pick them up on the agreed upon date, and the bank returned them as they could not hold that kind of cash in the facility.

We ran out of checks. Paul was unable to write checks for a couple of days as he ran out of checks. A day or two later, some checks showed up but I am not sure where they came from or how. Hoss had told us he had ordered them, however, when we talked with the bank, an order had not been placed. One day, Joe, Paul, and I ordered 4 boxes – which is what Joe wanted. After the Fair, Hoss said he had placed an order for checks that day.

The fairgrounds had lots of weeds. It was quite embarrassing when Congressman Pence had his picture taken by our sign on Troy and posted it to Facebook. Is that the image we've all strived for?? There were weeds all over the grounds, and in particular, the stream by the Park Stage. When I inquired with him about it, he became enraged and said I was just picking at him.

There was no or not much trash pick-up. In fact, I really didn't see a consistent trash crew other than Scooter. I honestly don't think he had anyone lined up for it. There were also little piles of trash everywhere in the Coliseum, and no one could really figure out why. It was never picked up and is probably still there.

There were no consistent cleaning crews. Hoss had told me that the port-o-let people were going to be the cleaning crew. I can tell you first-hand that his cleaning crew did not clean up the eating area in Marketplace. When they were asked to do so, they said it wasn't their job. However, the lady did clean one table. Since LaDonna is over Marketplace, I asked her to get a cleaning crew for the building. When Hoss found out, he told her that he had it covered. Needless to say, he did not.

The gates staffing was not planned nor shared with Susie. Susie asked numerous times before and during the Fair for Hoss to provide her with a list of those folks that would be staffing the gates. It was never provided and there was no consistent staffing at the gates.

Once again this year, the program was incomplete or wrong. Events weren't on there and events that were not going to be at the Fair were on the program.

The sheep/swine barn was not prepared as it should have been, and there were no ribbons even though Hoss assured Joe that he had hundreds. Michelle Williams was very upset because she had her volunteers there to help set up the pens. The building had not been cleaned or emptied in preparation for them. Hoss also arrived on a tractor to supposedly help but had a baby with him. After a few



minutes, he left and did not return. Michelle was very upset as she did not think her Dad, Joe, should be lifting or moving things around in that kind of heat.

There was no wine and beer garden. Hoss assured me that he had all of this taken care of and it would be up and running. However, when I realized it wasn't there, I asked Hoss about it, and he initially said the distributor couldn't get the items we needed. However, upon further investigation, Hoss just didn't place our order.

We lost our usual gate keepers, Lisa/Michelle (fun girls) and Ray, because Hoss refused to provide them with a cart and radio. However, during all through the Fair, his girlfriend had both a cart and radio. In fact, Hoss made several accusations of theft toward Lisa, Michelle, and Ray and stated that we needed disinterested parties working the gates. When Jane left, he put his girlfriend over the gates and had her family working the gates – which is what set off the argument between Hoss and me. When I arrived that day, Ashley from the office told me that Lisa had been in the office and was "barking orders at everyone." I inquired as to why and she said Hoss had put her over the gates. I then went over to the cattle barn – where Hoss was – and told him that I did not want her doing them and I did not want her family working the gates. He blew up and said I was trying to interfere with his relationship and that he would do what he thought was best for the Fair. In actuality, Susie should have found a replacement for Jane or covered it as she is over the gates.

Hoss ordered tickets from the State Fair for the Fairs Care program – which never made it out on the fairgrounds. I did not and have not yet seen any tickets for the State Fair. However, his failing to do the Fairs Care program and we had applied makes us really look bad. I doubt the fair will be able to get them next year.

The tree carving and blacksmith that he said would be there were not there. When I asked him about it, he just said they couldn't come. I seriously doubt they were ever scheduled.

The fireworks were another area that Hoss did not follow-up on. I asked Paul to call our usual guy for fireworks and he indicated that he had only been called two weeks prior to the fair and that it takes longer than that to order the product and get things in place. When I told Hoss this, he had some "friend" sell him some and set them off with Steve Ort and Paul – not of which are licensed.

No revenue was seen or turned in from the micro-wrestlers or boxing events. I do not know what kind of deal was cut with them but it is worth checking in to. It should also be noted that his gospel fest set for Sunday did not come through. When he was asked, he said they "ghosted" him, so there were no park stage performances that day.

Many board members had issues with Quest as they did not seem too effective. There were a couple of people that performed well but for the most part, they were walking in groups, watching acts, and eating. It should also be noted that Hoss insisted that "his kids" wear fair shirts. The kids wanted to wear the shirts as they got "lots of free stuff." I told Hoss that I did not want kids wearing fair shirts – so he sent them upstairs in the office and had them get the yellow shirts that had Security on the back of them. I told him this was unacceptable because if something happened, people would be seeking security and kids were not part of our security team. He did not see it as a problem and they continued to wear them throughout the fair.

FAIRGROUNDS_000168



Exhibit 1

Several comments were made about Hoss babysitting during the Fair. One time, one of the Board Members went up to the Lodge to get Hoss and he was asleep on the sofa with the baby on top of him. He also walked through the grounds with the baby. I do not hold Kaitlyn accountable for this – however, he should have told her that he was working and could not babysit while working.

We had also planned that we would have the Lodge in tip top shape so that we could hold an open house for it. We wanted people to see how nice it was for events and they would hopefully rent it for their special occasion. However, one of the Board Members went up to see it, and there were people laying all around, taking naps. Trash, vehicle parts, and vehicles were all over the yard, as well as a fire pit. He did not clean some of it up until he saw Danny and I looking at it. To see it in the condition it was in for the fair was quite a disappointment.

It should also be noted that it was my intent and that of the Board's that the Lodge was for the caretaker and possibly one other person. To date, it is used by at least 5 people – with five of them being kids. The Lodge was not built for that and cannot take that kind of wear and tear. It and the furniture and appliances will also look used and worn in a short period of time if he continues to use it as such.

Money. Where is the gate money that he collects at each event that is held on the fairgrounds? Where's all the cash coming from that he pays people? Hoss has been asked on many occasions by Joe and myself not to pay people in cash. Joe even went so far as to tell him that we cannot pay cash as it could jeopardize his license and our 501c3 status, but he continues to do so. Also, why wouldn't he turn in the money in the brown bag that he picked up from the office until he was forced? I'm sure he'll tell you something, but I can pretty much guarantee that it is not true.

W-9's were not completed by the police or anyone else other than the Park Stage folks. Supposedly, we have a scholarship/donation fund that he was paying them from. To the best of my knowledge, there is one fund and it's the general fund. There were also several people with the swine and sheep shows that were not paid from last year, as well as a queen contestant. Why?

As you know, Hoss does not share information pertaining to the fairgrounds to me or with the Board. It is his philosophy that "it's better to ask for forgiveness than to ask for permission." I believe this Fair is a perfect example of that.

You may have noticed that Hoss had little or no interaction with the midway or backtrack folks. That is because he has alienated himself with them by talking terribly to them, treating them poorly, or just plain lying to them. It is my belief, that neither group wants to work with him.

In conclusion, I believe in all of you. I asked most of you to serve on the Board because you represent decency and are known for your honesty and integrity, and I wish I could say the same about Hoss. As you know, I inherited Hoss when I took office as President. I also knew that he had had a hard life and wanted to help him turn his life around. As someone once told me, you can't change a leopard's spots, and boy, did I learn that to be true. And, as Hoss is proud to proclaim, "you can't change people."

Hoss has done a lot of positive things for the Fair, but unfortunately, his issues far outweigh any good that he's done. I trust you will do the right thing – whatever that may be.

Cindy

FAIRGROUNDS_000169




Exhibit 1

 Gmail

Jeremiah Tevebaugh <hosstevebaugh@gmail.com>

## Resignation
1 message

**Hoss Tevebaugh** <hosstevebaugh@gmail.com>                                        Mon, Oct 5, 2020 at 9:54 AM
Reply-To: hosstevebaugh@gmail.com
To: Cindy Mowery - MCF President <clmowery@aol.com>

Please refer to attached.
Jeremiah Tevebaugh - Hoss
317-922-7088

*"Awesome is always an option; be that!"*

 **a resignation letter.pdf**
8K



EXHIBIT

5

Exhibit 1

October 3, 2020

Marion County Fairgrounds
7300 E Troy Ave
Indianapolis, IN  46239

Esteemed Board Members.

It is with regret that I am resigning effective Friday, October 16, 2020 at the end of business.  I really appreciate the opportunity that being a part of the organization has provided.

Sincerely,


Jeremiah Tevebaugh - Hoss

**Exhibit 1**

 Gmail

**Jeremiah Tevebaugh <hosstevebaugh@gmail.com>**

---

## Expungement Letter
1 message

---

**Cindy Mowery** <clmowery@aol.com>                      Tue, Feb 2, 2021 at 9:18 AM
Reply-To: Cindy Mowery <clmowery@aol.com>
To: "hosstevebaugh@gmail.com" <hosstevebaugh@gmail.com>



Hoss,

I've made my tweeks - unless you have some, it's done.  Can you print this off on MCF letterhead and I'll stop by and
sign.  I've got a 10 a.m. meeting so it'll be after that before I can get there.

Cindy

📄 **Expungement Ltr - JT.docx**
   14K



EXHIBIT

Exhibit 1



February 2, 2021

RE:     Jeremiah Tevebaugh

To Whom It May Concern:

I am writing on behalf of Jeremiah Tevebaugh in support of his expungement efforts.  He is currently an employee of the Marion County Fairgrounds (MCF) and reports directly to me.

Mr. Tevebaugh currently serves as the MCF's Executive Director.  He handles all daily affairs, interacts with vendors and visitors, oversees the budget and financial matters, negotiates contracts for events and storage, manages buildings and grounds, and keeps the Board apprised of all activities.  He holds a Master's Degree from Indiana Wesleyan University and is highly intelligent.  As President, I work with Jeremiah on a daily basis and make most decisions based on his input.  He has quickly become an integral part of our organization.

I learned of Mr. Tevebaugh's past from him.   We had a lengthy conversation regarding it, as well as my expectations of him as an employee.   In my opinion, he just wanted a chance to prove himself and that he has done.  As he puts it, he has been given a second chance and is very grateful for it.  He has proven himself to be trustworthy – he works closely with our Treasurer and handles all monetary matters.  He is also very dependable – he works nearly six days a week and is always there when needed.  He is a loyal person – he is very dedicated to the MCF and Board.  He has helped us turn a declining organization into one with renewed hope.

In closing, it is my belief that expungements were created for people such as Jeremiah Tevebaugh.  This expungement would offer him opportunities that would not otherwise be afforded to him.  It is my sincere hope that an expungement is granted to him, allowing him to live a positive and productive life.

Sincerely,

Cindy Mowery

# Exhibit 1

Jeremiah Tevebaugh

Every day that Jeremiah worked, we had lunch. One time I would buy, the next time he would. We also had lunch on Fridays on a regular basis.

Has continually told me and other people that he is very ill – doctors can't identify what is wrong with him – and that he needed health insurance. I had a position open and thought I could help him with health insurance, and he would help VR with our workload.

He has gone to dinner with me, my friends, and my family. He and I have also gone to dinner several times.

He recently (probably a week prior to his complaint) came over to my house and cleaned my pool cover so that the pool could be open.

He knows the security codes at my house.

When I was out with my broken ankle, he regularly came over to check on me and to see if I needed anything.

My neighbor and I have had his dog since the end of May. We also had him most of last year.

I've included and taken him to GOP events and introduced him to various people to expose him to a better crowd. I let him speak on behalf of the Fair at a Senate Committee Meeting and the City-County Council.

I encouraged the Fair Board to build a caretaker's house with rentable event space so that he would have a secure place to live. He claims to have a home in Russiaville but I am not so sure of that.

When my dog of 12 years needed to be put down, he set up the appointment, took him to the crematory, and buried him.

We were planning a trip to Seattle the last week of August and the first week of September so that he could see his family and I could see mine. (He'd go his way, and I'd go mine, then we'd meet up to return home.)

He has anger management issues. He talks with a psychiatrist every Wednesday morning to help him keep his temper intact.

One of the Fair Board Members met with me and accused him of sexual harassment. I talked with him about it, gave him info on sexual harassment, and warned him that he would be terminated if he did it again. She did not want to pursue things any further as she was afraid of him.

He told me in my VR office that men liked "big titties and no teeth" and I told him to leave my office. The no teeth comment came from my having bridges.

He also told me in my VR office that he was only dating the girl he was seeing because he was "God in sex and she let him do whatever he wanted, like tie her up." I again told him to leave my office.



FAIRGROUNDS_000271



He got upset with me about a fair issue and told me that he knew people that would burn houses down and that he used to be the guy that people called to have them burnt down.

After his complaint and a conversation with Twana and LaDonna, I called Lt. Jeff Duhamell about filing a police report. Jeff recently retired so he went to south district, talked to a detective there, and said the detective was going to follow up with me. I asked if the Detective was going to talk with Jeremiah, he said he believed he would talk with him, and I told him I didn't want to file the report as I was afraid of Jeremiah and his temper. Jeff told me that he would talk with the Detective and said that enough people knew about the situation and that he would have police patrols increase their patrols that pass in front of my house.

It should also be noted that at no time did Jeremiah ever say I was harassing him or sending him harassing texts, nor did he ever ask me to quit sending whatever he found offensive.

In closing, Jeremiah and I shared a friendship – a close one that shared personal information. We also joked around often, too – whether it be verbally or in writing. We supported one another in good situations and especially in bad situations. I must admit that I am hurt and quite surprised that he would file any type of claim against me.

Cindy Mowery

07/25/2022

FAIRGROUNDS_000272

Exhibit 1

**Prepared for the continued employment of Jeremiah Tevebaugh**

### CONDUCT POLICY: ZERO TOLERANCE

1.0    OBJECTIVE:

To instruct employee, Jeremiah Tevebaugh, on the company policy regarding harassment, including sexual harassment, insubordination, misconduct and the ZERO Tolerance conditions that exist for the employee's employment.

2.0    SCOPE:

Jeremiah Tevebaugh, an employee of Marion County Agricultural Fair Association (hereinafter referred to as "MCAFA.") is covered by this conduct policy.

3.0    HARASSMENT

Harassment can take many forms.  It may be, but is not limited to words, signs, jokes, pranks, intimidation, physical contact, or violence.  Harassment is not necessarily sexual in nature.

Sexual Harassment may include unwelcome sexual advances, requests for sexual favors, other verbal or physical contact of a sexual nature when such contact creates an intimidating environment, prevents an individual from effectively performing the duties of their position, or when such conduct is made a condition of employment or compensation, either implicitly or explicitly.

MCAFA is committed to providing every employee a workplace free from all forms of discrimination and one in which every employee is treated with dignity, respect and professionalism.   To that end, MCAFA submits a "Zero Tolerance" policy against sexual harassment and any inappropriate conduct of a sexual nature by employees, managers, vendors or clients.

As a MCAFA, employee, you are responsible for keeping our work environment free of harassment.   Any employee, who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, must report it to any Director of MCAFA with whom you feel comfortable.  When MCAFA becomes aware that harassment might exist, it is obligated by law to take prompt and appropriate action, whether or not the victim wants the company to do so.

If you feel you have experienced harassment, report the incident immediately to any Director of MCAFA with whom you feel comfortable.  Appropriate investigation and disciplinary action will be taken.  All reports will be promptly investigated with regard for the privacy of everyone involved.  Complaints and investigations will be kept confidential and disclosed only to those individuals with a need to know.

If you are found to have harassed a fellow employee, subordinate or Director, you will be



FAIRGROUNDS_000010

subject to severe disciplinary action and possible discharge. MCAFA will also take any additional action necessary to appropriately correct the situation. MCAFA will not retaliate against any employee who makes a good faith report of alleged harassment, even if the employee was in error.

MCAFA accepts no liability for harassment of one employee by another employee. The individual who makes the unwelcome advances, threats, or in any way harasses another employee is personally liable for such actions and their consequences. MCAFA will not provide legal, financial or any other assistance to an individual accused of harassment if a legal complaint is filed.

It is the intent of MCAFA to provide an environment free from verbal, physical and visual (signs, posters and documents) forms of harassment and discrimination, including such conduct based on sex, race, age, religion and similar other categories. All employees are asked to be sensitive to the individual rights of their co-workers. All employees are asked to be sensitive to the individual rights of their co-workers.

DEFINITIONS:

    A.    Harassment

    Any behavior which is unwanted and causes another person to feel uncomfortable or uneasy.

    Repeated, unwanted or unwelcome verbalisms or behaviors of a sexist, racist or agaist nature or with overtones related to a protected characteristic

FAIRGROUNDS_000011



Exhibit 1

B.    Sexual Harassment

Unwelcome, uninvited, unsolicited or unencouraged sexual advances, requests for sexual favors and other verbal or physical contact of a sexual nature constitute sexual harassment when:

1.    Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;
2.    Submission to or rejection of such conduct is used as the basis for employment decisions affecting such individual;
3.    Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

C.    Hostile Work Environment

Conduct which has the purpose or effect of unreasonably interfering with another person's job performance or creates an intimidating or offensive work environment.

D.    Unwelcome Behavior

Conduct an employee did not solicit or incite and that the employee regards as undesirable or offensive in nature.

Examples of Evidence of Hostile Work Environment/Sexual Harassment:

Sexual Harassment can include, but is not limited to, the examples provided below. However, in keeping with MCAFA "Zero Tolerance" policy against sexual harassment, all conduct of a sexual nature is prohibited.

*    Explicit sexual propositions or pressuring someone for a date or sex.
*    Touching or other persistent sexual advances.
*    Sexual innuendoes, stories, jokes or suggestive comments.
*    Sexually orientated "kidding" or "teasing".
*    Practical jokes of a sexual nature.
*    Jokes about gender specific traits or denigrating gender specific remarks.
*    Sexual orientated letters, telephone calls, e-mails or faxes.
*    Turning work discussions into sexual topics.
*    Bragging about sexual prowess.
*    Asking personal questions about a co-worker's sex life.
*    Giving compliments with sexual overtones.
*    Making sexual comments about a person's clothing, body or looks.
*    Telling lies or spreading rumors about a co-worker's sex life.
*    Touching a co-worker's clothing, hair or body or giving a neck massage.
*    Referring to someone as doll, babe, honey, hunk, beefcake or similar term.
*    Hugging, kissing, patting, pinching, brushing against or stroking co-worker.
*    Passing around or displaying sexually or foul visual material (e.g. pinups, cartoons) or

FAIRGROUNDS_000012

Exhibit 1

downloading sexual material or pictures on the computer.
* Using foul or obscene language or gestures (whistling, catcalls).


4.0     INSUBORDINATION and MISCONDUCT

MCAFA is committed to providing every employee a workplace free from all forms of misconduct and every employee is treated with professionalism and honesty. To that end, MCAFA submits a "Zero Tolerance" policy against misconduct and _any_ inappropriate conduct related to the examples as provided below by the said employee.

EXAMPLES OF MISCONDUCT

The following are only examples of misconduct for which an employee may be subject to discipline and these examples do not constitute a complete list of the circumstances for which discipline will be warranted.

a. Falsification of any records or reports pertaining to absence from work, claims pertaining to injuries occurring on company premises, claims for any benefits provided by the company, communications or records including personnel records.
b. Disclosing confidential information to outsiders.
c. Gambling or fighting on job sites or company property.
d. Unethical conduct or serious conflicts of interest.
e. Concealing defective work.
f. Stealing the company's property, a customer's property or the property of any employee.
g. Hiding, concealing or misappropriation of company property or the property of other employees or customers; sabotage or willful damage to company property, or the property of other employees or customers.
h. Unauthorized use or sale of any company-owned property, salvage material or equipment.
i. Reporting to work under the influence of alcohol or illegal drugs; possession, sale or use of marijuana or illegal drugs or chemicals or consumption of alcohol while working on job sites, in the office or in company vehicles.
j. Gross negligence or willful acts in the performance of duties resulting in damage to company property or injury to others.
k. Gross insubordination - a willful and deliberate refusal to follow reasonable orders by a member of management.
l. Willfully misusing company property.
m. Violation of the company's equal opportunity or sexual harassment policies.
n. Serious safety violation resulting in injury.
o. Not following a reasonable order or failure to perform work assigned or to comply with work and safety rules.
p. Violation of company policies.
q. Misuse of company equipment.
r. Gaining unauthorized access to company records.
s. Speeding or reckless driving or unauthorized use of company vehicle.
t. Use of threatening, profane or abusive language.

FAIRGROUNDS_000013

Exhibit 1

u.  Demonstration of lack of courtesy towards other employees, customers or vendors.
v.  Not completing assignment up to the quality required by the company.
w.  Failure to report personal injury resulting from an on-the-job work situation.


It is fully understood that this ZERO TOLERANCE policy is being executed voluntarily by the undersigned in consideration for continued employment with the MCAFA.  It is fully understood that any violation of these policies shall be grounds for immediate termination of the employee by the MCAFA.

I have fully read and understand the terms and conditions of this agreement, and I, Jeremiah Tevebaugh, do agree to the Zero Tolerance policies standards as described in this policy and acknowledge the same by the execution of my signature below.


DATED:_____


Employee, Jeremiah Tevebaugh


_____
Jeremiah Tevebaugh, employee

FAIRGROUNDS_000014

Exhibit 1



-----Original Message-----
From: clmowery@aol.com
To: attyabdul@gmail.com <attyabdul@gmail.com>; jgoins@iupui.edu <jgoins@iupui.edu>;
ladonnafreeman42@yahoo.com <ladonnafreeman42@yahoo.com>; susieday20@yahoo.com <susieday20@yahoo.com>
Sent: Fri, May 13, 2022 6:07 pm
Subject: Executive Director Job Description

Executive Committee,

As we discussed in the Board Meeting, Hoss has asked for an Executive Director job description.  I have put a draft document together and would appreciate your review and input.  If you could take a look at it and get back to me by Monday, I'd really appreciate it.

Thanks,
Cindy



EXHIBIT

9

Exhibit 1

FAIRGROUNDS_000015

# Executive Director

### Position Description

## Purpose/Scope

The purpose of this Position Description is to describe the requirements and responsibilities of the Marion County Agricultural Fair and Fairgrounds (MCF) Executive Director.

## Position Qualifications

Candidate for employment shall have a working knowledge of the MCF Fair Board, fair industry, and facility management.

## Appointment

The Executive Director shall be considered an employee of the organization and serves at the pleasure of the President.  He/she shall be directly responsible to the Fair President.

## Performance Reviews

The Executive Director shall be:

- Reviewed annually.  However, a performance review may be done at any time and is not limited to just an "annual review."

## Responsibilities

The Executive Director shall:

- Perform such duties, but not limited to, as stated in this Position Description;
- Be charged with the administrative management of the MCF Board;
- Acts as the general (day-to-day) contact for the MCF Board;



**Exhibit 1**                    FAIRGROUNDS_000016

- Attends meetings of the Board of Directors;
- Serves as a resource to the Board and handle special projects as assigned by the Board;
- Maintain the officials Minutes and vital records of the MCF Board;
- Attends promptly to all correspondence regarding the MCF Board;
- Maintains official records and vital records of the MCF Board;
- Attends promptly to all correspondence regarding the MCF Board affairs;
- Maintains and makes available any contracts;
- Give notice of all Board of Directors and committee meetings as required;
- Assist in the preparation and distribution of the Agenda and Minutes for each of the above-named meetings;
- Work closely with the Treasurer and Finance Committee in preparation of annual budgets;
- Handle finances of the associated as instructed by the Treasurer and President;
- Daily manage the buildings and grounds for the MC Fairgrounds;
- Serve as the recorder for all standing committees;
- Work closely with the Board in the planning and production of the Fair;
- Devote time to the operation and betterment of the MC Fair;
- Respond to requests for membership information received via the internet website;
- Maintain the website;
- Work with the Board and the Web consultant to determined desired Web changes; and,
- Any other duties as may be assigned.

Exhibit 1                    FAIRGROUNDS_000017

49D10-2208-PO-029442

STATE OF INDIANA ) IN THE MARION SUPERIOR COURT 10
COUNTY OF MARION ) SS:
) COURT 49D10
Cindy Mowery, )
Petitioner )
)
vs. ) Case Number 49D10-2208-PO-029442
) Petition Filing Date 8/26/2022
Jeremiah, Jeremy Hoss Tevebaugh, )
Respondent )

F I L E D
August 30, 2022
CLERK OF THE COURT
MARION COUNTY
SW

**NOTICE DIRECTED TO:**

**Jeremiah, Jeremy Hoss Tevebaugh**
**7300 E Troy Ave, INDIANAPOLIS, IN 46239**

**NOTICE TO APPEAR**

With the Petitioner having filed a petition for an Ex Parte Order for Protection, the Court hereby sets this matter for Hearing as follows:

| | |
|---|---|
| DATE OF HEARING: | 9/26/2022 |
| TIME OF HEARING: | 9:00 AM |
| LOCATION OF HEARING: | Marion Circuit Court |
| | 675 Justice Way, INDIANAPOLIS, IN 46203 |

Please bring all documents and witnesses relating to this case with you to Court on your hearing date.

**This will be a Remote Hearing. Parties are to provide their email address and telephone numbers to the court so they may participate. Please contact the court at 317-327-5061 or email the court at MCOURTS-D01@indy.gov**

Date:  08/30/2022  Approved and ordered by:

*Jeffrey Marchal*

MR JEFFREY MARCHAL,  Magistrate

SERVICE BY SHERIFF OF MARION COUNTY

****** IMPORTANT NOTICE ******

If you do not attend the hearing in this case, the judge may hear the case in your absence and order additional relief that may include:

- Eviction/exclusion from a residence;
- Restricting possession of personal property;
- Restricting parenting time;
- Awarding child support; and,
- Prohibiting possession of firearms, ammunition or deadly weapons.



OJA-PO-0106 Approved 07/02
Rev. by State Ct. Admin. 07/08

Page 1 of 1

STATE OF INDIANA    )
                    ) SS:
COUNTY OF Marion    )

IN THE _____ COURT _____
(_____ DIVISION, ROOM ___)
CASE NO. 49D102208PO029442

Cindy Mowery
Petitioner (Your Name)
                    vs.
Jeremiah, Jeremy, Hoss Tevebaugh
Respondent (Person to be Restrained)

FILED

(137)  AUG 2 6 2022

Myla a. Eldridge
CLERK OF THE MARION CIRCUIT COURT

PETITION FOR AN ORDER FOR PROTECTION AND REQUEST FOR A
HEARING—Filed by Person Seeking Protection

IMPORTANT: This is a public document and a copy of it will be placed in the
Court's file. A copy may also be sent to the Respondent.
(Check those which apply)

1.    I am filing this Petition for myself:

___ a.  I am or have been a victim of domestic or family violence;
___ b.  I am or have been a victim of a sex offense;
___ c.  I am or have been a victim of stalking;
✓ d.  I am or have been a victim of repeated acts of harassment.

2.    The Respondent's relationship to me is:

    a.    the Respondent is my family or household member (check only the line
          which best applies):
          ___ the Respondent is my spouse;
          ___ the Respondent used to be my spouse;
          ___ the Respondent and I resided together in an intimate relationship;
          ___ the Respondent and I have a child in common;
          ___ the Respondent and I are dating, or have dated, each other;
          ___ the Respondent and I are, or have been, engaged in a sexual
              relationship;
          ___ the Respondent and I are related by blood or adoption. The
              Respondent is my _____;
          ___ the Respondent and I are, or used to be, related by marriage. The
              Respondent is my _____;
          ___ the Respondent is, or used to be, my guardian;
          ✓ the Respondent is, or used to be, my ~~ward~~; employee;
          ___ the Respondent is, or used to be, my custodian;
          ___ the Respondent is, or used to be, my foster parent; or,
          ___ I am a minor child of a person in one of the types of relationships
              described above.

1

OJA-PO-0109 Approved 07/02
Rev. by Ind. Office Ct. Serv. 7/19

Exhibit 1

_____ I have adopted the child of the respondent.

*If Respondent is not a family or household member as indicated above, but Respondent has committed stalking, a sex offense, or repeated acts of harassment (check only the line below which best applies):*

    b.     _____ the Respondent has committed stalking against me.

    c.     _____ the Respondent has committed a sex offense against me.

    d.     ✓ the Respondent has committed repeated acts of harassment against me.

3.    How old is the Respondent? __48__ years old.

4.    Please list all cases (divorce, protection orders, paternity, guardianship, criminal, juvenile, civil) involving the Respondent, yourself, or a child you have with the Respondent *(attach additional sheets of paper if necessary):*

| Case Name | Case Number | County & State |
|---|---|---|
| Pls See Attachment 4a. | | |
| | | |
| | | |

    ✓ Continued on Attachment 4a.

5.    This case is filed in this county because:

    _____ a. the Respondent lives in this county.

    _____ b. the incident(s) of domestic or family violence, stalking, sex offense, or harassment happened in this county.

    ✓ c. I live in this county.

6.    If you are not represented by an attorney, fill in your public mailing address:
    4340 S Franklin Rd., Indpls IN 46239

This address will not be kept secret, so you should use a mailing address that you feel comfortable having public. The address you place on the Confidential Form, PO-0104 will be kept confidential. If the Court grants the order, you may be eligible to obtain a confidential address through the Attorney General's Address Confidentiality Program (ACP). Email the ACP at: confidential@atg.state.in.us to get information on how to participate in that program.

7.    The Respondent has committed the following act(s) of domestic or family violence, stalking, sex offense, or harassment *(check those which apply):*

    _____ the Respondent attempted to cause physical harm to me;

    _____ the Respondent threatened to cause physical harm to me;

    _____ the Respondent did cause physical harm to me;

OJA-PO-0105 Approved 07/02
Rev. by Ind. Office Ct. Serv. 7/19

# Exhibit 1

___ the Respondent placed me in fear of physical harm;

___ the Respondent caused me to involuntarily engage in sexual activity by force, threat of force, or duress;

___ the Respondent committed stalking against me;

___ the Respondent committed a sex offense against me;

___ the Respondent committed an act of animal cruelty by beating, torturing, mutilating, or killing a vertebrate animal without justification with an intent to threaten, intimidate, coerce, harass or terrorize a family or household member;

✓ the Respondent committed repeated acts of harassment against me.

8. Describe what happened in each of the above incidents including the date(s), place(s) and witnesses to each incident *(attach additional sheets of paper if necessary)*:

Date of Incident #1: __05/2022__
Place of Incident: __Marion County Fairgrounds__

Description of Incident:
__Advised me he knew people that burns houses down and he used to be the person people called to do it. Also stated he would burn the entire__

List the names of all of the people who were present during the incident. You must include your own name if you were present: __fairgrounds to the ground if he was ever terminated__

Date of Incident #2: __Ongoing__
Place of Incident: _____
Description of Incident:
__Called my direct boss and made many untrue statements__

List the names of all of the people who were present during the incident. You must include your own name if you were present:

Date of Incident #3: __Ongoing__
Place of Incident: __Emails__
Description of Incident:
__Has sent several emails to my employer, Council attorney, and Fair Brd. (see attached). that contain false information.__   ← 8a.

List the names of all of the people who were present during the incident. You must include your own name if you were present:

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 7/19

Exhibit 1

_____✓_____ Continued on Attachment 8a.

9.    I am asking the Court to order the following relief *(check all which apply)*:

*NOTE: The following requested relief may be granted immediately by the Judge without a hearing. However, if the petition is based on harassment alone, the relief may be granted ONLY after notice to the Respondent and after a hearing to be held within thirty (30) days.*

_____ Prohibit the Respondent from committing, or threatening to commit, acts of domestic or family violence, stalking, or sex offenses against me;

_____ Prohibit the Respondent from committing, or threatening to commit, acts of domestic or family violence, stalking, or sex offenses against my family or household members, whose names are:

_____

_____;

__X__ Prohibit the Respondent from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with me;

__X__ Order the Respondent to stay away from my residence, school, place of employment, or other place, which is the _____, located at:

_____;

__X__ Order the Respondent to stay away from the following location(s) frequented by my family or household member(s), which may include a residence, school, or place of employment: or anywhere I may be. He contrirually intimidates me with threats and lies to others and in writings.

*Please complete:*
Please list all owners or lease signers at my residence: _____
Cynthia L. Mowery _____

*NOTE: The following requested relief may be granted immediately by the Judge, but the Court must hold a hearing within thirty (30) days. If the petition is based on harassment alone, the relief may be granted ONLY after notice to the Respondent and after a hearing to be held within thirty (30) days.*

_____ Evict the Respondent from my residence, which is located at:

_____;

_____ Order the Respondent to give me the possession and use of the following:
The residence located at: _____;
_____ An automobile/other motor vehicle described as: _____
_____;

_____ Other necessary personal items, described as: _____
_____

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 7/18

# Exhibit 1

✓ Prohibit Respondent from removing, transferring, injuring, concealing, harming, attacking, mistreating, threatening to harm, or otherwise disposing of the animal(s) listed below.

| Example | Name: | Max |
|---|---|---|
| | Age/Type: | 9 year old dog |
| | Size/Breed: | Large 55 pound black lab |
| | Color/Description: | Black hair, pink collar |

| Animal 1 | Name: | Odie |
|---|---|---|
| | Age/Type: | 1  Golden Retriever Dog |
| | Size/Breed: | Golden Retriever |
| | Color/Description: | Golden (Dark) |

| Animal 2 | Name: | _____ |
|---|---|---|
| | Age/Type: | _____ |
| | Size/Breed: | _____ |
| | Color/Description: | _____ |

Additional animals listed on Attachment 9(a).

___ Order that I will have the exclusive possession, care, custody, or control of an animal(s) owned, possessed, kept, or cared for by myself, the Respondent, a minor child of myself or the Respondent, or any other family or household member listed below.

| Animal 1 | Name: | _____ |
|---|---|---|
| | Age/Type: | _____ |
| | Size/Breed: | _____ |
| | Color/Description: | _____ |

| Animal 2 | Name: | _____ |
|---|---|---|
| | Age/Type: | _____ |
| | Size/Breed: | _____ |
| | Color/Description: | _____ |

Additional animals listed on Attachment 9(a).

✓ Order the following additional relief necessary to provide for my safety and welfare and the safety and welfare of my family or household members:

Cease and desist with communications, conversations, texts, emails with my name associated with them.

NOTE: The following requested relief may be granted ONLY after notice to the Respondent and after a hearing to be held within thirty (30) days:

5

Exhibit 1

_____ Specify the arrangements for parenting time with our minor child(ren);

_____ Require that parenting time be supervised by a third party;

_____ Deny the Respondent parenting time;

_____ Order the Respondent to pay my attorney fees;

_____ Order the Respondent to pay rent for my residence;

_____ Order the Respondent to make payment on a mortgage for my residence;

_____ Order the Respondent to pay child support for our minor child(ren);

_____ Order the Respondent to pay support/maintenance for me;

_____ Order the Respondent to reimburse me for expenses related
to the domestic or family violence, stalking, sex offense, or harassment as
follows:

*(specify the amount for each expense and bring documentation of the expense with you to Court for the Hearing)*:

| | |
|---|---|
| _____ Medical expenses: | $_____ |
| _____ Counseling: | $_____ |
| _____ Shelter: | $_____ |
| _____ Repair or replacement of damaged property: | $_____ |
| _____ Other costs or fees I have as a result of bringing this case: | $_____ |

✓ Prohibit the Respondent from using or possessing a firearm, ammunition, or deadly weapon;

_____ Order the Respondent to surrender the following firearm(s), ammunition, or deadly weapon(s) to a specified law enforcement agency *(list each item below and attach an additional sheet of paper if necessary)*:

_____

_____

_____

_____

_____

_____ Continued on Attachment 9(b).

_____ Order a wireless service provider to transfer to me the right to continued use of, and financial responsibility for, the following telephone number(s) used by me or by a minor child in my custody:

Telephone Number and User: _____

Wireless Service Provider: _____

Current Account Holder: _____

Telephone Number and User: _____

Wireless Service Provider: _____

CJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 7/19

# Exhibit 1

Current Account Holder: _____
Additional telephone numbers listed on Attachment 9(c)

*NOTE: A wireless service provider's normal requirements for setting up a
new cellular telephone account still apply. You should consider whether
you will be able to set up an account in your own name and whether you
will be able to pay for the account.*

10.    Number of pages attached: **61 total**

By filing this Petition, I am respectfully requesting that the Court immediately issue
an Ex Parte Order for Protection. I understand that, if I have asked the Court for any of
the following:
- evicting the Respondent from my/our home;
- giving me the possession of personal property;
- giving me possession of an animal;
- prohibiting Respondent from taking action against an animal;
- establishing rules for child parenting time;
- requiring the Respondent to pay fees, expenses, or child support;
- forbidding the Respondent from possessing a firearm, ammunition, or a deadly
  weapon;
- ordering the Respondent to surrender firearm(s), ammunition, or deadly weapons,
  or,
- allowing me or a child to continue to use a telephone number for which I will be
  financially responsible;
I must also ask the Court to set a date for a Hearing within thirty (30) days of
today's date.

I understand that if my petition is based on harassment alone, the Court may grant
relief ONLY after notice to the Respondent and after a hearing to be held within
thirty (30) days.

I understand that if a Hearing is set, and if I fail to appear for the Hearing, the
Court may terminate the Ex Parte Order and/or dismiss the case.

I affirm, under the penalties for perjury, that the foregoing representations are
true:
a.    on the basis of my own personal knowledge.
b.    on the basis that I have been informed and believe that the facts stated
      are true. *(NOTE: If this Petition is made solely on the basis of
      Petitioner's information and belief, Petitioner must attach affidavits by
      one or more persons who have personal knowledge of the facts stated.)*

DATE: **08/26/22**                    _____
                                      PETITIONER (Signature)

                                      **Cindy Mowery**
                                      _____
                                      PETITIONER (Type or print name)

OJA-PO-0100 Approved 07/02
Rev. by Ind. Office Ct. Serv. 7/19

# Exhibit 1



| Agency | Case Number |
|---|---|
| IP - INDIANAPOLIS/MARION COUNTY POLICE | IP220078553 |
| **Reporting Department** | **Case Report Number** |
| Perry Township Constable | IP220078553-001 |
| **Incident Jurisdiction** | **Reporting Officer** |
| Indianapolis Metro Police | Taylor, David |

## GENERAL INFORMATION

| | |
|---|---|
| **CAD Incident Type:** THREAT | **Location of Incident:** |
| **Report Disposition:** Active- Open | |
| **Entered On:** 8/9/2022 11:21:40 AM | 4340 S FRANKLIN RD |
| **Original Entered By:** Taylor, David | IND, IN 46239, Marion |
| **Reported On:** 8/9/2022 11:08:50 AM | |

| **Occurred On:** Thursday, 5/12/2022 12:00:00 PM | **Longitude:** | | **Latitude:** | |
|---|---|---|---|---|
| **To:** Thursday, 5/12/2022 12:30:00 PM | -86.0178173331728 | | 39.704233853834 | |
| **Assisted By:** | **Area:** | **Sector:** | | **Beat:** |

| **Suspected Hate Crime:** No | **Pointed a Firearm:** No | **Fired Weapon:** |
|---|---|---|
| **Interpreter Resource Used:** | | |
| **Other Resources:** | | |
| **Media Summary:** Complainant wants to report a delayed threat. | | |

### Other Involved Locations

| |
|---|
| |

## NIBRS CLASSIFICATION

| **NIBRS Classification:** N13C - Intimidation | **Is Completed:** Yes |
|---|---|
| **Primary Sub Category:** Intimidation | |
| **Location Type:** Residence/Home, Garage, Driveway, Yard | |
| **Hate Crime:** None( No/Unknown Hate Crime) | **Offender Used or Consumed:** Not Applicable/Unknown |
| **# Premises Entered:** | **Forced Entry:** |
| **Criminal Activity:** | |
| **Domestic Violence:** | **Weapon(s) Used in Offense:** |

## SUSPECT

| **Name:** Tevebaugh, Jeremy "Hoss" | **SSN:** | **DOB:** 5/14/1974 | **Age:** 47 |
|---|---|---|---|
| **Alias Name:** | **Alias SSN:** | **Alias DOB:** | |
| | | | |
| **Addresses:** | | | |
| | | | |
| **Phones:** | | | |
| | | | |

| **Race:** White | **Eye Color:** | **Teeth:** |
|---|---|---|
| **Ethnicity:** Not Hispanic or Latino | **Hair Color:** | **Build:** |
| **Sex:** Male | **Hair Style:** | **Height:** |
| **DLN/ID#:** | **Hair Length:** | **Weight:** |
| **DL/ID State:** | **Facial Hair:** | **Birthplace:** |
| **Resident:** Resides Within Jurisdiction | **Complexion:** | **Hand:** |

# Exhibit 1

| Case Number | - | Case Report Number |
|---|---|---|
| IP220078553 | | IP220078553-001 |

| Scars, Marks and Tattoos: | | | |
|---|---|---|---|
| | | | |
| Languages Spoken: | | | |
| | | | |
| Employer/School: | | Occupation/Grade: | |
| Employer/School Address: , | | | |
| Clothing Description: | | | |

### ADDITIONAL PERSON/ORGANIZATION: Complainant

| Name: Mowery, Cindy | | SSN: | DOB: 6/10/1958 | Age: 63 |
|---|---|---|---|---|
| Alias Name: | | Alias SSN: | Alias DOB: | |

| Addresses: | | | | |
|---|---|---|---|---|
| H - Home | 4340 S Franklin Rd | | Marion | |
| Phones: | | Emails: | | |
| M - Mobile | (317) 403-2778 | | | |
| Race: White | | Eye Color: | Height: | |
| Ethnicity: | | Hair Color: | Weight: | |
| Sex: Female | | Facial Hair: | Birthplace: | |
| DLN/ID#: | | Complexion: | Hand: | |
| DL/ID State: | | Resident: | | |

| Scars, Marks and Tattoos: | | | |
|---|---|---|---|
| | | | |
| Languages Spoken: | | | |
| | | | |
| Employer/School: | | Occupation/Grade: | |
| Employer/School Address: , | | | |
| Clothing Description: | | | |

### POLICE NARRATIVE

| Date/Time Entered: 8/8/2022 11:41:00 AM | Entered By: T3346 - Taylor, David |
|---|---|

On 8/9/2022 at approximately 11:00am Complainant Cindy Mowery notified Constable David Taylor of a delayed threat made against her on May 12 of this year. Apparently, suspect Tevebaugh made a statement to her inferring that he could burn her house down by stating that "her knew people that could burn houses down because he was one that was called in the past to do it. This has been an escalating situation due to the fact that suspect Tevebaugh has become a disgruntled soon to be ex employee at the County Fairgrounds where Complainant Mowery is on the Fair board. Complainant Mowery does not wish that the suspect be contacted at this time.

| INVESTIGATING DEPARTMENT | INVESTIGATING UNIT |
|---|---|
| Indianapolis Metro Police | INV UNIT - Southeast District |

# Exhibit 1



Exhibit 1

**From:** attyabdul@gmail.com,
**To:** clmowery@aol.com,
**Subject:** Fwd: Response to Hoss's email to the Board on 07/28/2022
**Date:** Wed, Apr 5, 2023 10:19 am

---------- Forwarded message ----------
From: <clmowery@aol.com>
Date: Fri, Jul 29, 2022 at 4:06 PM
Subject: Response to Hoss's email to the Board on 07/28/2022
To: attyabdul@gmail.com <attyabdul@gmail.com>, jgoins@iupui.edu <jgoins@iupui.edu>,
susieday20@yahoo.com <susieday20@yahoo.com>, ladonnafreeman42@yahoo.com
<ladonnafreeman42@yahoo.com>, wanamakerin@att.net <wanamakerin@att.net>, teveperry@gmail.com
<teveperry@gmail.com>, mikedilk@sbcglobal.net <mikedilk@sbcglobal.net>

All,

I recently learned of some accusations that Hoss made and believe they need addressed. If necessary, I will go head on
with Hoss on his comments.

The first claim that Hoss makes is regarding Paul's pay. Paul's pay during the Fair was $12/hour, same as Ashley Ort's.
Here are the dates and hours worked:

| | | |
|---|---|---|
| June 7, 8, 9, 10 | 25.0 hours | |
| June 13 thru 17 | 33.0 hours | |
| June 20 thru 26 | 84.0 hours | |
| June 27 thru July 3 | 80.0 hours | |
| July 4 | 12.0 hours | |
| Total Hours Worked | 234.0 hours | |



Of the 234.0 hours, 150 are at regular time of $12/hr, which equals $1,800.
He earned overtime of 44.0 hours for the period June 20 thru 26 and 40 hours for the period June 27 thru July 3. His
overtime would have been at $18/hr. Multiply the $18/hr by 84 hours and it equals $1,512. Add $1,800 and $1,512 and it
comes to $3,312. I also approved a $1,500 supplemental pay or bonus for Paul, because he did the things that Hoss was
to do but could not be found anywhere. (Paul talked with police officers, scheduled their time, kept track of their time, as
well as many other duties -- like finding people to pick-up trash. Paul went above and beyond what he was hired to do.) I
might also add that Paul was given overtime because Hoss put him on the Fair's payroll as an employee.) The total
amount that Paul s to be paid is $4,812. He was paid $1,868 and is currently awaiting the balance due him of $2,844.
Nothing in Paul's time is questionable and are standard business practices.

The claim Hoss makes regarding Paul's timesheet is simply not true. He has submitted everything that has been
requested, including his timesheets.

It should also be noted that an elected official can have other jobs and if a bonus or supplemental pay is given, it is not
ghost employment. It is a part of that job's pay for superior performance.

With regard to the paragraph regarding Susie and her comment about the Fair running like a business. I wholeheartedly
agree. However, in doing so, everyone is responsible for their areas the entire year -- not just the Fair. For example, and
I'm not pointing fingers, but Susie is over the gates. She should be taking care of the gates the entire year, not just the 10
days of the Fair. Danny and Steve are over buildings and grounds the entire year, not just during the Fair.

Please allow me to address the comments regarding Paul's campaign account and personal business. To the best of my
knowledge, a conversation such as that was never held between Hoss and me. He may have overheard something in the
office between folks but there was no conversation about it between us because it's simply not true. With regard to his
employment and residence status, that is absolutely none of Hoss' business or the Board's.
The issue between Paul and a fair black female vendor, I'm not exactly certain what happened. I do know that when
LaDonna and I discussed it, she readily admitted the lady had issues and that she had taken care of it.

The next issues of "First hand knowledge of and documented..."

Exhibit 1

1.    I was directly told that Hoss had his girlfriend and some of her children staying in the house. It may not have been all 5 of her children but some of them. I was also told that he lets them run the grounds. I had mentioned this to him, primarily because of the liability. If one of them gets hurt, it's the fair's responsibility. I was also very concerned about the wear and tear on the house, appliances, and furnishings. One group went to look at the house and said the kitchen was dirty, dishes in the sink, stove not cleaned up and things thrown around. It was never our intent for the house to be used primarily by a tenant. Hoss is in there because the back half of the house is his as a condition of his employment. It's an event venue. Unfortunately, we've not been able to use it as such as demonstrated during this year's Fair.

2.    As far as Paul and I scheming and planning the removal of Susie Day as Trustee is an absolute lie. As many people will tell you, Paul was interested in the position, talked with Susie about, made several considerations regarding it but in the end did not run. I talked with Paul extensively about his options, and I talked with their township chairman. With regard to the pig comment, it hurt my feelings but I prefer to believe that Susie was kidding.

3.    The accusations regarding Danny Meador is another outright lie. I asked Danny to be on the Board and I also asked him to run for Trustee, but as far as trying to remove him from the Board for using the venues, that's ridiculous. I do, however, believe that Danny probably did use the facility more than once and did let a friend use it, but I honestly don't think he understood the guidelines on it. I might also note that Hoss is the one that kept bringing Danny receiving commission on the things he has had done on the fairgrounds, such as internet, phones, etc. As of this writing, I have no idea if he does or does not.

4.    This particular issue is laughable. I'm assuming he's referring to the $100,000 we received from the City-County Council. He may want to look at the list of improvements that we've done and will find that the funds were used as described. None of the funds were used with vendors that I selected, either Hoss or Don Brunson selected them. It should also be noted that everything has gone to the Board. There were no secrets.

5.    Another laughable offense. I believe the GOP has used the grounds and paid for it. If they haven't, it's because they weren't given an invoice. As far as the Democrats, I repeatedly told Hoss that if the GOP uses the grounds, so do the Dems at the same rate of pay. I might also add that the Board is not political. The Board is interested persons that want to see the fairgrounds succeed and kids enjoy their time at the Fair. Hoss has made everything political because he has gone to a couple of events. I'd also like to add that he called the Council Office and told them the Fair wanted $200,000 this year – which is definitely not true. When contacted about it, I made it clear that no one had asked him to do that and that the Board was very grateful for any funds they had given us. Also, as far as me saying "I don't want any of her people there." is a flat out lie. I'm friends with as many Democrats as Republicans.

6.    With regard to Gladiator, I met Shane Hawk when Kevin Garrison asked him to come look at the roof on my house. We talked a bit and he mentioned his expertise was more commercial than residential, which led to a conversation about the Fair. Gladiator did not replace my roof, a gentleman by the name of Obdulio and his team did and I paid them with my own funds – and Hoss knows this. Gladiator did talk with the adjuster and insurance companies on behalf of the Fair trying to learn what they would and wouldn't cover. I'm not sure I ever received a quote or statement of work for such, but if I did, I guarantee that Hoss saw it and we discussed it. As you may recall, we had almost an entire meeting discussing the Gladiator situation. In the end, the adjuster and insurance company found Gladiator to be fraudulent – primarily because I provided them with emails that I had with Shane. As far as the $330,000 payment to Gladiator, I was specifically told by Hoss that we did not have to pay for anything due to Gladiator's fraudulent behavior. I'd like to see the recent invoices if we're to pay that amount.

7.    As far as Don Brunson goes, all of you know that that's a complete lie. Don worked on those windows for weeks and even helped install them to keep costs down. I guarantee that he did not have windows put on his house from Fair funds. He liked the vendor and hired them to do his home. I might also add that Don got three bids, but they're probably gone now that Hoss had Keith burn a large amount of fairgrounds documentation.

8.    I gave passes to the same people that I give them to every year – no more, no less. The President has always given passes and so has the Board. With regard to Fair Bucks, they were given to the queen and her court, police, or a special circumstance. In fact, we typically order 4-5,000 of them and this year 2,000 were ordered.

9.    The Bylaws were rewritten in 2018, I believe, and the Board had input, reviewed them, and passed them – which is typical in any organization with a Board.

10. I guess I always thought the land would revert to the county if the fair went under. However, any liens would have to be paid prior to doing so. I'm not sure what the issue is here.

FAIRGROUNDS_000172

# Exhibit 1

11. Hoss and I met prior to Board Meetings so that I could go over what he was presenting to the Board, and I also wanted to see the Treasurer's Report. (You may note that gate collections were never on the report and are not noted on the bank account.) Joe also looked at the Treasurer's Report right before the meeting, which I found odd as he should have reconciled with what Hoss had but he took Hoss' word for it. Meeting prior to a Board Meeting in preparation of the meeting is typical business practices.

12. With regard to LaDonna and me having a dispute. We did. I was upset because Hoss had told me that she was leaving in July and taking two VR employees – which would leave the office extremely short for the November election. It was worked out, but we didn't confer with Hoss.

13. I probably did ask Hoss to attend Abdul's performance because I thought we were friends. I also thought he would enjoy it. It wasn't a date. It was two friends going to see another friend perform in a play. Nothing more; nothing less.

14. As I have mentioned to the Board, there is someone interested in investing in the Fair. However, I did not share the information as to who it is for this reason. Unfortunately, I seriously doubt they will do anything with all that has gone on. With regard to Danny Huston and his company, his relationship with the Fair has always been exemplary until Hoss came along. He's opened their mail, caused trouble for them when they were staying on the grounds, and outright lied to and about them. Danny does not owe the fair ANYTHING. In fact, Hoss recently sent them a bill and Danny had Rick drop the check off. While Rick was there, there were boxes that had been delivered for NAMI, and they weren't even notified. Once the check was received by Hoss, Danny called Hoss and Hoss advised him that they were squared away and didn't owe any more. You might recall that the Board voted to let Danny and his group stay on the grounds for free. As far as campaign contributions from Danny, he sent a $1,500 check for both Councilors Mowery and Annee for a fundraiser I had them. Congressman Pence was also in attendance and donated to them. Once again, lies.

Danny is a "smart executive." In fact, he has one of the greatest business minds that I've ever come across, but I guarantee that he is out for the betterment and success of the fairgrounds. He's even an Honorary Director. Hoss should be ashamed of himself for mentioning Danny has ulterior motives.

I could go on and on about Hoss and relive the horror he added to my life. I left because of Hoss and it was quite a relief not to have to deal with him and his bullying tactics. He has proven himself to be a liar among other things, and I feel for you in that your leadership won't let him go. How much more evidence is needed to terminate his employment?

Cindy

PS: You have a leak on your Board. Hoss knows every move you consider or make…

--
Abdul-Hakim Shabazz, Esq.
Broadcaster/Commentator
Attorney at Law
Licensed to practice in Illinois and Indiana

"My job is to comfort the afflicted and afflict the comforted."
E.K. Hornbeck, "Inherit the Wind"

CONFIDENTIALITY NOTICE: This email (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. sec. 2510-2521, is confidential and may contain attorney-client materials and/or attorney work product, legally privileged and protected from disclosure. This email is intended only for the addressee(s) named above. If you are not the intended recipient, you are hereby notified that any interception, retention, dissemination, distribution or copying of this communication is strictly prohibited and will subject you to compensatory and punitive damages. If you have received this transmission in error, please immediately call us at (317) 727-1250, delete the transmission from all forms of electronic or other storage, and destroy all hard copies. Any unauthorized dissemination, distribution, or copying of this communication is strictly prohibited. Do not forward this transmission. We do not waive attorney-client or work product privilege by the transmission of this message.

FAIRGROUNDS_000173



Exhibit 1